UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| In re | Bk. No. 15-11400 (BAH) |
|---|---|
| TEMPNOLOGY, LLC | Chapter 11 |
| Debtor. | |

## DECLARATION OF KEVIN MCCARTHY IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

Kevin McCarthy declares and says:

1. I am the Chief Executive Officer ("CEO") of Tempnology LLC (the "Debtor"). I have held this position since January 2014. In that capacity, I am familiar with the Debtor's day-to-day operations, businesses, and financial affairs.

2. As CEO, I am responsible for, among other duties and responsibilities, overseeing all financial aspects of the Debtors' business, including, financial reporting and internal controls, financial planning, taxation and risk management.

3. I have been employed by the Debtor since 2012, and I have more than 30 years of experience in brand development, sales and marketing. Prior to being employed by the Debtor, I served in senior level executive positions at KOAR, Power Balance, Perry Ellis, LA Gear, Starter, and other global consumer brands.

4. I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the Debtor's first-day motions and applications filed contemporaneously herewith (the "First Day Motions"). I have reviewed the First Day Motions or have otherwise had their contents explained to me, and I believe that the relief sought in the First Day Motions is necessary to enable the Debtor to operate in chapter 11 with minimum disruption to its operations and minimum loss of value.

1

5. Except at otherwise indicated, all the facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other members of the Debtor's management or professionals, upon information learned from my review of the relevant documents, or opinion based upon my experience and knowledge of the Debtor's operations and financial condition and my experience in the textile and apparel industry generally. If called as a witness, I could and would testify to the facts set forth in this Declaration. Unless otherwise indicated all financial information contained herein is on a consolidated and unaudited basis.

6. Part I of this declaration describes the Debtors' businesses, Part II describes the circumstances giving rise to the commencement of these chapter 11 cases, Part III describes the Debtors' prepetition restructuring initiatives and Part IV sets forth the relevant facts in support of the First Day Motions.

## I.

## The Debtors' Businesses

**A. Operations**

7. Based in Portsmouth, New Hampshire, the Debtor is a material innovation company, with the front-facing brands of Coolcore and Dr. Cool.

8. Coolcore, the global leader in chemical-free cooling fabrics, has partnerships to develop fabrics for consumer brands throughout the world. The patented, chemical-free Coolcore materials deliver three distinct functions - wicking, moisture circulation and regulated evaporation - going far beyond traditional moisture--management textiles by reducing surface fabric temperature up to 30 percent lower than skin temperature when moisture is present. Coolcore fabric formulations have earned the prestigious "Innovate Technology" recognition

4846-1251-9718.4

from the Hohenstein Institute, a first for a U.S. company, and the only company globally to be awarded this recognition for "Cooling Power".

9. Coolcore fabrics are currently distributed by less than a dozen U.S. apparel and headwear companies, most of which will launch "powered by Coolcore" collections in Spring 2016. Coolcore is also currently distributed as an accessory and towel brand in select international markets such as Canada, Mexico, Israel, Australia, New Zealand, Taiwan, Hong Kong and Singapore.

10. Dr. Cool is a consumer goods brand based on the foundation of chemical--free cooling products. The brand initially launched in November of 2013 with the first and only flexible fabric wrap that combines ice and compression and has expanded into chemical--free cooling accessories and apparel. That original ice wrap invention was a 2014 finalist in the ITMA Future Material Awards. All Dr. Cool products either provide relief, help someone recover, and/or refresh the wearer. The Dr. Cool wrap is in multiple markets including the U.S., Canada, Mexico, Israel, Japan, Australia, New Zealand, and India.

11. The Debtor's technology is free of chemicals, polymers, gels, crystals or phase changing materials. The fibers used to create our technology are all biologically safe. The Debtor is dedicated to the development of "Earth Friendly" performance fabrics.

12. The Debtor has an experienced operation team with personnel based in the U.S., Europe and Asia. The corporate headquarters is located in Portsmouth, New Hampshire which is responsible for innovation, design, product development & costing, sourcing, customer service and logistics. The Debtor's operations in Germany relate to textile engineering, testing oversight & coordination, innovation and costing. Finally, the Debtor's operations in Shanghai, China are

responsible for finance, quality management, textile engineering, customer service, transportation and logistics.

13.     In 2014, the Debtor had revenues of $8.3 million and has projected revenues of $3.1 million for 2015. The Debtor has an extensive intellectual property portfolio including two patents, four additional pending patents, research studies as well as registered and pending trademarks in over fifty countries globally.

**B. Corporate Structure**

14.     The Debtor has only one subsidiary, Granite Textile Company, Ltd. ("Granite") located in Shanghai, China which is not a debtor in this case. Granite is a wholly foreign-owned enterprise established under Chinese law which allows the importation of components duty-free into China, to then be added to Chinese-made components and the finished product then re-exported.

**C. Capital Structure**

15.     As of September 1, 2015, the Debtor had approximately $6.3 million of liabilities (excluding asset retirement and capital lease obligations). Of this, approximately $5.5 million was comprised of secured debt. The balance is comprised of obligations to trade creditors and contract counterparties.

**(i)    Secured Debt**

16.     In 2013, the Debtor entered into a Loan and Security Agreement (the "Existing Security Agreement") with People's United Bank and, in accordance therewith, executed and delivered a Revolving Line of Credit Note (the "Existing Note"); both the Security Agreement and the Note being dated June 4, 2013 and evidencing a loan in the original principal amount of $350,000 from People's United Bank to Borrower (the "Existing Revolving Loan").

4

17. In connection with the Existing Revolving Loan, People's United Bank held the Existing Security Agreement, the Existing Note, and a UCC Financing Statement filed with the New Hampshire Secretary of State, File # 130610685869 ("UCC"), and all of the other documents executed in connection therewith (the "Existing Loan Documents").

18. To secure its obligations to People's United Bank under the Existing Security Agreement, the Debtor granted People's United Bank a security interest in and to certain collateral of the Debtor as described in the Existing Security Agreement and UCC, as security for the payment, performance and satisfaction of all of the Debtor's financial liabilities and other obligations to People's United Bank on account of, or arising from, out of or incidental to the Existing Revolving Loan.

19. On July 31, 2014, pursuant to a Purchase and Sale Agreement and Assignment and separate Assignment, by and between People's United Bank and the Schleicher & Stebbins Hotels L.L.C. ("S&S"), S&S purchased and was assigned the Existing Loan, including the Existing Secured Claims, the Existing Loan Documents, rights in the Collateral and all of the other Purchased Loan Assets (as defined in the Purchase and Sale Agreement and Assignment) and all privileges, remedies, rights, title and interest therein or thereto. A UCC amendment on Form UCC-3 assigning all of People's United Bank's rights and interest in the UCC to S&S as the secured party of record with respect to People United Bank's secured interest in the Collateral has been recorded with the New Hampshire Secretary of State, File #140804997892.

20. Thereafter the Debtor and S&S entered into a Second, and Third to Existing Revolving Line of Credit Note dated July 31, 2014, and March 25, 2015 respectively. By the Second Allonge, the term of the Existing Note was extended to July 1, 2015 and the Existing Revolving Loan Amount was increased to $2,500,000.00. By the Third Allonge, the term of the

4846-1251-9718.4

Existing Note was further extended to December 31, 2015 and the Existing Revolving Loan Amount was increased to $4,000,000.00.

21. On July 16, 2015, S&S asserted a payment default under the Existing Loan Documents and terminated its obligation to provide further financing under the Existing Loan Documents.

22. On July 17, 2015, the Debtor and S&S entered into a Forbearance Agreement (as subsequently modified or amended, the "Forbearance Agreement"), which provided that S&S would forbear in pursuing its remedies until August 28, 2015 and increasing the availability under the Existing Revolving Agreement to $5,200,000.000. In accordance with the Forbearance Agreement the Fourth Allonge, the term of the Existing Revolving Loan Amount was increased to $5,200,000.00.

23. On August 17, 2015, the Debtor and S&S entered into the Amended and Restated Forbearance Agreement which increased the availability under the Existing Revolving Agreement to $5,500,000.00.

24. As of the Petition Date, S&S hold a secured claim under the Loan Documents of $5,500,000.00 plus interest and fees against the Debtor.

(ii) **Unsecured Debt**

25. The Debtor and S&S are also parties to a certain Commercial Term Note dated August 15, 2013 from the Debtor to S&S in the original amount of up to $6,000,000.00, as it has been amended by the First Allonge to Commercial Term Note dated March 25, 2015 (the "Existing Term Note"). Pursuant to the Agreement Regarding Acquisition of Membership Units in Tempnology LLC dated March 25, 2015, a portion of this loan ($3,500,000.00) was converted

from debt to equity interests in the Debtor. $42,073.00 of principal remains outstanding under the Existing Term Note.

26.   As of the Petition Date, the Debtors also owe approximately $[---] in unsecured obligations to various trade creditors as will be described in more detail in the Debtors' Schedules and Statements of Financial Affairs to be filed in these cases.

### (iii)   Ownership Structure

27.   The Members and their respective percentage ownership interests in the Debtor are as follows:

| Members | % |
|---|---|
| Frigid Fabrics LLC | 36.93% |
| S&S Hotels LLC | 30.01% |
| Blue Wave LLC | 2.46% |
| CCT Corp | 12.28% |
| Mighty Moose LLC | 18.32% |
| **Total** | **100%** |

28.   S&S Hotels LLC owns 68.3% of Frigid Fabrics which is equivalent to 25.2% indirect ownership of the Debtor.

## II.

## Events Leading to Chapter 11 Cases

29.   It has become clear that the Debtor's businesses have become unsustainable without the benefits derived from reorganization under the Bankruptcy Code. After posting a profit of approximately $700,000 in 2012, the Debtor experienced net operating losses of approximately $3.4 million in 2013 and $1.9 million in 2014. At its current pace, the Debtor

7

expects to operate at a loss of approximately $3.5 to $4.0 million in 2015. Much of this decline is a result of a certain Co-Marketing and Distribution Agreement (the "<u>Distribution Agreement</u>") between the Debtor and Mission Product Holdings, Inc. ("<u>Mission</u>")

30. As part of the contract, Mission gained exclusivity to sell Tempnology's towels, wraps, hoodies, bandanas, multichill, and do-rags. Mission also gained perpetual access without expiration to the original patent and all improvements that were completed prior to the expiration of the contract.

31. On June 30, 2014, Mission exercised its right to terminate the Distribution Agreement without cause as they were seeking to direct source their cooling products to improve margins and they wished to start promoting their own brand exclusively. As part of the contract's termination clause, the Debtor is prohibited from selling any of the Mission exclusive products in the U.S. until June 2016. Due to the retail cycle, this prevents the Debtor from reaching the full market until the 2017 season.

32. Thereafter, on July 22, 2014, the Debtor issued a notice for breach of contract based on the fact that Mission recruited and subsequently hired the Debtor's then CEO for a position within Mission. This violated the Distribution Agreement's restriction on recruiting and/or hiring persons employed by the other party during the contract period. Mission's breach called for termination of the contract and a void of any boundaries of the contract. Mission disputed whether proper cause existed.

33. As a result of the dispute arising under the Distribution Agreement the parties, in January through June 2015, participated in discovery and an arbitration hearing was held after mediation failed.

8

4846-1251-9718.4

34. On June 10, 2015, the arbitrator issued his Partial Final Award ruling in favor of Mission and determining that the Debtor did not have cause to terminate the Distribution Agreement and that the two-year wind down period was in effect. No damages have been awarded to either party at this time. The judgment included a motion to uphold the termination clause in the contract which maintains Mission's product exclusivity for two-years. Effectively, absent a rejection of the Distribution Agreement, the Debtor is prohibited from selling all of the contract exclusive products in the U.S., and a number of non-exclusive products to certain channels until June 2016.

35. As a result of the Distribution Agreement being in effect, the Debtor has asserted certain claims against Mission based on its failure to abide by the terms of the Distribution Agreement during the wind down period. The Debtor believes that its claims against Mission may be as high as $2.0 million.

36. In addition, the sports textile and garment industry is a competitive industry in a crowded field. Many of the Debtor's direct competitors consist of large multinational companies, such as Nike, Under Armor, and Adidas, who have vastly more financial resources available for advertising, distribution, and sponsorship. As a result, the Debtor has experienced significant losses despite having superior technology to its competitors.

37. Finally, as the Debtor's secured debt has increased from $350,000 to over $5 million in only two years, S&S is unwilling to continue to fund an entity sinking deeper and deeper into debt.

## III.

## Pre-Bankruptcy Marketing Process

9

38. Contemporaneously herewith, the Debtor filed its Motion for Entry of an Order (I) Approving Procedures in Connection with Sale of Substantially All of Debtor's Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Approving Form and Manner of Notice Thereof, and (II)(A) Authorizing Sale of Substantially All of Debtor's Assets Pursuant to Successfully Bidder's Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto (the "Sale Motion"). The Sale Motion contemplates a sale of substantially all of the Debtor's assets to S&S, through a credit bid plus the assumption of certain liabilities, subject to higher and better bids. The Sale Motion is a result of extensive pre-petition sales and marketing efforts.

39. Specifically, as a result of financial pressure, in July 2015, the Debtor retained Phoenix Partners L.P. ("Phoenix") as an investment banker in order to market the assets of the Debtor on a going concern basis.

40. Upon its engagement, Phoenix provided the Debtor with an information request for information including, but not limited to, the Debtor's financial history and projections, legal structure, organizational structure, products, market landscape, strategy, suppliers, customers, ownership, and intellectual property.

41. Thereafter, Phoenix met with the Debtor's Chief Financial Officer and Chief Executive Officers during July 20, 2015 through July 23, 2015 in order to evaluate the Debtor's business structure, viability, and other information in order to formulate a cohesive marketing and sales plan for the Debtor's business.

4846-1251-9718.4

42. Prior to the Petition Date, Phoenix distributed the teaser to senior decision makers at the targeted potential strategic and financial buyers. Phoenix received three responses indicating the parties were not interested and the balance of the contacted parties chose not to respond.

43. Phoenix received on signed NDA from an interested party, but after internal discussion and cursory evaluation of the Debtor's business, the third party decided not to pursue the transaction any further.

44. Thereafter, the Debtor and its advisor met with the S&S (the proposed stalking horse bidder) on August 12, 2015, to negotiate the terms regarding a stalking horse bid and debtor-in-possession lending facility.

## IV.

## First Day Motions

A. *Debtors' Expedited Motion for an Order Granting Expedited Hearing on Certain First Day Motions and Approving Shortened and Limited Notice Thereof (the "<u>Expedited Hearing Motion</u>").*

45. The Debtor seeks entry of an order on an expedited basis for a hearing on its various first day motions and applications on limited notice.

46. The Debtor is in immediate need of the relief it is seeking by its first day pleadings, I believe that the relief requested in the Expedited Hearing Motion is critical to this case, provides adequate notice of these cases to the Debtor's creditors and all other parties in interest, and is critical to achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtor I respectfully submit that the Expedited Hearing Motion should be granted.

B. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. §363; (II) Granting Adequate Protection*

11

*to Pre-Petition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, and 364; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) (the "DIP Motion")*[ADD APPROVAL OF DIP UNDER 364(D)]

47. The Debtor has virtually no free or available cash to fund its ongoing operations. Moreover, the Debtor does not have sufficient capital to fund the Debtor's operation during the sale process. The Debtor urgently needs the use of the cash collateral and to obtain debtor-in-possession financing to purchase inventory, pay its employees, and continue its operations. Without the immediate availability of cash collateral and post-petition financing, the Debtor's operations would be severely disrupted and it would be forced to cease or sharply curtail it operations and eliminate their ability to generate revenue. The Debtor believes that the proposed post-petition financing will address the Debtor's immediate working capital and liquidity needs. In addition to providing much needed liquidity, the ability to access post-petition financing to fund operations will provide a sense of confidence in the Debtor's suppliers and employees. Without immediate access to post-petition financing, the Debtor faces a crisis that would threaten the viability of the bankruptcy case, and would likely result in the closure of the operations.

48. I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the DIP Motion should be granted.

C. *Motion for Interim and Final Orders: (I) Authorizing, But Not Requiring, Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation and (B) Maintain Benefits Programs; and (II) Authorizing and Directing Banks to Honor All Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion")*

49. In the Wages and Benefits Motion, the Debtor seeks entry of an order (a) authorizing, but not requiring, them to pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages and Benefits,

authorizing, but not requiring, them to continue, in their sole discretion, their plans, practices, programs and policies for their current Employees as those Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended or supplemented from time to time, in its sole discretion, and to make payments pursuant to the Employee Programs in the ordinary course of business, as well as to pay related administrative obligations.

50. If the requested relief is not granted, the Debtor's relationships with its employees would be adversely impacted and there could well be irreparable harm to the employees' morale, dedication, confidence and cooperation. The Debtor's business hinges on its relationships with their customers, and the ability to provide superior services is vital. The employees' support for the Debtor's efforts is critical to the success of this case. At this early stage, the Debtor simply cannot risk the substantial damage to its businesses that would inevitably attend any decline in their Employees' morale attributable to the Debtor's failure to pay wages, salaries, benefits and other similar items.

51. I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Wages and Benefits Motion should be granted.

D. *Debtors' Motion fir Entry of an Order Authorizing (i) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "<u>Cash Management Motion</u>")*

52. In the Cash Management Motion, the Debtor seeks entry of an order (a) authorizing, but not directing it, to continue to operate their prepetition cash management system with respect to intercompany cash management and obligations, maintain the Debtor's existing

13

4846-1251-9718.4

bank accounts, and maintain the Debtor's existing business forms. Without the requested relief, the Debtor would have great difficulty maintaining its operations, which could cause grievous harm to the Debtor and its estates.

53. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

E. ***Motion Of Debtor Pursuant To Bankruptcy Code Sections 105(A) And 366 (A) Approving Debtor's Proposed Adequate Assurance Of Payment To Utility Companies, And (B) Prohibiting Utility Companies From Altering, Refusing Or Discontinuing Service (the "Utilities Motion")***

54. In the Utilities Motion, the Debtor seeks entry of an order determining that the Debtor's proposed offer of deposits provides the Utility Providers listed in the Motion with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code and prohibiting the Utility Providers from altering, refusing or discontinuing any utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance.

55. The Debtor currently utilizes utility services in their operations provided by certain Utility Providers as described in greater detail in the Utilities Motion. Because the Utility Providers provide essential services, any interruption in such services would prove devastating to the Debtor's ability to continue its operations. The temporary or permanent discontinuation of utility services at the Debtor's offices, warehouses, and related operations would severely restrict the Debtors' ability to continue operating and could cause irreparable harm. Uninterrupted utility services are essential to the Debtor's ongoing operations.

4846-1251-9718.4

56. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be granted.

F. *Debtor's Motion to Honor Returns and Exchange Policies (the "Customer Motion")*

57. In the Customer Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor to continue to honor its return and exchange policies. Such policies are essential to allow the Debtor to maintain its important customer base. Alienation of the Debtor's customers will result in irreparable harm to the Debtor's operations. Moreover, as many of the costs associated with returns and exchanges falls on the Debtor's suppliers – the relief requested has little to no actual impact on the Debtor's available cash flow.

58. I believe that the relief requested in the Customer Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Customer Motion should be granted.

G. *Debtor's Motion For an Order Under Bankruptcy Code Sections 105(a), 363(b), 506, 1107(a) and 1108 Authorizing Payment of Certain Prepetition Shipping, Warehousing, and Delivery Charges (the "Shipping and Warehousing Motion")*

59. In the Shipping and Warehousing Motion, the Debtor seeks an order authorizing, but not requiring, it to pay prepetition Shipping and Warehousing Charges to third party shippers, haulers, warehousemen, common carriers, armored couriers, and other transporters (that the Debtor determines, in the exercise of its business judgment, are necessary or appropriate to obtain the release of goods in the possession of such parties and to satisfy the liens, if any, in

15

4846-1251-9718.4

respect of amounts owed to such parties. The Debtor estimates that the prepetition Shipping and Warehousing Charges to be paid under this Motion are collectively no more than $50,000.

60. The Debtor relies extensively on their Shippers and Warehousemen to distribute and transport goods, merchandise, and products from the production lines in China to its customers in the U.S. and abroad. The Debtor also relies on Shippers and Warehousemen to deliver goods to customers and to return goods to the Debtor's vendors. The services provided by these Shippers and Warehousemen are critical to the day-to-day operations of the Debtor's business.

61. I believe that the relief requested in the Shipping and Warehousing Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Shipping and Warehousing Motion should be granted.

I, the undersigned Chief Executive Officer for the Debtor, declare under penalty of perjury that the foregoing is true and correct.

Dated: September 1, 2015                    /s/ Kevin McCarthy
                                            Kevin McCarthy
                                            Chief Executive Officer