**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| In re | Bk. No. 15-11400 (BAH) |
| TEMPNOLOGY, LLC | Chapter 11 |
| Debtor. | **Hearing Date: TBD**<br>**Hearing Time: TBD**<br>**Objection Deadline: TBD** |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS, (B) APPROVING STALKING HORSE PROTECTIONS, (C) SCHEDULING RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE, (D) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (II)(A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS PURSUANT TO SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO**

Tempnology, LLC (the "Debtor"), as a debtor and debtor-in-possession, respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      As set forth in Declaration of Vince Colistra (the "Colistra Declaration"), after an extensive review of strategic alternatives for its business, the Debtor, with the assistance of Phoenix Capital Resources ("Phoenix") and in consultation with its advisors, has determined that maximizing the value of its estate is best accomplished through an orderly sale, free and clear of liabilities, of substantially all of the Debtor's assets (as described more fully herein, the "Assets").

2.      The Debtor agreed to the terms of an asset purchase agreement with Schleicher & Stebbins Hotels L.L.C. (the "Stalking Horse"), pursuant to which the Stalking Horse will

acquire the Assets, subject to higher or better offers, on the terms and conditions specified therein (collectively with the schedules and related documents thereto, the "Stalking Horse Agreement"),[1] a copy of which is attached as Exhibit 2 to the Bid Procedures Order (defined below). The sale transaction contemplated pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein. In light of extensive marketing efforts that have been conducted to date, the bidding timeline is appropriately tailored.

3.      Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse has agreed to purchase the Assets for $6,950,000 (the "Stalking Horse Purchase Price"). The Stalking Horse Agreement provides the Stalking Horse with certain bid protections, including reimbursement of its reasonable expenses not to exceed $100,000 (as described more fully below, together, the "Stalking Horse Protections"). The Debtor, in the exercise of its business judgment, believes that the Stalking Horse Protections are a necessary and reasonable inducement for the Stalking Horse to submit its stalking horse bid and, thus, establish a "floor" for the sale of the Debtor's Assets and encourage competitive bidding and realization of the highest possible value for the benefit of all stakeholders.

4.      The Debtor believes the sale of its Assets pursuant to the procedures and on the timeline proposed herein presents the best opportunity to maximize the value for all interested parties.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse Agreement.

6.      The statutory bases for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6005, 6006, 9007 and 9014 and LBR 6004-1.

## BACKGROUND

7.      On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire (the "Court"). The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of an examiner has been made in these chapter 11 cases.

8.      Based in Portsmouth, New Hampshire, the Debtor is a material innovation company, with the front-facing brands of Coolcore and Dr. Cool. Coolcore, the global leader in chemical-free cooling fabrics, has partnerships to develop fabrics for consumer brands throughout the world. Dr. Cool is a consumer goods brand based on the foundation of chemical-free cooling products.

9.      Additional information regarding the Debtor's business, capital structure and circumstances leadings to this chapter 11 filing is set forth in more detail in the *Declaration of Kevin McCarthy in Support of Debtor's First Day Pleadings* (the "First Day Declaration"), which is fully incorporated herein by reference.

## RELIEF REQUESTED

10.     Pursuant to this Motion, the Debtor requests relief in two steps. First, the Debtor requests entry of an order, in the form attached hereto as Exhibit A (the "Bid Procedures Order"): (A) approving procedures (the "Bid Procedures"), the form of which is attached thereto as Exhibit 1 to the Bid Procedures Order) for (i) submitting bids for any or all of the Assets and (ii) conducting an auction (the "Auction") with respect to the Assets in the event the Debtor

receives at least one additional bid; (B) approving the Stalking Horse Protections; (C) scheduling

the Auction for **October 16, 2015 at 10:00 a.m.** (prevailing Eastern Time) at the offices of

Nixon Peabody, LLP, 900 Elm Street, Manchester, NH 03101 or at such other time, place, and

date as may be designated by the Debtor; (D) scheduling a hearing on **October 30, 2015** or as

soon thereafter as the Court's calendar allows (the "Sale Hearing") to consider approval of the

sale of the Assets with respect to any bid(s) accepted by the Debtor; (E) approving the Cure

Procedures (as defined below) for the assumption and assignment of certain executory contracts

and unexpired leases (the "Contracts") of the Debtor to any purchaser(s) of the Assets, and to

resolve any objections thereto; and (F) approving (i) the form of notice of the Auction and Sale

(the "Procedures Notice"), attached to the Bid Procedures Order as Exhibit 3, to be served on the

Notice Parties (as defined below) and (ii) the form of notice to parties holding Contracts that may

be assumed and assigned in connection with the sale of the Assets, in the form attached to the

Bid Procedures Order as Exhibit 4. A chart detailing the Debtor's proposed timeline is below:

| Event | Date/Time[2] |
|---|---|
| Bid Procedures Hearing | September 18, 2015 at 10:00 a.m. |
| Entry of Bid Procedures Order | September 21, 2015 |
| Deadline to Mail (i) Notices of Assumption and Assignment and (ii) Notice of Bid Procedures to Procedures Notice Parties | September 23, 2015 |
| Bid Deadline | October 14, 2015 at 5:00 p.m. |
| Auction | October 16, 2015 at 10:00 a.m. |
| Notice of Successful Bidder | October 18, 2015 |
| Deadline to Object to (i) the Sale and (ii) Assumption/Assignment of Contracts | October 22, 2015 at 5:00 p.m. |
| Deadline to file Reply to Sale Objections | October 28, 2015 at 5:00 p.m. |
| Sale Hearing | October 30, 2015 at 10:00 a.m. |
| Closing Date | On or before November 20, 2015 |

---

[2] All times are prevailing Eastern Time.

11.     Second, the Debtor requests entry of an order, pursuant to sections 105, 363, and
365 of the Bankruptcy Code in the form attached hereto as Exhibit B (the "Sale Order"),
approving the sale of the Assets to the purchaser, free and clear of all liens, claims,
encumbrances, and liabilities, except as provided in the applicable asset purchase agreement, and
authorizing the Debtor to consummate the Sale (as defined below) and all documents,
agreements, and contracts executed in conjunction therewith.

## PROPOSED BID AND SALE PROCEDURES

### Stalking Horse Agreement

12.     As noted above, the Debtor seeks to complete a sale (the "Sale") of substantially
all of its Assets pursuant to the Stalking Horse Agreement. The following description of the
Stalking Horse Agreement is intended solely to provide a brief overview thereof and to
highlight material terms and provisions. Interested parties should refer to the Stalking Horse
Agreement to review the complete terms thereof. In the event of any inconsistencies between
this summary and Stalking Horse Agreement, the Stalking Horse Agreement itself shall
govern.

(a)     **Purchase Price**: $6,950,000.00 (consisting of a $685,000.00 credit bid
plus $100,000.00 of assumed liabilities).

(b)     **Closing Date**: On or before November 20, 2015.

(c)     **"As is Where Is"**: The Assets will be transferred on an "AS IS WHERE
IS BASIS" and the Debtor shall make no representations and warranties
pertaining to the Assets, provided however, the Debtor shall represent and
warrant that it has title to the Assets and is authorized to sell the Assets
and execute and documents, agreements, or instruments in connection
therewith.

(d)     **Acquired Assets:** Subject to and upon the terms and conditions of this
Agreement, the Stalking Horse shall purchase from the Seller, and the
Seller shall grant, transfer, sell, convey, assign and deliver to the Stalking
Horse, as a good faith purchaser for value within the meaning of Section
363(m) of the Bankruptcy Code, free and clear of all claims, Liens and

-5-

Encumbrances, all rights, title and interest of the Seller in and to all of its assets, properties and businesses, wherever located, as the same existed immediately prior to the Closing, excluding only the Excluded Assets.

(e)    **Assumed Liabilities**: The Stalking Horse shall perform and discharge, when due, to the extent existing on or after the Closing:  (i) all obligations and other Liabilities under or relating to the Assigned Contracts, if any, and the Assigned Permits; (ii) the Liabilities for Transferred Employees as described in Section 8.8 of the Stalking Horse Agreement; (iii) all obligations to vendors for goods or services provided to the Stalking Horse within 60 days prior to the Closing (excluding any claims arising in connection with the rejection of any agreements); (iv) all obligations and other Liabilities of the Seller relating to any of the taxes, charges, fees and expenses that the Stalking Horse is required to bear and pay pursuant to Section 12.2 of the Stalking Horse Agreement; and (v) all cure costs arising under Section 365(b) of the Bankruptcy Code.

(f)    **Excluded Assets**: (a) all rights of the Seller under the Stalking Horse Agreement, the Ancillary Agreements and the agreements and instruments executed and delivered to the Seller by the Stalking Horse pursuant to the Stalking Horse Agreement; (b) all of the Seller's books, records, ledgers, files and documents relating to Excluded Assets; (c) the Seller's formal corporate records, including its certificate of incorporation, bylaws, minute books, corporate books, stock transfer records and other records having to do with the corporate organization of the Seller; (d) any Tax attributes of the Seller, including, without limitation, any net operating loss carryovers and any right or claim for a Tax refund or rebate attributable to the Pre-Closing Period; (e) all personnel records and other records that the Seller is required by any Law to retain in its possession, provided that the Seller shall provide copies of such records to the Stalking Horse unless prohibited from doing so by Law; (f) all causes of action under chapter 5 of the Bankruptcy Code; (g)  all of the Seller's Employee Plans except for those that the Stalking Horse expressly elects to assume at the Closing pursuant to Section 8.15 of the Stalking Horse Agreement; (h) all existing agreements not being expressly assumed including, but not limited to, all of the Agreements between Seller and Mission Product Holdings, Inc.

4839-9463-8630.6

13.     The Debtor will not entertain bids for all or substantially all of the Assets that do not, individually or collectively, exceed the sum of the Stalking Horse Purchase Price plus the Expense Reimbursement, plus $250,000, in the aggregate (i.e. $7,300,000).[3]

14.     All of the Debtor's rights, title, and interest in all of the Assets shall be sold free and clear of any liens, security interests, claims, charges, or encumbrances pursuant to section 363 of the Bankruptcy Code.  The Debtor proposes that any such liens, security interests, claims, charges, or encumbrances shall attach to the amounts payable to the Debtor's estate resulting from the Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

### SUMMARY OF BID PROCEDURES

15.     In order to ensure that the Debtor receives the maximum value for its Assets, the Stalking Horse Agreement is subject to higher or otherwise better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.

**A.      Documentation Necessary for Qualification as a Potential Bidder**

16.     In order to be qualified to receive any confidential information from the Debtor, to submit an Initial Overbid (as defined below), and to participate in the Auction with respect to the Assets, a potential bidder (each, an "Interested Party") must submit each of the following to the Notice Parties (as defined below) on a timely basis:

      (a)      An executed confidentiality agreement which shall inure to the benefit of the Debtor and may be assigned to the Successful Bidder (as defined below), in a form and substance satisfactory to the Debtor;

---

[3]      The Debtor will also add the assumed liabilities as a component of the consideration provided for by the Stalking Horse Bidder.

4839-9463-8630.6

(b)     A statement demonstrating, to the satisfaction of the Debtor, that the Interested Party has a bona fide interest in purchasing the Assets; and

(c)     Current audited financial statements and latest unaudited financial statements of the Interested Party or, if the Interested Party is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Interested Party who will guarantee the obligations of the Interested Party, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that, as determined by the Debtor in its reasonable discretion, demonstrates that the Interested Party has the financial wherewithal and other capabilities necessary to consummate the Sale.

17.     An Interested Party that delivers the documents and information described above and that the Debtor determines in its reasonable business judgment is likely, based on availability of financing, experience, and other factors considered by the Debtor in its discretion, (i) to be able to consummate the sale and (ii) is pursuing the transaction in good faith, will be deemed to be a "Potential Bidder."

18.     As promptly as practicable after an Interested Party delivers all of the materials required above, the Debtor will determine whether the Interested Party is deemed to be a Potential Bidder and (a) will notify the Interested Party as to such determination and (b) will notify the Stalking Horse if it determines that the Interested Party is a Potential Bidder.

**B.**     **Due Diligence**

19.     The Debtor will provide any Potential Bidder such due diligence access or additional information as the Debtor, in consultation with its advisors, deems appropriate, in its reasonable discretion. For any Potential Bidder who is a competitor of the Debtor or is affiliated with any competitor of the Debtor, the Debtor reserves the right to withhold any materials or information that the Debtor determines are business-sensitive or otherwise not appropriate for disclosure to such Potential Bidder. The due diligence period shall extend through and include

-8-

the Bid Deadline (as defined below). Additional due diligence will not be provided after the Bid Deadline.

## C.   **Bid Deadline**

20.   A Potential Bidder that desires to make an Initial Overbid will deliver written copies of its Qualified Bid to each of the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtor: Nixon Peabody, LLP, 900 Elm Street, Manchester, NH 03101 (Attn: Daniel Sklar, Esq.), (ii) counsel to the Stalking Horse, and (iii) counsel to any official committee formed in these cases, so as to be received by no later than **October 14, 2015** at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").  In consultation with the Stalking Horse, the Debtor may extend the Bid Deadline in its discretion.

## D.   **Provisions Governing Qualifications of Overbids**

21.   A bid submitted by the Bid Deadline will be considered a qualified bid only if the bid is submitted by a Potential Bidder and complies with all of the following (a "Qualified Bid"):

(a)   includes a proposed purchase agreement, including all exhibits and schedules thereto (the "Competing Purchase Agreement"), duly authorized and executed by the Potential Bidder, along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and the Stalking Horse Agreement, that:

(1)   provides for consideration (the "Competing Purchase Price") that, in the business judgment of the Debtor, individually, or together with one or more other bids that otherwise satisfy the requirements for a Qualified Bid, exceeds the Purchase Price plus the Expense Reimbursement plus $250,000 (i.e. $7,300,000) (such amount, the "Minimum Overbid");

(2)   specifically disclaims any right of the Potential Bidder to receive a breakup fee or termination fee, and waives any claim to compensation under section 503(b) of the Bankruptcy Code for making a substantial contribution;

-9-

(3)     identifies with particularity which executory contracts and unexpired leases the Potential Bidder wishes to assume; and

(4)     contains a proposed closing date that is not later than **November 20, 2015**;

(b)     includes a cashier's check made payable to the order of the Debtor equal to (a) 10% of the Competing Purchase Price, if the total consideration is quantifiable or (b) an amount to be determined by the Debtor, if the total consideration is unquantifiable, which will be retained by the Debtor as a refundable deposit for application against the purchase price at the closing of the transaction, or returned to the Potential Bidder as set forth below;

(c)     identifies the full legal name of the Potential Bidder (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of consummating the Sale);

(d)     provides that such offer remains open and irrevocable as follows (i) until the closing of the Sale, if it is designated as the Successful Bid, (ii) until the Back-Up Expiration Date (as defined below) if it is designated as the Back-Up Bid (as defined below), and (iii) in all other cases, until the earlier of (x) entry of the Sale Order and (y) ten days after conclusion of the Auction;

(e)     contains information establishing, based upon the Debtor's business judgment, the Potential Bidder's ability to provide adequate assurance of performance with respect to the executory contracts and unexpired leases identified in subparagraph (a)(3) above;

(f)     is accompanied by evidence establishing, based upon the Debtor's business judgment, that the Potential Bidder has the financial ability to pay the Competing Purchase Price;

(g)     contains terms and conditions that, taken as a whole, are higher or otherwise better than the terms and conditions of the Stalking Horse Agreement as determined by the Debtor using its business judgment;

(h)     is accompanied by evidence establishing, based upon the Debtor's business judgment, that (a) the Potential Bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement and (b) all necessary internal, board, and shareholder approvals related to the submission, execution, delivery, and closing of the Competing Purchase Agreement have been obtained;

-10-

(i)     is not subject to any due diligence or financing contingencies of any kind, or any contingencies related to any internal or investment committee or similar approvals;

(j)     is accompanied by an affirmative statement that there are no conditions precedent to the Potential Bidder's execution, delivery, and closing of the Competing Purchase Agreement other than those contained in the Competing Purchase Agreement;

(k)     includes an acknowledgement and representation, in form and substance satisfactory to the Debtor, that the Potential Bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Competing Purchase Agreement;

(l)     contains such other information reasonably requested by the Debtor; and

(m)    is received by each of the Notice Parties prior to the Bid Deadline.

22.     The Stalking Horse and any Potential Bidder that timely submits a Qualified Bid (an "Initial Overbid"), as set forth above and as determined by the Debtor in its sole discretion, shall each be deemed a "Qualified Overbidder" and may bid for the Assets at the Auction. Any entity that fails to submit a timely, conforming Initial Overbid, as set forth above, shall be disqualified from bidding for the Assets at the Auction, provided, however, the Debtor reserves the right, in consultation with any official committee appointed in these cases, to waive any of the requirements outlined above if it reasonably believes that doing so will maximize the value obtained for the Assets.

23.     Notwithstanding the requirement set forth above, the Debtor, in its discretion, may accept, as a single Qualified Bid, multiple bids for the Assets, a portion of the Assets, or some or all of the Assets together with any other assets of the Debtor such that, when taken

-11-

together in the aggregate, such bids would otherwise meet the standards for a single Qualified

Bid. The Debtor may permit Potential Bidders who submitted such multiple bids by the Bid

Deadline but who were not identified as a component of a single Qualified Bid consisting of such

multiple bids and which otherwise satisfy the Qualified Bid criteria set forth above to participate

in the Auction and to submit at the Auction higher or otherwise better bids that in subsequent

rounds of bidding may be considered, together with other bids, as part of such a single

Qualifying Bid for overbid purposes.

**E.      Evaluation of Competing Bids**

24.      A Qualified Bid will be evaluated by the Debtor based upon several factors

including, without limitation, (1) the amount of the Competing Purchase Price, (2) the risks and

timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse

Agreement, (4) the ability of the Qualified Overbidder to obtain appropriate regulatory

approvals, and (5) any other factors deemed relevant by the Debtor in its business judgment.

**F.      No Competing Bid**

25.      If no timely, conforming Initial Overbid is received, the Debtor shall not conduct

an Auction, and following the Bid Deadline the Stalking Horse will be named the Successful

Bidder and the Debtor shall request at the Sale Hearing that the Bankruptcy Court approve the

Debtor entry into the Stalking Horse Agreement and consummation of the transactions

contemplated thereby, and request that the Sale Order be immediately effective upon entry.

**G.      Auction Procedures**

26.      If one or more timely conforming Initial Overbids is received, the Debtor will

conduct the Auction on **October 16, 2015 at 10:00 a.m.** (prevailing Eastern Time) (the "Auction

Date"), at the offices of Nixon Peabody LLP, 900 Elm Street, Manchester, NH 03101, or at such

4839-9463-8630.6

other location as shall be identified in a notice filed with the Bankruptcy Court at least 24 hours before the Auction, in which the Stalking Horse and all other Qualified Overbidders may participate. The Auction shall be governed by the following procedures:

(a)     only the Debtor, any official committee formed in these cases, the Stalking Horse, any Qualified Overbidders, the United States Trustee and their respective counsel and representatives shall be permitted to attend and all Qualified Overbidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Overbidder attending the Auction in person;

(b)     each Qualified Overbidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale, and that its Initial Overbid is a good faith bona fide offer and that it intends to consummate the proposed transaction if selected as the Successful Bidder;

(c)     at least one business day prior to the Auction, each Qualified Overbidder who has timely submitted a Qualified Bid must inform the Debtor whether it intends to attend the Auction; provided that in the event a Qualified Overbidder elects not to attend the Auction, such Qualified Overbidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Overbidder and such Qualified Overbidder may still be designated by the Debtor as the Back-Up Bidder;

(d)     each subsequent bid shall be in increments of no less than $100,000 above the immediately preceding bid, and the Debtor will evaluate each such bid in its sole discretion;

(e)     for the purpose of evaluating the value of the consideration provided by subsequent bids (including any subsequent bid by the Stalking Horse), the Debtor will give effect to any additional liabilities to be assumed by a Qualified Overbidder or the Stalking Horse and any additional costs which may be imposed on the Debtor;

(f)     the Auction shall be conducted openly and each bidder will be informed of the terms of the previous bid determined by the Debtor in its sole discretion to have been the highest or otherwise best bid;

(g)     the Auction shall continue until there is only one highest or otherwise best bid in the Debtor's sole discretion (the "Successful Bid" and the Qualified Overbidder submitting the same, the "Successful Bidder"); and

(h)     the bidding at the Auction shall be transcribed.

-13-

27.     As used herein, the term "Successful Bidder's Purchase Agreement" shall mean, as applicable, the (i) Competing Purchase Agreement of the Successful Bidder, if the Successful Bidder is any Qualified Overbidder other than the Stalking Horse, or (ii) Stalking Horse Agreement, as it may be modified during the Auction pursuant to the procedures set forth in the immediately preceding paragraph, if the Stalking Horse is the Successful Bidder, in either case, as approved pursuant to the Sale Order.

28.     The Debtor requests that in light of the nature of this process, that it be given the ability and discretion to amend or alter the sales process, bid requirements, auction procedures and/or timing, in consultation with any official committee appointed in these cases, without further order of the Court, in order to maximize the returns realized by any sale.

## H.     **Back-Up Bidder**

29.     The Qualified Overbidder with the next highest or otherwise best Qualified Bid (the "Back-Up Bid"), as determined by the Debtor in its sole discretion, whether or not an Auction is conducted, shall be required to serve as a back-up bidder (the "Back-Up Bidder"). If an Auction is conducted, the identity of the Back-Up Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtor at the conclusion of the Auction at the same time the Debtor announces the identity of the Successful Bidder.  If an Auction is not conducted, the Debtor shall file a notice with the Court promptly after the Auction Date identifying the Back-Up Bidder and the amount and material terms of the Backup Bid.  The Backup Bidder shall be required to keep the Back-Up Bid open and irrevocable until the earlier of (i) the closing under the Successful Bidder's Purchase Agreement and (ii) 5:00 p.m. (prevailing Eastern time) on the earlier of the first business day that is 60 days after the Auction Date (the "Backup Expiration Date").  If the Successful Bidder fails to consummate the

approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the Successful Bidder for all purposes under these Bid Procedures (and the Back-Up Bid will be deemed to be the Successful Bidder's Purchase Agreement for all purposes hereunder), and the Debtor will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.

**I.**     **Selection of Successful Bidder; As-Is Where-Is**

30.     The determination of the Successful Bid and the Back-Up Bid by the Debtor at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court. Any Sale will be on an "as is, where is" basis and without representations or warranties of any kind by the Debtor, its agents or the Debtor's chapter 11 estate, except and solely to the extent expressly set forth in the Successful Bidder's Purchase Agreement.

31.     Within 24 hours after the conclusion of the Auction (if any), the Debtor shall file a notice identifying the Successful Bidder and Back-Up Bidder (if any) with the Bankruptcy Court and shall serve such notice by fax, email, or overnight mail to all counterparties whose contracts are to be assumed and assigned.

32.     The Debtor and the Successful Bidder will consummate the transactions contemplated by the Successful Bidder's Purchase Agreement, pursuant to the terms and conditions thereof, upon the Bankruptcy Court's approval of the Successful Bidder's Purchase Agreement pursuant to the Sale Order.

**J.**     **Return of Deposits**

33.     All deposits shall be returned to each bidder not selected by the Debtor as the Successful Bidder or the Back-Up Bidder no later than five (5) business days following the conclusion of the Auction.  The Successful Bidder's deposit will be credited towards the

purchase price at the closing under the Successful Bidder's Purchase Agreement. The Back-Up

Bidder's deposit shall be returned to it no later than five (5) business days after the Backup

Expiration Date or, if the Back-Up Bidder is selected as the Backup Bidder and the Debtor elect

to consummate the Sale with the Back-Up Bidder, its deposit will be credited towards the

purchase price at the closing under the Back-Up Bid.

**K.**     **Reservation of Rights**

34.     The Debtor reserves the right to amend these Bid Procedures at any time and from

time to time in any manner that they determine in its discretion will promote the goals of the Sale

and Auction process.  The Debtor reserves the right to terminate discussions with any or all

Potential Bidders at any time and without specifying the reasons therefor.

**L.**     **Credit Bid Right**

35.     Pursuant to the Bidding Procedures Order and any and all applicable law,

pursuant to section 363(k) of the Bankruptcy Code, the Stalking Horse shall have the right to

credit bid on the Assets in an amount of up to $6,850,000.00.

**M.**     **Sale Hearing**

36.     The Debtor will seek entry of the Sale Order from the Bankruptcy Court,

approving and authorizing the Sale to the Successful Bidder in accordance with these Bid

Procedures and pursuant to the terms and conditions set forth in the Successful Bidder's

Purchase Agreement, at the Sale Hearing to begin on or before **October 30, 2015 at 10:00 a.m.**

(prevailing Eastern Time).  The Debtor proposes that any objections to the Sale be filed by

**October 22, 2015 at 5:00 p.m.** (prevailing Eastern Time).

37.     The Debtor also requests that the Court approve the form of the Procedures

Notice, substantially in the form of Exhibit 3 to the Bid Procedures Order.  The Debtor will serve

a copy of the Procedures Notice on the following parties: (i) the U.S. Trustee; (ii) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002; (iii) any entity that has expressed a bona fide interest in acquiring the Assets in the six (6) months preceding the date of this Motion; (iv) an official committee appointed in these cases; (v) the Stalking Horse (collectively with the parties specified in this paragraph, the "Procedures Notice Parties"). The Debtor proposes to serve the Procedures Notice within two (2) business days following entry of the Bid Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties. The proposed Procedures Notice provides that any party that has not received a copy of the Motion or the Bid Procedures Order that wishes to obtain a copy of this Motion or the Bid Procedures Order, including all exhibits thereto, may contact the Debtor's counsel.

38.     The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bid Procedures, the Auction and Sale, and the Sale Hearing to the Debtor's creditors and other parties in interest, as well as to those who have expressed an interest, or those the Debtor believes are likely to express an interest, in bidding on the Assets. Based on the foregoing, the Debtor respectfully requests that this Court approve these proposed notice procedures.

## SALE HEARING

39.     At the Sale Hearing, the Debtor will seek Court approval of the Sale to the Successful Bidder, free and clear of all liens, claims, and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims, and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Assets prior to the Sale, including the assumption by the Debtor, and assignment to the Successful Bidder, of the Contracts pursuant to section 365 of the Bankruptcy Code. The Debtor will submit and present

-17-

additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtor's estate and all interested parties.

### PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS

40.     The Debtor requests the following procedures (the "Cure Procedures") for notifying counterparties to Contracts of potential Cure Amounts (as defined below) with respect to those Contracts that the Debtor may seek to assume and assign on the Closing Date.

41.     Within two (2) days of the entry of the Bid Procedures Order, the Debtor will file a notice of potential assumption, assignment, and/or transfer of the Contracts listed therein (the "Designated Executory Contracts"), substantially in the form attached to the Bid Procedures Order as Exhibit 4 (the "Notice of Assumption and Assignment"), and serve such notice on all non-debtor parties to the Designated Executory Contracts (the "Contract Notice Parties").

42.     The Notice of Assumption and Assignment shall identify the calculation of the cure amounts, if any, that the Debtor believes must be paid to cure all defaults outstanding under each Designated Executory Contract (the "Cure Amounts") as of such date.

43.     The Debtor requests that this Court set the deadline to object to any Cure Amount or the assumption and assignment of any Designated Executory Contract as **October 22, 2015 at 5:00 p.m.** To that end, the Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment shall also provide that objections to any Cure Amount or the assumption and assignment of any Designated Executory Contract will be heard at the Sale Hearing or at a later hearing as determined by the Debtor subject to the Court's calendar.

44.     At the Sale Hearing, the Debtor and/or the Successful Bidder shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any or all Contracts to be assumed and assigned on the Closing Date to any Successful Bidder.

-18-

For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

## LEGAL BASIS FOR RELIEF REQUESTED

**A.**     **Sale of the Assets is Authorized by Section 363**
           **as a Sound Exercise of the Debtor's Business Judgment**

45.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be conducted by private sale or public auction. As set forth in detail in the First Day Declaration and the Colistra Declaration, which are incorporated by reference herein, the Debtor has determined that the Sale of its Assets by public auction will enable it to obtain the highest or otherwise best offer for its Assets (thereby maximizing the value of its estate) and is in the best interests of its stakeholders. The Stalking Horse Agreement is the result of comprehensive, arm's-length negotiations for the Sale of the Assets, and the Sale pursuant to the terms of the Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtor's creditors than would be provided by any other existing alternative.

46.     Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 289, 295 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 P.2d 143 (2d Cir. 1986); *see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141,

143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722

F.2d 1063, 1070 (2d Cir. 1983),

47.     The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.,* 107 F.3d 558, 564–

65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the

value of the estate at hand"); *Integrated Resources*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a

well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such

sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In

re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)). As long as the

sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should

only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the

provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331

B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005*); In re

WPRV-TV, Inc.,* 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to

administer the estate, including authority to conduct public or private sales of estate property.

Courts have much discretion on whether to approve proposed sales, but the trustee's business

judgment is subject to great judicial deference.").

48.     Applying section 363, the proposed Sale of the Assets should be approved. As set

forth in the  Colistra Declaration, the Debtor, with the assistance of its advisors, conducted a

thorough review of the Debtor's strategic alternatives, including an exploration of possible sale

options and determined that the proposed Sale of its business through a 363 sale process

governed by the Bid Procedures will maximize the value of its estate and is in the best interests

of its stakeholders. Thus, the Sale is supported by good business reasons.

49.     Further, the fairness and reasonableness of the consideration to be paid by the ultimate purchaser(s) will be demonstrated by adequate "market exposure" and an open and fair auction process – the best means for establishing whether a fair and reasonable price is being paid.  In order to ensure a fair auction process, following approval of the Bid Procedures Order until completion of the Auction, the Debtor is permitted to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any entity in connection with any sale or other disposition of the Assets.  Accordingly, the Debtor respectfully requests that the Sale of the Assets to the Successful Bidder be approved.

**B.     The Bid Procedures Are Appropriate and
     <u>Will Maximize the Value Received for the Assets</u>**

50.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Fin'l News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

51.     The Debtor believes that the Bid Procedures will establish the parameters under which the value of its Assets may be tested at the Auction and through the ensuing Sale Hearing. Such procedures will increase the likelihood that the Debtor's creditors will receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process.  They also allow the Debtor to undertake the Auction in as expeditious and efficient manner as possible, which the Debtor believes is essential to maximizing the value of its estate for its creditors.

-21-

52.     The Debtor also believes the proposed Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the highest or otherwise best offer reasonably available for its Assets.  In particular, the proposed Bid Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

53.     In sum, the Debtor believes the Bid Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtor's sound business judgment.

**C.     Sale of Assets Free and Clear of Liens and Other Interests is Authorized by Section 363(f) of the Bankruptcy Code**

54.     The Debtor further submits that it is appropriate to sell the Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Assets to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests, and encumbrances if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;
(2)     such entity consents;
(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
(4)     such interest is in bona fide dispute; or
(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

55.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free

-22-

and clear" of liens and interests. *See Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

56.     The Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the Sale of the Assets pursuant to the Stalking Horse Agreement. In particular, the Debtor believes that section 363(f)(2) will be met in connection with the transactions proposed under the Stalking Horse Agreement because each of the parties holding liens on the Assets will consent or, absent any objection to this Motion, will be deemed to have consented to the Sale. Further, any lienholder also will be adequately protected by having their liens, if any, in each instance against the Debtor or its estate, attach to the Sale Proceeds ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force, and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Debtor's assets free and clear of any such claims, interests, liabilities, or liens.

57.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV,* 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines, Inc.,* 322 F.3d 283, 288–89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem

-23-

interests in property," the trend in modern cases is towards "a more expansive reading of

'interests in property' which 'encompasses other obligations that may flow from ownership of

the property.'" *Id*. at 289 (citing 3 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶ 363.06[1] (L.

King, 15th rev. ed. 1988)). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal

Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), the scope of section 363(f) is not limited to *in rem*

interests. Thus, the Third Circuit in *Folger* stated that *Leckie* held that the debtors "could sell

their assets under § 363(f) free and clear of successor liability that otherwise would have arisen

under federal statute." *Folger*, 209 F.3d at 258.

58.    Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes such assets free from successor liability resulting from pre-existing claims.

*See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.,* 195 B.R. 716, 732 (Bankr. N.D.

Ind. 1996) (stating that a bankruptcy court has the power to authorize a sale of assets free and

clear of any interest that could be brought against the bankruptcy estate during the bankruptcy);

*MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 837 F.2d 89, 93–94

(2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear

under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.,* 19 B.R. 323, 329

(Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of

Title VII employment discrimination and civil rights claims of debtor's employees); *In re

Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any

interest permissible even though the estate had unpaid taxes); *American Living Systems v.

Bonapfel (In re All Am. Of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); *WBO

Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO Partnership),* 189 B.R.

-24-

97, 104–05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation
is an "interest" as used in section 363(f)). The purpose of an order purporting to authorize the
transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter
use the transfer as a basis to assert claims against the purchaser arising from the Debtor pre-sale
conduct. Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the
Debtor's assets are not infected with latent claims that will be asserted against the purchaser after
the proposed transaction is completed.

      59.     LBR 6004-1(a) provides that:

> Unless otherwise ordered by the court, a sale free and clear of liens
> may be accomplished by means of a motion, provided the motion:
> (1) specifies the requisite information regarding the sale; (2)
> includes notice language that otherwise conforms to the requisites
> of § 102(1) of the Bankruptcy Code and Bankruptcy Rule 6004(a);
> and (3) affords creditors, parties in interest, and affected parties
> and lienholders not less than twenty-one (21) days' notice of the
> hearing date and of the opportunity to object to the proposed action
> (unless the court shortens the notice period upon appropriate
> request). Objections to such motions must be timely filed pursuant
> to Bankruptcy Rule 6004(b).

The Debtor believes that the procedures proposed in the Motion fully comply with LBR 6004-1.

### D.    **Proposed Notice of Bid Procedures and Auction Is Appropriate**

      60.     The Debtor believes that it will obtain the maximum recovery for its estate if its
Assets are sold through a well-advertised sale and auction. As set forth in the Colistra
Declaration, the Debtor has already taken significant steps to identify potential purchasers.

      61.     Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify
creditors of a proposed sale of its assets, including disclosure of the time and place of an auction,
the terms and conditions of the sale, and the deadline for filing any objections thereto. The
Debtor submits that the proposed notice procedures herein comply fully with Bankruptcy Rule
2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction

4839-9463-8630.6

to the Debtor's creditors and other interested parties, as well as to those parties who have

expressed an interest, or may express an interest, in bidding on the Assets.  The proposed time

frame between the filing of this Motion, the commencement of the bidding process, and the

Auction should provide interested purchasers ample time to participate in the Auction.

E.    **Stalking Horse Protections are Appropriate Under the Circumstances**

62.    As noted above, the Stalking Horse was induced to submit its stalking horse bid in

reliance on promises by the Debtor to seek the Stalking Horse Protections and in reasonable

expectation that this Court would enter an order providing such relief.  The Debtor submits that

the Stalking Horse Protections are a normal, and oftentimes necessary, component of sales

outside the ordinary course of business under section 363 of the Bankruptcy Code.  In particular,

such protections encourage a potential purchaser to invest the requisite time, money, and effort to

conduct due diligence and sale negotiations with a debtor despite the inherent risks and

uncertainties of the chapter 11 process. *Integrated Resources*, 147 B.R. at 660 (noting that fees

may be legitimately necessary to convince a "white knight" to offer an initial bid by providing

some form of compensation for the expenses such bidder incurs and the risks such bidder faces

by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R.

191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to

make an initial bid for fear that their first bid will be shopped around for a higher bid from

another bidder who would capitalize on the initial bidder's . . . due diligence"); *In re Marrose*

*Corp.*, Case No. 89 B 12171 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992)

(stating that "agreements to provide reimbursement of fees and expenses are meant to

compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more

favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding

-26-

that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

63.     In this case, the Stalking Horse Protections consist of the Expense Reimbursement of up to $100,000.  A proposed bidding incentive, such as the Expense Reimbursement, should be approved when it is in the best interests of the estate.  *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994*); In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

64.     In *O'Brien*, the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate.  *O'Brien*, 181 F.3d at 536.  The court determined that Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.  *Id.* at 537.  The Debtor believes that approval of the Stalking Horse Protections will create such a competitive bidding process.

65.     The Debtor believes that the proposed Expense Reimbursement is fair and reasonably compensates the Stalking Horse for taking actions that will benefit the Debtor's

-27-

estate.  The Expense Reimbursement compensates the Stalking Horse for diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline.

66.     Moreover, the proposed Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtor and the Stalking Horse.  There is no evidence or reason to believe that the relationship between the Debtor and the Stalking Horse has been tainted by self-dealing or manipulation.

67.     The Debtor does not believe the Stalking Horse Protections will have a chilling effect on the sale process.  Rather, the Stalking Horse has increased the likelihood that the best possible price for the Assets will be received by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

68.     In sum, the Stalking Horse Protections are reasonable under the circumstances and will enable the Debtor to maximize the value for its Assets while limiting any chilling effect in the sale process.  The Stalking Horse Protections are not only necessary given the risk the Debtor assume in forgoing a known, willing, and able purchaser for a new potential acquirer, but also ensure that there is an increase in the net proceeds received by its estate, after deducting the Stalking Horse Protections to be paid to the Stalking Horse in the event of a prevailing overbid.

**F.**     **Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

69.     Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor."  11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business

judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir. 1993).

70. Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (a) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (b) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

71. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

72. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.,* 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and

-29-

expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

73.     To the extent necessary, the Debtor and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Successful Bidder to perform under the Contracts.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

74.     In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent any defaults exist under any Designated Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Purchase Agreement. Any provision in the Designated Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

75.     Accordingly, the Debtor submits that the Cure Procedures for effectuating the assumption and assignment of the Designated Executory Contracts as set forth herein are appropriate and should be approved.

### G.     The Successful Bidder Should Be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser

76.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Section 363(m) provides that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or

-30-

> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'" *In re Chateaugay Corp.*, Case No. 92 Civ. 7054 (PKL), 1993

U.S. Dist. Lexis 6130, *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*,

788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888

(S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be

affected by the reversal or modification on appeal of an unstayed order, whether or not the

transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162

(Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected

from the reversal of a sale on appeal unless there is a stay pending appeal").

77.     The Successful Bidder will either be the Stalking Horse, which made an offer

after arm's-length, good faith negotiation, or a higher bidder after a competitive purchasing

process.  Therefore, the Debtor intends to request at the Sale Hearing a finding that the

Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the

Bankruptcy Code.

**H.     Relief from the Fourteen Day Waiting Period Under**
**Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

78.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing

the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of

14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that

4839-9463-8630.6

the Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

79.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to FED. R. BANKR. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." COLLIER ON BANKRUPTCY P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

80.     In light of the deadlines set forth in the Stalking Horse Agreement, the Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## **NOTICE**

81.     The Debtor will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of New Hampshire; (ii) the holders of the 30 largest unsecured claims on a consolidated basis; (iii) counsel to the Stalking Horse Purchase; and (iv) all parties who have requested notice pursuant to Bankruptcy Rule 2002.

4839-9463-8630.6

## WAIVER OF MEMORANDUM OF LAW

82.     The Debtor requests that the Court waive and dispense with the requirement set

forth in LBR 7102(b)(2) that any motion filed shall have an accompanying memorandum of law.

The legal authorities upon which the Debtor relies are set forth in the Motion.  Accordingly, the

Debtor submits that a waiver of the LBR 7102(b)(2) requirement is appropriate under these

circumstances.

WHEREFORE, the Debtor respectfully requests that the Court enter the orders,

substantially in the form attached hereto as Exhibit A and B, granting the relief requested herein

and such other relief as the Court may deem just and proper.


                                        Respectfully submitted,

                                        TEMPNOLOGY, LLC
                                        By its attorneys,

                                        NIXON PEABODY LLP

Date: September 2, 2015

                                        /s/ Daniel W. Sklar
                                        Daniel W. Sklar, Esq. BNH# 01443
                                        Christopher Desiderio (PHV)
                                        Christopher Fong (PHV)
                                        Nixon Peabody LLP
                                        900 Elm Street
                                        Manchester, NH 03101
                                        Phone: (603) 628-4000

4839-9463-8630.6