UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re:<br><br>TEMPNOLOGY, LLC,<br><br>Debtor. | Bk. No. 15-11400-BAH<br>Chapter 11 |

**MISSION PRODUCT HOLDINGS, INC.'S (I) OBJECTION TO DEBTOR'S
(A) REJECTION MOTION, (B) SALE MOTION, AND (C) DIP FINANCING MOTION;
AND (II) NOTICE OF ELECTION PURSUANT TO 11 U.S.C. § 365(n)(1)(B)
(AND INCORPORATED MEMORANDUM OF LAW)[1]**

Mission Product Holdings, Inc. ("Mission"), by and through its undersigned counsel, hereby files this objection to the following motions filed by Tempnology, LLC, the debtor and debtor-in-possession in the above-captioned case (the "Debtor"):

(a) Debtor's Omnibus Motion to Reject Certain Executory Contracts *Nunc Pro Tunc* to the Petition Date [D.E. 35] (the "Rejection Motion");

(b) Debtor's Motion for Entry of an Order (I)(A) Approving Procedures in Connection with Sale of Substantially all of the Debtor's Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Approving Form and Manner of Notice Thereof, and (II)(A) Authorizing Sale of Substantially all of Debtor's Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and

---

[1] This objection is, by necessity, of a summary nature, given the shortened notice upon which the motions are being considered and the even shorter objection deadline. Accordingly, Mission reserves its right to supplement its objection as and when appropriate, including on the record of the scheduled September 18, 2015 hearing.

1

(B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto [D.E. 34] (the "Sale Motion"); and

(c) Motion of the Debtor for Entry of Interim and Final Orders: (I) Authorizing the Debtor to Obtain Post-Petition Financing; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; and (IV) Scheduling a Final Hearing [D.E. 14] (the "DIP Financing Motion").

Mission also files this pleading as its Notice of Election Pursuant to 11 U.S.C. § 365(n)(1)(B).  In support of this objection and notice, Mission states as follows:

## INTRODUCTION

1. The Debtor filed its chapter 11 case purportedly to allow it to sell substantially all of its assets as a going concern to Schleicher & Stebbins Hotels L.L.C. ("S&S").  As discussed below, Mission's contract with the Debtor may not be executory and therefore cannot be rejected.  Even if the contract is executory, Mission elects to retain its right in the contract pursuant to 11 U.S.C. § 365(n).  Accordingly, the Sale Motion should be denied because it impermissibly seeks to use 11 U.S.C. § 363 to sell the Debtor's assets free and clear of Mission's rights and by-pass Mission's ability to retain its rights pursuant to 11 U.S.C. § 365(n).

2. The Sale Motion should also be denied because the sale process is being driven by S&S who is an insider of the Debtor, the proposed buyer, the Debtor's major (and maybe only) secured creditor, and the proposed lender.  The Debtor has not evidenced adequate marketing of the assets or provided information as to the valuation of its assets.

3. Moreover, the Sale Motion and DIP Financing Motion should be denied to the extent those motions permit S&S to credit bid its claim.  There has been no determination as to the validity or extent of S&S' security interest in the Debtor.  Of course the S&S controlled

Debtor simply accepts that $5.6 million is due to S&S on a secured basis and has determined that S&S does not need to file a proof of claim evidencing its claim. However, none of the loan documents have been provided and the facts surrounding S&S' purchase of the loan seem to indicate that S&S' debt is actually equity. Further, allowing S&S to credit bid up to $6.85 million will chill competitive bidding.

4.      There are enough facts here to suggest that S&S' claim should be equitably subordinated or recharacterized as equity as S&S controlled the Debtor to the detriment of its creditors. Until S&S purchased the Debtor's secured loan in July 2014, the Debtor was a low-leverage company. However, in the year since S&S has entered the picture, the Debtor has gone from having a secured debt of at most $350,000 to an alleged approximate $5.6 million in secured debt owed to S&S. Now, S&S proposes to lend the Debtor up to $6.85 million, largely to repay itself, and also proposes to purchase the Debtor's assets for approximately $6.95 million of which S&S would credit bid $6.85 million. Curiously, the Debtor also had $3.5 million in unsecured debt owed to S&S which was converted to equity approximately five (5) months prior to the Petition Date. Neither the Debtor nor S&S has provided any credible financial reason why the Debtor went from a barely-leverage company to a company in debt to the same creditor for almost $9 million ($5.6 million on a secured basis and $3.5 million, before conversion to equity, on an unsecured basis) or why S&S would lend such an exorbitant amount to an undercapitalized company unless the debt was really an equity infusion.

5.      The estate, which appears to be administratively insolvent, will receive no meaningful consideration from the proposed sale and the rights of creditors, including Mission, will be detrimentally impacted as S&S seeks to manipulate the 363 sale process by obtaining relief it could never obtain outside of bankruptcy.

**RELEVANT BACKGROUND**

6. Mission and the Debtor entered into that certain Co-Marketing and Distribution Agreement dated November 21, 2012 (the "Agreement"). A true and correct copy of the Agreement (without referenced exhibits) is attached hereto as **Exhibit A** and incorporated herein by reference.

7. The Agreement provides, *inter alia*, that during the term of the Agreement, Mission shall have the following rights: (a) exclusive rights in the United States to sell certain of the Debtor's products developed under the Coolcore technology, and exclusive rights to sell cooling products in certain channels and to certain entities (the "Exclusivity Provision"); and (b) a royalty-free, non-exclusive, perpetual license with the right to use, reproduce, modify, and create derivative work based on and otherwise freely exploit the Debtor's intellectual property (excluding trademarks and domain names) (the "IP License"). See Agreement, ¶¶ 1, 5, and 15.

8. Mission exercised its rights to terminate the Agreement without cause on June 30, 2014. Upon notice of termination, the Agreement provides for an approximate two-year wind-down period during which time the Agreement remains in full force. See Agreement, ¶ 3. Based on Mission's exercise of its rights to terminate without cause, the effective date of termination under the Agreement is July 1, 2016. See id. Accordingly, Mission retains its rights under the Exclusivity Provision until July 1, 2016 and retains its rights under the IP License in perpetuity.

9. After Mission provided its notice of termination, the Debtor issued a notice of termination for cause on July 22, 2014 alleging Mission's violation of the Agreement. The Debtor ceased performing its obligations under the Agreement. As a result of the dispute, the parties entered into a two-phase arbitration with each party claiming breach by the other (the "Arbitration").

10. A decision was rendered on June 10, 2015 in the first phase of the Arbitration whereby the arbitrator determined that the Agreement remains in full force and effect with an effective termination date of July 1, 2016 (the "Arbitration Decision"). A true and correct copy of the Arbitration Decision is attached hereto as **Exhibit B** and incorporated herein by reference.

11. The second phase of the Arbitration – which would address whether the Debtor breached the Agreement by entering into contracts in violation of the Exclusivity Provision (which, plainly it had) and the extent of Mission's damages for such breaches, as well as whether Mission breached any of its contractual obligations – has not commenced and is currently stayed pursuant to the Debtor's bankruptcy filing.

12. On September 1, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On the same day the Debtor filed the DIP Financing Motion. On September 2, 2015, the day after the Petition Date, the Debtor filed the Sale Motion and the Rejection Motion.

13. The Members of the Debtor and their respective ownership interests in the Debtor are as follows:

    (a) Frigid Fabrics LLC: 36.93%;

    (b) S&S: 30.01%;

    (c) Cool Comfort Technologies, Inc. or CCT Corp.: 12.28%; and

    (d) Mighty Moose, LLC: 18.32%.

See Declaration of Kevin McCarthy in Support of Debtor's First Day Pleadings [D.E. 16] (the "McCarthy Declaration"), ¶ 27. S&S is a manager of and also owns 68.3% of Frigid Fabrics LLC which is equivalent to a 25.2% indirect ownership of the Debtor. Accordingly, S&S indirectly and directly owns approximately 55% of the Debtor.

14. S&S is the proposed lender under the DIP Financing Motion and the DIP Financing Motion seeks to allow S&S to credit bid the full amount of its purported claim pursuant to section 363(k) of the Bankruptcy Code, and the Sale Motion seeks to sell all or substantially all of the Debtor's assets free and clear of liens, claims, and encumbrances to S&S despite S&S's status as an insider of the Debtor. Moreover, although the Rejection Motion seeks to reject the Agreement, the Agreement is not subject to rejection. Nonetheless, by this objection and notice, Mission elects, under section 365(n) of the Bankruptcy Code, to retain its rights (including the right to enforce the Exclusivity Provision and IP License) under the Agreement. Accordingly, the Debtor cannot sell its assets free and clear of Mission's rights in the Exclusivity Provision and IP License.

**OBJECTION AND NOTICE OF ELECTION
PURSUANT TO 11 U.S.C. § 365(n)(1)(B)**

I. **The Court Should Deny the Rejection Motion**

   A. **The Agreement is Not Part of the Bankruptcy Estate**

15. Although the effective date of termination under the Agreement is July 1, 2016, Mission terminated its contract with the Debtor prior to the Petition Date. Accordingly, the Debtor cannot reject the Agreement and it is not part of the Debtor's bankruptcy estate. See Moody v. Amoco Oil Co., 734 F.2d 1200 (7th Cir. 1984) ("If a contract has been terminated pre-bankruptcy, there is nothing left for the debtor to assume [or reject]. . . . The fact that the termination itself was not effective for ninety days does not affect the result. The filing of the chapter 11 petition cannot expand debtors' rights as against Amoco.").

16. Even if the Agreement was not terminated prior to the Petition Date, it is possible that the Agreement is not an executory contract. Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory

6

contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Bankruptcy Code does not define the term "executory contract," but many courts apply the Countryman test to determine whether a contract is executory. See Butler v. Resident Care Innovation Corp., 241 B.R. 37, 42 (D.R.I. 1999). Under the Countryman test, a contract is executory if "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Id. quoting Vern Countryman, Executory Contracts in Bankruptcy: Part 1, 57 Minn. L. Rev. 439, 446 (1973). Utilizing this test, courts review whether both parties "are still obligated to render substantial performance." Butler, 241 B.R. at 42.

17. Mission and the Debtor each allege pre-existing material breaches by the other party, which dispute is the subject of the second phase of the Arbitration. Until those issues are resolved, it is unclear whether the Agreement is in fact an executory contract that can be rejected. For these reasons, the Court should deny the Rejection Motion until such time as the second phase of the Arbitration is complete or until a decision is rendered as to the nature of the Agreement as executory.

    **B.**    **Mission Elects to Retain Its Rights Under the Agreement Pursuant to Section 365(n)**

18. Even if the Court determines that the Agreement is subject to rejection, this pleading serves as Mission's notice of election to retain its rights in the Agreement pursuant to section 365(n) of the Bankruptcy Code.

19. Section 365(n) of the Bankruptcy Code provides, in pertinent part, as follows:

> (n)(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect –
>
>     . . .

>     (B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for –
>
>         (i) the duration of such contract; and
>
>         (ii) any period for which such contract may be extended by the licensee as of the right under applicable nonbankruptcy law.

11 U.S.C. § 365(n)(1)(B). Section 365(n)(3) further provides that:

> If the licensee elects to retain its rights . . . then on the written request of the licensee the trustee shall – . . . (B) not interfere with the rights of the licensee as provided in such contract . . . to such intellectual property . . . including any right to obtain such intellectual property (or such embodiment) from another entity.

11 U.S.C. § 365(n)(3)(B).

   20.   Section 101(35A) provides that:

> The term "intellectual property" means –
>
> (A) trade secret;
> (B) invention, process, design, or plant protected under title 35;
> (C) patent application;
> (D) plant variety;
> (E) work of authorship protected under title 17; or
> (F) mask work protected under chapter 9 of title 17;
>
> to the extent protected by applicable nonbankruptcy law.

11 U.S.C. § 101(35A).

   21.   The Agreement falls within the purview of section 365(n) of the Bankruptcy Code and Mission elects to retain its rights in the Exclusivity Provision and the IP Licenses under the Agreement and is entitled to do so without interference from the Debtor or any other entity pursuant to section 365(n) of the Bankruptcy Code. See In re Exide Technologies, 607 F.3d 957, 965 (3rd Cir. 2010) ("Through [section 365(n) of the Bankruptcy Code], Congress sought to

8

make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy.") (internal quotations omitted).

II. **The Court Should Deny the Sale Motion To the Extent the Sale is Free and Clear of Mission's Rights in the Agreement and because the Sale is to an Insider of the Debtor**

    A. **The Sale Motion Seeks to Improperly Sell the Debtor's Assets Free and Clear of Mission's Rights in the Agreement**

22. As discussed above, Mission believes that the Agreement is not part of the bankruptcy estate subject to the free and clear provisions of the Sale Motion. In any event, Mission's election to retain its rights in the Agreement under section 365(n) of the Bankruptcy Code prevents the Debtor from selling its assets free and clear of Mission's rights.

23. Although the Debtor lists the Agreement as one of the "Excluded Assets," the Debtor seeks to sell the "Acquired Assets" free and clear of all liens, security interests, claims, charges, encumbrances, and liabilities pursuant to section 363 of the Bankruptcy Code. The "Acquired Assets" include all of the Debtor's intellectual property, which necessarily includes the intellectual property (and such embodiment) that is the subject of the Agreement. See Asset Purchase Agreement, between the Debtor and S&S, filed with the Sale Motion, Art. I, § 2.1 and Exhibit 2.1.

24. Mission does not consent to the sale and given Mission's election under section 365(n) of the Bankruptcy Code to retain its rights under the Agreement, including in the Exclusivity Provision and IP License, the Debtor cannot use section 363(b) and (f) of the Bankruptcy Code to accomplish what it cannot accomplish through rejection under section 365 of the Bankruptcy Code. See In re Crumbs Bake Shop, Inc., 522 B.R. 766, 774 (Bankr. D.N.J. 2014) (finding that "[a] sale of the Debtors' assets pursuant to 11 U.S.C. §§ 363(b) and (f) does

not trump nor extinguish the rights of third party licensees under § 365(n), in the absence of consent.").

25. The Crumbs case is very similar to the facts here and proves instructive. In Crumbs, the debtor, Crumbs Bake Shop, Inc. ("Crumbs"), entered into various licensing agreements allowing third parties to use the Crumbs trademark, trade secrets, and sell products under the Crumbs brand. See id. at 769. Shortly after the petition date, Crumbs filed a sale motion to sell its assets to a third party free and clear of liens, claims, encumbrances, and interests. Id. Crumbs included the various license agreements at issue on its lists of excluded assets. Id. at 775. The licensees did not object to the sale and the sale was approved free and clear of liens, claims, encumbrances, and interests. Id. at 769. The parties sought determination of the effect of the sale on their respective rights. Id. The purchaser argued that the sale was free and clear of the licensee's trademark rights and that section 365(n) was not applicable. Id. at 774. The court noted that, because of the "definitional maze put in place under the APA" the sale motion [was] unclear as to what was being sold and "there [was] no clear discussion as to what rights were purported to be taken away as a result of the sale." Id. at 775. Accordingly, the court held that the licensees had "no apparent reason to believe that an objection would be necessary in order to retain their rights under § 365(n)," id., and "in the absence of consent, nothing in

§ 363(f) trumps, supersedes, or otherwise overrides the rights granted to Licensees under

§ 365(n)." Id. at 777. ("Indeed, the inclusion of the specific License Agreements on the Seller Disclosure Schedule as 'Excluded Assets' only adds to the confusion facing Licensees attempting to discern their rights and suggest to a reasonable person that their interests will be unaffected by the Sale Motion."). The Court further noted that "the content of the Sale Motion

was a calculated effort to camouflage the intent to treat the License Agreements as vitiated without raising the specter of § 365(n) rights." Id. at 777.

26. Like in Crumbs, the Court should determine that Mission retains its rights under section 365(n) of the Bankruptcy Code and that the sale pursuant to section 363 of the Bankruptcy Code does not circumvent those rights.

### B. The Debtor Proposes to Sell its Assets to an Insider

27. The very pace of this case and the speed by which the Debtor seeks to sell its assets is concerning for many reasons, one of which is a concern regarding whether the sale has been proposed in good faith and is a proper exercise of the Debtor's business judgment. See In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) ("[A] debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.") (internal quotations omitted).

28. The Debtor, who is controlled by S&S, proposes to sell its assets to S&S. See In re Tidal Const. Co., Inc., 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("§ 363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse."). "The higher scrutiny [of insider sales] requires (1) that the proposed purchase price be at the very least the lesser of an acceptable appraised value or the tax assessment value, and (2) that the property must have been offered to the public in some form before the court can approve an insider sale." Id. (internal citations omitted).

29. Section 101(31)(B) of the Bankruptcy Code defines "insider" as any director of the debtor, officer of the debtor, person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or relative of a: general partner, director,

11

officer, or person in control of the debtor.  See 11 U.S.C. § 101(31)(B).  As mentioned above, S&S indirectly or directly owns approximately 55% of the Debtor.  Upon information and belief, Mark Stebbins, Manager of S&S is on the Debtor's Management Committee.  Further, as noted in the Arbitration Decision, Mr. Stebbins "repeatedly made clear that he was the decision-maker for key decisions," and "[i]n some instances, Stebbins exercised his authority without the knowledge of [the Debtor's] president . . . or contrary to the President's better judgment[.]" Arbitration Decision, p.6.

30. S&S, through Mark Stebbins, fits the definition of a "person in control" of the Debtor, and S&S may even be an officer or director of the Debtor.  The Debtor has provided no evidence establishing the appraised value of the assets it proposes to sell and no evidence to suggest that the assets were aggressively marketed prior to the Petition Date.  The Debtor began marketing the assets no earlier than July 23, 2015; less than one month before the Debtor negotiated the terms of a stalking horse bid with S&S on August 12, 2015.  See Declaration of Vincent Colistra in Support of Debtor's Motion for Entry of an Order (I)(A) Approving Procedures in Connection with Sale of Substantially all of the Debtor's Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Approving Form and Manner of Notice Thereof, and (II)(A) Authorizing Sale of Substantially all of Debtor's Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto [D.E. 34-9] ¶¶ 7-13.  This is hardly evidence of adequate marketing.

31.     The sale process is being run by the very entity that is the proposed purchaser. An independent third party needs to review the Debtor's actions given that the S&S controlled Debtor is not going to do it.

32.     The Court should deny the Sale Motion and direct an independent third party to review whether the proposed sale is in the best interest of the Debtor and its estate or, at the very least, permit discovery, including depositions of Mark Stebbins, to determine whether this sale to an insider is an appropriate exercise of the Debtor's business judgment.

**III.    S&S' Credit Bid Rights Should Be Denied.**

33.     Mission objects to the DIP Financing Motion and the Sale Motion to the extent such motions permit S&S to credit bid its purported claim.

34.     Section 363(k) of the Bankruptcy Code provides that a court may deny a creditor's ability to credit bid "for cause."  Specifically, section 363(k) provides that:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, **unless the court for cause orders otherwise** the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).  "The right to credit bid is not absolute," and the Bankruptcy Code "plainly contemplates situations in which estate assets encumbered by liens are sold without affording secured lenders the right to credit bid."  In re Phila. Newspapers, LLC, 599 F.3d 298, 315 (3d Cir. 2010).

35.     First, cause exists to deny any right S&S may have to credit bid because there has been no determination as to the validity and amount of S&S's purported prepetition secured claim.  See In re Fisker Automotive Holdings, Inc., 510 B.R. 55, 61 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a valid lien of which has not yet been determined, as here,

may not bid its lien."); In re Merit Group, Inc., 464 B.R. 240, 252 (Bankr. D.S.C. 2011) ("courts have found 'cause' to deny the opportunity to credit bid when a sufficient dispute exists regarding the validity of the lien forming the basis for the credit bid.); In re Medical Software Solutions, 286 B.R. 431, 442 (Bankr. D. Utah 2002) (credit bidding permitted only if creditor has a valid security interest).

36. As mentioned above, S&S, the proposed buyer, is an insider of the Debtor. S&S is also an alleged secured creditor and the proposed lender under the DIP Financing Motion. In the DIP Financing Motion, the Debtor alleges, without challenge, that S&S has a secured claim in the amount of approximately $5.6 million for prepetition loans to the Debtor. See DIP Financing Motion, ¶ 20. While the Debtor refers to the loan documents purported to support this security, none of the documents have actually been filed with the Court. Moreover, the interim order on the DIP Financing Motion provides that S&S is not required to file a proof of claim, so there is no way for any interested party to verify the validity or amount of the debt supposedly owed to S&S. See Order, [D.E. 57] ¶ 18. And, as further detailed below, Mission questions whether S&S' alleged secured claim is in fact debt or equity; the Debtor, who is controlled by the proposed purchaser and debtor-in-possession lender, has resigned to accepting the amount and validity of the debt.

37. Second, the Debtor proposes allowing S&S to credit bid $6.85 million and to only permit alternative bids that have a minimum price of $7.3 million. Sale Motion, ¶¶ 12-13. Again, there has been no valuation evidence offered to support this price and permitting S&S to credit bid what it contends is the value of its security interest will deter competitive bidding and foreclose other parties from participating in an auction. See Fisker 510 B.R. at 60 ("Thus, the 'for cause' basis upon which the Court is limiting Hybrid's credit bid is that bidding will not

only be chilled without the cap; bidding will be frozen."); see also In re Free Lance-Star Publishing Co. of Fredericksburg, VA, 512 B.R. 798, 806 (Bankr. E.D. Va. 2014) (citing Fisker and finding cause to limit credit bidding rights, in part, because other bidders were reluctant to participate in the bidding process given the creditor's ability to credit bid its claim); In re Phila. Newspapers, LLC, 599 F.3d at 315 n.14 (courts have the authority to "deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.") (also noting that credit bidding can be denied if allowance would chill the bidding process).

38. Third, S&S' prepetition loan to the Debtor is a typical loan-to-own case where S&S exhibited inequitable conduct and only made so-called "loans" to the Debtor to exercise control of the Debtor and to ultimately acquire the Debtor at a depressed value. See Free Lance-Star, 512 B.R. at 806 (finding that secured creditor's loan-to-own strategy depressed enthusiasm for the sale). Accordingly, S&S should be prohibited from credit bidding its claim and its claim should be equitably subordinated.

39. Prior to July 31, 2014, when S&S acquired an existing loan from People's United Bank, the Debtor was a very low-leverage company. The Debtor alleges that the initial loan with People's United Bank was in the principal amount of $350,000. DIP Financing Motion, ¶ 12. Once S&S stepped in and acquired the loan, the Debtor almost immediately became a highly leverage company; the debt grew to $2.5 million, then $4 million, then $5.2 million then to the approximate $5.6 million claimed today. Id. at ¶¶ 16-20. Now, with the DIP Financing Motion and Sale Motion, the Debtor, controlled by S&S, proposes to use the post-petition financing to almost entirely repay S&S, whose claim has not been challenged, and allow S&S to credit bid its

claim to purchase the Debtor free and clear of any interest, claims, or encumbrances with little, if any, funds going to the estate.

40. Moreover, the Debtor claims that S&S is also an unsecured creditor based on a commercial term note in the original amount of $6 million, $3.5 million of which was converted from debt to equity in exchange for S&S acquiring 48.86 membership units of the Debtor. See McCarthy Declaration, ¶ 16. This is clearly a case where S&S may have breached its fiduciary duties as a person in control or as an officer or director of the Debtor, where the Debtor became undercapitalized at the time S&S acquired loans of the Debtor, and S&S' control of the Debtor only benefitted S&S. See Capitol Bank & Trust Co. v. 604 Columbus Avenue Realty Trust (In re 605 Columbus Ave. Realty Trust), 968 F.2d 1332, 1359-60 (1st Cir. 1992) ("Although the remedy of equitable subordination has been applied relatively infrequently, it is usually directed towards misconduct arising in three situations: when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds the other creditors."); see also Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.), 2 F.3d 128 , 131 (5th Cir. 1993) (when determining whether equitable subordination is appropriate, claims arising from the dealings between the debtor and an insider must be subjected to rigorous scrutiny, and the burden shifts to the insider to prove that the transaction was in good faith and inherently fair); Bergquist v. First National Bank of St. Paul (In re American Lumber Co.), 5 B.R. 470, 478 (Bankr. D. Minn. 1980) ("Before invoking the power [of equitable subordination], however, three conditions must be present: (1) The claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the

bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.").

41.     This case also presents a basis for the Court to recharacterize S&S's debt as equity.  To determine whether recharacterization of a claim is appropriate, courts in this district have applied the test set forth in Aquino v. Black (In re AtlanticRancher, Inc.), 279 B.R. 411 (Bankr. D. Mass. 2002).  See In re Micro-Precision Technologies, Inc., 303 B.R. 238, 245-247 (Bankr. D.N.H. 2003) (applying multi-factor test enunciated in AtlanticRancher to decide whether sufficient grounds existed to recharacterize lender's loan transaction); see also In re Felt Mfg. Co., Inc., 371 B.R. 589, 629 (Bankr. D.N.H. 2007) (citing to Micro-Precision and AtlanticRancher and utilizing AtlanticRancher factors to determine whether to dismiss a complaint asserting claims for recharacterization ).

42.     In AtlanticRancher, the court held that the following factors must be weighed in determining whether a claim should be recharacterized as equity:

(1) the adequacy of capital contributions;

(2) the ratio of shareholder loans to capital;

(3) the amount of degree of shareholder control;

(4) the availability of similar loans from outside lenders;

(5) certain relevant questions, such as

(a) whether the ultimate financial failure was caused by undercapitalization;

(b) whether the note included payment provisions and a fixed maturity date;

(c) whether a note or other debt document was executed;

(d) whether advances were used to acquire capital assets; and

(e) how the debt was treated in the business records.

AtlanticRancher, 279 B.R. at 433-434 ("These factors must be considered in the aggregate and no one factor is determinative.").

43. As discussed in length above, many if not all of the AtlanticRancher factors are present in this case. Accordingly, there are viable grounds for the Court to recharacterize S&S's debt as equity.

44. For these reasons, S&S should not be permitted to credit bid its claim.

## CONCLUSION

45. For all of the foregoing reasons, this Court should: (a) deny the Sale Motion and any right S&S may have to credit bid its claim; (b) deny the DIP Financing Motion to the extent that the motion permits S&S to credit bid; and (c) find that the Agreement is not an executory contract capable of rejection or, in the alternative, find that Mission has elected under section 365(n) of the Bankruptcy Code to retain its rights in the Agreement.

Dated:  September 11, 2015 	MISSION PRODUCT HOLDINGS, INC.

                By its attorneys:

*/s/ Michael A. Klass*
Michael A. Klass, Esq.  BNH #: 07284
BERNSTEIN SHUR SAWYER & NELSON, P.A.
Jefferson Mill Building
670 North Commercial Street
Suite 108
Manchester, NH 03105
Phone: (603) 623-8700
Fax: (603) 623-7775
Email: mklass@bernsteinshur.com

        and

*/s/ Robert J. Keach*
Robert J. Keach, Esq.
Roma N. Desai, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
Phone: (207) 774-1200
Fax: (207) 774-1127
Email: rkeach@bernsteinshur.com
      rdesai@bernsteinshur.com