UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re<br><br>TEMPNOLOGY, LLC<br><br>Debtor. | Bk. No. 15-11400 (BAH)<br><br>Chapter 11 |

**DEBTOR'S REPLY TO MISSION PRODUCT HOLDINGS, INC.'S (I) OBJECTION TO DEBTOR'S (A) REJECTION MOTION; (B) SALE MOTION; AND (C) DIP FINANCING MOTION; AND (II) ELECTION PURSUANT TO 11 U.S.C. § 365(n)(1)(B)**

Tempnology, LLC (the "Debtor"), as a debtor and debtor-in-possession, in support of its reply (the "Reply") to the objection (the "Objection") of Mission Product Holdings, Inc. ("Mission") to Debtor's (A) Rejection Motion; (B) Sale Motion and (C) DIP Financing Motion; and (II) Election Pursuant to 11 U.S.C. § 365(n)(1)(B), respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Mission's Objection is based on assumptions and assertions without the benefit of any factual support. Much of the Objection advances the same arguments asserted in its motion seeking the appointment of a chapter 11 trustee or an examiner (the "Trustee Motion").[1] As with the Trustee Motion, Mission's contentions simply disregard the facts.

2. Importantly, Mission ignores the fact that its performance under the Agreement (as defined below), which the Debtor now seeks to reject, had suffocated the Debtor's ability to market and distribute its products, thereby causing the Debtor to operate at a deficit for the last two years. Furthermore, despite obligations under the Agreement, Mission consistently failed to order, market or otherwise sell the Debtor's products during that period, essentially starving the

---

[1] For that reason, the facts and arguments asserted in the Debtor's Objection to the Trustee Motion are fully incorporated herein by reference.

4824-9650-0520.6

Debtor from any income. Each of these actions directly led to the operating losses and increased debt of the Debtor which Mission now, ironically, laments about.

3. The rejection of the Agreement with Mission, proposed financing, and proposed sale all pave the way for a healthy functioning company to emerge from chapter 11. Based on the Objection, it is clear that Mission simply seeks to force the Debtor to close its doors, without regard to the consequences to other creditors, employees, and parties-in-interest, in an effort to advance its own interests. Accordingly, the Debtor's Rejection Motion; (B) Sale Motion and (C) DIP Financing Motion (as each is defined in the Objection) should be granted in their entirety and Mission's Objection should be overruled.

## **REPLY**

**A. The Co-Marketing and Distribution Agreement is an Executory Contract That The Debtor May Reject Under Section 365 of The Bankruptcy Code.**

4. Prior to the Petition Date,[2] on or about November 21, 2012, the Debtor and Mission entered into that certain Co-Marketing and Distribution Agreement (the "<u>Agreement</u>") pursuant to which the Debtor granted Mission exclusive distribution rights to sell certain of the Debtor's products in the Territory (as defined in the Agreement) on the terms set forth in the Agreement.

5. On or about June 30, 2014 Mission purported to exercise its right to terminate the Agreement without cause which triggered a two-year wind down period during which, though terminated, the Agreement would remain in full force and effect and enforceable by and between the parties (the "<u>Wind Down Period</u>").

---

[2] All capitalized terms not defined in this section shall have the meaning ascribed to them in the Rejection Motion.

2

6. On July 22, 2014, citing certain breaches of the Agreement by Mission, the Debtor issued its own notice of termination to Mission. The parties, pursuant to the Agreement, then commenced a two-part arbitration process to resolve their cross claims of breach against one another.

7. At the end of the first phase of the arbitration process, the arbitrator issued a ruling (the "Partial Final Award") that, among other things, held that "the Agreement remains in full force and effect. . . ."

8. Nevertheless, the arbitrator also found that "Mission is relieved of its obligation to source products, as otherwise provided for in the Agreement, through to the date of this Partial Final Award."

9. Mission has affirmatively stated it will not fulfill any obligations to further source products from the Debtor. This is clearly demonstrated by the revenues derived from Mission orders and sales. In 2014, the Debtor received approximately **$5 million** in revenues from Mission. In the calendar year 2015, those revenues have been **$0.00** to date.

10. The arbitration scheduled to proceed to a second stage to address issues of damages but that process has been stayed by the commencement of this Bankruptcy.

11. In the Objection, Mission argues that the Agreement is not an executory contract and therefore, the Debtor cannot assume, assign or reject the Agreement under Section 365 of the Bankruptcy Code.

12. It is well-settled that section 365(a) of the Bankruptcy Code authorizes a debtor-in-possession to reject its obligations under an executory contract or unexpired lease, such as the Agreement. *See Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys. (In re CellNet Data Sys.)*, 327 F.3d 242, 246 (3d Cir. 2003); *see also In re Wells*, 227 B.R. 553, 564 (Bankr. M.D. Fla.

3

1998) (holding that the authority to reject certain contracts is essential to the bankruptcy process and provides a mechanism through which extreme economic burdens may be alleviated while the debtor attempts to reorganize).

13. While the Bankruptcy Code does not define what is or is not an "executory contract" most courts subscribe to the so-called Countryman test that looks to whether "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other. Vern Countryman, *Executory Contracts in Bankruptcy*, Part 1, 57 Minn. L. Rev. 439, 446 (1973). Generally, an executory contract or lease that is "terminated" prepetition cannot be assumed or rejected by a debtor. *See, e.g, In re Thompson*, 186 B.R. 301, 307 (Bankr. N.D. Ga. 1995) (contract terminated prepetition "cannot be revived solely by virtue of a bankruptcy petition. Filing for bankruptcy relief does not confer new rights on a debtor in regard to terminated agreements and a debtor is not permitted to cure his defaults and/or assume such agreements"); *Ross v. Metro. Dade County*, 142 B.R. 193 (S.D. Fla. 1992) (discussing test for whether contract is terminated for § 365 purposes).

14. However, the termination process must be complete and not subject to reversal. *See Moody v. Amoco Oil Co.,* 734 F.2d 1200 (7th Cir.), cert. denied, 469 U.S. 982 (1984); In re Triangle Lab., 663 F.2d 463 (3d Cir. 1981); *In re Iriss*, 630 F.2d 1370 (10th Cir. 1980) (contract terminated before filing cannot be assumed or rejected). Moreover, a contract is not terminated merely because the debtor defaults or breaches the contract prepetition. *In re Nemko, Inc.*, 163 B.R. 927, 939 (Bankr. E.D.N.Y. 1994).

15. Here, admittedly, a determination of the executory nature of the Agreement is complicated by the terms of the Agreement itself, which allow for a two-year long wind down

4

period during which the parties agree to continue to perform under the Agreement. Adding further nuance to a determination under Section 365, the arbitrator's ruling in the Partial Final Award expressly states that the Agreement "remains in full force and effect" while finding that the Debtor had "clearly repudiated the Agreement" while also excusing Mission's performance up to the date of the Partial Final Award—June 10, 2015—but not thereafter.

16. Nevertheless, (i) the express contractual provision for the Wind Down Period and (ii) the ruling in the Partial Final Award that the Agreement "remains in full force and effect" argue in favor of a finding that the Agreement is an executory contract. The fact that both parties have outstanding, unperformed obligations for the remainder of the Wind Down Period, clearly places the Agreement within the definition of executory contracts.

17. Because the Agreement is an executory contract, the Debtor has the right to reject the Agreement under Section 365.

**B. Mission Is Not Entitled To the Protections of a Non-debtor Licensee under Section 365(n) of the Bankruptcy Code.**

18. By the Opposition, Mission argues that the rights provided a non-debtor licensee under Section 365(n) act as a complete barrier to the Debtor's right to sell or otherwise license its intellectual property rights to the proposed purchaser to the extent those intellectual property rights are otherwise embodied in the Agreement.

19. In particular, Mission focuses on what it calls the Exclusivity Provision of the Agreement that grants Mission the exclusive <u>right to distribute</u> certain of the Debtor's products in the United States and the right of first refusal to obtain exclusive rights of <u>distribution</u> in certain other countries. Mission argues that the protections afforded those rights under Section 365(n) cannot be obviated by a sale free and clear under Section 363(b) and (f). In support of its position, Mission relies on *In re Crumbs Bake Shop, Inc.* in which the court held that a sale under

5

4824-9650-0520.6

Sections 365(b) and (f) did not trump or extinguish the rights of third party licensees under Section 365(n).  *See* 522 B.R 766, 774 (Bankr. D. N.J. 2014).

20.     However, Mission's position is fundamentally flawed in its reliance on Section 365(n) and the *In re Crumbs* case.  Section 365(n) is intended to protect the rights of non-debtor licensees to continue to enjoy their rights in <u>intellectual property</u> when a debtor rejects a license agreement embodying that intellectual property.  Section 365(n) provides in relevant part:

> (1)  If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—
>
> * * *
>
> (B)  <u>to retain its rights</u> (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, <u>to such intellectual property</u> (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), <u>as such rights existed immediately before the case commenced</u>, for—
>
> > (i)   the duration of such contract; and
> >
> > (ii)  any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

11 U.S.C. § 365(n) (emphasis supplied).

21.     Section 365(n) is intended to protect rights in intellectual property, not other rights under contract.   Mission seizes on the parenthetical in Section 365 that allows for the enforcement of "any exclusivity provision" of a rejected intellectual property license to suggest that the Exclusivity Provisions of the Agreement fall within the sphere of protection under section 365(n).  This reading distorts the meaning and intent of Section 365(n).   The Exclusivity Provisions of the Agreement do not grant an exclusive right to intellectual property; rather, they

6

address the scope of the available distribution. A right to distribute or grant of a territory is not an intellectual property right subject to the protections provided under Section 365(n).

22. Additionally, Mission's attempt to clothe itself in the mantle of protection under Section 365(n) undermines the fundamental bankruptcy goal of debtor rehabilitation. Mission suggests that the facts in *In re Crumbs* are sufficiently similar to the present facts that this Court should be guided by that ruling. However, the facts between the present matter and *In re Crumbs* are distinct in certain critical aspects that argue against following that holding here.

23. The Court in *In re Crumbs* was confronted with a circumstance in which the rights to and uses of the intellectual property of the non-debtor licensees under the relevant license agreements were not in dispute. *See id*. The relevant issue before the court in *In re Crumbs* was the interplay between Section 363(f) and Section 365(n) and the court was tasked with harmonizing those sections when the application of Section 365(n) was not at issue and the conduct of the non-debtor under the license was also not at issue. *See id*. As discussed above, Section 365(n)'s protections are not available to Mission and should have no bearing on the sale.

24. Further, unlike in *In re Crumbs,* the Debtor's demise here is due in large measure to the constraints placed on the Debtor by the Agreement with Mission, which the Debtor now seeks to reject. The very terms of the Agreement have severely limited the Debtor's ability to market and sell its products to third parties. The Debtor believes that Mission, acting in an effort to eliminate market competition, has failed to make any efforts to market and sell the Debtor's products in good faith during the past two years. As a result, the Debtor has been unable to market and sell its product on a wide basis because of Mission's failure to perform under the Agreement has effectively eliminated that market to the Debtor. As has been the case with its failure to perform under the Agreement, Mission's assertion of its purported rights under

7

Section 365(n) is not motivated by what is best for creditors, but rather by its own self-interest which is the ultimate demise of the Debtor.

25.  The Debtor has legitimate concerns that Mission has no intention of changing its course of action of non-performance under the Agreement moving forward if the Court follows *In re Crumbs* and elevates Mission's claim to Section 365(n) protection above the broader fundamental goal of maximizing the estate in the best interest of all creditors.  If the Court determines that the Agreement is executory and allows the Debtor to reject the Agreement, but then allows Mission impermissibly to leverage Section 365(n) to destroy the value of the Agreement in the proposed sale, it is almost certain that the sale will not go forward and any value that might have been realized for the estate's broader creditor constituents will be lost.  The only winner would be Mission which is clearly the purpose of its Objection.  The Court should not sanction the elevation of the self-interest of one party at the expense of the larger stakeholder body.

### C.  Mission's Objections to the Sale Motion Are Premature

26.  Mission's objection with respect to whether the sale can be made "free and clear" of its claims is premature and is an issue to be considered at the sale hearing.  At this time, the Debtor only seeks the approval of bid procedures to establish an orderly process to market and sell substantially all of the Debtor's assets.  Although, for the reasons described above, the Debtor believes that Mission's 365(n) election does not afford them the entitlements that they assert.  Further, even if Mission prevails with respect to the scope of its 365(n) rights, the Debtor believes it will demonstrate that ample cause, and legal basis, exists to sell the Debtor's assets free and clear of Mission's claims.  However, such objection should be overruled as it is not before the Court at this time.

4824-9650-0520.6

### D. The Bidding Procedures Should be Approved

27. Although Mission has asserted that this is an "expedited" sales process, the proposed deadlines all comport with the provisions proscribed in the Bankruptcy Code and Bankruptcy Rules. As will be demonstrated at the bid procedures hearing, the Debtor engaged in extensive marketing efforts prior to the filing and has a strategic and comprehensive plan to market the Debtor's assets following the filing.

28. As set forth in the Colistra Declaration, and as will be demonstrated at the bid procedures hearing, the Debtor engaged in pre-bankruptcy sales efforts. More importantly, the Debtor anticipates an even more aggressive and broad post-filing sales effort.

29. Prior to the Petition Date, the Debtor retained Phoenix Capital Resources ("Phoenix") as an investment banker to provide independent advice to the Debtor and its management on how to best market and sell its operating assets. The Debtor selected Phoenix due to its extensive experience and expertise in the marketing and sale of distressed companies. Moreover, the selection of Phoenix was done in close consultation with the Debtor's counsel.

30. Phoenix determined, in its experience, that a targeted initial marketing process was necessary to identify and select potential stalking horse bidders. Phoenix identified over 150 potential targets to contact. These companies consist of suppliers of performance fabric, competitors of the Debtor, potential customers of the Debtor products and private equity firms that have portfolio companies in the retail industry.

31. For its initial pre-petition solicitation process Phoenix, selected fifteen strategic entities to contact prior to the filing. This initial solicitation included two of the industry's largest retail brand appraisal firms in an effort to reach addition points of contact within the industry. This initial solicitation was conducted as a broad marketing effort, prior to a chapter 11

9

could have jeopardized the Debtor's relationships with its key vendors and customers – thereby destroying any potential going concern value of the Debtors.

32. Of the fifteen firms that were contacts, nine did not respond and six responded but all were not interested in pursuing the transaction further at that time. The two main issues of these parties were (1) the financial profile of the Debtor was unattractive with little or no enterprise value and (2) there was too much uncertainty with respect to Mission in order to properly evaluate future revenue streams.

33. As part of the marketing process, the Debtor and Phoenix entered into discussions with S&S to determine their interest in "credit bidding" their secured claim. It was clear from these discussions, that S&S had wished to do so. After analyzing S&S's claims, the Debtor, in consultation with its advisors, determined that S&S held a valid and perfected lien in the Debtor's assets and as such, S&S had the right to credit it bid its claim pursuant to 363(k) of the Bankruptcy Code.[3] Further, as a result of negotiations between the Debtor and S&S, S&S agreed to assume all trade payables (excluding rejection damages) that were less than 60 days' old. Such consideration, essentially left a majority of the Debtor's creditors paid in full.

34. Further, as set forth in the Debtor's objection to the Trustee Motion, the Debtor and S&S retained independent counsel who handled substantially all of the negotiations between the parties in order to ensure a fair and arms' length process. In addition, or about July 16, 2015, Mark Stebbins and Mark Schleicher resigned from the management committee in order to allow the Debtor to explore its various restructuring alternatives without S&S's participation. At that time, Richard Ferdinand and Kevin McCarthy filled the vacant positions on the management

---

[3] Upon information and belief, the Debtor understands that S&S will be filing its own reply to the Objection which will, in part, demonstrate the validity and perfection of their liens as well as set forth the legal basis for their credit bid rights. As such, the Debtor does not address these issues herein, except to state that it had independently investigated S&S's purported liens and determined that they are indeed valid and enforceable obligations of the Debtor's estate.

10

committee. Accordingly, all negotiations leading up to the filing and related to the proposed financing and sale were at arms' length and were conducted between sophisticated parties. Moreover, even prior to this clear delineation, there is no factual basis to support that S&S used its insider status to gain an advantage over other creditors.

35. The proposed bidding procedures have been designed to give parties a fair and sufficient opportunity to assess their interest in submitting a bid. Phoenix anticipates contacting approximately 150 parties upon the approval of the bid procedures. Phoenix has extensive experience and expertise in this area to ensure that the Debtor receives the highest and best offer for its assets in order to maximize value for all creditors and parties-in-interest.

36. The Debtor's efforts must be weighed against the likelihood that an extended marketing period will indeed result in higher bids. Based on the Debtor's business judgment, in consultation with its advisors, it is unlikely that the increased administrative costs associated with a longer marketing process will result in additional value for the Debtor's estate, and will in fact, likely deteriorate the Debtor's asset value base due to such additional costs and expenses.

37. For these reasons and those set forth in the Sale Motion, the proposed bidding procedures should be approved.

                                                          Respectfully submitted,

                                                          TEMPNOLOGY, LLC
                                                          By its attorneys,

                                                          NIXON PEABODY LLP

Date: September 17, 2015
                                                          /s/ *Daniel W. Sklar*
                                                          Daniel W. Sklar, Esq. BNH# 01443
                                                          Christopher Desiderio (PHV)
                                                          Lee Harrington (PHV)
                                                          Nixon Peabody LLP
                                                          900 Elm Street
                                                          Manchester, NH 03101
                                                          Phone: (603) 628-4000

## **CERTIFICATE OF SERVICE**

       I hereby certify that a copy of the foregoing *Debtor's Reply To Mission Product Holdings, Inc.'s (I) Objection To Debtor's (A) Rejection Motion; (B) Sale Motion; And (C) Dip Financing Motion; And (II) Election Pursuant To 11 U.S.C. § 365(n)(1)(B)* was served on this 17th day of September, 2015, via CM/ECF, e-mail, or Regular U.S. Mail on the following parties as indicated below.

**VIA CM/ECF:**

Office of the United States Trustee
USTPRegion01.MR.ECF@usdoj.gov

Christopher M. Candon Counsel to Creditor Schleicher & Stebbins Hotels, LLC
ccandon@sheehan.com

Roma N. Desai Counsel to Creditor Mission Product Holdings, Inc.
rdesai@bernsteinshur.com

Robert J. Keach Counsel to Creditor Mission Product Holdings, Inc.
rkeach@bernsteinshur.com

Michael A. Klass Counsel to Creditor Mission Product Holdings, Inc.
mklass@bernsteinshur.com

Jessica A. Lewis Counsel to Creditor Mission Product Holdings, Inc.
jlewis@bernsteinshur.com

James F. Raymond Counsel to Creditor Cool Canuck Corp.
jraymond@upton-hatfield.com

4824-9650-0520.6

Steven J. Venezia Counsel to Creditor Cool Canuck Corp.
svenezia@uptonhatfield.com


**VIA EMAIL:**

Greenberg Traurig – Creditor
BELLJ@GTLAW.com

Haining Baoquin Textile – Creditor
lch0704@yeah.net

Baker Newman Noyes – Creditor
BSteele@bnncpa.com

Stebbins, Lazos – Creditor
hstebbins@slvlaw.com

American Arbitration Association – Creditor
ZainoJ@adr.org

Texwell – Creditor
xy_xu@tex-fabric.com

First Tracks Marketing – Creditor
mnelson@firsttracksmarketing.com

210 Commerce Way, LLC – Creditor
Mkane@netkane.com

Experticity – Creditor
Kelby.Roth@experticity.com

Jim Zeiba – Creditor
jzeiba@comcast.net

Tucker & Latifi LLP – Creditor
RTucker@tuckerlatifi.com

Caseiro & Burke – Creditor
ccaseiro@caseiroburke.com

Crane Worldwide – Creditor
Shelley.barrett@cranww.com

**VIA U.S. REGULAR MAIL**

Michael Siedband Counsel to Creditor Mission Product Holdings, Inc.
Bernstein, Shur, Sawyer & Nelson
100 Middle Street
Portland, ME 04101

Employee #1 – Creditor
[Address Redacted]

Employee #3 – Creditor
[Address Redacted]

Employee #4 – Creditor
[Address Redacted]


Employee #5 – Creditor
[Address Redacted]

Employee #7 – Creditor
[Address Redacted]

Employee #8 – Creditor
[Address Redacted]

Employee #9 – Creditor
[Address Redacted]

Employee #12 – Creditor
[Address Redacted]


                                              /s/ *Daniel W. Sklar*