UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re<br><br>TEMPNOLOGY, LLC<br><br>Debtor. | Bk. No. 15-11400 (BAH)<br><br>Chapter 11 |

**SCHLEICHER & STEBBINS HOTELS L.L.C.'S LIMITED RESPONSE TO
U.S. TRUSTEE'S AND MISSION PRODUCT HOLDINGS, INC.'S
OBJECTIONS TO DEBTOR'S SALE AND DIP FINANCING MOTIONS**

Schleicher & Stebbins Hotels L.L.C. ("S&S"), by and through its undersigned counsel, hereby responds to the objections filed by Mission Product Holdings, Inc. ("Mission") and the U.S. Trustee to the Debtor's Sale Motion and DIP Financing Motion. In its objection (the "Mission Objection")[Docket No. 99], Mission contends that S&S should be denied its fundamental credit bid rights under Section 363(k) of the Bankruptcy Code based on Mission's incorrect suspicions and unsubstantiated allegations. The U.S. Trustee has objected to the Debtor's Sale Motion and DIP Financing Motion, raising similar concerns about S&S's right to credit bid in the proposed sale of the Debtor's assets (the "U.S. Trustee Objections")[Docket Nos. 117 and 118]. In support of this response, S&S respectfully states as follows:

**RESPONSE**

I.      **S&S's Secured Claim**

1.      As set forth in the DIP Financing Motion [Docket No. 14] and the Interim DIP Financing Order [Docket No. 57], prior to the Petition Date (September 1, 2015), the Debtor entered into a Loan and Security Agreement with People's United Bank (the "Security Agreement") and, in accordance therewith, executed and delivered a Revolving Line of Credit Note (the "Note"); both the Security Agreement and the Note being dated June 4, 2013 and

{S0632880.1}

evidencing a loan in the original principal amount of $350,000 from People's United Bank to the Debtor (together, the "Revolving Loan").  Copies of the Security Agreement and the Note are attached hereto as Exhibits A and B, respectively.

2. In connection with the Revolving Loan, People's United Bank held the Security Agreement, the Note, and a UCC Financing Statement filed with the New Hampshire Secretary of State, File # 130610685869 ("UCC"), and all of the other documents executed in connection therewith (the "Loan Documents").  A copy of the UCC is attached hereto as Exhibit C.

3. To secure its obligations to People's United Bank under the Security Agreement, the Debtor granted to People's United Bank a security interest in and to all assets of the Debtor, including, without limitation, all then owned or after acquired right, title, and interest in and to "all assets," including without limitation, each of the following: accounts, chattel paper, goods, inventory, equipment, fixtures, farm products, instruments, investment property, documents, commercial tort claims, deposit accounts, letter-of-credit rights, general intangibles, supporting obligations and records of, accession to and proceeds and products of the foregoing, as described in the Security Agreement and UCC, as security for the payment, performance and satisfaction of all of the Debtor's financial liabilities and other obligations to People's United Bank on account of, or arising from, out of or incidental to the Revolving Loan (the "Collateral" and the "Secured Claims").

4. Pursuant to a Purchase and Sale Agreement and Assignment and separate Assignment, by and between People's United Bank and S&S, each dated July 31, 2014, S&S purchased and was assigned the Loan, including the Secured Claims, the Loan Documents, rights in the Collateral and all of the other Purchased Loan Assets (as defined in the Purchase and Sale Agreement and Assignment) and all privileges, remedies, rights, title and interest therein or

thereto. A UCC Financing Statement assigning to S&S all of People's United Bank's rights and interest in the UCC as the secured party of record with respect to People United Bank's secured interest in the Collateral has been recorded with the New Hampshire Secretary of State, File #140804997892 (the "S&S UCC"). Copies of the Purchase and Sale Agreement and Assignment, the Assignment and the S&S UCC are attached hereto as Exhibits D, E and F, respectively.

5. S&S and the Debtor thereafter entered into several allonges to the Note, ultimately extending the term on the Note to December 31, 2015 and increasing the Revolving Loan Amount to $5,550,000.00. Copies of the allonges are attached hereto as Exhibit G.

6. S&S and the Debtor are also parties to that certain Commercial Term Note dated August 15, 2013 from the Debtor to S&S in the original amount of up to $6,000,000.00, as it has been amended by the First Allonge to Commercial Term Note dated March 25, 2015 (the "Term Note"), and under such Term Note the Debtor borrowed $5,374,308 in principal amount. Pursuant to the Agreement Regarding Acquisition of Membership Units in Tempnology LLC dated March 25, 2015 (the "Acquisition Agreement"), a portion of said loan ($3,500,000.00) has been converted from debt to equity interests in the Debtor. Copies of the Term Note and the Acquisition Agreement are attached hereto as Exhibits H and I, respectively.

7. As of the Petition Date, there is due and owing from Debtor to S&S under the Note $5,550,000.00 in principal amount and $94,525.00 accrued interest thereon, plus certain costs and expenses of S&S. As of the Petition Date, the Debtor is also indebted to S&S under the Term Note in the approximate amount of $149,425.00 in principal amount and accrued interest thereon, plus certain costs and expenses of S&S.

8. Under the DIP Financing Motion and pursuant to the Interim DIP Financing Order, proposed Final DIP Financing Order and the DIP Agreement, the Debtor seeks authority

to obtain a senior secured priming loan credit facility in the amount of up to $6,850,000. Pursuant to the Interim DIP Financing Order, the Debtor was authorized to borrow up to $500,000 on an interim basis.

## II. S&S's Credit Bid Rights

### A. S&S is Entitled to Credit Bid the Full Amount of the Secured Loan

9. S&S holds valid, perfected, first-priority security interests in all of the Debtor's assets by virtue of the grant of security in the Loan Documents and the filing of the UCC and the S&S UCC and the entry of the Interim DIP Financing Order. Additionally, the Debtor has listed S&S on Schedule D of its Schedules of Assets and Liabilities with a secured claim in the amount of $5,550,000 and did not schedule this claim as disputed, contingent or unliquidated. See Docket No. 1.[1] If the DIP Financing Motion is approved on a final basis and advances are made to cover the items set forth in the Debtor's proposed budget, the Debtor's total secured indebtedness to S&S will be more than $6,850,000. The approval of the DIP Financing Motion is contingent on S&S being granted an unqualified right to credit bid the full amount of its claim.

10. Section 363(k) of the Bankruptcy Code provides that

> [a]t a sale under subsection (b) of the section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). Put simply, Section 363(k) generally allows the secured creditor to bid for its collateral in a bankruptcy sale auction without having to put in new cash. In re Phila. Newspapers, LLC, 599 F3.d 298, 320 (3d Cir. 2010)(Ambro, J., dissenting) (noting that credit

---

[1] See Fed. R. Bankr. P. 3003(b)(1), which provides, in pertinent part: "the schedule of liabilities filed pursuant to § 521(a)(1) of the Code shall constitute *prima facie* evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent or unliquidated."

{S0632880.1}  4

bidding "allows a secured lender to bid a debt owed in lieu of other currency at a sale of its collateral").  As a result, credit bidding protects the secured creditor from the risk that its assets will be sold at the sale for an unreasonably low amount.  <u>Beal Bank S.S.B. v. Waters Edge Ltd. P'ship</u>, 248 B.R. 668, 679 (D. Mass. 2000).  It is well settled that creditors can bid the full face value of their secured claims under Section 363(k), including any unsecured deficiency portion thereof.  See <u>Cohen v. KB Mezzanine Fund II LP (In re SubMicron Sys. Corp.)</u>, 432 F.3d 448, 459-60 (3d Cir. 2006)(citing <u>In re SunCruz Casinos, LLC</u>, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003); <u>In re Morgan House Gen. P'ship</u>, 1997 WL 50419, at *1 (E.D. Pa. Feb.7, 1997); <u>In re Midway Invs., Ltd.</u>, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995)).

11.    Accordingly, S&S should be entitled to credit bid the full amount of its secured claim.

### B. Mission's Objection to Prohibit S&S from Credit Bidding Should be Overruled

12.    Notwithstanding S&S's secured claim and Section 363(k)'s protection of its right to credit bid, Mission seeks to prohibit S&S from credit bidding and argues that its claim should be equitably subordinated.  Mission Objection, pp. 13-18.  To support its objection to eliminate S&S's credit bid rights, Mission makes unsubstantiated and inflammatory assertions of misconduct and principally relies on two inapposite cases: <u>In re Fisker Automotive Holdings, Inc.</u>, 510 B.R. 55 (Bankr. D. Del. 2014) and <u>Free Lance-Star Publishing Co. of Fredericksburg, VA</u>, 512 B.R. 798 (Bankr. E.D. Va. 2014).  In both of these cases, despite the actions taken by the lenders, the courts did not altogether prohibit credit bidding as Mission seeks now, but rather limited the lenders' credit bid rights "for cause" based on factors that are wholly absent here.

13.    The facts in both <u>Fisker</u> and <u>Free Lance-Star</u> were particularly egregious.  In <u>Fisker</u>, approximately one month before the bankruptcy filing, the lender, Hybrid Tech

{S0632880.1}                                     5

Holdings, LLC ("Hybrid"), purchased the debtor's prepetition secured loan of $168.5 million in a public auction for $25 million. In the following weeks, Fisker and Hybrid entered into negotiations concerning Hybrid's acquisition of Fisker's assets. The parties ultimately agreed that Hybrid would purchase Fisker's assets pursuant to a partial credit bid of $75 million under a Section 363 sale. The parties further agreed that Fisker would file bankruptcy in late November and the sale would be consummated by early January and there would be no marketing efforts. The court ultimately limited Hybrid's credit bid to what it paid for the loan -- $25 million.

14.     Similarly, in Free Lance-Star, the lender, DSP, purchased the $50 million secured loan from the prior lender. After reviewing the brief history between DSP and the debtor, the court concluded that DSP engaged in "inequitable conduct" by, among other things, filing financing statements in the prepetition period on assets it knew it did not have liens on and not disclosing that fact to the court or the parties, exerting pressure on the debtor to file a petition and consummate a sale within six weeks of the filing, and insisting that to the extent any marketing efforts were made that DSP's credit bidding rights be advertised in the marketing materials. The court ultimately limited DSP's credit bid right to a value determined by an expert on certain of the collateral that it held valid liens against.

15.     By comparison, in this case, S&S does not fall within these "loan to own" cases. S&S did not acquire its secured position by purchasing the existing debt at a steep discount. Rather, the amount owed to S&S is directly attributable to advances made by S&S. Moreover, unlike the lenders in Fisker and Free Lance-Star, S&S not only supports a full and fair auction process, it has insisted on it. S&S has done nothing to interfere with or to accelerate the process. S&S has agreed to extend DIP financing for a period long enough to sustain a full marketing effort and to conduct the sale without having to move this Court for an expedited consideration

and entry of a sale order.  Furthermore, S&S agreed, subject to adherence to the budget and this Court's approval, to various first day motions to pay creditors for certain prepetition obligations. Additionally, by the asset purchase agreement, S&S has agreed to assume trade payables that were less than 60 days old, resulting in a majority of the Debtor's creditors being paid in full. S&S further agreed to keep the expense reimbursement provision in the Sale Procedures at $100,000, a figure far less than the typical 3% - 5% of the purchase price that is routinely requested by stalking horse bidders.

16.	Merely raising the specter of the Fisker and Free Lance-Star decisions does not constitute "cause" to prohibit or even limit S&S's credit bid right.  The facts in this case are distinguishable and fundamentally different from the facts that led the courts in those cases to limit the lenders' credit bid rights.

### C. Mission's Equitable Subordination and Debt Recharacterization Claims Are Without Merit

17.	As a final shot at inventing "cause" to prohibit S&S from credit bidding in this case, Mission suggests that equitable subordination and debt recharacterization may be appropriate.  As Mission acknowledges, these extraordinary equitable remedies are rarely applied, Mission Objection at p. 16, and both are inappropriate here.

18.	This Court has established the standard for equitable subordination:

> In order to exercise the power of equitable subordination, the bankruptcy court must find that: (1) the creditor engaged in some type of inequitable conduct or fraud, (2) such conduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the creditor, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

In re Felt Mfg. Co., Inc., 371 B.R. 589, 624 (Bankr. D. N.H. 2007).  "[E]quitable subordination is an extraordinary remedy to be employed by courts sparingly. 'Wrongful or unpredictable

{S0632880.1}                                                7

subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity.'" In re Alternate Fuels, Inc., 789 F.3d 1139 (10 Cir. 2015)(quoting In re Lifschultz Fast Freight, 132 F.3d 339, 347 (7th Cir. 1997)).  Baseless allegations of misconduct are not sufficient to have this Court invoke equitable subordination, and certainly do not constitute "cause" under Section 363(k) of the Bankruptcy Code.

19.     Mission's debt recharacterization argument is even more cursory.  A bankruptcy court may recharacterize debt as equity if there is sufficient evidence that a creditor's payment was equity from the beginning, rather than a loan, as determined by the factors laid out in AtlanticRancher, as adopted by this Court in Felt Mfg.  Felt Mfg., 371 B.R. at 630 (citing Aquino v. Black (In re AtlanticRancher, Inc.), 279 B.R. 411 (Bankr. D. Mass. 2002)).  Courts agree that the weight given to the factors can vary and that no one factor is controlling.  In re Dornier Aviation, 453 F.3d 225, 234 (4th Cir. 2006).  Courts also agree that a creditor's status as an insider and the undercapitalization of the debtor are, standing alone, insufficient to support debt recharacterization.  Id. at 232.

20.     Mission asserts that S&S's status makes the loans to the Debtor subject to debt recharacterization.  But as recently stated by 10th Circuit in Alternate Fuels:

> We have previously declined to hold broadly that "a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor." In re Mid–Town Produce Terminal, Inc., 599 F.2d 389, 392 (10th Cir. 1979). We have been careful not to "discourage owners from trying to salvage a business" by requiring "all contributions to be made in the form of equity capital." Id. Indeed, owners may often be "the only party willing to make a loan to a struggling business," In re Dornier Aviation, 453 F.3d at 234, and needlessly punishing their efforts is neither "desirable as social policy" nor required by our precedent. In re Mid–Town Produce, 599 F.2d at 392.

Alternate Fuels, 789 F.3d at 1152-53.  Mission's entire argument consists of "many if not all of the AtlanticRancher factors are present in this case."  Suggesting that the extraordinary action of recharacterization is appropriate based on the assertions in the Mission Objection is without merit.  This is especially true in this case considering that the factors in AtlanticRancher actually do not support debt recharacterization.

### D.  United States Trustee's Objection to S&S's Credit Bid Rights

21. The United States Trustee cites to Mission's objection in its objections to the Debtor's Sale Motion and the DIP Financing Motion and also raises concerns about S&S's credit bid rights.  Under the Interim DIP Financing Order, the U.S. Trustee did not object to S&S's credit bid rights.  In any event, as set forth herein, S&S holds valid, perfected, first-priority security interests in all of the Debtor's assets and its right to credit bid should not be limited.

                                        SCHLEICHER & STEBBINS HOTELS, L.L.C.

                                        By its attorneys,
                                        Sheehan Phinney Bass + Green PA

Dated: September 17, 2015       /s/ Christopher M. Candon
                                        Christopher M. Candon (BNH 07285)
                                        1000 Elm Street, P.O. Box 3701
                                        Manchester, New Hampshire 03105-3701
                                        (603) 627-8168
                                        ccandon@sheehan.com