**2015 BNH 011**

---

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:

                                   Bk. No. 15-11400-JMD
                                   Chapter 11

Tempnology, LLC,
        Debtors

| | |
|---|---|
| *Daniel W. Sklar, Esq.* | *Robert J. Keach, Esq.* |
| *Christopher Desiderio, Esq.* | *Michael Siedband, Esq.* |
| *Lee Harrington, Esq.* | *Michael A. Klass, Esq.* |
| *Nixon Peabody LLP* | *Bernstein Shur Sawyer & Nelson, P.A.* |
| *Manchester, NH* | *Manchester, NH and Portland, ME* |
| *Attorneys for the Debtor* | *Attorneys for Mission Products Holdings, Inc.* |

## MEMORANDUM OPINION

### I. INTRODUCTION

The matter before the Court is the "Debtor's Motion for Determination of the Applicability and Scope of Mission Product Holdings, Inc.'s Election Pursuant to 11 U.S.C. § 365(n)(1)(B)" (Doc. No. 211) (the "Motion") filed by Tempnology, LLC (the "Debtor"), the chapter 11 debtor-in-possession, and the objection thereto filed by creditor Mission Product Holdings, Inc. ("Mission"). On October 2, 2015, the Court entered an order granting the Debtor's motion to reject its contract with Mission subject to Mission's election to preserve its rights under 11 U.S.C. § 365(n).[1] Through the present Motion, the Debtor seeks a determination that those rights do not extend to the grant of

---

[1] Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

certain exclusive distribution rights or to the use of the Debtor's trademarks and logos. For the reasons set forth below, the Court will grant the Motion.

**II. JURISDICTION**

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding under 28 U.S.C. § 157(b).

**III. FACTS**

The facts are not in dispute. The Debtor is a Portsmouth, New Hampshire based material innovation company that, among other things, develops chemical-free cooling fabrics under the Coolcore brand for use in consumer products.

On November 21, 2012, the Debtor and Mission entered into a Co-Marketing and Distribution Agreement (the "Agreement"). Pursuant to section 1(A) of the Agreement, the Debtor granted Mission "exclusive distribution rights within the United States and first rights of notice and of refusal . . . on exclusive distribution rights in certain other countries," defined as the "Exclusive Territory," with respect to "the Cooling Accessories," defined as products of specific types that are listed in an attached exhibit to the Agreement and certain future derivatives of those products.[2] In section 5 of the Agreement, the Debtor agreed that "it will not license or sell the Cooling Accessories . . . to anyone other than [Mission] during the Term" of the Agreement in the Exclusive Territory.[3]

---

[2] Id. at § 1(A).

[3] Id. at § 5.

Similarly, in section 6 of the Agreement, the Debtor agreed that "[i]n the U.S. and elsewhere in the Exclusive Territory . . . it will not sell any Cooling Accessories, New Products or Cooling Accessory Derivatives, directly or indirectly, to any retailer or other entity . . . throughout the Term."  Finally, section 7 of the Agreement, titled "Cooperation and Further Assurances," provides in relevant part:

> [The Debtor] agrees that (i) it shall take no actions to directly or indirectly frustrate its exclusivity obligations hereunder; (ii) [the Debtor] shall fully cooperate with [Mission] to ensure that no third parties take any actions that frustrate the purposes of the exclusivity provisions herein, and (iii) [the Debtor] shall take such actions as are necessary to enforce [the Debtor's] intellectual property rights and contractual rights against third parties." [4]

Mission's "product exclusivity rights as delineated in Sections 5 and 6" were subject to it meeting certain purchasing forecasts as described in section 8 of the Agreeement.[5]

Intellectual property is addressed in section 15 of the Agreement.  Subparagraph (a) broadly defines "Intellectual Property Rights" to include, *inter alia*, the Debtor's copyrights, patentable and unpatentable inventions, discoveries, designs, technology, trademarks, and trade secrets.[6]  In subsection (b), the Debtor granted Mission the following license (the "Non-Exclusive License"):

> Excluding those elements of the CC Property consisting of Marks, Domain Names, [the Debtor] hereby grants to [Mission] and its agents and contractors a non-exclusive, irrevocable, royalty-free, fully paid-up, perpetual, worldwide, fully-transferrable license, with the right to sublicense (through multiple tiers), use, reproduce, modify, and create derivative work based on and otherwise freely exploit the CC Property in any manner for the benefit of [Mission], its licensees and other third parties. [7]

---

[4] Id. at § 7.

[5] Id. at § 8.

[6] Id. at § 15(a).

[7] Id. at § 15(b).

"CC Property" is defined, in relevant part, as "all products (including without limitation the Cooling Accessories) . . . developed or provided by [the Debtor] hereunder and all Intellectual Property Rights with respect to any of the foregoing. . . ."[8] In subsection (d), the Debtor granted Mission "a non-exclusive, non-transferable, limited license . . . to use its Coolcore trademark and logo (as well as any other Marks licensed hereunder) for the limited purpose of performing its obligations hereunder" during the term of the Agreement.[9]

The Agreement had an initial term of two years and was subject to renewal.[10] Either party could terminate the Agreement without cause upon written notice.[11] Any event of termination, however, would trigger a two year wind down period during which Mission would retain the right to purchase, distribute, and sell the Cooling Accessories in accordance with the provisions of the Agreement.[12]

The Debtor filed a voluntary chapter 11 petition on September 1, 2015. The following day, on September 2, 2015, the Debtor filed an omnibus motion to reject executory contracts *nunc pro tunc* to the petition date, including the Agreement. Mission objected asserting that the Agreement was not executory, and expressly reserving its rights under § 365(n). On October 2, 2015, the Court held a hearing on rejection and, after the conclusion of oral arguments, entered an order allowing the Debtor to reject the Agreement subject to Mission's election to retain its rights under § 365(n).

---

[8] Id.

[9] Id. at § 15(d).

[10] Id. at § 2.

[11] Id. at § 3.

[12] Id. at § 4.

On October 15, 2015, the Debtor filed the Motion seeking a determination that Mission's rights under § 365(n) were limited to only the grant of the Non-Exclusive License under section 15(b) of the Agreement. Mission objected, asserting that § 365(n) also protected its exclusive distribution rights and use of the Debtor's trademarks for the remainder of the wind down period, which will expire in July, 2016.[13] The Court heard oral arguments on November 3, 2015, and, in light of the imminent auction of the Debtor's assets free and clear of all liens and interests, indicated its intention to grant the Motion, but took the matter under advisement in order to complete the findings and rulings in this opinion.

**IV. POSITIONS OF THE PARTIES**

A. The Debtor

The Debtor does not dispute that the Non-Exclusive License, granted to Mission pursuant to section 15(b) of the Agreement, is entitled to protection under § 365(n), but argues that Mission's so-called "exclusivity rights" under sections 1, 5, 6, and 7 of the Agreement are not. The Debtor contends that these provisions simply grant exclusive distribution rights and are not rights to intellectual property. For this reason, the Debtor asserts that Mission places too much emphasis on the parenthetical language of § 365(n) that states "including a right to enforce any exclusivity provision of such contract" without acknowledging that the provision only applies to "rights . . . to such intellectual property." 11 U.S.C. § 365(n)(1)(B).

---

[13] Mission also argued that the Motion was procedurally improper and the relief requested must be the subject of an adversary proceeding under Fed. R. Bankr. P. 7001(2) and (9). The Court rejected this argument, viewing the Motion in the context of rejection under § 365, which is a contested matter under Fed. R. Bankr. P. 9014.

5

Additionally, the Debtor argues Mission does not retain any rights to the Debtor's trademarks under the Agreement. To start, the Debtor notes that trademarks were excluded from the definition of CC Property in section 15(b) of the Agreeement, and are not part of the Non-Exclusive License. Instead, Mission's license to use the Debtor's trademarks under the Agreement was expressly limited in section 15(d) of the Agreement. In any event, the Debtor asserts that the omission of trademarks from § 101(35A) mandates the conclusion that trademarks are not protected under § 365(n).

B. <u>Mission</u>

The primary thrust of Mission's argument is that § 365(n) permits a licensee of intellectual property to retain its rights "including a right to enforce *any* exclusivity provision of such contract." 11 U.S.C. § 365(n)(1)(B) (emphasis added). Mission construes its exclusivity rights under sections 1, 5, 6, and 7 of the Agreement as the grant of an exclusive license apart from the Non-Exclusive License under section 15(b) of the Agreement. In doing so, it focuses on the language sections 5 and 6 of the Agreement where the Debtor agrees that it will not license or sell the Cooling Accessories to anyone else during the term of the Agreement. Contending that one cannot sell without a license, Mission urges that the negative language implies the grant of an exclusive license to the underlying products.

Mission counters the Debtor's assertion that this exclusive license is not one to intellectual property by emphasizing that § 365(n) explicitly applies to "any embodiment of such intellectual property." 11 U.S.C. § 365(n). Mission posits that because it has the exclusive right to distribute the Cooling Accessories, and the Cooling Accessories are the embodiment of the Debtor's intellectual property subject to patents, these exclusive rights must fall within the protection of § 365(n). Mission finds further support for its position in section 7 of the Agreement, wherein the

6

Debtor agrees to take such actions to enforce the Debtor's intellectual property rights from third parties.

With respect to the Debtor's trademarks, Mission disagrees that they fall outside the definition of intellectual property in the Bankruptcy Code. Instead, it relies on <u>In re Crumbs Bake Shop, Inc.</u>, 522 B.R. 766, 772 (Bankr. D.N.J. 2014), for the proposition that the Court may use its equitable powers to determine whether a licensee may retain rights to a debtor's trademarks post-rejection.

**V. DISCUSSION**

Section 365(a) of the Bankruptcy Code permits a debtor-in-possession to assume or reject any executory contract of the debtor subject to Court approval. 11 U.S.C. § 365(a). The rejection of an executory contract constitutes a breach of the contract as of the petition date, entitling the counter-party to damages. 11 U.S.C. § 365(g). Section 365(n), however, affords additional protections to licensees of intellectual property. It provides:

> If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect-
>
> > (A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or
> >
> > (B) to retain its rights (including the right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced for-

>> (i) the duration of such contract; and
>
> (ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

11 U.S.C. 365(n)(1). "Thus, in the event that a bankrupt licensor rejects an intellectual property license, § 365(n) allows a licensee to retain its licensed rights along with its duties absent any obligations owed by the debtor-licensor." In re Exide Techs., 607 F.3d 957, 965 (3d Cir. 2010) (Ambro, J., concurring). Upon the licensee's election to retain its rights, the trustee or debtor-in-possession must allow the licensee to exercise those rights free from interference. 11 U.S.C. § 365(n)(2), (3).

Congress enacted § 365(n) as a direct response to the decision by the United States Court of Appeals for the Fourth Circuit in Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985). In Lubrizol, the Fourth Circuit held that rejection of an intellectual property license deprives the licensee of the rights previously granted under the license. Id. at 1048. The result was widely viewed as unjust, as monetary damages, assuming the debtor's estate could eventually pay them, would not make up for the loss of a one of a kind technology around which the licensee built its business. See S. Rep. No. 100-505, 100th Cong. 2d Sess. (1988), reprinted in 1988 U.S.C.C.A.N. 3201-3202. Lawmakers were concerned that technologists would respond to Lubrizol by insisting on outright assignments of intellectual property rather than agree to a licensing arrangement that could evaporate in the event of bankruptcy. Id. at 3202. Seeing this as a threat to the system of licensing of intellectual property that had evolved in the United States, the express purpose of § 365(n) was "to make clear that the rights of an intellectual property licensee to use the

licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy." Id. at 3200.

In the present case, no one disputes that under § 365(n), Mission retains the Non-Exclusive License granted to it pursuant to section 15(b) of the Agreement and may exercise those rights free from interference by the Debtor or any prospective buyer. Therefore, the only issues before the Court are whether Mission retains its exclusive distributions rights and rights to the Debtor's trademarks.

While there is no question that a contract, like the Agreement, can serve more than one purpose, it is clear from both the statutory text of § 365(n) and its legislative history that the protection afforded to licensees is solely limited to intellectual property rights. Thus, not all rights under an executory contract that licenses intellectual property will necessarily be retained post-rejection. The central question is whether the rights claimed are truly "rights to . . . intellectual property." 11 U.S.C. § 365(n)(1)(B). For several reasons, the Court finds that Mission's exclusivity rights are not.

Although not dispositive, it is apparent that the focus of the Agreement is marketing and distribution. To that end, section 1(A) of the Agreement is a grant of "exclusive distribution rights" with respect to the Cooling Accessories. Even when read in conjunction with sections 5, 6, and 7, of the Agreement, there is nothing that to suggest that the rights granted by those paragraphs amount to anything more than the right to sell and distribute specified products. In contrast, the Non-Exclusive License granted in section 15(b) of the Agreement uses wholly dissimilar language and is explicit in its effect.

Critically, the Non-Exclusive License appears to be unrelated to the distribution aspect of the Agreement. Indeed, under the Non-Exclusive License, Mission's ability to "reproduce" and "freely exploit" the "CC Property," which includes the Cooling Accessories and all Intellectual Property Rights, seemingly renders distribution irrelevant in as much as Mission no longer needed the Debtor to manufacture and sell the products. In this way, the Non-Exclusive License, which is perpetual, irrevocable, and royalty free, appears to serve as consideration for Mission's efforts in marketing and selling the Debtor's products, and protection from the Debtor's termination of the Agreement after Mission had done substantial work building the market and the brand.

Admittedly, the Cooling Accessories are patented products, but the Court is unpersuaded that Mission's exclusive right to sell them, by itself, rises to the level of a protected right to the "embodiment of . . . intellectual property" under § 365(n)(1)(B). Section 365(n) is a narrow exception to the general rule that counter-parties to executory contracts are left with only a claim for damages upon rejection. Construing the naked right to sell a patented product as a right to intellectual property itself would extend the protection of § 365(n) far beyond its stated purpose of protecting the licensee that builds its business around licensed intellectual property to which there is no substitute. Not surprisingly, Mission has not cited any case that has applied § 365(n) so broadly, which may explain why this argument was raised for the first time at the November 3, 2015, hearing and did not appear in its papers.

For all these reasons the Court concludes that the exclusive distribution rights granted to Mission in the Agreement are not rights that it retains post-rejection under § 365(n)(1)(B).

The final issue before the Court is whether Mission retains rights to the Debtor's trademarks post-rejection. The Bankruptcy Code defines "intellectual property" to include trade secrets,

inventions, processes, designs, plants protected under title 35, patent applications, plant varieties, works of authorship protected under title 17, or mask work protected under chapter 9 of title 17. 11 U.S.C. § 101(35A).  Notably absent from the list is trademarks, which according to the accompanying Senate Report, was consciously excluded because further study was needed before taking legislative action. See S. Rep. No. 100-505, 100th Cong. 2d Sess. 5 (1988), reprinted in 1988 U.S.C.C.A.N. 3201-3204.  A minority of courts conclude, as Mission urges this Court to do, that "Congress intended the bankruptcy courts to exercise their equitable powers to decide, on a case by case basis, whether trademark licensees may retain the rights listed under § 365(n)." In re Crumbs Bake Shop, Inc., 522 B.R. at 772; see In re Exide Techs., 607 F.3d 966 (Ambro, J., concurring). Most courts, however, reason by negative inference that the omission of trademarks from § 101(35A) means that Lubrizol's holding was not overruled with respect to trademark licenses and those rights are not afforded any protection under § 365(n).  See e.g., In re Old Carco LLC, 406 B.R. 180, 211 (Bankr. S.D.N.Y. 2009); In re Dynamic Tooling Sys., Inc., 349 B.R. 847, 856 (Bankr. D. Kan. 2006); In re HQ Global Holdings, Inc., 290 B.R. 507, 513 (Bankr. D. Del. 2003); In re Centura Software Corp., 281 B.R. 660, 674-75 (Bankr. N.D. Cal. 2002).

Having reviewed both lines of reasoning, the Court finds the rationale of the majority more persuasive.  Section 101(35A) identifies six categories of intellectual property that will be subject to protection under § 365(n), while trademarks were knowingly omitted.  Under the maxim of *expressio unius est exclusio alterious* the expression of one thing is the exclusion of other things, see, e.g., United States v. Hernandez-Ferrer, 599 F.3d 63, 67-68 (1st Cir. 2010)  the omission of trademarks from the definition of intellectual property in § 101(35A) indicates that Congress did not

intend for them to be treated the same as the six identified categories. Therefore, Mission does not retain rights to the Debtor's trademarks and logos post-rejection.

**VI. CONCLUSION**

    For the reasons stated above, the Court shall enter a separate order granting the Motion. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

    ENTERED at Manchester, New Hampshire.


Dated: November 12, 2015                   /s/ J. Michael Deasy
                                                        J. Michael Deasy
                                                        Bankruptcy Judge