2015 BNH 012

---

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 15-11400-JMD
                                                                Chapter 11

Tempnology, LLC,
                Debtor

Daniel W. Sklar, Esq.                          Robert J. Keach, Esq.
Christopher Desiderio, Esq.                    Michael Siedband, Esq.
Lee Harrington, Esq.                           Michael A. Klass, Esq.
Nixon Peabody LLP                              Bernstein Shur Sawyer & Nelson, P.A.
Manchester, NH                                 Manchester, NH and Portland, ME
Attorneys for the Debtor                       Attorneys for Mission Products Holdings, Inc.

Christopher M. Candon, Esq.                    Edmond J. Ford
Sheehan Phinney Bass + Green PA                Ford & McPartlin, P.A.
Manchester, NH                                 Portsmouth, NH
Attorney for Schleicher & Stebbins Hotels, L.L.C.   Attorney for Michael S. Askenaizer, Chapter 11
                                               Examiner

## MEMORANDUM OPINION

## I. INTRODUCTION

Pursuant to the Court's order dated October 8, 2015, approving procedures in connection with the sale of substantially all of the assets of Tempnology, LLC (the "Debtor"), the Debtor conducted an auction on November 5, 2015 (the "Auction"), at which Schleicher & Stebbins Hotels, L.L.C. ("S&S"), the stalking horse bidder, was declared the successful bidder.  The Debtor now seeks an order: (i) authorizing the sale free and clear of liens, claims, encumbrances, and other interests, except as provided by the asset and purchase agreement; (ii) approving the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases related thereto; and (iii) other related relief.  Mission Product Holdings, Inc. ("Mission") objects

to the conduct of the auction and sale for various reasons and challenges S&S's right to credit bid any prepetition debt (the "Objections").[1]  The Court conducted an evidentiary hearing concerning the proposed sale on November 18, 2015 and November 23, 2015, at which Vincent Colistra ("Colistra") of Phoenix Capital Resources ("Phoenix"), the Debtor's investment banker, Kevin McCarthy ("McCarthy"), the Debtor's CEO, Richard Ferdinand ("Ferdinand"), the Debtor's CFO, and Mark Stebbins ("Stebbins"), one of the principals of S&S, testified.  Eighteen exhibits were admitted into evidence.  For the reasons set forth below, the Court will overrule Mission's Objections and approve the sale.

## II. JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a).  This is a core proceeding under 28 U.S.C. § 157(b).

## III. FACTS

By way of background, the Debtor is a Portsmouth, New Hampshire based material innovation company that, among other things, develops chemical-free cooling fabrics under the Coolcore brand for use in consumer products.  S&S wears many hats in this case as the Debtor's majority equity owner, largest secured creditor, postpetition debtor in possession financier; stalking horse bidder; and purported successful purchaser.  Mission was the counterparty to a Co-Marketing and Distribution Agreement (the "Mission Agreement") that the Debtor has since rejected pursuant to 11 U.S.C. § 365 and was the only other qualified bidder at the Auction.

---

[1] Doc. Nos. 241, 244, 246.

A. <u>Prepetition Events</u>

The Debtor was formed in 2011.  On November 21, 2012, the Debtor entered into a the Mission Agreement with Mission whereby the Debtor granted Mission the exclusive distribution rights to certain of the Debtor's products within the United States and a non-exclusive, irrevocable, royalty-free, perpetual, worldwide, fully-transferrable license to, *inter alia*, freely exploit the Debtor's intellectual property.  Despite sales, the Debtor has remained unprofitable and has been plagued with losses.

In order to combat its liquidity problems, the Debtor sought financing.  In the spring of 2013, the Debtor obtained a secured line of credit through People's United Bank (the "People's LOC") with a credit limit of approximately $350,000.  During the same period, S&S loaned millions of dollars to the Debtor on an unsecured basis.  Eventually, the balance of the S&S loan grew to a point where Stebbins and his partner, Mark Schleicher ("Schleicher"), agreed that further lending could only be done on a secured basis.

In the spring of 2014, the People's LOC provided S&S with a vehicle through which it could continuing advancing funds to the Debtor when People's United Bank called the loan. S&S then acquired the People's LOC and increased the loan limit for the secured loan from $350,000 to $4,000,000, and later to potentially $6,000,000.  Following the acquisition of the People's LOC, S&S converted then-existing antecedent unsecured debt in the "multiple millions of dollars" to secured debt.  By the spring of 2014, when S&S loaned the Debtor millions of dollars on a secured basis, no conventional lender would have done so based on the Debtor's history of losses dating back to 2012.

The Debtor's relationship with Mission also deteriorated in 2014, with both parties asserting material breaches of the Mission Agreement.  After both parties attempted to terminate

the Mission Agreement, the matter was submitted for arbitration.  On June 5, 2015, the arbitrator issued a Partial Final Award, determining that the Debtor's termination for cause was ineffective and the Mission Agreement remained in full force and effect.  The remainder of the arbitration has been stayed by the Debtor's bankruptcy.

In March, 2015, the Debtor's management committee accepted a proposal by S&S to convert a portion of S&S's unsecured debt to equity.  Stebbins testified that this was done primarily to "right size" the Debtor's balance sheet to reflect a positive net worth.  Although Stebbins and Schleicher were members of the management committee at this time, Stebbins testified that he abstained from the vote on this proposal.  The record does not reflect whether Schleicher voted or abstained.  In any event, as a result of the equity conversion and S&S's prior indirect interests in the Debtor through a company known as Frigid Fabrics, S&S gained a majority ownership interest in the Debtor.

Stebbins testified that his only role in the Debtor was as a member of the management committee.  Although both McCarthy and Ferdinand sought advice from Stebbins regarding the Debtor's operations, he was not involved in the day to day operations of the Debtor, devoting only about an hour a week to the Debtor.  Stebbins attended quarterly management committee meetings, and typically met with McCarthy and Ferdinand once or twice a month.

According to Stebbins, by July, 2015, it became obvious that a "workout" would be necessary when the Debtor's financial situation did not improve.  On July 13, 2015, the Debtor's management committee met with Stebbins to discuss the Debtor's financial status and discussed the terms of a forbearance agreement for S&S's secured loans.  On July 15, 2015, Stebbins and Schleicher each resigned from the Debtor's management committee and were replaced by McCarthy and Ferdinand.  Following the resignations, neither McCarthy nor Ferdinand had any

further discussions with Stebbins regarding the Debtor's operations and both the Debtor and S&S obtained independent counsel.  On July 16, 2015, S&S issued the Debtor a notice of default regarding the secured loan on account of the Debtor's failure to make interest payments.

On or about July 20, 2015, the Debtor engaged Phoenix as its investment banker to assess the Debtor's options, with Colistra serving as the lead investment banker.  Neither S&S nor Stebbins had any involvement in the selection and engagement of Phoenix.

At a meeting in August, 2015, S&S and the Debtor agreed on the terms of a forbearance agreement.  McCarthy and Ferdinand accepted the basic terms of a proposal made by S&S, which may have been made at the meeting on July 13, 2015, but the details were negotiated by the parties' respective counsel in August, 2015.  The forbearance agreement provided for an additional $1,400,000 in secured financing through September 1, 2015, on the condition that the Debtor file for bankruptcy and seek to sell substantially all its assets pursuant to 11 U.S.C. § 363.

Based on a review of the Debtor's liquidity and its ability to raise debt, as well the existence of a forbearance agreement regarding substantial debt that would have to be paid off, Colistra determined that a sale was necessary.  Phoenix, without direction from the Debtor, contacted S&S to commence stalking horse negotiations after five other parties declined to do. Neither McCarthy nor Ferdinand was involved in the stocking horse negotiations with S&S and relied on counsel from Nixon Peabody to negotiate the agreement on the Debtor's behalf. Stebbins discussed possible terms of a stalking horse agreement with his counsel, Attorney Christopher Candon, but Attorney Candon primarily negotiated the terms on his behalf.

The original stalking horse agreement dated September 1, 2015 provided for a bid with an assigned value of approximately $7,000,000, the vast majority of which consisted of a credit bid of S&S's prepetition secured loan.  The stalking horse agreement also contained a condition

that both McCarthy and Ferdinand accept offers of employment from S&S (the "Employment Condition"). Ferdinand testified that the original stalking horse agreement embodied terms that were initially discussed at the meeting held on July 13, 2015. Notwithstanding the likelihood that some terms may have been first raised at the July 13, 2015 meeting, all witnesses testified that it was Phoenix that approached S&S regarding the possibility of it serving as a stalking horse, and that the negotiations were completed by counsel.

Admittedly, the parties expected that the purchaser would be S&S, but understood that the sale would ultimately be to the highest bidder and subject to bankruptcy court approval. Stebbins wanted the proposed sale to take place as quickly as possible, but deferred to Phoenix regarding how much marketing was needed. He also testified that S&S pursued this transaction because he and Schleicher always believed in the company and its product, but that a reorganization of the prior management's acts—namely, the Mission Agreement—was necessary for S&S to be involved.

B. The Bankruptcy Filing

On September 1, 2015 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 petition. On Schedule D – Creditors Holding Secured Claims, the Debtor listed S&S as holding a secured claim in the amount of $5,550,000 for advances made between August 28, 2014 and August 24, 2015.[2] S&S did not need to file and, to date, has not filed a proof of claim and Mission has not otherwise sought to directly object to S&S's claim.

---

[2] Section 1111(a) and Fed. R. Bankr. P. 3003(b)(1) provide that schedules filed by the Debtor in a Chapter 11 proceeding that do not list a liability as disputed, contingent, or unliquidated constitute prima facie evidence of a claim and a creditor need not file a proof of claim.

The following day, on September 2, 2015, the Debtor filed a motion seeking, *inter alia*, approval of procedures in connection with a sale of substantially all of the Debtor's assets[3] (the "Sale Procedures Motion") and an Omnibus Motion to Reject Executory Contracts Nunc Pro Tunc to the Petition Date[4] (the "Rejection Motion"), including the Mission Agreement.  Mission objected to the Sale Procedures Motion and the Rejection Motion, specifically electing to retain all permissible contractual and property rights under the contract the Debtor sought to reject pursuant to 11 U.S.C. § 365(n), which it contends includes the exclusive distribution rights in the Debtor's intellectual property.

On September 9, 2015, S&S advanced $250,000 to the Debtor under a Court-approved debtor in possession financing facility (the "DIP Facility").  The wire transfer of the $250,000 advance was initiated by Pro Con, Inc. ("Pro Con"), an entity of which Stebbins is the chairman and CEO, but was drawn on S&S's checking account.  Stebbins did not know why Pro Con was listed as the initiator, but testified that because S&S has no employees, he directed Pro Con's Vice President of Finance to effectuate the transfer.

On September 18, 2015, upon the motions of Mission and the United States Trustee, the Court appointed Michael Askenaizer as examiner (the "Examiner") to oversee the proposed sale process.  The Examiner filed an interim report on September 30, 2015.  On October 2, 2015, the Court entered an order granting the Rejection Motion, permitting the Debtor reject its contract with Mission subject to Mission's election to preserve its rights under 11 U.S.C. § 365(n).

On October 8, 2015, following a continued, contested hearing, the Court granted the Sale Procedures Motion.  At this hearing, S&S agreed to lower its stalking horse bid to $1,050,000,

---

[3] Doc. No. 34.

[4] Doc. No. 35.

consisting of a credit bid of $750,000 in financing extended to the Debtor postpetition (the "DIP Financing") and the assumption of approximately $300,000 in liabilities, consisting of approximately $130,000 in prepetition accounts payable incurred within 60 days of the Petition Date and approximately $150,000 in cure costs related to certain contracts the Debtor elected to assume. Stebbins testified that S&S considered its agreement to lower its bid to be a concession to defer a fight over its credit bidding rights, but that S&S always intended to credit bid its prepetition debt if necessary. Moreover, notwithstanding the amount of DIP Financing embodied in the stalking horse bid, both Ferdinand and Stebbins testified that only $250,000 had been advanced as of the date of the bid.

The Court's order dated October 8, 2015 approving the sale procedures (the "Sale Procedures Order") set a deadline for bids of November 2, 2015, an auction date of November 5, 2015, and an objection deadline of November 12, 2015. Attached to the Sale Procedures Motion were the approved Bidding Procedures for the Auction and the asset purchase agreement executed by S&S. The Debtor served the approved form of Notice of Sale Procedures, Auction Date, and Sale Hearing on all creditors. The notice referenced the Sale Procedures Order and directed interested parties to refer to it for more information.

On October 15, 2015, the Debtor filed a Motion for Determination of Applicability and Scope of Mission Product Holdings, Inc.'s Election Pursuant to 11 U.S.C. Section 365(n)(1)(B)[5] (the "365(n) Motion"). Mission objected to the 365(n) Motion.[6] On November 12, 2015, following a contested hearing on the matter, the Court granted the 365(n) Motion, concluding that Mission retained certain nonexclusive rights to the Debtor's intellectual property, but did not

---

[5] Doc. No. 211.

[6] Doc. No. 231.

8

retain any exclusive rights granted under the Mission Agreement.  See In re Tempnology, LLC, 541 B.R. 1 (Bankr. D.N.H. 2015).  On the same date, Mission filed a Notice of Appeal of the Court's order and the appeal remains pending.

On October 29, 2015, one week before the auction, S&S, at Ferdinand's request, advanced an additional $500,000 to the Debtor under the DIP Facility.  Like the previous wire of $250,000, the $500,000 advance was initiated by Pro Con for reasons unknown but drawn on S&S's checking account.  Ferdinand testified that the $500,000 advance under the DIP Facility was necessary to fund the carve-out for professional fees and expenses. In any event, on the auction date, the full amount of the DIP Financing had been advanced as was contemplated by the stalking horse bid.

On November 2, 2015, Mission placed a timely, qualified overbid consisting of a cash bid of $1,300,000.

C. Marketing Efforts

Prior to the Petition Date, Phoenix developed a sales and marketing strategy that involved the preparation of a marketing teaser to entice potential buyers, a data room for the review of confidential information, and a nondisclosure agreement.  Phoenix initially contacted five parties in search of a stalking horse, and received some interest from a company known as Hill Co. that had branding experience, but all declined citing the expense.  Colistra testified that these parties were targeted based on their ability to understand the business, move quickly, and have the financial wherewithal to complete the transaction.  Ultimately, Phoenix contacted S&S to commence stalking horse negotiations in the beginning of August, 2015.

Following the Petition Date, Phoenix sent the teaser materials to 164 potential buyers that it identified as likely prospects from a database customarily used by investment bankers.  These

prospects were selected based on them being in a like or similar industry as the Debtor, or industry associated with the Debtor's products.  Colistra testified that Phoenix contacted a broad range of potential buyers, including liquidators, branding experts, apparel and textile companies, medical businesses, and hedge funds.

Of those sent the teaser, twenty-six responded that they were not interested, and Phoenix made an additional 112 follow-up calls in an attempt to "talk to a human being."  Other than S&S, only four parties signed nondisclosure agreements and gained access to the data room, and only Mission submitted a bid that was higher than S&S's stalking horse bid.  Phoenix tracked the reasons given by various potential purchasers for not submitting bids.  Among the concerns raised were: (i) the opportunity was too small; (ii) the Debtor's history of losses and lack of sales; (iii) market saturation of similar products; (iv) lack of confidence in the defensibility of the Debtor's patents, particularly in light of Mission's assertion of exclusive rights; and (v) the potential of S&S to credit bid a substantial amount.

According to Colistra and McCarthy, the Debtor provided Phoenix with a "do not contact list" containing the names of businesses that Phoenix was instructed not to contact in connection with the proposed sale.  The list consisted of major existing or prospective customers even though Colistra testified that major customers are often the most active bidders in sales pursuant to 11 U.S.C. § 363.  McCarthy did not want vendors contacted because the Debtor's size makes it reliant on every order and he did not want to raise concerns about the Debtor's ability to fulfill orders.  Notwithstanding the lack of direct marketing, a press release regarding the sale was transmitted to all customers, distributors, and other "key international players."  Colistra testified that Phoenix followed its normal sales and marketing process and, given his experience with

sales both in and out of bankruptcy, opined that an additional sixty-days of marketing and due diligence would not have yielded a different result in light of the responses Phoenix received.

    D. <u>The Auction</u>

    On November 5, 2015, the Debtor conducted the Auction at the offices of its counsel, Nixon Peabody.  At the outset of the Auction, the Debtor made the following representations of regarding the then-present state of its assets and liabilities: (i) S&S had loaned the Debtor $750,000 under the DIP Facility; (ii) the Debtor was holding cash in the amount of $600,000; (iii) the Debtor had accounts receivable in the amount of $100,000; (iv) the Debtor had inventory of $1,200,000 at cost consisting almost entirely of finished product with sale margin of at least 20%; (v) the Debtor had postpetition accounts payable of approximately $350,000; and (vi) the "carve-out" from the sale for the Debtor's professionals totaled $400,000.  Notably, under the asset purchase agreements signed by S&S and Mission, the Debtor's cash and cash equivalents were listed as acquired assets.  The Debtor also explicitly reserved the right to conduct negotiations off the record.

    In light of Mission's qualified overbid of $1,300,000 in cash, S&S opened bidding with a credit bid of $1,400,000, which included a prepetition credit bid, which the Debtor immediately accepted and stated was a superior bid.  Mission protested S&S's credit bid of prepetition debt and reserved the right to return to its original bid, but continued to offer higher bids consisting of the Debtor's cash and cash equivalents, meaning that such cash or cash equivalents would be left in the estate and excluded from the acquired assets.  In response to Mission bidding the Debtor's assets, including its accounts receivable and inventory, the Debtor announced that for purposes of the Auction the value of the accounts receivable would be reduced from $100,000 to $80,000, and the value of the inventory was reduced from $1,200,000 to a liquidation value of $120,000.

Colistra testified that this was done when he realized that it was not appropriate to utilize "book value" in this context for these assets.

After several more rounds of bidding, Mission submitted the penultimate bid of $2,600,000 (the "Mission Bid"), consisting of the following:

(i) $1,800,000 in cash paid by Mission;

(ii) $600,000 of the Debtor's cash to be left in the estate;

(iii) $80,000 of the Debtor's accounts receivable to be left in the estate; and

(iv) $120,000 of the Debtor's inventory to be left in the estate.

The Debtor accepted the Mission Bid.

Following the Mission Bid, S&S bid $2,700,000 (the "S&S Bid") consisting of the following:

(i) $750,000 credit bid of DIP Facility;

(ii) $657,000 of assumed prepetition unsecured debt at the amount scheduled by the Debtor excluding disputed claims and any rejection damage claim;

(iii) $600,000 of the Debtor's cash to be left in the estate;

(iv) $80,000 of the Debtor's accounts receivable to be left in the estate;

(v) $120,000 of the Debtor's inventory to be left in the estate;

(vi) $50,000 of assumed postpetition accounts payable; and

(vii) $443,000 credit bid of prepetition debt.

Stebbins testified that S&S altered its bidding strategy on the advice of Attorney Candon, reasoning that mirroring Mission's bid structure made it easier to compare the two bids and avoided a further challenge by Mission by reducing S&S's need to credit bid prepetition debt. Similarly, S&S incorporated the assumption of $657,000 in prepetition liabilities into its bid at Attorney Candon's advice.  Indeed, Stebbins testified S&S has the financial ability to pay these

claims, but that he did not know which creditors' claims were being assumed and relied on Attorney Candon to formulate this component of S&S's bid. At the Auction, S&S also reserved the right to try to renegotiate any amount of an assumed liability directly with the claimant.

At the Auction, no representations were made regarding whether the Employment Condition was waived or satisfied. At the sale hearings, both McCarthy and Ferdinand testified that they have not received employment offers from S&S, but expected such offers to be forthcoming. Stebbins testified that S&S intends to keep all eighteen of the Debtor's employees.

The Debtor accepted the S&S Bid as superior to the Mission Bid. Mission declined to bid further or be designated as the backup bidder, protesting that the Mission Bid was already best and highest. The Debtor filed a notice of successful bidder on November 6, 2015.

E. Post-Auction Procedural History

Mission filed the Objections on November 12, 2015, asserting, *inter alia*, that: the S&S Bid was miscalculated and inferior to the Mission Bid; S&S's credit bidding rights should be denied and its claim recharacterized as equity; the sale was conducted in bad faith; and the sale must be denied as a *sub rosa* plan. On November 16, 2015, the Examiner, the Debtor, and S&S each filed responses to the Objections.[7]

The Examiner filed his final report on November 13, 2015 (the "Final Report"), which was subsequently amended with leave of the Court on November 24, 2015.[8] In the Final Report, the Examiner concluded that Mission and all other creditors will receive better treatment through the proposed sale than through the only realistic alternative—a liquidation. In support, the Examiner reasoned that in light of S&S's secured claim in the amount of $5,500,000, which he

---

[7] Doc. Nos. 257, 258, 259, respectively.

[8] Doc. Nos. 252, 270.

determined is not subject to a viable claim for equitable subordination and only $2,000,000 of which might be vulnerable to a recharacterization challenge, the Debtor's creditors would not receive any distribution under any other circumstances.  The Examiner further opined that given the limited value of the Debtor's business and the fact that the only bidders were the parties already embroiled in litigation, additional or different marketing would not yield a different or better result.

The Court conducted an evidentiary hearing concerning the proposed sale on November 18, 2015, and November 23, 2015.  At the conclusion of the hearing, the Court took the matter under advisement and directed the parties to file proposed findings by December 1, 2015.  Both Mission and the Debtor filed proposed findings.  Attached to the Debtor's proposed order were revised copies of the asset purchase agreement signed by S&S.  In addition to amending Exhibits 2.1 and 2.2 to conform the definitions of acquired assets and excluded assets to the S&S Bid, Exhibit 3.1, which states the methodology for calculating the S&S Bid, now lists prepetition liabilities totaling $657,278 to be assumed by S&S by claimant and amount to be paid by S&S.

## IV. POSITIONS OF THE PARTIES

Generally, the Debtor asserts that the record reflects its marketing efforts were appropriate, the S&S Bid was higher in all respects, and the sale represents a good faith, arm's length transaction which the Court should approve.  For the sake of clarity, the Court will focus on Mission's objections and the various parties' responses thereto.

A. <u>Mission</u>

Through the Objections, Mission takes issue with nearly every aspect of the sale process. From the outset, Mission argues that the Debtor and S&S have colluded to use this bankruptcy case for the sole impermissible purpose of rejecting the Mission Agreement and now seek to use

14

the sale as a foreclosure vehicle for "notional" value.  The central premise of most of Mission's complaints is the allegation that the Debtor is entirely controlled by S&S through Stebbins.  As evidence of this pervasive control, Mission alleges that S&S and Stebbins have repeatedly dictated terms to the Debtor, such as the stalking horse bid and forbearance agreement, which the Debtor has accepted without negotiation.

Mission asserts that S&S should be prohibited from credit bidding its prepetition debt for cause under 11 U.S.C. § 363(k) for several reasons.  First, Mission urges that the Court to find that S&S has engaged in inequitable conduct as evidenced by its self-dealing and "loan to own" strategy.  Second, Mission posits that S&S's credit bidding rights should be limited because the validity and amount of its secured claim is subject to a bona fide dispute and has not yet been determined.  Third, Mission argues that under the standard articulated in Aquino v. Black (In re AtlanticRancher, Inc.), 279 B.R. 411, 433 (Bankr. D. Mass. 2002), cause exists to recharacterize S&S's secured loans as equity and, as such, S&S's credit bid rights must be limited to the actual and necessary extension of credit under the DIP Facility.[9]  In support, Mission cites the Debtor's financial history which indicates inadequate capitalization, substantial control by Stebbins, S&S's loan mirroring its controlling equity position, and the fact that no conventional lender would have loaned the Debtor money on similar terms.

Turning to the sale process, Mission contends that there was an insufficient marketing period to allow for an open and competitive sale.  Mission also asserts that Phoenix's adherence to a "do not contact list" given to it by the Debtor further reflects that the Debtor intentionally did not actively market itself to companies who, according to Colistra, are often some of the most active bidders in bankruptcy sales.  Indeed, Mission argues that the Debtor never even

---

[9] Although the specter of equitable subordination was raised early in this case, Mission has not advanced an argument under that theory in the Objections or requested any relevant findings in its proposed findings of fact.

investigated any options other than a going concern sale to S&S.  Additionally, Mission states that S&S's initial credit bid of approximately $7,000,000 chilled interest in the sale process.

Mission also cites several flaws and/or incidences of inequitable conduct in the Auction. Mission asserts that the Debtor's open admission that it would, and then did, negotiate bids off the record with S&S evidences collusion.  Moreover, Mission complains that the Debtor's unilateral, mid-Auction announcement that it was changing the Auction values of the Debtor's inventory and accounts receivable was done for the sole purpose of devaluing Mission's bids and strengthening S&S's bidding position.  Mission also notes that S&S never announced whether the Employment Condition was waived or satisfied.

Mission's primary objection to the Auction, however, is that it should have been declared the successful bidder as each of its bids were "unequivocally higher" than those of S&S. Mission suggests that the Debtor fraudulently inflated the value of each of S&S's bids, including the S&S Bid, by colluding with S&S to "park" an unnecessary advance of $500,000 under the DIP Facility in the Debtor's accounts to create a postpetition credit bid right.  Because this advance did not occur until after the stalking horse bid was accepted, Mission asserts that it was overvalued from the start.  Then, based on the presence of $600,000 in the Debtor's bank account at the time of the Auction, a mere week after the $500,000 advance under the DIP Facility, Mission argues the advance must have been unnecessary.  Moreover, because the Debtor's cash and cash equivalents were, at least initially, acquired assets under the respective asset purchase agreements, Mission contends that S&S's credit bid would have essentially bought its own cash back, thus reducing the net value of the transaction by $500,000.

Based on that line of reasoning, Mission argues that S&S bidding the Debtor's cash results in the same asset being counted twice—first as a liability and then as an asset.  According

to Mission, only once S&S agrees to leave the Debtor's cash in the estate is the $500,000 loan completed, justifying a bid with a net economic value of no more than $750,000.  Mission concedes, however, that the result might be different had the Debtor exhausted the DIP Facility in its operations prior to the auction.  In any event, because the Mission Bid did not suffer from this mathematical infirmity, it was superior to the S&S Bid.

Mission also contests the value assigned to S&S's assumption of liabilities.  In support, Mission makes much of the fact that Stebbins testified that the total amount assumed was approximately $600,000, and he did not know with specificity which claims are being assumed.  This so-called "cap," coupled with a lack of clarity regarding which claims are being assumed, and S&S's admission that it could negotiate to pay less than $657,000, drive Mission to the conclusion that S&S's assumption of prepetition liabilities is impossible to value for bidding purposes.

Ultimately, Mission argues that the proposed sale to S&S will constitute a *de facto* plan that is incapable of confirmation.  First, Mission contends that the proposed sale essentially creates an undefined class of unsecured creditors who will be paid in full, while the remainder will likely receive nothing under the sale or any subsequent plan.  This, Mission urges, is unfair discrimination against creditors in the same class.  Second, because S&S will retain its ownership of the Debtor notwithstanding this treatment of the contested unsecured creditors, Mission asserts that the proposed sale violates the absolute priority rule.

For all these reasons, Mission argues that S&S is not a good faith purchaser and the sale must be denied.

B. <u>The Debtor</u>

The Debtor argues that the record overwhelmingly supports approval of the sale.  Indeed, the Debtor notes from the outset that the Examiner, a third party appointed to oversee the sale process at the request of Mission and the United States Trustee, supports the sale to S&S. Furthermore, the Debtor asserts that Mission's repeated allegations of inappropriate conduct by the Debtor and S&S are not supported by a scintilla of evidence.

To start, the Debtor states that the record reflects, and the Examiner has confirmed, that Phoenix adequately marketed the Debtor's assets, having developed a marketing strategy based on its professional experience and contacted over 160 prospective buyers in similar or associated businesses.  The Debtor asserts there is no evidence that S&S influenced or interfered with Phoenix's efforts or otherwise directed the course of the sale.  Moreover, the Debtor emphasizes that Colistra testified that Phoenix followed its customary procedures for such a transaction and he believed additional marketing would not have yielded a different result.  In further support of that statement, the Debtor points out that one of the reasons identified by prospective buyers who declined to pursue the transaction was the ongoing dispute with Mission regarding the Mission Agreement.

The Debtor maintains that Mission's protests regarding the Auction are equally without merit.  The Debtor notes that Mission did not object to its reservation of the right to conduct bid negotiations off the record, and contends that the Debtor had conversations with all parties, Mission included, during the break.  With respect to Mission's complaint about the unilateral devaluation of the Debtor's assets mid-Auction, the Debtor explains that the assets were initially given a book value because they would be acquired by the purchaser.  Only once Mission began bidding the assets was it determined that a liquidation value as both necessary and appropriate

for purposes of the Auction.  The Debtor argues that Mission was not prejudiced by this change because the discount factor applied to both parties at the same rate.

The Debtor states that Mission's complaints that S&S is bidding only "notional" value is ironic, as S&S simply adopted Mission's bidding strategy, and undercut by Mission's assertion that the exclusion of assets from the purchase increased the value of their bid.  Like the discount factor, the Debtor contends that the value of the excluded assets must be applied equally to both bids.  The Debtor further characterizes Mission's claim that the Debtor's cash should not be counted as consideration for the S&S Bid as "nonsensical," arguing that leaving the $600,000 is the same as a cash bid.  The Debtor emphasizes that the advances under the DIP Facility were made in accordance with the budget approved by the Court.  In sum, the Debtor argues that "basic math" supports the assertion that the S&S Bid is superior to the Mission Bid in all respects.

The Debtor also contests Mission's assertions that the proposed sale is a *sub rosa* plan, and argues that it complies with 11 U.S.C. § 363.  The Debtor urges that the proposed sale preserves the going concern value of the Debtor's business, while Mission's was simply a liquidating bid.  The Debtor further opines that it is not uncommon for a party to assume liabilities as part of a transaction.  Finally, the Debtor states that a liquidating plan will be filed to address the disposition of the excluded assets and provide a waterfall for the remaining claim holders in a manner consistent with the Bankruptcy Code.

In sum, the Debtor argues that Mission has not pointed to any facts to support its allegations that the Debtor or S&S have acted in bad faith.  The Debtor asserts that it filed the present case to reject a burdensome contract, right size its balance sheet, and emerge as a going concern.  Moreover, the Debtor contends that the Debtor and S&S have gone to "extreme

lengths" to preserve an arm's length transaction, and that there is no evidence that the Debtor colluded with or is controlled by S&S.  In further support, the Debtor again cites the Examiner's report, which it states confirms the Debtor's position that the conduct of the sale was appropriate and that S&S's liens are valid at least in an amount sufficient to cover S&S's proposed prepetition credit bid.

C. <u>S&S</u>

S&S supports the sale and suggests that the record amply establishes S&S is a good faith purchaser.  According to S&S, Mission has attempted to cloud the issues before the Court by making inflammatory accusations regarding collusion and misconduct, but was ultimately unable to present any evidence in support of its allegations.  S&S contends that the record before the Court demonstrates that neither S&S nor Stebbins have done anything to interfere with or manipulate the sale process.  To the contrary, S&S posits that the testimony of all four witnesses, which was not rebutted by any witness called by Mission, shows that S&S participated in an open and fair auction.

S&S disputes Mission's assertion that there is any basis to limit its credit bidding rights. With respect to the postpetition DIP Financing, S&S argues that it indisputably loaned $750,000 as approved by the Court's interim and final orders regarding cash collateral and is entitled to credit bid that amount.  With respect to its prepetition secured debt, S&S maintains that it has the right to credit bid up to $5,550,000, noting that the Examiner's independent analysis concludes that at least $3,500,000 of that claim is not subject to a viable recharacterization challenge. Thus, S&S asserts that if the Court were to estimate its claim for credit bidding purposes, the result would not affect S&S's actual credit bid of only $443,000 prepetition debt.  Moreover, distinguishing the present case from the "loan to own" characterization advanced by Mission,

20

S&S emphasizes that unlike In re Fisker Auto. Holdings, Inc., 510 B.R. 55 (Bankr. D. Del. 2014), and In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA, 512 B.R. 798 (Bankr. E.D. Va. 2014), S&S did not acquire its prepetition debt at a steep discount, but instead paid full value.

D. The Examiner

The Examiner filed a response to the Objections to address "misleading" arguments and emphasize that the estate and its creditors are best served by a prompt consummation of the sale. Indeed, the Examiner posits that there is no alternative that is likely to pay the prepetition creditors. The Examiner contends there is no evidence of collusion or misconduct, and, relying on his prior report, asserts that the amount of S&S's prepetition credit bid is not subject to recharacterization. Alternatively, even if there were some collusion, which he disputes, the Examiner suggests that it is relevant only to issues under 11 U.S.C. § 363(m), and does not warrant denial of the sale.

The Examiner argues that the Court should reject Mission's "notional" consideration argument as factually incorrect. The Examiner explains that neither S&S nor the Debtor are double counting the Debtor's cash on hand because in order to compare the relative worth of the competing bids, one would compare the net equity on the Debtor's balance after each bid. Thus, on a balance sheet, the S&S Bid results in both the reduction in the Debtor's liabilities arising from the DIP Financing and assets in the amount of $600,000. For this reason, the Examiner concludes that the S&S Bid is higher and better.

The Examiner states that there is a business justification to the sale, as the assets are wasting, the sale furthers the interests of the Debtor, creditors, and equity, and does not render creditor's rights meaningless. Moreover, the Examiner opines that if the sale were denied,

21

conversion will quickly follow as S&S would cease funding the operation.  Lastly, the Examiner argues that the sale does not implicate the absolute priority rule because S&S is not receiving anything on account of its equity interest, but is instead buying the assets in exchange for its debt.

## V. DISCUSSION

Section 363(f) of the Bankruptcy Code permits the sale of estate property free and clear of any interest.  11 U.S.C. § 363(f).  Under 11 U.S.C. § 363(b)(1), a Chapter 11 debtor in possession may do so other than in the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1); see also 11 U.S.C. § 1107(a) (affording a Chapter 11 debtor in possession the rights of a trustee).  Section 1123(b)(4) of the Bankruptcy Code contemplates that sale of all or substantially all of Chapter 11 debtor's assets may be effectuated through a plan, 11 U.S.C. § 1123(b)(4), but the Supreme Court of the United States has recognized that a Chapter 11 debtor may alternatively sell substantially all its assets pursuant to 11 U.S.C. § 363(b) prior to confirmation to then be followed with the confirmation of a liquidating plan.  Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 128 S.Ct. 2326, 2331 n. 2 (2008).  The concern raised by pre-confirmation sales is that "[s]ection 363(b) seems on its face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary course of business, of property of the estate," Comm. of Equity Sec. Holders v. The Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2nd Cir. 1983), which could deny creditors the statutory protections they would otherwise receive through the Chapter 11 confirmation process by establishing the terms of a *sub rosa*, or perhaps more accurately, *de facto*, plan in connection with the sale.  See, e.g., Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 466

(2d Cir.2007) ("The reason sub rosa plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of Chapter 11 for confirmation of a reorganization plan." (internal quotation marks and alteration omitted)); In re Braniff Airways, Inc., 700 F.2d 935, 940 (5th Cir. 1983) (holding that debtor may not use 11 U.S.C. § 363 to sidestep the protection creditors have when it comes time to confirm a plan of reorganization).   The tension is clear—"[d]ebtors need flexibility and speed to preserve going concern value; yet one or more classes of creditors should not be able to nullify Chapter 11's requirements."   In re Chrysler LLC, 576 F.3d 108, 116 (2d Cir.), cert. granted, judgment vacated sub nom. Indiana State Police Pension Trust v. Chrysler LLC, 558 U.S. 1087, 130 S. Ct. 1015 (2009) and vacated sub nom. In re Chrysler, LLC, 592 F.3d 370 (2d Cir. 2010).

This Court addressed this friction in In re Pub. Serv. Co. of New Hampshire, 90 B.R. 575, 582 (Bankr. D.N.H. 1988), holding that it must apply a greater level of scrutiny to a proposed transaction the closer it is to the heart of the reorganization process.  It found that the appropriate standard for approval of a transaction that essentially reorganizes the debtor outside the confirmation process is:

> whether good cause has been shown to implement the transaction of this stage of this proceeding i.e., does it have valid business reasons supporting it and does it make good sense in the overall context of the reorganization process? Phrased negatively, the standard might be whether the proposed transaction might improperly and indirectly lock the estate into any particular plan mode prematurely, and without the protection afforded by the procedures surrounding a disclosure statement and confirmation hearing, in a plan of reorganization.

Id. at 581.  Factors that may help the Court assess the business sense and reason for the proposed transaction include:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis

23

any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

In re Lionel Corp., 722 F.2d at 1071.  The Court must also find that creditors were afforded the following protections provided through the plan confirmation process:

> (1) The right of creditors to receive a disclosure statement;
>
> (2) The power of creditors holding claims in an impaired class to vote;
>
> (3) The entitlement of dissenting creditors and equity interest holders to a return equal to or greater than that which they would receive in a liquidation pursuant to chapter 7;
>
> (4) The absolute priority rule; and
>
> (5) The ability of all parties-in-interest to be heard at a confirmation hearing as to matters affecting confirmation, including good faith, continuance of management, and feasibility.

In re Isaacson Steel, Inc., Bk. No. 11-12415-JMD, 2013 WL 5428725, at *5 (Bankr. D.N.H. Sept. 25, 2013) (quoting In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 881 (Bankr. S.D.N.Y. 1990)); see also Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.), 43 F.3d 714, 720 (1st Cir. 1994) (noting that 11 U.S.C. § 363(b)(1) mirrors the court's duty under 11 U.S.C. § 1129 to independently scrutinize the debtor's reorganization plan).

Notably, section "363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse." See In re Tidal Const. Co., Inc., 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009).  The Bankruptcy Code defines an "insider" as any director, officer, general partner, or person in control of the debtor as well as relatives of any such persons.  See 11 U.S.C. § 101(31)(B).  Insider status may also be found where and individual or entity has a relationship "close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties."    Friedman v. Sheila Plotsky Brokers, Inc. (In re

Friedman), 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991); see Schreiber v. Stephenson (In re Emerson), 244 B.R. 1, 31-32 (Bankr. D.N.H. 1999) ("The legislative history of 11 U.S.C. § 101(31) states that '[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'"). In this context, higher scrutiny requires a debtor to demonstrate "that the assets are being sold for the highest price attainable" and " that [the] insider transaction is the result of bona fide arm's length transaction[] and not driven by other factors." In re Tidal Const. Co., Inc., 446 B.R. at 624.

A. The Sale Procedures Afforded Creditors the Same Substantive Protections as the Confirmation Process

Section 1125 of the Bankruptcy Code requires that plan proponents provide creditors and parties in interest a disclosure containing adequate information to allow the holder of a claim to make an informed judgment about the plan. 11 U.S.C. § 1125. Therefore, because the proposed sale of substantially all of the Debtor's assets is the functional equivalent of a plan, the creditors and parties in interest were entitled to the functional equivalent of a disclosure statement. Here, creditors and parties in interest received the Sale Procedures Motion, the stalking horse bid, and the Notice of Sale Procedures, Auction Date, and Sale Hearing which expressly referenced the Sale Procedures Order. These documents laid out the relevant terms and procedures associated with the sale, and outlined the impact on the estate. The Court finds that creditors received adequate disclosure to determine whether they wished to object to the sale.

Next, pursuant to 11 U.S.C. § 1126, holders of a claim or interest may vote to accept or reject a plan. 11 U.S.C. § 1126. While creditors did not have the right to vote on the sale *per se*, they did have the right to file objections to both the Sale Procedures Motion and to the approval of the sale. The deadlines for doing so were noticed far in advance, and only Mission opted to do so. Under the circumstances, the Court finds that 11 U.S.C. § 1126 is satisfied. See In re

Isaacson Steel, Inc., 2013 WL 5428725, at *7 (finding the right to object to a proposed settlement was the functional equivalent to voting).

Similarly, creditors have the right to be heard at a confirmation hearing with respect to matters affecting confirmation.  Here, the Court conducted hearings on the Sale Motion on September 18, 2015, and October 2, 2015, and a two day evidentiary hearing with respect to the proposed sale on November 18, 2015 and November 23, 2015.  All hearings were appropriately noticed.  Interested parties appeared and were heard both in support and opposition of the proposed sale.

Section 1129(b)(2)(B)(ii) of the Bankruptcy Code requires fair and equitable treatment for a class of impaired creditors that have not accepted the plan by mandating that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii). This provision is known as the absolute priority rule.  Mission contends that the proposed sale violates the absolute priority rule because S&S will retain its equity interests while Mission, an unsecured creditor, will receive nothing.  Mission's objection is factually incorrect because S&S will not retain its equity interest or receive any distribution on account of it, but is instead purchasing the Debtor's assets.  Therefore, the absolute priority rule is not implicated.

A Chapter 11 plan may not unfairly discriminate among creditors of the same class.  11 U.S.C. § 1123(a)(4).  The United States Court of Appeals for the First Circuit has specifically held that "all creditors of equal rank with claims against the same property should be placed in the same class."  Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund, 748 F.2d 42 (1st Cir. 1984).  Mission argues that is precisely what the proposed sale fails to do as essentially all uncontested prepetition unsecured creditors will be paid through the

proposed sale while Mission will receive nothing.  Again, Mission mischaracterizes the effect of

the proposed sale.  Admittedly, many creditors of the same class as Mission will receive

payment, but that is only because S&S has assumed those liabilities as part of the consideration

for the S&S Bid.  The assumption of liabilities is common practice and there are sound business

reasons why some are assumed while others are not.  This is particularly the case where a

purchaser of the debtor's assets may wish to continue doing business with certain prepetition

creditors.  Notably, the proposed sale in this case is distinguishable from In re CGE Shattuck,

LLC, 254 B.R. 5, 11 (Bankr. D.N.H. 2000), where a plan opponent used the promise of a

discriminatory distribution to secure votes against a plan of reorganization.  In sum, the Court

finds that S&S's assumption of liabilities does not constitute an attempt to circumvent the

Bankruptcy Code.

The final substantive protection is that the holders of claims in a class that has rejected

the plan must "receive or retain under the plan on account of such claim or interest property of a

value, as of the effective date of the plan, that is not less than the amount that such holder would

so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . ."

11 U.S.C. § 1129(a)(7).  As will be discussed in greater detail below, unsecured creditors would

almost certainly receive nothing in a liquidation, while in comparison $50,000 of postpetition

accounts payable and approximately $657,000 of prepetition unsecured debt will be assumed by

S&S as part of the sale.

    B. The Proposed Sale Has a Valid Business Reason and Makes Good Sense in the
     Overall Context of the Reorganization

Under the present circumstances, the business reason to proceed with the proposed sale is

apparent—there is likely no alternative that will yield any benefit to the Debtor's creditors.  By

all accounts, the Debtor is administratively insolvent and cannot continue in Chapter 11 without

DIP Financing.  If the proposed sale is rejected, it is unlikely S&S will continue to fund the reorganization.  Based on his investigation and observations, the Examiner has concluded that unless the sale is consummated quickly, the value of the Debtor and its assets will continue to decline.  Given that S&S holds a secured claim in excess of $5,500,000, there would be no funds available for distribution in a Chapter 7 liquidation.  In contrast, the proposed sale not only provides for the payment of most of the Debtor's unsecured debt, but also provides a pool of assets for the estate from which additional claims may be paid through a future liquidating plan.  Therefore, in this context, a pre-confirmation sale pursuant to 11 U.S.C. § 363(b) is a logical vehicle to attempt to maximize the Debtor's value as a going concern.

The Court finds that the marketing of the Debtor's assets was sufficient and appropriate under facts of this case.  Phoenix engaged in extensive marketing efforts which consisted of contacting over 160 prospective buyers that it identified using databases customarily used by investment bankers.  These prospective buyers were targeted based on their business interests in an attempt to find a buyer in the same, similar, or related industry for a synergistic match.  Notwithstanding these efforts, only five entities executed nondisclosure agreements to gain access to the confidential data room and only two submitted qualified bids.  While Phoenix did adhere to a "do not contact" list given by the Debtor, the Debtor's rationale for doing so— concern that marketing would have jeopardized outstanding and future contracts—was reasonable and there is no evidence that it negatively impacted the sale process.  To the contrary, the responses given by parties who declined to bid indicate that there was a common perception that there was little value in the sale, particularly in light of the Debtor's history of losses, S&S's credit bid, and the concern regarding the defensibility of the Debtor's intellectual property rights

against Mission.  These observations support Colistra's conclusion that an additional sixty days of marketing and due diligence would not have yielded a different result.

Contrary to Mission's assertions, there is no evidence in the record establishing any misconduct or collusion in the sale process by the Debtor and S&S.  Stebbins credibly testified that when it became apparent that a workout would be necessary, both Stebbins and Schleicher resigned from the management committee, the Debtor and S&S each retained independent counsel, and Stebbins took no further part in the Debtor's operations.   His testimony was supported by that of McCarthy and Ferdinand, who each testified that Stebbins was not involved with the Debtor's operations post-resignation or otherwise exerting any undue influence into the Chapter 11 process.

Mission protests that S&S, through Stebbins, has on numerous occasions dictated the terms of important transactions, such as the forbearance agreement and stalking horse bid, and the Debtor has simply acquiesced without negotiation.   This, however, is not a proper characterization of the record.  While the salient terms of the forbearance agreement and stalking horse bid may have been initially discussed at the meeting held on July 13, 2015, the uncontroverted testimony is that the details of those agreements were negotiated later by their respective counsel.   The Court further notes that agreement to a proposal, by itself, is not evidence of undue influence or collusion where the proposal is attractive and fair from the Debtor's perspective.  This is particularly true where a debtor's financial status has left it with few options.

Mission points to several alleged flaws in the sale process that rendered the Auction unfair, but upon review, the Court discerns no prejudice.  First, Mission argues that the stalking horse bid should not have been accepted because the full amount of the DIP Financing had not

been advanced until a week before the Auction.  Although it is technically true that S&S's stalking horse bid was underfunded at the time the Debtor accepted it, the issue was resolved prior to the Auction when the Debtor requested the full amount of the DIP Facility in accordance with its budgeted needs.  Second, Mission complains that the Debtor engaged in off the record bid negotiations with S&S, but that was consistent with the announced procedures and Mission failed to explain how these negotiations tainted the Auction.  Third, Mission objects to the Debtor's mid-Auction revaluation of the Debtor's assets—specifically the inventory and accounts receivable—as having been done purposely to devalue Mission's bids.  To the extent that the same discount factor applied to both parties' bids, Mission remained on equal footing with S&S and its objection is ill-taken.

Mission asserts that collusion and misconduct are apparent by the Debtor's constant inflation of the S&S Bid's value, but simple math refutes this argument.  Both the S&S Bid and the Mission Bid contain three of the same components: (i) $600,000 of the Debtor's cash to be left in the estate; (ii) $80,000 of the Debtor's accounts receivable to be left in the estate; and (iii) $120,000 of the Debtor's inventory to be left in the estate.  Mission, however, contends that S&S cannot bid the Debtor's cash because that amount is already embodied in S&S's $750,000 credit bid of the DIP Facility.  The DIP Financing, Mission explains, was not actually a loan until S&S agreed to leave the funds in the estate.  Ironically, if, as Mission says, the DIP Financing was not a loan, then the Debtor's cash position must be adjusted to reflect that no loan occurred, meaning that the $600,000 would not be in the estate for Mission to bid.  Put simply, either the $600,000 is an asset of the estate with a corresponding liability for the DIP Facility, or it is not.  Indeed, the transfer cannot be characterized one way for the Mission Bid and another for the S&S Bid.

As such, Mission, by bidding the Debtor's cash, waived any argument that it was improperly advanced.

Mission's challenge to S&S's prepetition credit bid of $443,000 is equally without merit. Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, *unless the court for cause orders otherwise* the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).  "The right to credit bid is not absolute," and the Bankruptcy Code "plainly contemplates situations in which estate assets encumbered by liens are sold without affording secured lenders the right to credit bid."  In re Phila. Newspapers, LLC, 599 F.3d 298, 315 (3d Cir. 2010), as amended (May 7, 2010).  Courts have recognized inequitable conduct as cause to limit credit bidding, see, e.g., In re Free Lance-Star Publ'g Co. of Fredericksburg, VA, 512 B.R. at 806, but it is not necessary.  See In re Philadelphia Newspapers, LLC, 599 F.3d at 316 n.14 (3d Cir. 2010) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.").  Courts have also denied the right to credit bid where "a sufficient dispute exists regarding the validity of the lien forming the basis for a credit bid."  In re Merit Grp., Inc., 464 B.R. 240, 252 (Bankr. D.S.C. 2011); see In re Fisker Auto. Holdings, Inc., 510 B.R. 55, 61 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a valid lien of which has not yet been determined, as here, may not bid its lien."); In re Medical Software Sols., 286 B.R. 431, 442 (Bankr. D. Utah 2002) (credit bidding permitted only if creditor has a valid security interest).

As the Court has repeatedly stated, the record is devoid of any facts to establish S&S engaged in any inequitable conduct.  Mission has also failed to demonstrate a compelling reason why S&S's credit bidding rights should be limited.  Although some prospective purchasers declined to bid based on S&S's ability to credit bid, others cited the uncertainty of Mission's rights to the Debtor's intellectual property as a chilling factor.  Couple those economic realities with the Debtor's history of losses, and it is not surprising that S&S and Mission, the two parties with the biggest stakes in the game, were the only bidders.

The Court is also unpersuaded that S&S's secured claim is subject to a bona fide dispute.  On Schedule D, the Debtor listed S&S as holding a secured claim in the amount of $5,550,000.  Although S&S has not filed a proof of claim, "[a] proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(a)(1) or 1106(a)(2)" that is not "scheduled as disputed, contingent, or unliquidated."  11 U.S.C. § 1111(a).  Despite Mission's persistent refrain that S&S's secured claim is invalid, Mission never filed an objection to the claim.  Instead, Mission challenged S&S's ability to credit bid the claim in the Auction based on objections that have never been asserted.  For this reason, the Court cannot find that the validity of S&S's secured claim is sufficiently in dispute to warrant a limitation of its bidding rights.

As a final basis to challenge S&S's right to credit bid its prepetition debt, Mission argues that cause exists to recharacterize the debt as equity, and as such, S&S's credit bid should be limited to necessary postpetition advances.[10]  Every circuit court of appeals to consider the issue has upheld a bankruptcy court's equitable authority under 11 U.S.C. § 105(a) to recharacterize

---

[10] Unlike Mission's proposed findings, which limits the requested relief to denying S&S the right to credit bid based on the existence of cause to recharacterize its debt, the prayer for relief contained in Mission Product Holdings, Inc.'s Objection to Conduct of Auction and Sale specifically requests that the Court actually recharacterize the debt. Regardless of the extent of the relief Mission requests, the Court finds that Mission has failed to sustain its burden.

debt as equity.  See Fairchild Dornier GmbH v. Official Committee of Unsecured Creditors (In re Official Committee of Unsecured Creditors for Dornier Aviation (North Am.), Inc.), 453 F.3d 225, 231 (4th Cir. 2006); Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 455 (3d Cir. 2006); Sender v. The Bronze Group, Ltd. (In re Hedged–Invs. Assoc., Inc.), 380 F.3d 1292, 1298 (10th Cir. 2004); Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726, 748 (6th Cir. 2001); Estes v. N & D Props., Inc. (In re N & D Props., Inc.), 799 F.2d 726, 733 (11th Cir. 1986).  To determine whether to recharacterize debt as equity, this Court has previously applied the multi-factor test enunciated in In re AtlanticRancher, Inc., 279 B.R. at 433, and Blasbalg v. Tarro (In Hyperion Enters., Inc.), 158 B.R. 555, 561 (D.R.I. 1993).  In re Felt Mfg. Co., Inc., 371 B.R. 589, 629 (Bankr. D.N.H. 2007); In re Micro-Precision Techs., Inc., 303 B.R. 238, 246 (Bankr. D.N.H. 2003).  These factors include:

(1) The adequacy of capital contributions;

(2) The ratio of shareholder loans to capital;

(3) The amount or degree of shareholder control;

(4) The availability of similar loans from outside lenders;

(5) Certain relevant questions, such as

    a. whether the ultimate financial failure was caused by undercapitalization;

    b. whether the note included payment provisions and a fixed maturity date;

    c. whether a note or other debt document was executed;

    d. whether advances were used to acquire capital assets; and

    e. how the debt was treated in the business records.

In re Hyperion Enters., Inc., 158 B.R. at 561; In re AtlanticRancher, Inc., 279 B.R. at 434.  No one factor is decisive, and the more a transaction appears to reflect the characteristics of an arm's length negotiation, the more likely it will be treated as debt.  In re Micro-Precision Techs., Inc., 303 B.R. at 247.

The Court notes the record before it is sparse and does not include the relevant loan documents.  Instead, Mission relies solely on the testimony of witnesses to make its case.  In its submissions, Mission proposed the following finding in support of recharacterization:

> Testimony regarding the Debtor's financial history indicates that it was inadequately capitalized, substantially controlled by Stebbins, and S&S's loan (the Debtor's primary alleged debt) mirrored its controlling equity position. Moreover, at the time of the creation of the Secured Line, no conventional lender would have loaned the Debtor money and thus no loan similar to the Secured Line was available from an outside lender.

Mission Product Holdings, Inc.'s Proposed Findings of Fact, Conclusions of Law, Orders for Relief, Doc. No. 278 at ¶ 106.  In the first instance, the record does not support the assertion that the Debtor was substantially controlled by Stebbins.  While Stebbins was a member of the management committee whose opinion was valued by the Debtor's management, he credibly testified that he has never been involved in the Debtor's operations.  The remainder of the allegations make out a weak case at best.

Mission's showing for recharacterization is even more anemic when one balances the total amount of S&S's secured claim—$5,500,000—against the amount of the prepetition credit bid—only $443,000.  In order to make a practical difference in this case, S&S's claim would have to be almost completely recharacterized as equity.  The Examiner, who conducted an independent investigation into this possibility, concluded that, at best, only $2,000,000 may be vulnerable to recharacterization and the remaining $3,500,000 is not.  Ultimately, Mission has

failed to sustain its burden of showing that S&S's debt should be recharacterized in any amount, for any purpose.

The final component of the S&S Bid that Mission attacks is the assumption of prepetition unsecured debt in the aggregate amount of $657,000.  Although it is not entirely clear why, Mission insists that this consideration is too vague and uncertain to be ascribed any value. Presumably, the basis for this assertion is Stebbins' testimony that he did not know which liabilities would be assumed and his understanding that the amount was approximately $600,000. The bid, as articulated at the Auction, was:

> [S&S] would assume all pre-petition liabilities except for those liabilities that are scheduled as disputed or that are as a result of rejection damages claims.  And for those that are unliquidated or contingent but not disputed, they would assume those debts at the scheduled amount, the debtor's scheduled amount.  The debtor's schedules reflect that this would be a value of $657,000.

Exhibit 104 at 36:13-21.  Even if the Debtor's schedules were somehow vague on this point, the Debtor's revision to Exhibit 3.1 of the asset purchase agreement as filed on December 1, 2015 now lists prepetition liabilities totaling $657,278, to be assumed by S&S, by claimant and amount to be paid by S&S.  Therefore, Mission's objection is without merit.

Having addressed all of Mission's objections to the calculation of the S&S Bid, there is little question that the S&S Bid is in fact higher and better than the Mission Bid.  Compared to Mission's Bid of $2,600,000, the S&S Bid provided total consideration of $2,700,000 consisting of the following:

(i) $750,000 credit bid of DIP Facility;

(ii) $657,000 of assumed prepetition unsecured debt at the amount scheduled by the Debtor excluding disputed claims and any rejection damage claim;

(iii) $600,000 of the Debtor's cash to be left in the estate;

(iv) $80,000 of the Debtor's accounts receivable to be left in the estate;

(v) $120,000 of the Debtor's inventory to be left in the estate;

(vi) $50,000 of assumed postpetition accounts payable; and

(vii) $443,000 credit bid of prepetition debt.

Under the totality of the circumstances, the Court finds that the price is fair and reasonable, particularly in light of the diminishing value of the Debtor's assets.

In conclusion, the Court finds that the proposed sale is not a *de facto* plan, that creditors were afforded protections consistent with the statutory safeguards attendant to the Chapter 11 confirmation process, that there is a valid business reason for the proposed sale outside the confirmation process, and that the proposed sale makes good sense in the overall context of the reorganization.

### C. S&S is a Good Faith Purchaser

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not specify what constitutes good faith, courts have consistently defined the term as one who purchases in good faith for value and without knowledge of adverse claims.  See Jeremiah v. Richardson, 148 F.3d 17, 23 (1st Cir. 1998);  Oakville Dev. Corp. v. F.D.I.C., 986 F.2d 611, 614 (1st Cir. 1993); Greylock Glen Corp. v. Community Sav. Bank, 656 F.2d 1, 3–4 (1st Cir. 1981).  "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of

other bidders." In re Cable One CATV, 169 B.R. 488, 493 (Bankr. D.N.H. 1994) (citing In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Rock Indus. Mach. Corp., 572 F.2d 1195 (7th Cir. 1978)).

Based on the findings outlined above, the Court concludes that S&S purchased for value. Despite the repeated invective, Mission has failed to demonstrate that the proposed sale is anything other than an arm's length transaction. There is no evidence of fraud, collusion, or any other tainting of the sale process in the record. To the contrary, the witness testimony reflects that Stebbins and S&S essentially divorced themselves from the Debtor when it became clear that a reorganization was needed. McCarthy and Ferdinand both testified that neither Stebbins nor S&S had any role the Debtor's operations or marketing efforts once Stebbins and Schleicher resigned from the management committee. Colistra, the professional responsible for the Debtor's marketing strategy, testified that Phoenix had no contact with S&S other than to commence stalking horse negotiations when no other could be found. Even if the initial sale proposal pre-dated the involvement of independent counsel, Stebbins, McCarthy, and Ferdinand each credibly testified that no agreement was reached until the details were negotiated by counsel. Notably, the entire sale process was overseen by the Examiner and the United States Trustee, and neither have voiced any concerns or objections. Therefore, the Court finds that S&S is a good faith purchaser entitled to the protection of 11 U.S.C. § 363(m).

**VI. CONCLUSION**

For the reasons stated above, the Objections are without merit and will be overruled. Accordingly, the sale is approved and the Court will enter a separate order consistent with this opinion.   This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

ENTERED at Manchester, New Hampshire.


Dated: December 18, 2015               /s/ J. Michael Deasy
                                        J. Michael Deasy
                                        Bankruptcy Judge