# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                              Bk. No. 15-11400-JMD
                                                                    Chapter 11

Tempnology, LLC,
                    Debtor


**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALLTHE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS PROVIDED IN THE SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT; (B) AUTHORIZING AND APPROVING THE ASSET PURCHASE AGREEMENT; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (D) GRANTING RELATED RELIEF**

This proceeding having come before the Court on November 18, 2015, and November 23, 2015 for evidentiary hearings on the motion (the "Motion") of the above-captioned debtor (the "Debtor") seeking entry of an order (this "Order"), pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code. rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules, and LBR 6004-1, (i)(a) approving procedures in connection with the sale of substantially all of the Debtor's assets; (b) approving the Stalking Horse Protections; (c) scheduling the related auction and hearing to consider approval of sale; (d) approving procedures related to the assumption and assignment of executory contracts and unexpired leases; (e) approving the form and manner of notice thereof; and (f) granting related relief; and (ii)(a) authorizing the sale of such assets free and clear of liens, claims, encumbrances. and other interests, except as provided by an asset purchase agreement; (b) approving the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases related thereto; and (c) granting related relief, and the Court having issued its memorandum opinion of even date,

IT IS HEREBY ORDERED THAT:

1

1. The Motion is GRANTED.

2. All objections to the Motion, including the objections contained in the Mission Product Holdings, Inc.'s Challenge to Credit Bid of Pre-Petition Credit of Schleicher & Stebbins Hotels, LLC [Docket No. 241] and (ii) Mission Product Holdings, Inc.'s Objection to Conduct of Auction and Sale. as amended [Docket No. 246], that have not been overruled, withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied in their entirety. For purposes of clarity, the Court rules that (i) the chapter 11 case was not filed in bad faith, (ii) the contemplated sale is for adequate and reasonable consideration, (iii) that the sale does not constitute a sub rosa plan, and (iv) that in connection with the Auction and the DIP Financing, Schleicher & Stebbins Hotels, L.L.C. ("S&S" or the "Successful Bidder") acted at all times in good faith and arms' length and did not act in bad faith.

3. The Successful Bidder's offer for the assets ("Assets") to be sold, as embodied in the Successful Bidder's Purchase Agreement, annexed hereto as Exhibit 1, is the highest or best offer for the Assets under the circumstances of this case and is hereby approved.

4. The Successful Bidder's Purchase Agreement is hereby approved pursuant to section 363(b) of the Bankruptcy Code and the Debtor is authorized to consummate and perform all of its obligations under the Successful Bidder's Purchase Agreement and to execute such other documents and take such other actions as are necessary or appropriate to effectuate the Successful Bidder's Purchase Agreement.

5. Pursuant to section 363(f) of the Bankruptcy Code, the Assets are being sold and transferred free and clear of all liens. claims, interests, and encumbrances (collectively. The "Liens") except as otherwise provided in the Successful Bidder's Purchase Agreement, with any and all such Liens to attach to proceeds of such sale with the same validity, priority, force, and

effect such Liens had on the Assets immediately prior to the sale and subject to the rights, claims, defenses, and objections, if any, of the Debtor and all interested parties with respect to any such asserted Liens, provided, however, the sale of the Assets shall not be free and clear of claims Mission Product Holdings, Inc. may have pursuant to 11 U.S.C. § 365(n) as determined by a final non-appealable order by a court of competent jurisdiction.

6. Except as expressly permitted by the Successful Bidder's Purchase Agreement as to any Liens, all persons and entities. including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities (to the fullest extent allowed by applicable law), lenders, trade creditors, contract counterparties, customers, landlords, licensors, employees, litigation claimants, and other persons, holding Liens of any kind or nature whatsoever against or in the Debtor or the Debtor's interests in the Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this chapter 11 case, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with. or in any way relating to, the Debtor, the Assets, the operation of the Debtor's business before the closing under the Successful Bidder's Asset Purchase Agreement or the transfer of the Debtor's interests in the Assets to the Successful Bidder, shall not assert, prosecute, or otherwise pursue any Liens against the Successful Bidder, its property (including, without limitation. the Assets), its successors and assigns, or interfere with the Successful Bidder's title to, use, or enjoyment of the Assets, in each case, without first obtaining an order of this Court after notice and a hearing permitting such Lien to proceed.

7. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the sale by the Debtor to the Successful Bidder of the Assets and transactions related thereto, upon the closing under the Successful Bidder's Purchase Agreement, are authorized and approved in all respects.

8. Pursuant to section 365 of the Bankruptcy Code, the assignment and assumption of the Assumed Contracts, as identified in the Successful Bidder's Purchase Agreement, by the Successful Bidder, is hereby authorized and approved in all respects.  To the extent necessary or required by applicable law, the Debtor or the Successful Bidder, as applicable, has or will have as of the closing date: (i) cured, or provided adequate assurance of cure, of any default existing prior to the closing date with respect to the Assumed Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (ii) provided compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The respective amounts set forth on Exhibit 2 hereto (subject to the adjustments that may be made as expressly noted on Exhibit 2 hereto) are the sole amounts necessary under sections 365(b)(l)(A) and 365(f)(2)(A) of the Bankruptcy Code to cure all such monetary defaults and pay all actual pecuniary losses under the Assumed Contracts.

9. No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Successful Bidder's Asset Purchase Agreement, the Motion or this Order.

10. This is a final order and is enforceable upon entry and to the extent necessary under Rules 5003, 9014, 9021 and 9022 of the Bankruptcy Rules. This Court expressly finds and rules that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein and the stay imposed by Bankruptcy Rules 6004(h) and

4

6006(d) are hereby waived and this Order shall be effective immediately upon its entry and the Debtor is hereby authorized and directed to consummate the sale of the Assets to the Successful Bidder and to take any other acts required or contemplated under the Successful Bidder's Asset Purchase Agreement.

11. The terms of this Order shall be binding on the Successful Bidder and its successors, the Debtor, creditors and equity interest holders of the Debtor, and all other parties in interest in the Debtor's chapter 11 case, including but not limited to, all persons asserting a claim against or interest in the estate or any of the Assets to be sold, conveyed or assigned to the Successful Bidder pursuant to the Successful Bidder's Asset Purchase Agreement, and any successors of the Debtor, including any trustee or examiner appointed in this case or upon a conversion of this case to chapter 7 of the Bankruptcy Code, and the terms of this Order shall survive and be binding in the event of any dismissal of this case.

12. The Successful Bidder is a good faith purchaser entitled to the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

13. The Purchase Price to be paid for the Assets, as set forth in the Successful Bidder's Asset Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

14. Except as expressly set forth in the Successful Bidder's Asset Purchase Agreement, the Successful Bidder shall have no successor or vicarious liabilities of any kind or character. Neither the purchase of the Assets by the Successful Bidder nor the subsequent operation by the Successful Bidder of any business previously operated by the Debtor, shall cause the Successful Bidder to be deemed a successor in any respect to the Debtor's business within the meaning of any law, rule or regulation. including but not limited to any revenue, pension, ERISA, tax, labor

or environmental law, rule or regulation or under any products liability law with respect to the Debtor.

15. With respect to the transactions consummated pursuant to this Order, this Order shall be sole and sufficient evidence of the transfer of title to any particular purchaser, and the sale transaction consummated pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Order, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials, and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

16. The provisions of this Order are non-severable and mutually dependent.

17. Nothing contained in any plan of reorganization (or liquidation) confirmed in this case or the order of confirmation confirming any such plan of reorganization (or liquidation) shall conflict with or derogate from the provisions of the Successful Bidder's Asset Purchase Agreement or the terms of this Order.

18. This Court retains jurisdiction to interpret, implement, and enforce the provisions of, and resolve any disputes arising under or related to, this Order and the Successful Bidder's Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith.

19. The failure specifically to include any particular provisions of the Successful Bidder's Purchase Agreement or any of the documents, agreements, or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement or instrument, it being the intent of the Court that the Successful Bidder's Purchase Agreement and each document, agreement, or instrument be authorized and approved in its entirety.

20. The Successful Bidder's Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification. amendment. or supplement does not have a material adverse effect on the Debtor's estate.

21. The Successful Bidder has the ability to credit bid its pre-petition secured claim for the Assets pursuant to section 363(k) of the Bankruptcy Code.

ENTERED at Manchester, New Hampshire.

Dated: December 18, 2015                /s/ J. Michael Deasy
                                        J. Michael Deasy
                                        Bankruptcy Judge

Exhibit 1 to Sale Order

**Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of September 1, 2015, by and between Tempnology LLC, a limited liability company organized and existing under the laws of the State of New Hampshire (the "**Seller**") and Schleicher & Stebbins Hotels, L.L.C., a limited liability company organized and existing under the laws of the State of New Hampshire (including its assignees, the "**Purchaser**" and together with the Seller, each, a "**Party**" and, collectively, the "**Parties**").

**WHEREAS**, on September 1, 2015, the Seller filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") and, as of the date hereof, the Seller continues in possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, the Purchaser desires to purchase all assets of the Seller (other than the Excluded Assets) and to have the right to accept the assignment of certain contracts of the Seller, and the Seller desires to sell such assets and assign such contracts, if any, to the Purchaser, on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the promises set forth herein and in consideration of the representations, warranties, and covenants herein contained, and for other good and valuable consideration described herein, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

"**Acquired Assets**" shall have the meaning set forth in Section 2.1.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"**Allocation**" shall have the meaning set forth in Section 3.3.

"**Alternative Proposal**" shall have the meaning set forth in Section 5.3(b).

"**Alternative Transaction**" shall mean a single transaction or a series of transactions involving a sale of all or substantially all of the Acquired Assets to a Third Party either pursuant to the sale process described in the Sale Procedures Order or to a Third Party that submitted a Qualified Bid (as defined in the Sale Procedures Order) provided that the sale is consummated on or before November 20, 2015, and further provided that the gross proceeds from such sale at closing are equal to or greater than the sum of what the Purchase Price would have been plus $100,000.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Ancillary Agreements**" means the Bill of Sale and the Assignment Agreement attached as **Exhibits A** and **B**.

"**Approval Order**" shall have the meaning set forth in Section 5.1(b).

"**Assigned Contracts**" shall mean the executory contracts, including leases, of the Seller set forth in **Exhibit 2.1**.

"**Assigned Permits**" shall mean the permits identified on **Exhibit C**.

"**Assignment Agreement**" shall have the meaning set forth in Section 4.2(a).

"**Assumed Liabilities**" shall have the meaning set forth in Section 2.3.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended, and as codified in 11 U.S.C. Section 101, et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Hampshire.

"**Bill of Sale**" shall have the meaning set forth in Section 4.2(a).

"**Business**" means any and all business activities of any kind that are conducted by the Seller.

"**Business Day**" means any day except a Saturday, a Sunday or other day on which commercial banks are required or authorized to close in New Hampshire.

"**Certified Closing Reports**" shall have the meaning set forth in Section 3.1.

"**Chapter 11 Case**" means the Chapter 11 case of the Seller filed on September 1, 2015 in the Bankruptcy Court.

"**Charges**" shall have the meaning set forth in Section 12.2.

"**Claim**" means any claim, lawsuit, cause of action, demand, suit, inquiry made, hearing, investigation, notice of violation, litigation, proceeding, arbitration, or other dispute, whether civil, criminal, administrative or otherwise, including, without limitation, any and all claims as defined in section 101(5) of the Bankruptcy Code.

"**Closing**" shall have the meaning set forth in Section 4.1.

"**Closing Date**" shall have the meaning set forth in Section 4.1.

"**Confidentiality Agreement**" means the Confidentiality Agreement, dated August 12, 2015 by and between the Purchaser and the Seller.

"**Dollars**" or "**$**" means the currency of the United States of America, unless otherwise specified.

"**Deposit**" shall have the meaning set forth in Section 3.2.

"**Employee Plans**" means any pension, retirement, savings, disability, medical, dental, health, life (including, without limitation, any individual life insurance policy under which any employee of the Seller is the named insured and as to which the Seller, on behalf of the Business, makes premium payments, whether or not the Seller is the owner, beneficiary or both of such policy), death benefit, group insurance, profit-sharing, deferred compensation, stock option, stock purchase, bonus, incentive, executive compensation, vacation pay, holiday pay, severance pay, collective bargaining agreement, employment or consulting agreement, or other employee benefit plan, trust, arrangement, agreement, policy or commitment, whether or not any of the foregoing is funded or insured and whether written or oral, which is intended to provide or does in fact provide benefits to any or all employees of the Seller, and (i) to which the Seller is party or by which the Seller (or any of the rights, properties or assets of the Seller) is bound; (ii) with respect to which the Seller has made any payments, contributions or commitments, or may otherwise have any liability (whether or not the Seller still maintains such plan, trust, arrangement, contract, agreement, policy or commitment); or (iii) under which any director, employee or agent of the Seller is a beneficiary as a result of his or her employment or affiliation with the Seller.

"**Encumbrances**" means and includes interests, contractual rights, security interests, mortgages, liens, licenses, pledges, guarantees, charges, easements, reservations, restrictions, clouds, equities, rights of way, options, rights of first refusal and all other encumbrances, whether or not relating to the extension of credit or the borrowing of money.

"**Excluded Assets**" shall have the meaning set forth in Section 2.2.

"**Excluded Liabilities**" shall have the meaning set forth in Section 2.3.

"**Expense Reimbursement**" shall mean those amounts paid by the Seller to the Purchaser in cash in an amount equal to such fees, costs and expenses actually and reasonably incurred by the Purchaser in connection with its due diligence investigation of the Seller, the negotiation and execution of this Agreement, the Ancillary Agreements and the transaction contemplated hereby and thereby, including fees and expenses of counsel, financial advisors, accountants, experts, consultants, officers, directors, employees and other representatives or agents of the Purchaser; provided, however, that in no event shall such amount exceed, in the aggregate, $150,000.00.

"**Filing Date**" means September 1, 2015.

"**Governmental Authority**" means any foreign, United States federal, state or local government, political subdivision or governmental, regulatory or administrative authority, body,

agency, board, bureau, commission, department, instrumentality or court, quasi-governmental authority, self-regulatory organization or stock exchange.

"**Intellectual Property**" shall mean intellectual property rights worldwide, including, without limitation, trademarks, service marks, trade names, service names, URLs and Internet domain names and applications therefor (and all interest therein), and general intangibles of like nature, together with goodwill related to the foregoing (including any registrations and applications for any of the foregoing); patents (including any registrations, continuations, continuations in part, renewals and applications for any of the foregoing); copyrights (including any registrations, applications and renewals for any of the foregoing); confidential or proprietary information that derives economic value (actual or potential) from not being generally known to other persons who can obtain economic value from its disclosure; and other proprietary rights recognized under the laws of any jurisdiction in the world in concepts, ideas, designs, plans, schematics, drawings, specifications, software, databases, research and development information, technology and product roadmaps, technology, confidential information, know-how, proprietary technology, processes, formulae, algorithms, models, customer lists, inventions, discoveries, improvements, methodologies, architecture, structure, layouts, and inventions including the foreign and domestic patents, trademarks and trade names listed on the Attachment to Exhibit 2.1.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, together with the Treasury regulations promulgated thereunder.

"**Inventory Parts**" shall have the meaning set forth in Section 8.13.

"**Knowledge**" and similar terms shall mean and refer only to matters actually known or that should have been known to Richard Ferdinand and Kevin McCarthy, and any such knowledge that either Richard Ferdinand or Kevin McCarthy should have had following a reasonable investigation in the course of their duties on behalf of Seller.

"**Law**" or "**Laws**" means any and all statutes, laws, ordinances, proclamations, regulations, orders, decrees, consent decrees and rules of any Governmental Authority, in each case, as amended and in effect from time to time.

"**Leased Property**" shall mean all of the Seller's leasehold interest in the property set forth in **Exhibit I-A**.

"**Lender**" means Schleicher & Stebbins Hotels, L.L.C.

"**Liability**" means any liability or obligation of any nature, whether known or unknown, liquidated or unliquidated, asserted or unasserted, matured or unmatured, fixed or contingent, secured or unsecured, accrued, absolute or otherwise.

"**Liens**" means all liens, claims, judgments, licenses, subleases, encumbrances, mortgages, pledges, security interests, conditional sales agreements, charges, options, rights of first refusal, reservations, restrictions or other encumbrances or defects in title of any kind.

"**Material Adverse Effect**" means the loss or damage of a material portion of the Acquired Assets, whether through accident, misuse, theft, sabotage, natural disaster or other cause.

"**Offer Letters**" shall have the meaning set forth in Section 9.1(k).

"**Ordinary Course of Business**" means the operation of the Business in the ordinary course of business consistent with the Seller's usual and customary practices in managing and operating the Business.

"**Party**" or "**Parties**" shall have the meaning set forth in the Preamble.

"**Person**" means and includes any individual, any legal entity, including, without limitation, any partnership, joint venture, corporation, limited liability company, trust, or unincorporated organization, and any Governmental Authority.

"**Post-Closing Period**" means the period of time commencing with and following the Closing Date.

"**Pre-Closing Period**" means the period of time prior to the Closing Date.

"**Proposed Sale**" shall have the meaning set forth in Section 5.1(a).

"**Purchase Price**" shall have the meaning set forth in Section 3.1.

"**Purchase Protection Superpriority Claim**" shall have the meaning set forth in Section 5.2(b).

"**Purchaser**" shall have the meaning set forth in the Preamble.

"**Purchaser Closing Certificate**" shall have the meaning set forth in Section 10.1(a).

"**Sale Approval Date**" shall have the meaning set forth in Section 5.1(b).

"**Sale Hearing**" shall have the meaning set forth in Section 5.1(a).

"**Sale Procedures**" shall have the meaning set forth in Section 5.1(a).

"**Sale Procedure Order**" shall have the meaning set forth in Section 5.1(a).

"**Secured Loans**" means the outstanding obligations of Seller to Lender as evidenced by that certain Loan and Security Agreement dated June 4, 2013, as amended and in effect as of the Filing Date, together with all related documents and agreements, by and between the Seller and People's United Bank as lender, which, on July 31, 2014, such interest was purchased by and assigned to the Lender and that certain Post-Petition Loan and Security Agreement dated September 1, 2015, by and between the Seller and Lender.

"**Seller**" shall have the meaning set forth in the Preamble.

"**Seller Closing Certificate**" shall have the meaning set forth in Section 9.1(a).

"**Seller's Employee Plans**" means all of the Seller's Employee Plans set forth on **Exhibit I-B**.

"**Tax**" or "**Taxes**" means any foreign, United States federal, state or local income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, including all estimated taxes, deficiency assessments and any interest, penalty or addition thereto.

"**Third Party**" shall mean any Person other than the Seller, the Purchaser or any of their respective Affiliates.

"**Transferred Employees**" shall have the meaning set forth in Section 8.8(a).

# ARTICLE II

## PURCHASE AND SALE OF ACQUIRED ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Acquired Assets.  Subject to and upon the terms and conditions of this Agreement, the Purchaser shall purchase from the Seller, and the Seller shall grant, transfer, sell, convey, assign and deliver to the Purchaser, as a good faith purchaser for value within the meaning of Section 363(m) of the Bankruptcy Code, free and clear of all claims, Liens and Encumbrances, all rights, title and interest of the Seller in and to all of its assets, properties and businesses, wherever located, as the same existed immediately prior to the Closing, excluding only the Excluded Assets (collectively, the "**Acquired Assets**").  The Acquired Assets include, but are in no way limited to, the items set forth on **Exhibit 2.1**.  At any time before the Closing, the Purchaser may add one or more contracts or leases to the Assigned Contracts list set forth in **Exhibit 2.1**.  In the event any Assigned Contracts are assigned to the Purchaser, the Purchaser shall be responsible for payment of any and all cure costs relating to the assignment of any such Assigned Contracts and shall be responsible for any and all other obligations arising out of the assignment as provided for by section 365 of the Bankruptcy Code.

Section 2.2    Excluded Assets.  Notwithstanding Section 2.1, the Seller will not be required to sell or transfer to the Purchaser, and the Acquired Assets shall not include, the assets or any right or interest in or to any of the assets specifically set forth on **Exhibit 2.2** (collectively, the "**Excluded Assets**").

Section 2.3    No Assumption of Liabilities.  Except as expressly set forth in this Section 2.3, the Purchaser shall not assume and under no circumstance shall the Purchaser be obligated to pay, perform or discharge, and none of the Acquired Assets shall be or become liable for or subject to, any Liabilities or other obligations of the Seller ("**Excluded Liabilities**").  The Purchaser shall perform and discharge, when due, to the extent existing on or after the Closing: (i) all obligations and other Liabilities under or relating to the Assigned Contracts, if any, and the

Assigned Permits; (ii) the Liabilities for Transferred Employees as described in Section 8.8; (iii) prepetition general unsecured debt at the amount scheduled by the Seller in the aggregate amount of approximately $657,000 excluding prepetition debt scheduled as disputed and any rejection damage claim and (iv) postpetition trade accounts payable of approximately $50,000 (excluding rejection damages claims or alleged litigation claims); (v) all obligations and other Liabilities of the Seller relating to any of the taxes, charges, fees and expenses that the Purchaser is required to bear and pay pursuant to Section 12.2; and (vi) all cure costs arising under Section 365(b) of the Bankruptcy Code (collectively, the "**Assumed Liabilities**"). All other Liabilities of the Seller shall remain the sole responsibility of the Seller and shall be retained, paid, performed and discharged, if at all, solely by the Seller.

## ARTICLE III

### PURCHASE PRICE;
### PAYMENT OF PURCHASE PRICE; DEPOSIT:
### ALLOCATION OF PURCHASE PRICE

Section 3.1     Purchase Price; Payment of Purchase Price. As consideration for the sale, conveyance, transfer and assignment of the Acquired Assets, the Purchaser will deliver, or cause to be delivered to Seller pursuant to Section 363(k) of the Bankruptcy Code, an acknowledgement that it has accepted title to the Acquired Assets in satisfaction of $1,193,000 of the Seller's outstanding obligations to Lender pursuant to the Secured Loans, comprising of $443,000 of the Lender's prepetition secured debt and $750,000 of the Lender's postpetition secured debt..

The amount set forth above, together with the Assumed Liabilities, shall be referred to herein as the "**Purchase Price**".

The Purchase Price equals $1,900,000.00, calculated as reflected on **Exhibit 3.1** hereto.

Section 3.2     [RESERVED]

Section 3.3     Allocation of the Purchase Price. The Purchase Price shall be allocated among the Acquired Assets and, to the extent appropriate, the Ancillary Agreements as of the Closing Date in accordance with **Exhibit 3.3** (the "**Allocation**"). The Allocation will be determined in a manner consistent with this Section 3.3 and Section 1060 of the Internal Revenue Code. For all Tax purposes, the Purchaser and the Seller agree to report the transactions contemplated in this Agreement in a manner consistent with the terms of this Agreement, including the Allocation under **Exhibit 3.3**, except as provided below, and that neither Party will take, or permit any of its Affiliates or representatives to take, any position inconsistent therewith in any Tax return, in any refund claim, in any Tax litigation, or otherwise except as required by a final determination within the meaning of Section 1313(a) of the Internal Revenue Code or any equivalent provision of any applicable state or local Law. Each Party will promptly provide the other Party with any additional information required to complete Form 8594 if the filing of such form is required. Each Party will timely notify the other Party, and will timely provide the other Party with assistance, in the event of an examination, audit or other proceeding regarding the Allocation.

**ARTICLE IV**

**CLOSING**

Section 4.1    Closing.  Subject to the terms and conditions of this Agreement and the sale order, the closing of the purchase and sale of the Acquired Assets (the "**Closing**") will be at 1:00 P.M. Eastern Standard Time at the offices of Nixon Peabody LLP located at 900 Elm Street, Manchester, NH 03101, or at such other time and location agreed to by the Purchaser and the Seller, on the second Business Day following the satisfaction or waiver of the last to be satisfied or waived of the conditions set forth in Articles IX and X (other than those conditions that by their nature are to be satisfied at the Closing) (the date of the Closing being herein referred to as the "**Closing Date**").

Section 4.2    Deliveries by the Seller at the Closing.  At the Closing, the Seller will deliver, or cause to be delivered, to the Purchaser:

(a)    (i) a bill of sale (the "**Bill of Sale**") and (ii) an assignment agreement (the "**Assignment Agreement**"), substantially in the forms of **Exhibit A** and **Exhibit B**, respectively, each executed by Seller;

(b)    a domain name assignment agreement substantially in the form of **Exhibit C**, executed by Seller;

(c)    a trademark assignment agreement substantially in the form of **Exhibit D** and a patent assignment agreement substantially in the form of **Exhibit E**, each executed by Seller;

(d)    a certified resolution of the Board of Directors and members of the Seller authorizing the sale of the Acquired Assets, the execution and delivery of this Agreement, the Ancillary Agreements and all other documents and agreements delivered in connection herewith by officers of the Seller and consummation of the transactions contemplated hereby and thereby;

(e)    physical possession of all of the Acquired Assets wherever located;

(f)    evidence that the Seller has changed its name to one that does not incorporate either of the words "Tempnology" or "Coolcore";

(g)    possession and physical occupancy of the Leased Property together with all keys to the structures located on such Leased Property in Seller's possession;

(h)    evidence of payment by Seller of an estimate of all real property and personal property Taxes, assessments and similar charges to be levied with respect to the Acquired Assets for the Pre-Closing Period, in accordance with Section 8.6; and

(i)    the documents described in Sections 9.1(a) and 9.1(k).

Section 4.3     Payment of the Purchase Price.   At the Closing, in accordance with Section 3.1, the Purchaser will  tender to Seller a counter signed Bill of Sale pursuant to which the Purchaser expressly acknowledges that it is receiving marketable title to the Acquired Assets as payment of $1,193,000 of the amount then due and owing from Seller to Lender under the Secured Loans.

Section 4.4     Further Assurances.

(a)     Each Party will from time to time, at the reasonable request of any other Party, execute and deliver such other instruments of conveyance and transfer and such other instruments, documents and agreements and take such other actions as such other Party may reasonably request or as may be reasonably requested by any applicable Governmental Authorities or third parties, in each case in order to consummate and make effective any of the transactions contemplated hereby and to vest in the Purchaser the right, title and interest in, to and under the Acquired Assets, to assist the Purchaser in the transfer, assignment, collection and reduction to possession of the Acquired Assets (and the exercise of rights with respect thereto); provided that the requesting Party will prepare any additional documents and instruments and will handle any submission, application, processing, recording and registration and bear all expenses related thereto. Without limiting the provisions of Section 12.4, the Parties hereby irrevocably consent to the personal and subject-matter jurisdiction of the Bankruptcy Court for all purposes necessary to effectuate this Section 4.4.

(b)     The Purchaser will return any records the Seller inadvertently delivers to the Purchaser that are or are reasonably likely to be attorney-client privileged or considered attorney work product or which the Purchaser realizes are or are likely to be attorney-client privileged or considered attorney work product.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

Section 5.1     Bankruptcy Court Orders.

(a)     No later than five (5) Business Days after execution of this Agreement, the Seller shall file a motion that seeks the entry of an order substantially in the form of **Exhibit 5.1(a)** (the "**Sale Procedure Order**") approving, among other things, the procedures in connection with (i) the Seller's request to sell and assign, as applicable, the Acquired Assets to the Purchaser pursuant to this Agreement and Sections 363 and 365 of the Bankruptcy Code, free and clear of all Claims, Liens or Encumbrances in or on the Acquired Assets (the "**Proposed Sale**" and the hearing to consider approval of the Proposed Sale, the "**Sale Hearing**"), (ii) establishing notice and service requirements to all creditors and parties in interest of the Proposed Sale and the Sale Hearing (including the Internal Revenue Service and all other Tax authorities with jurisdiction over the Seller or the Acquired Assets), (iii) approving the payment of the Expense Reimbursement in the event the conditions described in Section 5.2(a) are met, (iv) establishing a deadline for the submission of competing bids for the Acquired Assets and (v) establishing thresholds for initial overbids, the bidding procedures and setting a date for the Sale Hearing (collectively, the "**Sale Procedures**") as set forth in the Sale Procedures Order.  For the

avoidance of doubt, in the event that the Expense Reimbursement is due to the Purchaser, the payment of the Expense Reimbursement shall be the sole and exclusive remedy of the Purchaser against the Seller. Notwithstanding the foregoing, if the Lender is not the Purchaser, Lender shall retain all of its rights and remedies as a secured creditor until it receives payment of the Purchase Price.

(b)     The order approving the Proposed Sale (the "**Approval Order**") will be substantially in the form of **Exhibit 5.1(b)**, and the motions and proofs of service relating to the Approval Order will be in form and substance reasonably satisfactory to the Purchaser; *provided, however*, that in no event shall the Purchaser have the right to disapprove the Approval Order or terminate this transaction by reason of the Seller's inability to assign any or all of the Assigned Contracts if such failure is due to the Bankruptcy Court's determination that the Purchaser has failed to provide adequate assurance of future performance to the counter party, it being acknowledged and agreed that the Purchaser shall bear sole responsibility for providing such adequate assurance. Upon timely docketing of the Approval Order (such docketing date being referred to herein as the "**Sale Approval Date**"), the conditions set forth in this Section 5.1(b) shall conclusively be deemed satisfied.

(c)     Subject to the Seller's obligations to comply with any order of the Bankruptcy Court (including, without limitation, the Sale Procedures), the Seller and the Purchaser will promptly make any filings, take all actions and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the transactions contemplated hereby. The Seller shall use its reasonable best efforts to have the Bankruptcy Court enter the Approval Order as soon as reasonably practicable after the conclusion of the Sale Hearing. The Seller shall use its reasonable best efforts to cause the Sale Procedures Order and the Approval Order to become final orders as soon as possible after their entry.

(d)     The Seller shall promptly provide the Purchaser with drafts of all documents, motions, orders, filings or pleadings that the Seller proposes to file with the Bankruptcy Court which relate to the consummation or approval of this Agreement and to the extent practicable will provide the Purchaser with reasonable opportunity to review such filings. The Seller will also promptly provide the Purchaser with written notice and copies of any notice of appeal and any motion or application filed in connection with any appeal from or application for reconsideration of, any of such orders and any related briefs.

Section 5.2     Expense Reimbursement and Overbid Provisions.

(a)     In the event that this Agreement is terminated for any reason other than pursuant to Section 11.1(c) [or 11.1(i)] and any Alternative Transaction is consummated, then the Seller, at the closing of any such Alternative Transaction, pay to the Purchaser the Expense Reimbursement.

(b)     Pursuant to Bankruptcy Code Section 364(c)(1), the Expense Reimbursement shall receive superpriority administrative claim status. Pursuant to Bankruptcy Code Section 364(c)(1), the administrative claims in respect of the Expense Reimbursement shall have priority over any and all administrative expenses of the kinds specified in Bankruptcy Code Sections 503(b), 506(c), 507(a) or 507(b) (the "**Purchaser Protection Superpriority Claims**").

(c)     The rights of the Purchaser to the Expense Reimbursement and the Purchaser Protection Superpriority Claims shall all survive rejection or breach by the Seller of this Agreement, and shall be unaffected thereby.

(d)     The Sale Procedure Order shall provide for, among other things, that any Alternative Proposal includes a purchase price having a value at least $250,000.00 greater than the Purchase Price.

Section 5.3     <u>Limited Exclusivity</u>.  After execution of this Agreement, the Seller and its directors, officers, employees, representatives and agents may provide information (public or non-public) to any Person in connection with making a proposal as part of the Section 363 sale process contemplated by this Agreement and in accordance with the Sale Procedures (an "**Alternative Proposal**"), or have discussions with such Person with respect to such information as it relates to the making of such proposal, including without limitation, Persons with whom the Seller has previously provided such information, provided, however, that the Seller shall only be permitted to enter into an agreement for an Alternative Proposal to the extent permitted under the Sale Procedure Order.

Section 5.4     <u>No Warranty</u>.  As of the Closing, the Purchaser hereby acknowledges and agrees, notwithstanding any provision contained herein, in the Ancillary Agreements, in the Seller Closing Certificate or in any other agreement, document or certificate delivered in connection with the transactions contemplated herein, that the Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets (including income to be derived or expenses to be incurred in connection with the Acquired Assets, the physical condition of any personal property or any tangible or intangible personal property comprising a part of the property or assets which are the subject of any of the Assigned Contracts, if any, to be assumed by the Purchaser at the Closing; the environmental condition or other matter relating to the physical condition of any property or improvements (or any portion thereof); the merchantability or fitness of the Acquired Assets for any particular purpose; or any other matter or thing relating to the Acquired Assets (or any portion thereof)). Without in any way limiting the foregoing, the Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Acquired Assets.  The Purchaser has conducted and shall conduct its own independent due diligence and shall have no claims or causes of action against the Seller or the Seller's directors, officers, employees, agents, attorneys, representatives or lenders, including without limitation the Lender, and such lenders' directors, officers, employees, agents, attorneys, representatives arising out of or relating to the inaccuracy of the Seller's representations and warranties, or the incompleteness of or failure to disclose any information provided to the Purchaser or failure to disclose any information to the Purchaser in connection with this Agreement.  Accordingly, the Purchaser will accept the Acquired Assets at the Closing **"AS-IS," "WHERE IS" and "WITH ALL FAULTS."**

<div align="center">

**ARTICLE VI**

**<u>REPRESENTATIONS OF THE SELLER</u>**

</div>

The Seller represents and warrants to the Purchaser as follows:

Section 6.1    Corporate Power and Authority.  Subject to compliance with applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court, the Seller has the corporate power and authority to own, lease and operate its properties and to conduct its business as is presently conducted and as conducted prior to the suspension of the manufacturing operations of the Seller.

Section 6.2    Existence and Good Standing.  The Seller is a limited liability company duly incorporated, validly existing and in good standing under the laws of the State of New Hampshire.  The Seller is duly qualified as a foreign corporation in the jurisdictions set forth on Schedule 6.2 and is in good standing in each jurisdiction in which such qualification is required by law, except where the failure to be so qualified or to be in good standing has not had, or would not reasonably be expected to have, a materially detrimental impact on the Acquired Assets.

Section 6.3    Authority; No Consents.  Subject to compliance with the applicable provisions of the Bankruptcy Code and the entry by the Bankruptcy Court of the Approval Order prior to the Closing, the execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of the Seller and this Agreement has been, and the Ancillary Agreements to which it is a party when executed and delivered by the Seller will be, duly and validly executed and delivered and the valid and binding obligations of the Seller, enforceable against it in accordance with their respective terms, subject to (i) laws of general application relating to bankruptcy, insolvency and the relief of debtors and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.  Subject to compliance with the applicable provisions of the Bankruptcy Code and the entry by the Bankruptcy Court of the Approval Order prior to the Closing neither the execution, delivery and performance of this Agreement or the Ancillary Agreements to which the Seller is a party, the consummation by the Seller of the transactions contemplated hereby or thereby, nor compliance by the Seller with any provision hereof or thereof will (I)(A) conflict with, (B) result in any violation of, (C) cause a default under (with or without due notice, lapse of time or both), (D) give rise to any right of termination, amendment, cancellation or acceleration of any obligation contained in or the loss of any benefit under or (E) result in the creation of any Encumbrance on or against any assets, rights or property of the Seller under (x) any instrument or agreement to which the Seller is a party, or by which the Seller or any of its properties, assets or rights may be bound or (y) any term, condition or provision of any law, statute, rule, regulation, order, writ, injunction, decree, permit, concession, license or franchise of any Governmental Authority applicable to the Seller or any of its properties, assets or rights, other than any such conflict, violation, default, right, loss or Encumbrance that is pre-empted, overruled, superseded or made inapplicable by the Bankruptcy Code, by bankruptcy law, or by the Approval Order, and other than any such conflict, violation, default, right, loss or Encumbrance that would not have a materially detrimental impact on the Acquired Assets, or (II) conflict with or result in any violation of the Seller's Certificate of Formation or operating agreement.  With the exception of the Approval Order, no permit, authorization, consent or approval of or by, or any notification of or filing with, any Governmental Authority is required to be made or obtained by the Seller in connection with the execution, delivery and performance by the Seller of this Agreement or the Ancillary Agreements or the consummation by the Seller of the transactions contemplated hereby or

thereby.  With the exception of the Approval Order, the Seller is not and will not be required to obtain any consent from any Person, in connection with the execution, delivery or performance of this Agreement or any of the Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby.  Additionally, to the Seller's knowledge, it is: (i) in compliance with all laws; (ii) not infringing on the intellectual property rights of any third party; (iii) not experiencing the infringement upon the Seller's intellectual property rights, and (iv) not violating any environmental laws.

<div align="center">

**ARTICLE VII**

**REPRESENTATIONS OF THE PURCHASER**

</div>

<u>Representations of the Purchaser</u>.  The Purchaser represents and warrants to the Seller as follows:

Section 7.1    <u>Existence and Good Standing; Authorization and Validity of Agreement</u>.

(a)    The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Hampshire.  The Purchaser is duly qualified as a foreign corporation and is in good standing in each jurisdiction in which such qualification is required by law, except where the failure to be so qualified or to be in good standing would not prevent, interfere or delay the Purchaser from performing its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement. The Purchaser has the corporate power and authority to own, lease and operate its properties and to conduct its business as is presently conducted

(b)    The execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of the Purchaser and this Agreement has been, and the Ancillary Agreements to which it is a party when executed and delivered by the Purchaser will be, duly and validly executed and delivered and the valid and binding obligations of the Purchaser, enforceable against it in accordance with their respective terms, subject to (i) laws of general application relating to bankruptcy, insolvency and the relief of debtors and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies. To the best of Purchaser's knowledge, neither the execution, delivery and performance of this Agreement or the Ancillary Agreements to which the Purchaser is a party, the consummation by the Purchaser of the transactions contemplated hereby or thereby, nor compliance by the Purchaser with any provision hereof or thereof will (I) (A) conflict with, (B) result in any violation of, (C) cause a default under (with or without due notice, lapse of time or both), (D) give rise to any right of termination, amendment, cancellation or acceleration of any obligation contained in or the loss of any benefit under or (E) result in the creation of any Encumbrance on or against any assets, rights or property of the Purchaser under any term, condition or provision of (x) any instrument or agreement to which the Purchaser is a party, or by which the Purchaser or any of its properties, assets or rights may be bound or (y) any law, statute, rule, regulation, order, writ, injunction, decree, permit, concession, license or franchise of any Governmental Authority applicable to the Purchaser or any of its properties, assets or rights, other than any such conflict,

violation, default, right, loss or Encumbrance that would not (i) have a Material Adverse Effect on the business, capitalization, assets (tangible or intangible), Liabilities or operations of the Purchaser or (ii) prevent, interfere or delay the Purchaser from performing its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement, or (II) conflict with or result in any violation of the Purchaser's charter documents or operating agreement.  With the exception of the Approval Order, no permit, authorization, consent or approval of or by, or any notification of or filing with, any Governmental Authority is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance by the Purchaser of this Agreement or the Ancillary Agreements or the consummation by the Purchaser of the transactions contemplated hereby or thereby.  With the exception of the Approval Order, the Purchaser is not and will not be required to obtain any consent from any Person, in connection with the execution, delivery or performance of this Agreement or any of the Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby.

Section 7.2    Broker's or Finder's Fees.  No agent, broker, Person or firm is, or will be, entitled to any commission or broker's or finder's fees from any Party, or from any Affiliate of any Party, in connection with any of the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Purchaser.

## ARTICLE VIII

## ADDITIONAL AGREEMENTS

Section 8.1    Operation of Business.

(a)    Except as may be necessary to carry out any of the transactions contemplated by this Agreement or the Ancillary Agreements, or as may be necessary to satisfy the cure requirements of any of the Assigned Contracts, or as consented to by the Purchaser, or as required by the Bankruptcy Code or any orders entered by the Bankruptcy Court in the Chapter 11 Case, or as otherwise required by applicable Law, the Seller shall not:

(i)    sell, lease, license, sublicense, encumber or dispose of any Acquired Assets, except for the sale of inventory and collection of accounts receivable in the Ordinary Course of Business provided, however, that the Seller and the Lender shall not solicit, encourage nor seek to (A) collect any accounts receivable in any fashion than is sooner or more aggressive than the terms of existing purchase orders nor earlier than the Seller's customary practice; (B) discount any accounts receivable without the prior written consent of the Purchaser; or (C) sell any inventory at prices that are less than fair market value or on terms that are not substantially the same as the majority of existing purchase orders;

(ii)    enter into any agreement or commitment or engage in any transaction which is not in the Ordinary Course of Business;

(iii)    take any action to waive or compromise any material Claims (whether or not asserted in any pending litigation) which are included in the Acquired Assets;

> (iv)     agree in writing or otherwise to take any of the foregoing actions; or

> (v)     terminate any employees of the Seller or hire any additional employees;

provided, however, the Seller may reduce the hours of the shippers and the accounting staff.

(b)     Except as may be necessary to carry out any of the transactions contemplated by this Agreement or the Ancillary Agreements, or as may be necessary to satisfy the cure requirements of any of the Assigned Contracts, or as consented to by the Purchaser, or as required by the Bankruptcy Code or any orders entered by the Bankruptcy Court in the Chapter 11 Case or otherwise required by applicable Law, the Seller shall conduct its operations in the Ordinary Course of Business, and shall:

> (i)     operate the Business substantially in accordance with the budget approved by the Purchaser and report weekly to the Purchaser concerning the status of its business, operations and finances;

> (ii)     keep in full force and effect, without amendment, all material rights relating to the Acquired Assets;

> (iii)     maintain in full force and effect all existing insurance with respect to the Acquired Assets and the Business through the Closing Date in amounts not less than those in effect on the date hereof;

> (iv)     comply with all Laws applicable to the operations of the Business;

> (iv)     cooperate with the Purchaser and assist the Purchaser in identifying the permits and governmental authorization required by the Purchaser to operate the Business from and after the Closing Date and either transferring existing permits and governmental authorities of the Seller to the Purchaser, where permissible, or obtaining new permits and governmental authorizations for the Purchaser; and

> (v)     maintain all books and records of the Seller relating to the Business in the Ordinary Course of Business;

Section 8.2     <u>Review of the Seller</u>.  Subject to the provisions of the Confidentiality Agreement and applicable laws and regulations, prior to the Closing Date, the Seller will, after receiving reasonable advance notice from the Purchaser, give the Purchaser full access to the premises, the books and records (excluding records which are attorney-client privileged or considered attorney work product) and employees and agents of the Seller that relate to the Acquired Assets during normal working hours, for the sole purposes of enabling the Purchaser (i) to further investigate, at the Purchaser's sole expense, the Acquired Assets and any other appropriate matters germane to the subject matter of this Agreement and the Ancillary Agreements and (ii) to verify the accuracy of the representations and warranties set forth in Article 6.

Section 8.3     <u>Reasonable Efforts; Cooperation; Consents and Approvals</u>.  Subject to their respective obligations to comply with any order of the Bankruptcy Court, each of the

Parties agrees to use its commercially reasonable efforts to take, or cause to be taken, all action to do or cause to be done, and to assist and cooperate with each other Party in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement (in each case, to the extent that the same is within the control of such Party), including, without limitation, (i) compliance with any Bankruptcy Court approvals, consents and orders, (ii) the defending of any lawsuits or any other legal proceedings whether judicial or administrative, challenging this Agreement, the Ancillary Agreements or the consummation of the transactions contemplated hereby and thereby and (iii) causing the conditions set forth in Articles IX and X to be satisfied. Except as otherwise expressly set forth in the Sale Procedures, the Seller will use its commercially reasonable efforts to (i) obtain from the Bankruptcy Court all orders, consents and approvals necessary to consummate the transactions contemplated by this Agreement, including without limitation, the Approval Order and (ii) obtain all necessary waivers, consents and approvals from Governmental Authorities and make all necessary registrations and filings and the taking of all reasonable steps as may be necessary to obtain any approval or waiver from, or to avoid any action or proceeding by, any Governmental Authority.

Section 8.4    Sale Procedures. The Seller (a) will conduct the auction process in accordance with the Sale Procedures Order and (b) will not amend, waive, modify or supplement in any material respect the Sale Procedures except as set forth herein or therein or as required or ordered by the Bankruptcy Court.

Section 8.5    Public Disclosure. Except as otherwise required by law or regulation, as contemplated by the Sale Procedures Order or as may be necessary or appropriate in connection with the pending Chapter 11 Case, each Party shall consult with the other Party and obtain such other Party's consent, which consent shall not be unreasonably withheld, before issuing any press release or otherwise making any public statements with respect to this Agreement or the matters contained herein and will not issue any such press release or make any such statement prior to such consultation and agreement.

Section 8.6    Apportionment.   All real property and personal property Taxes, assessments and similar governmental charges levied with respect to the Acquired Assets for a taxable period which includes (but does not end on) the Closing Date shall be apportioned between the Pre-Closing Period and the Post-Closing Period as of the Closing Date on a per diem basis. On or prior to the Closing Date, the Seller shall pay an estimate of all real property and personal property Taxes, assessments and similar charges to be levied with respect to the Acquired Assets for the Pre-Closing Period to the appropriate Tax authority. Thereafter, the Seller shall notify the Purchaser upon receipt of any bill for real or personal property Taxes or similar charges relating to the Acquired Assets, part or all of which are attributable to any Post-Closing Period, and shall promptly deliver such Tax bill to the Purchaser who shall pay the same to the appropriate governmental authority; provided, that if such bill covers the Pre-Closing Period, the Seller shall also remit to the Purchaser, prior to the due date of such Tax bill, payment for the proportionate amount of such bill that is attributable to the Pre-Closing Period. If either the Seller or the Purchaser shall make a payment for which such Party is entitled to have such payment made by the other Party under this Section, the other Party shall make reimbursement promptly but in no event later than fifteen (15) Business Days after the presentation of a statement setting forth the amount of reimbursement to which the presenting

Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Any payment between the Parties required under this Section 8.6 shall bear interest at the rate per annum determined, from time to time, under the provisions of Section 6621(a)(2) of the Code for each day from the date the relevant Tax is due to be paid to the Tax authority until paid. The Purchaser and the Seller shall cooperate with each other and shall use commercially reasonable efforts to assist the other Party to obtain any and all available tax refunds and rebates. The Seller shall turn over and pay to the Purchaser any portion of any refund or rebate that is attributable to the Post-Closing Period, and the Purchaser shall turn over and pay to the Seller any refund or rebate that is attributable to the Pre-Closing Period. Any refund or rebate that cannot be attributable to either the Pre-Closing Period or the Post-Closing Period shall be pro-rated over the respective periods in accordance with the amount of taxes paid in such periods. The Seller hereby directs that any refunds or rebates to which it would be entitled be paid to Lender, which holds a perfected first priority security interest in the Seller's interest in such refunds and rebates.

Section 8.7    Access to Records and Certain Personnel. During the Pre-Closing Period, the Seller shall permit the Purchaser and any successors or assigns, its counsel, tax advisors and other Affiliates reasonable access to (i) the financial and other books and records relating to the Business (whether in documentary or data form) during the Pre-Closing Period, (ii) the Seller's employees and (iii) the Leased Property for any purpose relating to the operation, winding down, liquidation and final administration of the Business or the bankruptcy estate, which access shall include (A) the right of such professionals to copy and use such documents and records as they may reasonably request, and (B) the Purchaser's copying and delivering to the Seller  or its professionals (at the Seller's expense) such documents or records as they may reasonably request.

Section 8.8    Employees; Employee Benefits.

(a)    Agreements Regarding Employees. The Purchaser may offer employment to some or all of the Seller's employees commencing as of the Closing Date. Employees who accept employment with the Purchaser shall be referred to hereinafter as "**Transferred Employees**." The Purchaser shall not assume any Liability for any accrued and unused paid time off earned by any Transferred Employees in connection with their employment by the Seller.

(b)    Other Obligations. The Seller and the Purchaser agree to cooperate reasonably concerning all matters relating to the Transferred Employees, including, without limitation, the Seller's permitting the Purchaser to speak with, consult and otherwise interview any of the Seller's employees prior to the Closing.

(c)    WARN. Prior to the Closing Date, the Seller shall terminate all of the Transferred Employees and assume any and all obligations and notice requirements, if any, under the Worker Adjustment and Retraining Notification Act and analogous provisions of state law (collectively, "**WARN**") with regard to such Transferred Employees to the extent WARN applies. While the Purchaser intends to offer employment to some or all of Seller's employees, the Purchaser shall have no obligation to offer employment to any employee of Seller. The Purchaser shall have no obligation whatsoever to any person currently or previously employed or affiliated in any

manner with the Seller unless such person is employed by the Purchaser after the Closing Date. In no event shall the Purchaser be liable for any compensation, retirement or benefit plan established by the Seller and payable to any person currently or previously employed by the Seller (including any Transferred Employees).

Section 8.9     Cooperation.

(a)     The Seller covenants and agrees that, during the period between the date hereof and the Closing, the Seller shall promptly inform the Purchaser in writing of any breaches of the representations and warranties contained in Article VI or any breach of any covenant of the Seller.

(b)     The Purchaser covenants and agrees that, during the period between the date hereof and the Closing, the Purchaser shall promptly inform the Seller in writing of any breaches of the representations and warranties contained in Article VII or any breach of any covenant of the Purchaser.

Section 8.10     [Intentionally omitted]

Section 8.11     Bankruptcy Case.  The Purchaser will cooperate fully with the Bankruptcy Court and with the Seller to expedite the Bankruptcy Case and to obtain orders as described in Article V.

Section 8.12     Assignment of Claims.  In the event that the Purchaser elects to pay or otherwise satisfy any of the Excluded Liabilities, the Purchaser agrees that it will not, by assignment, subrogation or otherwise, succeed to the rights of the Person holding such Excluded Liability, nor assert (nor permit any other Person to assert) any claim against the Seller or the Seller's bankruptcy estate for any such Excluded Liability.

Section 8.13     [Intentionally omitted]

Section 8.14     [Intentionally omitted]

Section 8.15     Seller's Employee Plans.  In the event that the Purchaser, in its discretion, elects to assume any of the Seller's Employee Plans, the Purchaser shall provide notice to the Seller within at least three (3) Business Days of the Closing Date and the Seller agrees to use its best efforts to assist with the transfer of the Seller's Employee Plans on the Closing Date, at the Purchaser's expense.

## ARTICLE IX

## CONDITIONS TO THE OBLIGATIONS OF THE PURCHASER

Section 9.1     Closing Conditions to the Purchaser's Obligations.  The obligations of the Purchaser to consummate the Closing are conditioned upon the satisfaction or waiver in writing

(subject to applicable Law), on or prior to the Closing Date (or such earlier date as is specified), of the following conditions:

(a)     Representations and Warranties.  The representations and warranties of the Seller contained in Article VI and any representations and warranties of the Seller set forth in the Ancillary Agreements qualified by materiality shall be true and correct in all respects, except for such exceptions as are permitted by this Agreement, without further qualification as of the date hereof and the Closing Date, as if made on such date (except for such representations and warranties that relate to a specific date, which shall be true and correct in all respects as of such date), and all representations and warranties of the Seller contained in Article VI and any representations and warranties of the Seller set forth in the Ancillary Agreements that are not so qualified shall be true and correct in all material respects as of the Closing Date, as if made on such date (except for such representations and warranties that relate to a specific date, which shall be true and correct in all material respects as of such date).  The Seller shall have delivered to the Purchaser a certificate, dated as of the Closing Date and signed by the Seller's President, Chief Restructuring Officer or other authorized officer of the Seller (the "**Seller Closing Certificate**"), confirming that the conditions set forth in this Section 9.1(a) have been satisfied.

(b)     Performance of Agreements.  Each and all of the agreements of the Seller to be performed on or prior to the Closing pursuant to the terms hereof and the Ancillary Agreements shall have been duly performed in all respects, and the Seller Closing Certificate shall confirm that the conditions set forth in this Section 9.1(b) have been satisfied.

(c)     Closing Deliverables.  The Purchaser shall have received the documents required to be delivered by the Seller to the Purchaser pursuant to Section 4.2.

(d)     No Injunction.  No court or other Governmental Authority of competent jurisdiction shall have issued an order or stay pending appeal which shall then be in effect restraining or prohibiting the completion of the transactions contemplated hereby.

(e)     Statutes.  No Law of any kind shall have been enacted, entered, promulgated or enforced by any Governmental Authority which prohibits, or has the effect of making illegal, the consummation of the transactions contemplated hereby and shall remain in effect.

(f)     Governmental Approvals.  All governmental and other consents and approvals necessary to permit the consummation of the transactions contemplated by this Agreement shall have been received.

(g)     Bankruptcy Matters.  The Sale Procedure Order and Approval Order shall have been entered by the Bankruptcy Court in substantially the form attached to this Agreement, including the unqualified right of the Lender to satisfy the Purchase Price by credit bid in accordance with section 363(k) of the Bankruptcy Code, and no notice of appeal from the Approval Order shall have been filed on or before the Closing.

(h)     No Material Adverse Effect.  During the period from the date hereof to the Closing Date, there shall not have been any occurrence, or any occurrences which, when taken together in the aggregate, would reasonably be expected to constitute a Material Adverse Effect.

(i)     Employment.  Neither Richard Ferdinand nor Kevin McCarthy shall have died or become permanently disabled on or before the Closing Date.

(j)     [Omitted].

(k)     Offer Letters.  Prior to Closing, Richard Ferdinand and Kevin McCarthy shall have executed employment offer letters from the Purchaser in a form acceptable to the Purchaser (the "**Offer Letters**").  This condition shall be deemed satisfied unless the Purchaser notifies the Seller in writing on or before 11:59 p.m. on or before three Business Days before the scheduled Closing that it has not been satisfied and that the Purchaser is terminating this Agreement for failure of this condition.  For purposes of this subparagraph (k), the Purchaser's written notice may be delivered by electronic mail to Daniel W. Sklar, Esq. at DSklar@nixonpeabody.com.

## ARTICLE X

## CONDITIONS TO THE OBLIGATIONS OF THE SELLER

Section 10.1.  Conditions to the Seller's Obligations.  The obligations of the Seller to consummate the Closing are conditioned upon the satisfaction or waiver in writing (subject to applicable Law), on or prior to the Closing Date, of the following conditions:

(a)     Representations and Warranties.  The representations and warranties of the Purchaser contained in Article VII (and any representations and warranties of the Purchaser set forth in the Ancillary Agreements) qualified by materiality shall be true and correct in all respects, except for such exceptions as are permitted by this Agreement, without further qualification as of the Closing Date, as if made on such date (except for such representations and warranties that relate to a specific date, which shall be true and correct in all respects as of such date), and all representations and warranties of the Purchaser contained in Article VII (and any representations and warranties of the Purchaser set forth in the Ancillary Agreements) that are not so qualified shall be true and correct in all material respects as of the Closing Date, as if made on such date (except for such representations and warranties that relate to a specific date, which shall be true and correct in all material respects as of such date) with only such exceptions as are permitted by this Agreement or which, individually or in the aggregate, would not prevent, interfere or delay the Purchaser from performing its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.  The Purchaser shall have delivered to the Seller a certificate, dated as of the Closing Date and signed by the Purchaser's Manager or other duly authorized officer (the "**Purchaser Closing Certificate**"), confirming that the conditions set forth in this Section 10.1(a) have been satisfied.

(b)     Performance of Agreements.  Each and all of the agreements of the Purchaser to be performed on or prior to the Closing pursuant to the terms hereof and the Ancillary Agreements shall have been duly performed in all respects, and the Purchaser Closing Certificate shall confirm that the conditions set forth in this Section 10.1(b) have been satisfied.

(c)     [Omitted.]

(d)     Payment of Purchase Price.  The Purchaser shall have paid to the Seller the Purchase Price in accordance with Section 3.1(a).

(e)     No Injunction.  No court or other Governmental Authority of competent jurisdiction shall have issued an order or stay pending appeal which shall then be in effect restraining or prohibiting the completion of the transactions contemplated hereby.

(f)     Statutes.  No Law of any kind shall have been enacted, entered, promulgated or enforced by any Governmental Authority which prohibits, or has the effect of making illegal, the consummation of the transactions contemplated hereby and shall remain in effect.

(g)     Governmental Approvals.  All material governmental and other material consents and approvals necessary to permit the consummation of the transactions contemplated by this Agreement shall have been received.

(h)     Bankruptcy Matters.  The Sale Procedure Order and Approval Order shall have been entered by the Bankruptcy Court in substantially the form attached to this Agreement, and no notice of appeal from the Approval Order shall have been filed on or before the Closing.

## ARTICLE XI

## TERMINATION

Section 11.1   Events of Termination.   This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     by mutual written consent of the Parties;

(b)     by either Party, if the Closing Date shall not have occurred by November 20, 2015; provided, that the right to terminate this Agreement under this Section 11.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall be the cause of the failure of the Closing Date to occur on or before such date;

(c)     by the Seller if (i) there shall have been a material breach on the part of the Purchaser of any of its representations, warranties or covenants such that the conditions set forth in Section 10.1(a) or Section 10.1(b) would not be satisfied as of the time of such breach, (ii) the Seller shall have given written notice of such breach to the Purchaser, (iii) at least two (2) Business Days shall have elapsed since the delivery of such written notice to the Purchaser and (iv) such breach shall not have been cured in all material respects; provided that the Seller may not terminate this Agreement pursuant to this Section 11.1(c) if it shall have materially breached this Agreement and such breach has not been duly cured;

(d)     by the Purchaser if (i) there shall have been a material breach on the part of the Seller of any of its representations, warranties or covenants such that the conditions set forth in Section 9.1(a) or Section 9.1(b) would not be satisfied as of the time of such breach, (ii) the Purchaser shall have given written notice of such breach to the Seller, (iii) at least two (2) Business Days shall have elapsed since the delivery of such written notice to the Seller and (iv) such breach shall not have been cured in all material respects; provided that the Purchaser may

not terminate this Agreement pursuant to this Section 11.1(d) if it shall have materially breached this Agreement and such breach has not been duly cured;

(e)      by any Party, if there shall be any Law of any Governmental Authority that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or if any judgment, injunction, order or decree of any competent authority prohibiting such transactions is entered and such judgment, injunction, order or decree shall have become final and non-appealable;

(f)      by either Party if (i) the Sale Procedure Order is not issued by the Bankruptcy Court on or before September 21, 2015 or in the event that a stay pending appeal or a writ of mandate of the Approval Order is granted on behalf of any party; or (ii) the Lender refuses to close the transactions contemplated by this Agreement or withdraws its consent to the transactions contemplated by this Agreement;

(g)      by either Party if the Approval Order in form and substance that is in accordance with the provisions of this Agreement is not issued by the Bankruptcy Court in time to permit the Closing to occur on or before November 20, 2015; or

(h)      by any Party, if an Alternative Transaction is approved by the Bankruptcy Court.

If either Party wishes to terminate this Agreement pursuant to this Section 11.1, such Party will deliver to the other Party a written termination notification stating that such Party is terminating this Agreement and setting forth a brief statement of the basis on which such Party is terminating this Agreement.

Section 11.2    Effect of Termination.  Except as otherwise provided in this Section 11.2, in the event that this Agreement shall be terminated pursuant to Section 11.1, all further obligations of the Parties under this Agreement shall terminate without further Liability or obligation of any Party to any other Party hereunder, provided, however, that (i) Sections 3.2, 5.2, 8.5, 11.2, 12.1, 12.3, 12.4, 12.6 and 12.22 shall survive the termination of this Agreement; (ii) the Parties will remain bound by the provisions of the Confidentiality Agreement; and (iii) no Party shall be released from Liability hereunder if this Agreement is terminated and the transactions abandoned by reason of (A) failure of such Party to have performed its obligations hereunder in any respect or (B) any willful misconduct, fraud or intentional misrepresentation made by such Party of any matter set forth herein.

**ARTICLE XII**

**MISCELLANEOUS**

Section 12.1    Expenses; Fees.  Except as otherwise set forth in this Agreement, the Parties shall pay all of their own expenses relating to the transactions contemplated by this Agreement.

Section 12.2    Transfer Taxes.  The Parties recognize and acknowledge that the sale, transfer, assignment and delivery of the Acquired Assets may be exempt under Section 1146(c) of the Bankruptcy Code and the Approval Order from all state and local transfer, recording,

stamp or other similar transfer Taxes that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets. The Seller on the one hand and the Purchaser on the other hand shall each bear and pay one-half of any transfer Taxes that may become payable in connection with the sale of the Acquired Assets to the Purchaser, the assumption by the Purchaser of the Assumed Liabilities or any of the other transactions contemplated by this Agreement or the Ancillary Agreements (the "**Charges**"). The Seller and the Purchaser agree to use their commercially reasonable efforts to minimize, and to cooperate with and assist the other in, minimizing the Charges. For the avoidance of doubt, any broker's or finder's fees of Seller, including the fee set forth on Schedule 12.23 shall not be deemed a Charge and shall be paid in full by the Seller.

Section 12.3   APPLICABLE LAW. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH U.S. FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW HAMPSHIRE SHALL GOVERN, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

Section 12.4   JURISDICTION; WAIVER OF JURY TRIAL. THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW HAMPSHIRE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF NEW HAMPSHIRE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY CONSENTS AND SUBMITS TO THE JURISDICTION OF SUCH COURTS AND WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.5   Captions; Headings; Table of Contents. The Article and Section captions and the headings and table of contents set forth herein are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

Section 12.6   Notices. All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered in person or mailed, certified or registered mail with postage prepaid, or sent by telex, telegram or telecopy and a confirmation of transmission is obtained, as follows:

(a)      if to the Seller, to:

Tempnology LLC
210 Commerce Way, Suite 100
Portsmouth, NH 03801
Attention: Kevin McCarthy, President

with a copy to:

Nixon Peabody LLP
900 Elm Street
Manchester, NH 03101
Facsimile: 866-947-0745
Attention: Daniel W. Sklar, Esq.

(b)      if to the Purchaser, to:


Schleicher & Stebbins Hotels, L.L.C.
1359 Hooksett Road
Hooksett, NH 03106
Attention: Mark Stebbins, Manager

with a copy to:

Sheehan Phinney Bass & Green P.A
1000 Elm Street
Manchester, NH 03101
Facsimile: (603) 641-8768
Attention: Christopher M. Candon, Esq.

or to such other Person or address as any Party shall specify by notice in writing to each of the other Parties. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date of delivery unless if mailed by registered or certified mail, postage prepaid, in which case on the third Business Day after the mailing thereof except for a notice of a change of address, which shall be effective only upon receipt thereof.

Section 12.7   <u>Assignment; Parties in Interest</u>.  This Agreement may not be transferred, assigned, pledged or hypothecated by the Seller (whether voluntarily, involuntarily, by way of merger or otherwise) to any other Person without the prior written consent of the Purchaser. This Agreement may be transferred or assigned by the Purchaser to any Affiliate of the Purchaser without the consent of the Seller, provided however that the Purchaser shall remain fully liable for the obligations of the Purchaser under this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 12.8   <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, in original form or by facsimile, each of which shall be deemed an original, but all of which together will constitute one and the same document.

Section 12.9    Entire Agreement.  This Agreement, including the exhibits, schedules and other documents referred to herein which form a part hereof, and the Confidentiality Agreement, contains the entire understanding of the Parties with respect to the subject matter contained herein and therein.  This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.

Section 12.10   Severability; Enforcement.  The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof.  If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each Party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by Law, and each Party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

Section 12.11   Amendments; Waiver.  This Agreement may not be changed orally, but only by an agreement in writing signed by all Parties.  Any provision of this Agreement can be waived, amended, supplemented or modified by written agreement of the Parties.  The failure of any Party to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

Section 12.12   No Strict Construction.  The Parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all Parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

Section 12.13   Pronouns.  As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof whenever the context and facts require such construction.

Section 12.14   No Third Party Beneficiaries.   Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any Person other than the Parties and the respective successors or assigns of the Parties, any rights, remedies, obligations or Liabilities whatsoever.

Section 12.15   Interpretation.  This Agreement has been negotiated between the Parties and will not be deemed to be drafted by, or the product of, any party.  As such, this Agreement will not be interpreted in favor of, or against, any party.

Section 12.16   No Joint Venture.   No Party hereto shall make any warranties or representations, or assume or create any obligations, on the other Party's behalf except as may be expressly permitted hereunder or in writing by such other Party.  Each Party shall be solely responsible for the actions of all its respective employees, agents and representatives.

Section 12.17   Specific Performance.  The transactions contemplated by this Agreement are unique transactions and any failure on the part of either Party to complete the transactions

contemplated by this Agreement or any of the Ancillary Agreements on the terms of this Agreement or any of the Ancillary Agreements will not be fully compensable in damages and the breach or threatened breach of the provisions of this Agreement or any of the Ancillary Agreements would cause the non-breaching Party irreparable harm.  Accordingly, in addition to and not in limitation of any other remedies available to the non-breaching Party for a breach or threatened breach of this Agreement or any of the Ancillary Agreements, such Party will be entitled to specific performance of this Agreement or any of the Ancillary Agreements upon any breach by the other Party, and to an injunction restraining any such party from such breach or threatened breach.

Section 12.18  No Other Representations.  The Parties acknowledge that, except as expressly set forth in this Agreement or the Ancillary Agreements, neither Party has made or is making any representations or warranties whatsoever to the other, implied or otherwise.

Section 12.19  Access of Seller to Books and Records.  At all times after the Closing Date, Purchaser will give Seller and Seller's advisors and representatives reasonable access to any books and records of Seller that are included in the Acquired Assets (to the extent such books and records relate to any period prior to the Closing Date).

Section 12.20  Survival of Representations and Warranties.  None of Seller's representations, warranties and pre-closing covenants contained in this Agreement, the Ancillary Agreements, the Seller Closing Certificate or in any other agreement, document or certificate delivered pursuant to this Agreement shall survive the Closing.  None of Purchaser's representations, warranties and pre-closing covenants contained in this Agreement, the Ancillary Agreements, the Purchaser Closing Certificate or in any other agreement, document or certificate delivered pursuant to this Agreement shall survive the Closing.

Section 12.21  Entire Agreement.  This Agreement and the Ancillary Agreements set forth the entire understanding of the Parties and supersede all other agreements and understandings between the Parties relating to the subject matter hereof and thereof.

Section 12.22  Confidentiality.  On and at all times from the date hereof, the Parties shall remain subject to that certain Non-Disclosure Agreement by and between the Parties dated August 12, 2015.

Section 12.23  Broker's or Finder's Fees.  Except as set forth on Schedule 12.23, no agent, broker, Person or firm is, or will be, entitled to any commission or broker's or finder's fees from any Party, or from any Affiliate of any Party, in connection with any of the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its officers thereunto duly authorized, all as of the day and year first above written.

Tempnology, LLC

By:_____
    Name:
    Title:

Schleicher & Stebbins Hotels, L.L.C.
By: _____
    Name: Mark Stebbins
    Title:  Manager

**Exhibit I-A**

## LEASED PROPERTY

1.      That certain Lease dated June 22, 2012 by and between Seller as Tenant and Muirfields, LLC as Landlord.


2.      That certain Lease Agreement dated March 18, 2015 by and between Jewett Commercial Park, LLC as Lessor and Seller as Lessee.

**Exhibit I-B**

**SELLER'S EMPLOYEE PLANS**

**[To be Provided]**

<div align="right"><u>**Exhibit 2.1**</u></div>

<u>**ACQUIRED ASSETS**</u>

The Acquired Assets shall include any and all interests of the Seller in the following:

        (a)    All securities in entities other than the Seller owned by the Seller, and of Seller's interest in Granite Textile, Ltd.

        (b)    all personal property and interests therein, including, without limitation, vehicles, machinery, equipment, furniture, office equipment, molds, patterns and dies, tools, fixtures and other tangible property of any kind or nature;

        (c)    all general intangibles and, to the extent not otherwise constituting general intangibles, any interest of the Seller in any and all claims by the Seller against any other person, contingent or otherwise, known or unknown, including, without limitation, all rights under express or implied warranties from suppliers, claims for collection or indemnity, and choses in action other than choses in action relating to Excluded Assets other than choses in action relating to Excluded Assets described in items (a) through (h) and (i) of Exhibit 2.2;

        (d)    all rights and interests, but no Liabilities or other obligations other than the Assumed Liabilities;

        (e)    all Assigned Permits;

        (f    all Intellectual Property;

        (g)    except as set forth in subsection (d) of **Exhibit 2.2**, all books, records, files and papers, whether in hard copy or computer format, including, without limitation, all materials, manuals, sales and promotional materials and records, advertising materials, customer lists, supplier lists, mailing lists, distribution lists, business plans, litigation files, credit information, cost and pricing information, blueprints for tools, machines and machine components, and all documents embodying the Intellectual Property, in each case relating to the Acquired Assets, excluding records which are attorney-client privileged or considered attorney work product;

        (h)    any telephone and facsimile numbers, e-mail addresses and post office boxes;

        (i)    all insurance benefits, including rights and proceeds, and similar items, arising from or relating to the Acquired Assets prior to the Closing Date;

        ;

        (j)    any or all of the Seller's Employee Plans that the Purchaser elects to assume at the Closing pursuant to Section 8.15;

(k)     all Leased Property; and

(l)     the specific property listed in the attachment to this **Exhibit 2.1**, including Assigned Contracts so listed, and Assigned Contracts added to this **Exhibit 2.1** pursuant to Section 2.1.

## ATTACHMENT TO EXHIBIT 2.1

List of Assigned Contracts:  All of the agreements listed on Schedule G of the Seller's Bankruptcy Schedules excluding those that are expressly rejected by the Seller at or prior to the Closing.

Intellectual Property:  (see attached list)

**Attachment to Exhibit 2.1**

**Assumed Contracts**

| Contract Date | Expiration Date | Counter Party | Address | Proposed Cure Amount |
|---|---|---|---|---|
| Jan 1, 2012 | | ADP Total Source | 11 Northeastern Blvd, Salem, NH 03079 | $0.00 |
| Oct 1, 2014 | Sept 30, 2015 | Barrett Distribution Services | 15 Freedom Way, Franklin, Ma 02038 | $0.00 |
| April 1, 2015 | March 31, 2017 | Jewett Commercial Park LLC | 32 Harriman Hill Rd, Raymond, NH 03077 | $0.00 |
| Oct 10, 2014 | Dec 31, 2016 | Hohenstein Institute of America | 1688 Westbrook Ave, Burlington, NC 27215 | $9,677.00 |
| Pending | 3 years | GECC | 300 E John Carpenter Freeway, Irving, Tx 75062 | $0.00 |
| Aug 1, 2012 | July 31, 2017 | Muirfields LLC | c/o Kane Mgmt Group LLC, 210 Commerce Way #300, Portsmouth, NH 02801 | $0.00 |
| Feb 20, 2015 | Jan 1, 2020 | Fruit of the Loom | 1 Fruit of the Loom Drive, Bowling Green, Kentucky 42103 | $0.00 |
| Feb 1, 2015 | Jan 31, 2020 | Disney Worldwide Services | DWS, 1675 Buena Vista Drive, Lake Buena Vista, Florida 32830 | $156,250.00 |
| Feb 1, 2015 | Dec 31, 2017 | Rope-A-Towel | PO Box 1052, Windemere Fla  34786 | $0.00 |
| July 1, 2015 | Dec 31, 2016 | MPW Sports Inc | 21193 Gladiolos Way, Lake Forest, Ca 92630 | $0.00 |
| March 1, 2015 | | Perennial Sales | 4963 Bacopa Lane S, #605, St Petersburg, Fla 33715 | $0.00 |
| May 15, 2014 | Dec 31, 2016 | Kittredge and Associates | 63 Grand Ave, River Edge, NJ 07661 | $0.00 |
| July 1, 2015 | Dec 31, 2019 | Toshiya Sato | 2-15-61 Inukura, Miyamae-Ku, Kawasaki, Kanagawa 216-011, Japan | $0.00 |
| June 1, 2015 | May 31, 2017 | Tony Fernandez | 4 Bateson Drive, Andover, Ma 01810 | $0.00 |
| July 1, 2015 | Dec 31, 2015 | Prime Pacific Connections LLC | PO Box 15583, Irvine, Ca 92623 | $0.00 |
| June 19, 2015 | Dec 31, 2015 | Jim Zeiba | 10 Applewood Drive, Derry, NH 03038 | $0.00 |
| March 1, 2015 | Feb 28, 2016 | Athena Apparel Solutions LLC | 100 Albany St., Portsmouth, NH 03801 | $0.00 |
| June 3, 2011 | June 3, 2016 | Rob Westergren | 8 West Ridge Dr., Hampton, NH 03842 | $0.00 |
| June 3, 2011 | June 3, 2016 | Dennis Ackroyd | 810 Meadow Rd., Caso, Maine 04015 | $0.00 |
| Oct 1, 2014 | Sept 30, 2019 | PJS Distributors Pty Ltd | 440 Collins St., Level 12, Melbourne, VIC 3000, Australia | $0.00 |
| March 1, 2015 | Feb 28, 2020 | Sportsline | Unit 1504-05, 102 Austin Road, Tsinshatsui, Kowloon Hong Kong | $0.00 |
| Nov 1, 2014 | Oct 31, 2019 | Unique Piertech Solutions Pvt Limited | Peninsula Techno Park, Equinox Building Park, Tower 1, 7th Fl Off Bandra Kurla Rd., LBS Marg, Mumbai 400070 India | $0.00 |

4840-2900-2022.9

| Feb 1, 2015 | Jan 31, 2018 | Hae Min Trading Co | Haemin Bldg, 2F, 23 Seokchonhosu-ro-18-gil, songpa-gu, Seoul, Korea | $0.00 |
| July 1, 2015 | June 30, 2019 | Beattie Matheson Ltd | Level 2, 272 Parnell Rd, Parnell, Auckland 1052 New Zealand | $0.00 |
| June 1, 2015 | Dec 31, 2017 | RON Corp | 1-3-4 Shimomae, Toda City, Saitama 335-0016, Japan | $0.00 |
| March 1, 2015 | Feb 28, 2018 | Metroasis (Country Life Ltd) | 169-1, Sec 1, Kangle Road, Xinfeng Township, Hsinchu County 304 Taiwan | $0.00 |

4840-2900-2022.9

|  | | Case | | Priority | **Status,** Filing Date, | Pat/Reg No., | | |
|---|---|---|---|---|---|---|---|---|
| **Case Number** | | **Type** | **Country** | **Case Number** | **App. Serial No.** | **Issue/Reg Date** | **Title** | **#** |
| 32D-001 | | US Patent | US | DDD-001PROV | Status: Issued | Issued: 5/14/2013 | Title: Fabric and Method of Making the Same | 1 |
| | | | | | Filed: 12/15/2008 | Pat. #: 8,440,119 | | |
| | | | | | Serial #: 12/334,682 | Expires: 2/24/2031 | | |
| 32D-001DIV | | US App | US | DDD-001PROV | Status: Pending | | Title: Fabric with cooling characteristics | 2 |
| | | | | | Filed: 4/19/2013 | | | |
| | | | | | Serial #: 13/866,294 | | | |
| 32D-001DIV2 | | US App | US | DDD-001PROV | Status: Allowed | Scheduled to issue 9/1/2015; Pat #: 9,121,642 (tentative) | Title: Method of cooling an object with a fabric | 3 |
| | | | | | Filed: 5/8/2013 | | | |
| | | | | | Serial #: 13/889,466 | | | |

Page 1

| Case Number | Case Type | Country | Priority Case Number | Status, Filing Date, App. Serial No. | Pat/Reg No., Issue/Reg Date | Title | # |
|---|---|---|---|---|---|---|---|
| TEMP-002 | US App | US | DDD-001PROV | Status: Pending<br>Filed: 10/16/2012<br>Serial #:<br>13/653,216 | | Title: Fabric and Method of Making the Same (DR COOL) | 7 |
| TEMP-002AU | Foreign App | Australia | TEMP-002 | Status: Pending<br>Filed: 5/4/2015<br>Serial #:<br>2013331379 | | Title: Fabric and Method of Making the Same | 8 |
| TEMP-002BR | Foreign App | Brazil | TEMP-002 | Status: Pending<br>Filed: 4/14/2015<br>Serial #:<br>112015083293 | | Title: Fabric and Method of Making the Same | 9 |

| Case Number | Case Type | Country | Priority Case Number | Status, Filing Date, App. Serial No. | Pat/Reg No., Issue/Reg Date | Title | # |
|---|---|---|---|---|---|---|---|
| TEMP-002CA | Foreign App | Canada | TEMP-002 | Status: Pending  Filed: 4/14/2015  Serial #: 2888932 | | Title: Fabric and Method of Making the Same | 10 |
| TEMP-002CN | Foreign App | China | TEMP-002 | Status: Pending  Filed: 6/16/2015  Serial #: 201380065828.9 | | Title: Fabric and Method of Making the Same | 11 |
| TEMP-002EP | Foreign App | EPO | TEMP-002 | Status: Pending  Filed: 5/1/2015  Serial #: 13846584.4 | | Title: Fabric and Method of Making the Same | 12 |

Page 3

| Case Number | Case Type | Country | Priority Case Number | Status, Filing Date, App. Serial No. | Pat/Reg No., Issue/Reg Date | Title | # |
|---|---|---|---|---|---|---|---|
| TEMP-002IN | Foreign App | India | TEMP-002 | Status: Pending<br><br>Filed: 5/5/2015<br><br>Serial #: 1275/KOLNP/2015 | | Title: Fabric and Method of Making the Same | 13 |
| TEMP-002JP | Foreign App | Japan | TEMP-002 | Status: Pending<br><br>Filed: 4/15/2015<br><br>Serial #: 2015-537781 | | Title: Fabric and Method of Making the Same | 14 |
| TEMP-002KR | Foreign App | Korea, Republic of | TEMP-002 | Status: Pending<br><br>Filed: 5/11/2015<br><br>Serial #: 2015-7012256 | | Title: Fabric and Method of Making the Same | 15 |

| Case Number | Case Type | Country | Priority Case Number | Status, Filing Date, App. Serial No. | Pat/Reg No., Issue/Reg Date | Title | # |
|---|---|---|---|---|---|---|---|
| TEMP-002PCT | PCT App | PCT | TEMP-002 | Status: Done<br><br>Filed: 10/15/2013<br><br>Serial #:<br>PCT/US2013/06<br>5125 | | Title: Fabric and Method of Making the Same | 16 |
| TEMP-002RU | Foreign App | Russian Federation | TEMP-002 | Status: Pending<br><br>Filed: 5/15/2015<br><br>Serial #:<br>2015118384 | | Title: Fabric and Method of Making the Same | 17 |
| TEMP-002ZA | Foreign App | South Africia | TEMP-002 | Status: Pending<br><br>Filed: 4/15/2015<br><br>Serial #:<br>2015/02531 | | Title: Fabric and Method of Making the Same | 18 |

Page 5

| Case Number | Case Type | Country | Priority Case Number | Status, Filing Date, App. Serial No. | Pat/Reg No., Issue/Reg Date | Title | # |
|---|---|---|---|---|---|---|---|
| TEMP-003PROV | US App | US | | Status: Pending  Filed: 10/14/2014  Serial #: 62/063,850 | | Title: Stretchable fabric and method of making the same | 19 |
| TEMP-004PROV | US App | US | | Status: Pending  Filed: 10/14/2014  Serial #: 62/063,830 | | Title: Hybrid yarns, method of making hybrid yarns and fabrics made of hybrid yarns | 20 |

Page 6

Case Tracking System

## Foreign Trademark Summary Report

### TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-AR-01 | Argentina | COOLCORE | COOLCORE | 024 | 7/1/2011 3,100,257 | | Pending |
| TEM-AR-02 | Argentina | COOLCORE | COOLCORE | 025 | 7/1/2011 3,100,258 | 11/2/2012 2.535.081 | Registered 11/2/2022 |
| TEM-AR-03 | Argentina | Dr. Cool plus Water Drop Design | dr.cool | 010 | 6/24/2013 3257574 | 8/14/2014 2668529 | Registered 8/14/2024 |
| TEM-AU-02 | Australia | Dr. Cool by CoolCore (Stylized) | dr.cool coolcore | 010 | 1/7/2013 1534495 | 1/7/2013 1534495 | Registered 1/7/2023 |
| TEM-AU-03 | Australia | COOLCORE plus Design | coolcore | 024  025 | 5/7/2013 1555797 | | Pending |
| TEM-BR-01 | Brazil | COOLCORE | COOLCORE | 024 | 6/28/2011 903787032 | | Pending |
| TEM-BR-02 | Brazil | COOLCORE | COOLCORE | 025 | 6/28/2011 903787032 | | Pending |

Page 7

Case Tracking System

# Foreign Trademark Summary Report

## TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-BR-03 | Brazil | Dr. Cool plus Water Drop Design | dr.cool | 010 | 6/20/2013 840552963 | | Pending |
| TEM-CA-01 | Canada | COOLCORE | COOLCORE | 024  025 | 7/10/2012 1585182 | | Pending |
| TEM-CA-02 | Canada | Dr. Cool plus Water Drop Design | dr.cool | 010 | 6/21/2013 1632191 | 10/6/2014 887,480 | Registered 10/6/2029 |
| TEM-CA-03 | Canada | templush plus Design | templush | 024 | 4/16/2014 1,673,059 | | Pending |
| TEM-CH-02 | China | COOLCORE plus Design | coolcore° | 024 | 12/19/2012 11915046 | | Pending |
| TEM-CH-03 | China | COOLCORE plus Design | coolcore° | 025 | 12/19/2012 11915045 | 4/13/2015 11915045 | Registered 4/13/2025 |
| TEM-CH-04 | China | COOLCORE (word mark) | COOLCORE | 024 | 12/19/2012 11915044 | | Pending |

Page 8

Case Tracking System

# Foreign Trademark Summary Report

## TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-CH-06 | China | COOLCORE in Chinese | 酷儿酷 | 024 | 12/19/2012 11915042 | | Pending |
| TEM-CH-07 | China | COOLCORE in Chinese | 酷儿酷 | 025 | 12/19/2012 11915041 | | Pending |
| TEM-CH-08 | China | Dr. Cool By CoolCore (Stylized) | drcool | 010 | 1/9/2013 12018019 | 6/28/2014 12018019 | Registered 6/27/2024 |
| TEM-CH-09 | China | Coolcore (chemical free-cooling) | COOLCORE | 025 | 3/31/2015 TBA | | Pending |
| TEM-CHL-01 | Chile | COOLCORE | COOLCORE | 024 | 9/21/2011 970782 | 2/8/2013 992896 | Registered 2/8/2023 |
| TEM-CHL-02 | Chile | COOLCORE | coolcore | 025 | 9/21/2011 970783 | 7/12/2013 1022319 | Registered 7/12/2023 |
| TEM-CHL-03 | Chile | COOLCORE plus Water Drop Logo | drcool | 024  025 | 6/3/2013 1060692 | | Pending |

Page 9

Case Tracking System

# Foreign Trademark Summary Report

## TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-CHL-04 | Chile | **Dr. Cool plus Water Drop Design** | | 010 | 6/20/2013 1063467 | | Pending |
| TEM-COL-01 | Colombia | **COOLCORE plus Water Drop Logo** | | 024  025 | 5/30/2013 2013-132632 | | Pending |
| TEM-COL-02 | Colombia | **Dr. Cool plus Water Drop Design** | | 010 | 6/20/2013 13-147022 | | Pending |
| TEM-CR-01 | Costa Rica | **COOLCORE plus Water Drop Logo** | | 024  025 | 5/30/2013 2013-004726 | 2/25/2014 233875 | Registered 2/25/2024 |
| TEM-CR-02 | Costa Rica | **Dr. Cool plus Water Drop Design** | | 010 | 6/20/2013 2013-005437 | 2/24/2014 233863 | Registered 2/24/2024 |
| TEM-CTM-03 | CTM | **COOLCORE plus Water Drop Logo** | | 010  024 | 5/7/2013 11796539 | 12/11/2014 11796539 | Registered 5/7/2023 |
| TEM-CTM-04 | CTM | **Dr. Cool plus Water Drop Design** | | 010 | 6/20/2013 11917176 | 10/30/2013 11917176 | Registered 6/20/2023 |

Page 10

Case Tracking System

# Foreign Trademark Summary Report

## TEMNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-CTM-05 | CTM | Dr. Cool plus Water Drop Logo | | 035 | 10/10/2014 / 13345947 | 5/7/2015 / 13345947 | Registered / 10/10/2024 |
| TEM-EC-01 | Ecuador | COOLCORE plus Water Drop Logo | | 024 | 5/30/2013 / 2013-40834 | 2/18/2014 / 2953-14 | Registered / 2/18/2024 |
| TEM-EC-02 | Ecuador | COOLCORE plus Water Drop Logo | | 025 | 5/30/2013 / 2013-40832 | 2/18/2014 / 2952-14 | Registered / 2/18/2024 |
| TEM-EC-03 | Ecuador | Dr. Cool plus Water Drop Design | | 010 | 6/20/2013 / 2013-42052-RE | 2/25/2014 / 4416-14 | Registered / 2/25/2024 |
| TEM-FR-01 | France | Coolcore plus Water Drop Logo | | 025 | 3/19/2015 / 15/4166215 | | Pending |
| TEM-HK-01 | Hong Kong | Dr. Cool By CoolCore (Stylized) | | 010 | 1/7/2013 / 302487268 | 1/7/2013 / 302487268 | Registered / 1/6/2023 |
| TEM-HK-02 | Hong Kong | COOLCORE plus Design | | 024  025 | 5/7/2013 / 302599787 | | Pending |

Page 11

Case Tracking System

## Foreign Trademark Summary Report

### TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-HK-03 | Hong Kong | COOLCORE (Stylized) |  | 024  025 | 4/2/2013 302565414 | 4/2/2013 302565414 | Registered 4/2/2023 |
| TEM-ID-01 | Indonesia | Dr. Cool By CoolCore (Stylized) |  | 010 | 2/21/2013 D00 2013 008067 | | Pending |
| TEM-ID-02 | Indonesia | COOLCORE plus Design |  | 024  025 | 5/31/2013 D00 2013 026155 | | Pending |
| TEM-IN-01 | India | COOLCORE plus Design |  | 024  025 | 5/15/2013 2531798 | | Pending |
| TEM-IN-02 | India | COOLCORE |  | 024 | 11/14/2013 2627556 | | Pending |
| TEM-IN-03 | India | dr. cool plus Water Drop Logo |  | 010 | 11/14/2013 2627555 | | Pending |
| TEM-IN-04 | India | COOLCORE plus Water Drop Logo |  | 025 | 11/14/2013 2627557 | | Pending |

Page 12

Case Tracking System

## Foreign Trademark Summary Report

### TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|---|
| TEM-IN-05 | India | COOLKNIT | | 024 | | 4/21/2015 2947938 | | Pending |
| TEM-IS-01 | Israel | COOLCORE plus Design | | 024 | 025 | 11/14/2012 250,911 | 11/14/2012 250,911 | Registered 11/14/2022 |
| TEM-IS-02 | Israel | Dr. Cool plus Water Drop Design | | 010 | | 6/23/2013 256,753 | | Pending |
| TEM-IT-01 | Italy | Coolcore plus Water Drop Logo | | 025 | | 3/11/2015 302015000008307 | | Pending |
| TEM-JA-02 | Japan | COOLCORE | COOLCORE | 024 | 025 | 7/23/2012 2012-059150 | 3/28/2014 5659086 | Registered 3/28/2024 |
| TEM-JA-03 | Japan | COOLCORE plus Design | | 024 | 025 | 12/7/2012 2012-099445 | 12/20/2013 5638667 | Registered 12/20/2023 |
| TEM-JA-04 | Japan | Dr. Cool By CoolCore (Stylized) | | 005 | 010 | 1/9/2013 2013-000849 | 10/11/2013 5622361 | Registered 10/11/2023 |

Page 13

Case Tracking System

# Foreign Trademark Summary Report

## TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-KO-01 | Korea | COOLCORE | COOLCORE | 024  025 | 6/27/2011 / 1 086 296 | 6/27/2011 / 1 086 296 | Registered / 6/27/2021 |
| TEM-KO-02 | Korea | COOLCORE plus Design | coolcore° | 024  025 | 11/16/2012 / 40-2012-71357 | 3/18/2014 / 40-1028129 | Registered / 3/18/2024 |
| TEM-KO-03 | Korea | Dr. Cool plus Water Drop Logo | dr.cool | 010  025 | 1/13/2015 / 40-2015-0002317 | | Pending |
| TEM-MA-01 | Malaysia | Dr. Cool By CoolCore (Stylized) | dr.cool | 010 | 2/8/2013 / 2013051086 | | Pending |
| TEM-MA-02 | Malaysia | COOLCORE plus Design | coolcore | 024 | 5/10/2013 / 2013054501 | | Pending |
| TEM-MA-03 | Malaysia | COOLCORE plus Design | coolcore | 025 | 5/10/2013 / 2013054512 | | Pending |
| TEM-MC-01 | Macau | Dr. Cool plus Water Drop Logo | dr.cool | 010 | 4/20/2015 / N/98506 | | Pending |

Page 14

Case Tracking System

**Foreign Trademark Summary Report**

**TEMPNOLOGY LLC**

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-MC-02 | Macau | COOLCORE plus Water Drop Logo | | 025 | 4/20/2015 N/98507 | | Pending |
| TEM-MO-01 | Morocco | COOLCORE plus Design | | 024  025 | 5/20/2013 152146 | 5/20/2013 152146 | Registered 5/20/2023 |
| TEM-MX-01 | Mexico | COOLCORE | COOLCORE | 024 | 6/28/2011 1190336 | 11/18/2011 1253059 | Registered 11/18/2021 |
| TEM-MX-02 | Mexico | COOLCORE | COOLCORE | 025 | 6/28/2011 1190337 | 11/14/2011 1190337 | Registered 11/14/2021 |
| TEM-MX-04 | Mexico | COOLCORE plus Design | | 035 | 11/25/2013 1434882 | | Pending |
| TEM-NZ-01 | New Zealand | COOLCORE | COOLCORE | 024  025 | 6/28/2011 844716 | 844716 | Registered |
| TEM-NZ-02 | New Zealand | Dr. Cool plus Water Drop Logo | | 010 | 5/19/2014 998173 | | Pending |

Case Tracking System

# Foreign Trademark Summary Report

## TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-PA-01 | Panama | COOLCORE plus Water Drop Logo |  | 024  025 | 5/30/2013 / 223265 | | Pending |
| TEM-PA-02 | Panama | Dr. Cool plus Water Drop Design |  | 010 | 6/20/2013 / 223941 | 6/20/2013 / 223941-01 | Registered / 6/20/2023 |
| TEM-PE-01 | Peru | COOLCORE plus Water Drop Logo |  | 024  025 | 5/30/2013 / 534848-2013 | 2/21/2014 / 00007645 | Registered / 2/21/2024 |
| TEM-PE-02 | Peru | Dr. Cool plus Water Drop Design |  | 010 | 6/20/2013 / 537239 | 12/18/2013 / 00206084 | Registered / 12/18/2023 |
| TEM-PH-01 | Philippines | Dr. Cool By CoolCore (Stylized) |  | 010 | 1/7/2013 / 4-2013-000154 | 6/20/2013 / 4-2013-000154 | Registered / 6/20/2023 |
| TEM-PH-02 | Philippines | COOLCORE plus Design |  | 024  025 | 5/8/2013 / 4-2013-005288 | 10/3/2013 / 4-2013-005288 | Registered / 10/3/2023 |
| TEM-RU-02 | Russian Federation | COOLCORE plus Design |  | 024  025 | 5/13/2013 / 2013715808 | 10/27/2014 / 525482 | Registered / 5/13/2023 |

Page 16

Case Tracking System

# Foreign Trademark Summary Report

## TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-SA-01 | Saudi Arabia | COOLCORE | COOLCORE | 024 | 7/4/2011 169901 | | Pending |
| TEM-SA-02 | Saudi Arabia | COOLCORE | COOLCORE | 025 | 7/4/2011 169902 | | Pending |
| TEM-SA-03 | Saudi Arabia | COOLCORE plus Design | | 025 | 5/18/2013 196922 | | Pending |
| TEM-SI-01 | Singapore | Dr. Cool By CoolCore (Stylized) | | 010 | 1/11/2013 T1300706B | 1/11/2013 TM1300706 R | Registered 1/11/2023 |
| TEM-SI-02 | Singapore | COOLCORE plus Design | | 024  025 | 5/9/2013 T1307404E | 5/9/2013 T1307404E | Registered 5/9/2023 |
| TEM-SO-01 | South Africia | Coolcore plus Design | | 024 | 4/22/2014 2013/01330 | | Pending |
| TEM-SO-02 | South Africia | Coolcore plus Design | | 025 | 4/22/2014 2013/01331 | | Pending |

Page 17

Case Tracking System

**Foreign Trademark Summary Report**

**TEMPNOLOGY LLC**

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date Serial # | Reg Date Reg # | Status Renewal Due |
|---|---|---|---|---|---|---|---|
| **TEM-SO-03** | South Africia | **Coolcore plus Design** | | 035 | 4/22/2014 2013/01332 | | Pending |
| **TEM-SO-04** | South Africia | **Dr. Cool plus Design** | | 010 | 4/22/2014 2014/10328 | | Pending |
| **TEM-SO-05** | South Africia | **Dr. Cool plus Design** | | 035 | 4/22/2014 2014/10329 | | Pending |
| **TEM-SP-01** | Spain | **Coolcore plus Water Drop Logo** | | 025 | 3/10/2015 3.552.089 | 6/26/2015 3552089 | Registered 3/10/2025 |
| **TEM-TH-01** | Thailand | **Dr. Cool By CoolCore (Stylized)** | | 010 | 1/11/2013 877531 | | Pending |
| **TEM-TH-02** | Thailand | **COOLCORE plus Design** | | 024 | 5/29/2013 894154 | | Pending |
| **TEM-TH-03** | Thailand | **COOLCORE plus Design** | | 025 | 5/29/2013 894155 | | Pending |

Page 18

Case Tracking System

## Foreign Trademark Summary Report

### TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | Status / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-TH-04 | Thailand | COOLCORE plus Degree Logo | coolcore° | 024 | 4/25/2013 890158 | 4/25/2013 TM391672 | Registered 4/24/2023 |
| TEM-TH-05 | Thailand | COOLCORE plus Degree Logo | coolcore° | 025 | 4/25/2013 890159 | 4/25/2013 TM391673 | Registered 4/24/2023 |
| TEM-TW-01 | Taiwan | COOLCORE | COOLCORE | 024  025 | 6/30/2011 100032812 | 10/16/2012 1543174 | Registered 10/16/2022 |
| TEM-TW-02 | Taiwan | dr. cool plus Design | dr.cool | 010 | 11/4/2013 102061515 | 6/16/2014 01648716 | Registered 6/16/2024 |
| TEM-UAE-01 | United Arab Emirates | COOLCORE plus Design | coolcore | 025 | 5/12/2013 191538 | 6/16/2014 191538 | Registered 6/16/2024 |
| TEM-UAE-02 | United Arab Emirates | Dr. Cool plus Design | dr.cool | 010 | 4/20/2014 210213 | 8/31/2014 210213 | Registered 4/20/2024 |
| TEM-UAE-03 | United Arab Emirates | Coolcore plus Design | coolcore | 024 | 4/20/2014 210214 | 8/31/2014 21014 | Registered 4/20/2024 |

Page 19

Case Tracking System

# Foreign Trademark Summary Report

## TEMPNOLOGY LLC

Date: June 16, 2015

| Case Number | Country | Mark | Trademark Image | Class | Filing Date Serial # | Reg Date Reg # | Status Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-UK-01 | United Kingdom | COOLCORE plus Water Drop Logo | | 025 | 3/5/2015 3097726 | 5/29/2015 3097726 | Registered 3/5/2025 |
| TEM-VI-01 | Vietnam | CoolCore (word mark) | COOLCORE | 024  025 | 9/10/2012 4-2012-20158 | 1/20/2014 218732 | Registered 9/10/2022 |
| TEM-VI-02 | Vietnam | Dr. Cool plus Design | | 010 | 2/19/2013 4-2013-03148 | 2/19/2013 223437 | Registered 2/19/2023 |

Page 20

Case Tracking System

# U.S. Trademark Summary Report

## TEMPNOLOGY LLC

Date: October 7, 2015

| Case Number | Mark | Trademark Image | Class | Filing Date / Serial # | Reg Date / Reg # | ROA Due / SOU Due | Status / § 8 Due / § 15 Due / Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-08 | HEATSTAR | HEATSTAR | 024 025 | 5/18/2012 / 85/629,127 | | ROA: | Pending |
| TEM-09 | SOLARSTAR | SOLARSTAR | 024 025 | 5/18/2012 / 85/629,136 | | ROA: | Pending |
| TEM-17 | DR.COOL | Dr.Cool | 010 | 6/28/2012 / 85/664,851 | 8/13/2013 / 4,385,337 | ROA: | Registered / 8/13/2019 |
| TEM-18 | DR.COOL BY COOLCORE | Dr.Cool by CoolCore | 010 | 6/28/2012 / 85/664,854 | 2/12/2013 / 4,290,312 | ROA: | Registered / 2/12/2019 |
| TEM-20 | COOLCORE | COOLCORE | 035 | 10/19/2012 / 85/758,933 | | ROA: | Pending |

Page 21

Case Tracking System

## U.S. Trademark Summary Report

### TEMPNOLOGY LLC

Date: October 7, 2015

| Case Number | Mark | Trademark Image | Class | Filing Date | Serial # | Reg Date | Reg # | ROA Due / SOU Due | Status / § 8 Due / § 15 Due / Renewal Due |
|---|---|---|---|---|---|---|---|---|---|
| TEM-24 | CoolCore (Stylized) plus Design |  | 024 | 10/26/2012 | 85/764,959 | 6/11/2013 | 4,350,270 | ROA: | Registered 6/11/2019 |
| TEM-25 | COOL-CORE | COOL-CORE | 025 | 9/22/2010 | 75/983,760 | 12/6/2011 | 4,359,494 | ROA: | Registered 12/6/2017 |
| TEM-26 | COOLKNIT | COOLKNIT | 025 | 6/17/2013 | 85/961,334 | | | ROA: | Pending |
| TEM-28 | templush | templush | 024 | 4/16/2014 | 86/253,674 | | | ROA: | Pending |
| TEM-29 | SYPHON-X plus Design |  | 024 | 6/6/2014 | 86/303,041 | | | ROA:12/8/2014 | Pending |

Page 22

Case Tracking System

## U.S. Trademark Summary Report

### TEMPNOLOGY LLC

Date: October 7, 2015

| Case Number | Mark | Trademark Image | Class | Filing Date Serial # | Reg Date Reg # | ROA Due SOU Due | Status § 8 Due § 15 Due Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-30 | COOL-CORE | COOL-CORE | 025 | 9/22/2010 85/975,730 | 12/6/2011 4,068,747 | ROA: | Registered 12/6/2017 |
| TEM-31 | Dr. Cool | DR. COOL | 035 | 10/23/2014 86/432,377 | 6/16/2015 4,755,395 | ROA: | Registered 6/16/2021 |
| TEM-32 | Coolcore plus Water Drop Logo | coolcore | 025 | 11/3/2014 86/442,998 | | ROA: | Pending |
| TEM-33 | COOLQWICK (stylized) | COOLQWICK | 024 | 12/24/2014 86/490,059 | | ROA: | Pending |
| TEM-34 | Powered by CoolKnit | POWERED BY COOLKNIT | 024 025 | 2/20/2015 86/541,321 | | ROA: | Pending |

Page 23

Case Tracking System

## U.S. Trademark Summary Report

### TEMPNOLOGY LLC

Date: October 7, 2015

| Case Number | Mark | Trademark Image | Class | Filing Date Serial # | Reg Date Reg # | ROA Due SOU Due | Status § 8 Due § 15 Due Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-35 | Intellitemp (stylized) | INTELLITEMP | 024 025 | 2/23/2015 86/542,701 | | ROA:10/6/2015 | Pending |
| TEM-36 | DR. COOL plus Water Drop Logo | dr.cool | 010 | 3/9/2015 86/558,039 | | ROA: | Pending |
| TEM-37 | Coolcore (chemical free-cooling) | coolcore Chemical-Free Cooling | 025 | 3/11/2015 86/560,192 | | ROA: | Pending |
| TEM-38 | Comfortex | COMFORTEX | 024 | 3/18/2015 86/568,503 | | ROA:10/5/2015 | Pending |
| TEM-39 | Dr. Cool plus Water Drop Logo | dr.cool | 025 | 4/14/2015 86/596,788 | | ROA: | Pending |

Page 24

Case Tracking System

## U.S. Trademark Summary Report

### TEMPNOLOGY LLC

Date: October 7, 2015

| Case Number | Mark | Trademark Image | Class | Filing Date Serial # | Reg Date Reg # | ROA Due SOU Due | Status § 8 Due § 15 Due Renewal Due |
|---|---|---|---|---|---|---|---|
| TEM-40 | Dr. Cool plus Water Drop Logo |  | 025 | 4/14/2015 86/596,812 | | ROA: | Pending |

Page 25

**Exhibit 2.2**

<div align="center">

**EXCLUDED ASSETS**

</div>

Notwithstanding anything contained in this Agreement or **Exhibit 2.1** to the contrary, the Excluded Assets shall include:

(a)    all raw materials, work in process, finished goods, and supplies inventories on the Closing Date and all computer records and other records relating to the foregoing;

(b)    all cash and cash equivalents;

(c)    all rights of the Seller under this Agreement, the Ancillary Agreements and the agreements and instruments executed and delivered to the Seller by the Purchaser pursuant to this Agreement;

(d)    all of the Seller's books, records, ledgers, files and documents relating to Excluded Assets;

(e)    The Seller's formal corporate records, including its certificate of incorporation, bylaws, minute books, corporate books, stock transfer records and other records having to do with the corporate organization of the Seller;

(f)    all personnel records and other records that the Seller is required by any Law to retain in its possession, provided that the Seller shall provide copies of such records to the Purchaser unless prohibited from doing so by Law;

(g)    all causes of action under chapter 5 of the Bankruptcy Code;

(h)    all of the Seller's Employee Plans except for those that the Purchaser expressly elects to assume at the Closing pursuant to Section 8.15;

(g)    all existing agreements not being expressly assumed including, but not limited to, all of the Agreements between Seller and Mission Product Holdings and other agreements identified in the Debtor's Omnibus Motion to Reject Certain Executory Contracts and Unexpired Leases *Nunc Pro Tunc* to the Petition Date; and

(i)    all accounts receivable on the books and records of the Seller on the Closing Date.

<div align="right"><u>**Exhibit 3.1**</u></div>

## <u>METHODOLOGY FOR CALCULATING THE PURCHASE PRICE</u>

$1,193,000.00 Credit Bid based on Pre and Post-Petition Borrowing

+ $657,278.00 Assumed Prepetition Liabilities (see chart below)

<u>+ $60,820.00</u>   Approximate Assumed Post petition Liabilities

$1,911,098.00 Total Purchase Price

### <u>Assumed Prepetition Liabilities as of November 20, 2015</u>

| Creditor | Amount to be Assumed by Purchaser |
|---|---:|
| **210 Commerce Way, LLC** | 9,763 |
| **American Arbitration Association** | 20,100 |
| **Baker Newman Noyes** | 34,040 |
| **Caseiro Burke LLC** | 5,761 |
| **Comcast** | 238 |
| **Cool Canuck V** | 3,000 |
| **Disney Sports Attractions** | 156,250 |
| **Experticity, Inc.** | 6,612 |
| **FirstTracks Marketing Group, LLC** | 16,024 |
| **GreenbergTraurig, LLC** | 319,637 |
| **Hohenstein** | 9,677 |
| **Legacy Supply Chain** | 19,942 |
| **Nova Tex** | 27,315 |
| **Portsmouth Computer Group** | 744 |
| **Stebbins, Lazos & Van Der Beken, P.A.** | 26,748 |
| **Tucker Latifi** | 1,362 |
| **Uline** | 65 |
| **Total** | **657,278** |

### Assumed Postpetition Liabilities as of November 20, 2015

| Creditor | Amount to be Assumed by Purchaser |
|---|---|
| Barrett Warehouse and Transport, Inc | 8,318 |
| Brian Hyman | 131 |
| Brice Robertson Design Consultancy | 4,400 |
| Caseiro Burke LLC | 25,819 |
| Eversource/PSNH | 4 |
| FedEx | 271 |
| Tucker & Latifi  LLP | 16,831 |
| Uline | 46 |
| WGSN Inc. | 5,000 |
| Total | $  60,820 |

**Exhibit 3.3**

## ALLOCATION OF CONSIDERATION

To be determined by agreement of the parties following the Closing.

<div align="right"><u>**Exhibit 5.1(a)**</u></div>

## <u>SALE PROCEDURE ORDER</u>

See Exhibit "A" to the Seller's Motion For Entry Of An Order (I)(A) Approving  Procedures In Connection With Sale Of Substantially All Of  Debtor's Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction And Hearing To Consider Approval Of Sale, (D) Approving Procedures Related To Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (E) Approving Form And Manner Of Notice Thereof, And (Ii)(A) Authorizing Sale Of Substantially All Of Debtor's Assets Pursuant To Successful Bidder's Asset Purchase Agreement, Free And Clear Of Liens, Claims, Encumbrances, And Other Interests, And (B) Approving Assumption And Assignment Of Certain  Executory Contracts And Unexpired Leases Related Thereto.

<div align="right"><u>**Exhibit 5.1(b)**</u></div>

<div align="center"><u>**APPROVAL ORDER**</u></div>

See Exhibit "B" to the Debtor's Motion For Entry Of An Order (I)(A) Approving  Procedures In Connection With Sale Of Substantially All Of  Debtor's Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Related Auction And Hearing To Consider Approval Of Sale, (D) Approving Procedures Related To Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (E) Approving Form And Manner Of Notice Thereof, And (Ii)(A) Authorizing Sale Of Substantially All Of Debtor's Assets Pursuant To Successful Bidder's Asset Purchase Agreement, Free And Clear Of Liens, Claims, Encumbrances, And Other Interests, And (B) Approving Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto

**Exhibit A**

## FORM OF BILL OF SALE

FOR THE CONSIDERATION described in the Asset Purchase Agreement (the "Agreement") dated as of September __, 2015 among [_____], a limited liability company organized and existing under the laws of the State of New Hampshire (the "Buyer") and Tempnology LLC, a limited liability company organized and existing under the laws of the State of New Hampshire (the "Seller"), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller hereby grants, bargains, sells, conveys, assigns, transfers, sets over and delivers to the Buyer all of the Seller's right, title and interest in and to the Acquired Assets, free and clear of all claims, Liens and Encumbrances. Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Agreement.

The Seller hereby constitutes and appoints the Buyer, its successors and assigns, the true and lawful agent and attorney-in-fact of the Seller to receive, demand, assert, collect, enforce and sue for any of the Acquired Assets, either in the name of the Seller or in the name of the Buyer, its successors and assigns, all for the use and benefit and at the expense of the Buyer, its successors and assigns. The Seller hereby acknowledges and declares that the foregoing powers are coupled with an interest in favor of the Buyer, and are and shall be irrevocable by the Seller.

The Seller hereby covenants and agrees that it will at any time and from time to time, at the request of the Buyer, its successors or assigns, execute and deliver to it or them such new or confirmatory instruments and other and further instruments, and take or cause to be taken such further action which the Buyer, its successors or assigns, may reasonably request to vest in it or them all of the Acquired Assets or to enable the Buyer, its successors and assigns, to realize upon or otherwise to enjoy any of the same or to carry into effect the intent and purpose hereof.

Any of the property, including the Acquired Assets, transferred pursuant to this Bill of Sale is being transferred AS IS, WHERE IS AND WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND.

This Bill of Sale shall be binding upon the Seller and its successors, assigns, representatives and heirs, and shall inure to the benefit of the Buyer and its successors and assigns.

This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of New Hampshire, without regard to principles of conflict of laws.

Nothing in this Bill of Sale shall constitute or be construed as a waiver or limitation of either parties' rights, powers, duties, obligations or remedies under the Agreement or any other agreement between the parties. In the event of any conflict between the terms, conditions and provisions of this Bill of Sale and the Agreement any other agreement between the parties, the terms, conditions and provisions of the Agreement or such other agreement shall govern.

4840-2900-2022.9

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly effective as of the __ day of _____, 2015.

_____
_____

By:_____

Its:_____

**Exhibit B**

## FORM OF ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "Agreement") is made as of the __ day of _____, 2015, by and between [_____], a limited liability company organized and existing under the law of the State of New Hampshire ("Assignee"), and Tempnology, LLC., a New Hampshire limited liability company ("Assignor").

### Recitals:

A.        Pursuant to that certain Asset Purchase Agreement dated as of September __, 2015, (the "Asset Purchase Agreement") as approved by the United States Bankruptcy Court for the District of New Hampshire in chapter 11 case number 15-_____, Assignor has agreed to assign to Assignee all of its right, title and interest in and to the Assigned Contracts (as defined in the Asset Purchase Agreement).

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Asset Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.        Assignment.  Assignor hereby grants, bargains, sells, conveys, assigns, transfers, sets over and delivers to Assignee, without recourse, all of its right, title and interest in and to the Assigned Contracts and the Assigned Permits.    ANY ASSIGNED CONTRACTS BEING ASSIGNED PURSUANT TO THIS AGREEMENT ARE BEING ASSIGNED AS IS, WHERE IS AND WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND.

2.        Assumption.  Subject to the terms and conditions set forth herein, Assignee hereby accepts the assignment of, and, solely to the extent arising as of or after the date hereof, assumes and agrees to fulfill, perform and observe all of the terms, conditions and obligations of Assignor with respect to, the Assigned Contracts and the Assigned Permits.

3.        Further Assurances.  Each of the parties hereto agrees to cooperate at all times from and after the execution and delivery of this Agreement with respect to the matters described herein, and to execute such further assignments, releases, acceptances, amendments, notifications, consents and other documents as may be reasonably requested by the other party for the purpose of giving effect to, evidencing or giving notice of the transactions contemplated by this Agreement.

4.        Successors and Assigns.    The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of Assignee, Assignor and their respective successors and assigns.

5.        Modification.  This Agreement may be modified only by a written instrument duly executed and delivered by each of the parties hereto.

6.        Governing Law.  This Agreement is a contract made under, and shall be governed by and construed in accordance with, the laws of the State of New Hampshire applicable to contracts

made and to be performed entirely within such State and without giving effect to choice of law principles of such State.

7.  <u>Waiver</u>.  Nothing in this Agreement shall constitute or be construed as a waiver or limitation of either parties' rights, powers, duties, obligations or remedies under any other agreement between the parties.  In the event of any conflict between the terms, conditions and provisions of this Agreement and the Asset Purchase Agreement or any other agreement between the parties, the terms, conditions and provisions of the Asset Purchase Agreement or such other agreement shall govern.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

<div style="margin-left: 50%;">

TEMPNOLOGY LLC
By: _____
Its: _____


By: _____
Its: _____

</div>

<div align="right"><u>**Exhibit C**</u></div>

<u>**FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT**</u>

This Domain Name Assignment (this "<u>**Assignment**</u>"), effective as of September [__], 2015, is delivered by Tempnology LLC, a limited liability company organized and existing under the laws of the State of New Hampshire ("<u>**Assignor**</u>"), to Schleicher & Stebbins Hotels, L.L.C., a limited liability company organized and existing under the laws of the State of New Hampshire ("<u>**Assignee**</u>"), pursuant to the Asset Purchase Agreement, dated as of September [__], 2015 (the "<u>**Agreement**</u>"), by and among Assignor and Assignee. Capitalized terms used herein but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

WHEREAS, Assignor has assigned the Acquired Assets to Assignee pursuant to the terms of the Agreement and in accordance therewith Assignor desires to deliver to Assignee such instruments of sale, transfer, conveyance, assignment and delivery as are required to vest in Assignee all of Assignor's right, title and interest in and to the domain name registration for each of the Internet domain names set forth in <u>Schedule A</u> hereto (the "<u>**Domain Names**</u>").

NOW, THEREFORE, pursuant to the Agreement and in consideration of the payment of the Purchase Price contemplated by the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee, and Assignee does hereby purchase and acquire from Assignor, free and clear of all Encumbrances, all of Assignor's right, title and interest in and to the Domain Names to be held by and for the exclusive use and benefit of Assignee, its successors, assigns and legal representatives, to the full end of the term for which said Domain Names may be granted as fully and entirely as the same would have been held by Assignor had this Assignment and sale not been made. This Assignment includes any prepaid expense for maintenance of the website with respect to the Domain Names.

Assignee and Assignor covenant and agree that the representations, warranties, covenants and agreements of the parties contained in the Agreement shall not merge into or with this Assignment, but shall survive this Assignment and become a part hereof and shall continue in full force and effect for the periods specified in the Agreement as though set forth herein at length. Assignee and Assignor, by their execution of this Assignment, each acknowledge and agree that neither the representations and warranties nor the rights and remedies of the parties under the Agreement shall be deemed to be enlarged, modified or altered in any way by such execution and acceptance of this Assignment and that the terms and conditions of the Agreement shall govern the transfer of the Domain Names.

Assignor agrees to assist and cooperate with Assignee in registration and transfer of the Domain Names, and to execute and deliver all documents requested by Assignee or required by a domain name registrar in connection with Assignee's ownership, registration and transfer of the Domain Names.

This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. This Assignment may be executed by facsimile signatures which shall be considered originals.

4840-2900-2022.9

IN WITNESS WHEREOF, the parties hereto have caused this Domain Name Assignment to be executed effective as of the date first above written.

<u>**ASSIGNOR:**</u>

**TEMPNOLOGY LLC**

By: _____
Name:
Title:

<u>**ASSIGNEE:**</u>

**SCHLEICHER & STEBBINS HOTELS, L.L.C.**

By: _____
Name:
Title:

**Exhibit D**

## FORM OF TRADEMARK ASSIGNMENT AGREEMENT

This Trademark Assignment (this "Assignment") is made and entered into as of September ___, 2015 (the "Effective Date") by and between Tempnology LLC, a limited liability company organized and existing under the laws of the State of New Hampshire (hereinafter "Assignor"), and Schleicher & Stebbins Hotels, L.L.C., a limited liability company organized and existing under the laws of the State of New Hampshire (hereinafter "Assignee").

Whereas, Assignor wishes to assign to Assignee, and Assignee wishes to acquire from Assignor, the trademarks, registrations, and registration applications set forth on Schedule A attached hereto (collectively, the "Assigned Trademarks").

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, transfers, and sets over to Assignee its entire right, title, and interest in and to the Assigned Trademarks, together with the goodwill of the business in connection with which the Assigned Trademarks are used and which is represented by the Assigned Trademarks, and all other corresponding rights that are or may be secured under the laws of the United States and any foreign country, now or hereafter in effect, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns, or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, including but not limited to all contracts and contract rights relating to the Assigned Trademarks, whether oral or written, including but not limited to all license agreements, and all of Assignor's claims, rights to sue and to institute or defend legal and equitable proceedings, past, present and future, connected in any way with the Assigned Trademarks, together with all income, royalties, damages, or payments due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present, or future infringement or other unauthorized use of the Assigned Trademarks, with the right to sue for and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns, or other legal representatives.

Assignor hereby authorizes and requests the USPTO Commissioner for Trademarks, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the Assigned Trademarks.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor and Assignee have caused this Trademark Assignment to be executed by their duly authorized representatives as of the Effective Date.

**Assignor:**

TEMPNOLOGY LLC

By: _____
Name:
Title:

**Assignee:**

SCHLEICHER & STEBBINS
HOTELS, L.L.C.

By: _____
Name:
Title:

**Exhibit E**

## FORM OF PATENT ASSIGNMENT AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Tempnology LLC, a limited liability company organized and existing under the laws of the State of New Hampshire (hereinafter "**Assignor**"), does hereby sell, transfer and convey to Schleicher & Stebbins Hotels, L.L.C., a limited liability company organized and existing under the laws of the State of New Hampshire (hereinafter "**Assignee**"), Assignor's entire right, title and interest in and to all of the patents and/or patent applications (hereinafter "**Patents**") identified in the Schedule attached to and forming a part of this Patent Assignment and with all rights of protection throughout the world, including but not limited to any reissues, extensions and applications which are continuations, continuations-in-part, substitutes, divisions or renewals. Assignor hereby further sells, transfers and conveys to Assignee Assignor's entire right, title and interest in and to the aforesaid Patents in the United States and each and every country foreign to the United States; and Assignor further conveys to Assignee all priority rights resulting from the Patents and all causes of action for infringement arising prior to and after the date of this Patent Assignment.

Assignor covenants that Assignor has the full right and power to convey the entire interest herein assigned, and that Assignor has not executed and shall not hereafter execute any document in conflict with this Patent Assignment.

Assignor agrees that upon request of Assignee or its successors, assigns or other legal representatives, Assignor or its successors, assigns or other legal representatives shall do all other legal acts reasonably necessary to carry out the intent of this Patent Assignment at Assignor's expense, as well as provide such other material, information or assistance as Assignee or its successors, assigns or other legal representatives may consider necessary with respect to the Patents; including but not limited to causing any party under Assignor's control to execute such documents and do all other legal acts reasonably necessary to carry out the intent of this Patent Assignment. In furtherance thereof, Assignor hereby irrevocably designates and appoints Assignee, its successors, assigns and other legal representatives as agents and attorneys-in-fact to act for and on behalf and instead of Assignor, to execute and file any such documents and to do all other lawfully permitted acts to further the above purposes with the same legal force and effect as if executed by Assignor.

Assignor hereby authorizes and requests the Director of the United States Patent and Trademark Office, and corresponding officials in other jurisdictions, to issue any of the Patents to the Assignee, as assignee of the whole right, title and interest thereto.

This Patent Assignment shall be governed by and construed in accordance with the laws of the State of New Hampshire, without regard to any applicable principles of conflicts of law.

### [SIGNATURE PAGE FOLLOWS]

4840-2900-2022.9

IN WITNESS WHEREOF, the parties hereto have caused this Patent Assignment to be executed effective as of the date first above written.

**Assignor:**

TEMPNOLOGY LLC

By: _____
Name:
Title:

**Assignee:**

SCHLEICHER & STEBBINS
HOTELS, L.L.C.

By: _____
Name:
Title:

**<u>SCHEDULE 6.2</u>**

**<u>FOREIGN JURISDICTIONS</u>**

1.  France

2.  Germany

3.  China

## SCHEDULE 12.23

### BROKER'S AND FINDER'S FEES

The Seller shall be solely responsible for the payment of any fees due and owing to
Phoenix Capital Resources pursuant to the terms of a certain letter agreement dated July
20, 2015 as subsequently approved by Order of the Bankruptcy Court.

Exhibit 2 to Sale Order

**<u>Assumed Contracts</u>**

**Attachment to Exhibit 2.1**

**Assumed Contracts**

| Contract Date | Expiration Date | Counter Party | Address | Proposed Cure Amount |
|---|---|---|---|---|
| Jan 1, 2012 | | ADP Total Source | 11 Northeastern Blvd, Salem, NH 03079 | $0.00 |
| Oct 1, 2014 | Sept 30, 2015 | Barrett Distribution Services | 15 Freedom Way, Franklin, Ma 02038 | $0.00 |
| April 1, 2015 | March 31, 2017 | Jewett Commercial Park LLC | 32 Harriman Hill Rd. Raymond, NH 03077 | $0.00 |
| Oct 10, 2014 | Dec 31, 2016 | Hohenstein Institute of America | 1688 Westbrook Ave. Burlington, NC 27215 | $9,677.00 |
| Pending | 3 years | GECC | 300 E John Carpenter Freeway, Irving, Tx 75062 | $0.00 |
| Aug 1, 2012 | July 31, 2017 | Muirfields LLC | c/o Kane Mgmt Group LLC, 210 Commerce Way #300, Portsmouth, NH 02801 | $0.00 |
| Feb 20, 2015 | Jan 1, 2020 | Fruit of the Loom | 1 Fruit of the Loom Drive, Bowling Green, Kentucky 42103 | $0.00 |
| Feb 1, 2015 | Jan 31, 2020 | Disney Worldwide Services | DWS, 1675 Buena Vista Drive, Lake Buena Vista, Florida 32830 | $156,250.00 |
| Feb 1, 2015 | Dec 31, 2017 | Rope-A-Towel | PO Box 1052, Windemere Fla 34786 | $0.00 |
| July 1, 2015 | Dec 31, 2016 | MPW Sports Inc | 21195 Gladiolos Way, Lake Forest, Ca 92630 | $0.00 |
| March 1, 2015 | | Perennial Sales | 4963 Bacopa Lane S, #605, St Petersburg, Fla 33715 | $0.00 |
| May 15, 2014 | Dec 31, 2016 | Kittredge and Associates | 63 Grand Ave, River Edge, NJ 07661 | $0.00 |
| July 1, 2015 | Dec 31, 2019 | Toshiya Sato | 2-15-61 Inukura, Miyamae-Ku, Kawasaki, Kanagawa 216-011, Japan | $0.00 |
| June 1, 2015 | May 31, 2017 | Tony Fernandez | 4 Bateson Drive, Andover, Ma 01810 | $0.00 |
| July 1, 2015 | Dec 31, 2015 | Prime Pacific Connections LLC | PO Box 15583, Irvine, Ca 92623 | $0.00 |
| June 19, 2015 | Dec 31, 2015 | Jim Zeiba | 10 Applewood Drive, Derry, NH 03038 | $0.00 |
| March 1, 2015 | Feb 28, 2016 | Athena Apparel Solutions LLC | 100 Albany St., Portsmouth, NH 03801 | $0.00 |
| June 3, 2011 | June 3, 2016 | Rob Westergren | 8 West Ridge Dr., Hampton, NH 03842 | $0.00 |
| June 3, 2011 | June 3, 2016 | Dennis Ackroyd | 810 Meadow Rd., Caso, Maine 04015 | $0.00 |
| Oct 1, 2014 | Sept 30, 2019 | PJS Distributors Pty Ltd | 440 Collins St., Level 12, Melbourne, VIC 3000, Australia | $0.00 |
| March 1, 2015 | Feb 28, 2020 | Sportsline | Unit 1504-05, 102 Austin Road, Tsinshatsui, Kowloon Hong Kong | $0.00 |
| Nov 1, 2014 | Oct 31, 2019 | Unique Piertech Solutions Pvt Limited | Peninsula Techno Park, Equinox Building Park, Tower 1, 7th Fl Off Bandra Kurla Rd., LBS Marg, Mumbai 400070 India | $0.00 |

4846-2900-2022.9

| Feb 1, 2015 | Jan 31, 2018 | Hae Min Trading Co | Haemin Bldg, 2F, 23 Seokchonhosu-ro-18-gil, songpa-gu, Seoul, Korea | $0.00 |
| July 1, 2015 | June 30, 2019 | Beattie Matheson Ltd | Level 2, 272 Parnell Rd, Parnell, Auckland 1052 New Zealand | $0.00 |
| June 1, 2015 | Dec 31, 2017 | RON Corp | 1-3-4 Shimomae, Toda City, Saitama 335-0016, Japan | $0.00 |
| March 1, 2015 | Feb 28, 2018 | Metroasis (Country Life Ltd) | 169-1, Sec 1, Kangle Road, Xinfeng Township, Hsinchu County 304 Taiwan | $0.00 |

4840-2900-2022.9