FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE FIRST CIRCUIT

————————————————

**BAP NO. NH 18-048**

————————————————

**Bankruptcy Case No. 15-11400-CJP**

————————————————

**OLD COLD, LLC,**
**Debtor.**

————————————————

**MISSION PRODUCT HOLDINGS, INC.,**
**Appellant,**

**v.**

**SCHLEICHER & STEBBINS HOTELS, L.L.C., and**
**OLD COLD, LLC,**
**Appellees.**

————————————————

**Appeal from the United States Bankruptcy Court**
**for the District of New Hampshire**
**(Hon. Christopher J. Panos, U.S. Bankruptcy Judge)**

————————————————

**Before**
**Lamoutte, Godoy, and Finkle,**
**United States Bankruptcy Appellate Panel Judges.**

————————————————

**Robert J. Keach, Esq., and Lindsay Z. Milne, Esq., on brief for Appellant.**
**Christopher M. Candon, Esq., on brief for Appellee, Schleicher & Stebbins Hotels, L.L.C.**
**No brief filed by Appellee, Old Cold, LLC.**

————————————————

**June 18, 2019**

————————————————

**Lamoutte, U.S. Bankruptcy Appellate Panel Judge.**

Mission Product Holdings, Inc. ("Mission"), an unsuccessful bidder for the debtor's assets and a party to one of the debtor's rejected executory contracts, appeals from the bankruptcy court's order granting the motion for relief from the automatic stay (the "Stay Relief Order") filed by creditor, Schleicher & Stebbins Hotels, LLC ("S&S"). In the motion, S&S, the pre- and post-petition secured lender to the debtor and the successful purchaser of the majority of the debtor's assets in a § 363 sale, sought relief from the automatic stay under § 362(d)(2) "to pursue its rights and remedies as a holder of a valid, perfected, first-priority security interest" in all of the debtor's remaining assets."[1] Mission opposed the motion, arguing that: (1) the bankruptcy court was divested of jurisdiction to consider it given the pendency of a petition for writ of certiorari before the U.S. Supreme Court (the "Supreme Court") relating to Mission's purported post-rejection rights under a license agreement pursuant to § 365(n);[2] and (2) S&S was not entitled to stay relief because, as part of its winning bid for the debtor's assets, S&S waived its lien on certain assets excluded from the sale which remained in the bankruptcy estate. Rejecting both arguments, the bankruptcy court granted S&S's request for relief from stay.

For the reasons set forth below, we **AFFIRM**.

---

[1] All references to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

[2] For a discussion of § 365(n), see infra at n.6.

# INTRODUCTION[3]

Prior to the bankruptcy filing, Old Cold, LLC, formerly known as Tempnology, LLC (the "Debtor"), made specialized products—such as towels, socks, headbands, and other accessories—designed to remain at low temperatures even when used during exercise. S&S, an investment holding company, owned a majority interest in the Debtor and was the Debtor's pre-petition lender.

Three years before the petition date, the Debtor and Mission entered into an agreement, whereby the Debtor granted Mission a non-exclusive license to use the Debtor's intellectual property as well as certain exclusive product distribution rights. In the three years that followed, the Debtor experienced "multi-million dollar losses," which it blamed on the agreement with Mission. Eventually, Mission's relationship with the Debtor soured and, in 2014, Mission exercised its contractual right to terminate the license agreement.

The parties' contentious relationship spawned several strands of litigation in the Debtor's bankruptcy case. One related to the Debtor's rejection of the license agreement and Mission's assertion of post-rejection rights under that agreement pursuant to § 365(n). Another related to the Debtor's 2015 sale to S&S of primarily all its assets—with the exception of cash, inventory,

---

[3] The facts set forth in this opinion are primarily gleaned from the record as well as the decisions of the U.S. Court of Appeals for the First Circuit (the "First Circuit") and the Panel arising from these bankruptcy proceedings (as described later). See Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC), 879 F.3d 389, 405 (1st Cir. 2018) (affirming bankruptcy court's order regarding Mission's retention of rights under § 365(n)); Mission Prod. Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC), 879 F.3d 376, 378 (1st Cir. 2018) (affirming bankruptcy court order approving § 363 sale of the Debtor's assets to S&S); Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC), 559 B.R. 809, 825 (B.A.P. 1st Cir. 2016) (reversing bankruptcy court's ruling that Mission's trademark rights terminated upon rejection and affirming as to all other rulings regarding Mission's retention of rights under § 365(n)); Mission Prod. Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC), 558 B.R. 500, 503 (B.A.P. 1st Cir. 2016) (affirming bankruptcy court order approving § 363 sale of the Debtor's assets to S&S).

and accounts receivable—which the bankruptcy court approved over the objection of Mission, who was the unsuccessful bidder for those assets.  Disagreeing with the outcomes in those contested matters, Mission appealed to both the Panel and the First Circuit and, with respect to its alleged post-rejection rights under the license agreement, to the Supreme Court.  None of the appeals have been successful (with the exception of the single issue addressed by the Supreme Court, as discussed later).  Despite the finality of the bankruptcy court's order approving the sale, Mission remains dissatisfied with the Debtor's sale of its assets to S&S.  When S&S requested relief from the automatic stay to exercise its rights as the holder of a security interest in the assets remaining in the bankruptcy estate, Mission objected, asserting for the first time that S&S had waived its lien on those assets as part of the § 363 sale, although no such waiver was expressed in the sale order or the asset purchase agreement.  Mission also argued that the bankruptcy court was divested of jurisdiction to consider the stay relief motion because stay relief would "impermissibly interfere" with the § 365(n) rights Mission was asserting in its petition to the Supreme Court.  The bankruptcy court, finding no evidence in the extensive record that S&S had waived its lien, rejected both arguments and granted S&S relief from stay.  Mission appealed.  Although it sought a stay pending appeal from both the bankruptcy court and the Panel, neither court granted the request.  Thereafter, the Debtor distributed the remaining estate asset—approximately $500,000 in cash—to S&S.

As an understanding of the course of proceedings before the bankruptcy court is relevant to the merits of this appeal, we begin with a detailed discussion of the relevant pre- and post-petition events.

## BACKGROUND

### I.  Pre-Petition Events

In 2012, the Debtor and Mission entered into a Co-Marketing and Distribution Agreement (the "Mission Agreement"), which granted Mission a non-exclusive, perpetual license to use the Debtor's intellectual property and an exclusive distributorship for certain manufactured products of the Debtor.

In the spring of 2013, the Debtor obtained a line of credit from People's United Bank ("People's") pursuant to a note in the original principal amount of $350,000 (the "LOC Note"). To secure its obligations under the LOC Note, the Debtor granted to People's a security interest in all of the Debtor's assets and executed a UCC financing statement which was filed with the New Hampshire Secretary of State.

The Debtor also borrowed money from S&S. In August 2013, the Debtor executed a term note of up to $6,000,000 (the "Term Note"), and S&S loaned millions of dollars to the Debtor under the Term Note on an unsecured basis. Then, in July 2014, S&S purchased the LOC Note, along with People's "first position security interest in the Debtor's assets." S&S increased the loan limit from $350,000 to $4,000,000, and rolled some of its unsecured debt into the secured LOC loan. Another UCC financing statement, assigning to S&S all of People's rights and interests under the original UCC financing statement, was filed with the New Hampshire Secretary of State. (All of these documents are collectively referred to as the "Loan Documents").

On June 30, 2014, Mission exercised its contractual right to terminate the Mission Agreement without cause, triggering a two-year wind-down period during which time the Mission Agreement remained in full force. The Debtor responded by seeking to terminate the

Mission Agreement for cause, claiming a breach by Mission. As a result of the dispute, the parties entered into a two-phase arbitration with each party claiming breach by the other. The arbitrator found that the Debtor's attempted termination for cause was improper, potentially entitling Mission to damages for the Debtor's failure to abide by the Mission Agreement leading up to arbitration. The hearing to determine the amount of these damages was stayed by the Debtor's bankruptcy filing.

## II.    The Bankruptcy Proceedings[4]

### A.    The Bankruptcy Filing

The Debtor filed a chapter 11 petition on September 1, 2015. On the petition date, S&S formally became a stalking horse bidder by signing an agreement to purchase the Debtor's assets for $6.95 million, composed almost entirely of forgiven pre-petition debt owed by the Debtor to S&S.[5]

On its bankruptcy schedules, the Debtor listed S&S as its only secured creditor with a claim in the amount of $5,550,000 for pre-petition "advances" made by S&S. Additionally, the Debtor listed Mission as an unsecured creditor with a contingent, unliquidated, disputed claim in the amount of $0, and identified the Mission Agreement as one of its executory contracts.

The Debtor also filed a number of motions at the outset of the case, including: (1) a motion seeking authority to obtain post-petition debtor-in-possession financing from S&S and to

---

[4] The Honorable J. Michael Deasy presided over the bankruptcy case until his retirement in September 2017. The case was then reassigned to the Honorable Christopher J. Panos, who entered the Stay Relief Order which is at issue in this appeal.

[5] As the First Circuit explained, "[t]his strategy of offsetting a purchase price with the value of a secured lien is called credit bidding, and it is permitted in a [§] 363 sale 'unless the court for cause orders otherwise.'" In re Old Cold, 879 F.3d at 379 (quoting 11 U.S.C. § 363(k)).

use S&S's cash collateral (the "DIP Financing Motion"); (2) a motion to establish procedures for the sale of substantially all of its assets (the "Sale Motion"); and (3) a motion to reject executory contracts, including the Mission Agreement (the "Rejection Motion"). Mission filed a single objection to all three motions, and extensive litigation between the parties ensued.

### B.    The DIP Financing Motion

Three days after the bankruptcy filing, the bankruptcy court issued an order (the "First Interim DIP Order") granting the DIP Financing Motion on an interim basis and authorizing the Debtor to borrow up to $500,000 from S&S (the "DIP Facility"). The First Interim DIP Order acknowledged that S&S's pre-petition liens on the Debtor's assets were "valid, binding, enforceable, and perfected first-priority liens . . . ." Thereafter, the bankruptcy court entered additional orders approving the DIP Facility on an interim basis on the same or similar terms and conditions as set forth in the First Interim DIP Order.

In December 2015, after a hearing, the bankruptcy court entered a final order approving the DIP Facility (as amended, the "Final DIP Order"), authorizing the Debtor "to incur debt" of up to $1,450,000 secured by "first priority perfected liens . . . on property of the Debtor's estate . . . ." (the "DIP Liens"). The Final DIP Order indicated that the Debtor's pre-petition debt to S&S was approximately $5,500,000 under the LOC Note and that S&S would have "replacement security interests and liens in the Collateral . . . with the same validity as existed on the petition date . . . ." It further provided:

> This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Pre-Petition Replacement Liens (collectively, the "Liens") without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required . . . to validate or perfect the Liens or to entitle [S&S] to the priorities granted herein.

The Interim and Final DIP Orders set November 12, 2015 (pre-petition lending period) and December 31, 2015 (post-petition lending period), as the deadlines for any objections or challenges regarding "the validity, extent, perfection or priority of the security interests and liens of [S&S]" or "the validity, allowability, priority, status or amount" of the debt owed to S&S (the "Challenge Periods").  No party commenced a contested matter or adversary proceeding raising an objection or challenge to S&S's secured claim or liens before the Challenge Periods expired.

### C.      Motion to Reject the Mission Agreement

As noted above, the Debtor also filed at the outset of the case the Rejection Motion, seeking to reject certain executory contracts, including the Mission Agreement.  Mission objected arguing, among other things, that even if the Mission Agreement was an executory contract subject to rejection, Mission retained both its intellectual property license and its exclusive distribution rights under § 365(n).[6]  After a hearing, the bankruptcy court entered an order granting the Debtor's motion to reject the Mission Agreement under § 365(a) "subject to [Mission's] election to preserve its rights under [ ] § 365(n)."  The Debtor then filed a motion seeking a determination of the scope of Mission's post-rejection rights under § 365(n) (the "365(n) Motion").

After a hearing in November 2015, the bankruptcy court entered an order (the "365(n) Order") concluding that Mission's post-rejection rights under § 365(n) were limited to the non-exclusive intellectual property license and that its exclusive distribution rights and

---

[6]  Section 365(a) permits a debtor-in-possession, subject to court approval, to assume or reject executory contracts of the debtor.  See 11 U.S.C. § 365(a).  Section 365(n) allows a counter-party who is a licensee under an intellectual property license to elect to retain certain rights under the contract notwithstanding the debtor's rejection of it.  See 11 U.S.C. § 365(n).

trademark license did not survive rejection.  See In re Tempnology, LLC, 541 B.R. 1, 6-7 (Bankr. D.N.H. 2015).  Mission appealed, and the Panel affirmed in part and reversed in part. See In re Tempnology, LLC, 559 B.R. at 825 (reversing the 365(n) Order as to the bankruptcy court's ruling that Mission's trademark rights terminated upon rejection, and affirming as to all other aspects of the 365(n) Order).  Mission then appealed to the First Circuit, which affirmed the bankruptcy court's decision.  See In re Tempnology, LLC, 879 F.3d at 405.[7]

In June 2018, Mission filed a petition for a writ of certiorari with the Supreme Court (the "Petition") with respect to the 365(n) Order.  In October 2018, after the bankruptcy court issued the Stay Relief Order at issue in this appeal, the Supreme Court granted the Petition as to the following question (the "365(n) Question"): "Whether, under § 365 of the Bankruptcy Code, a debtor-licensor's 'rejection' of a license agreement—which 'constitutes a breach of such contract,' 11 U.S.C. § 365(g)—terminates rights of the licensee that would survive the licensor's breach under applicable nonbankruptcy law."  See Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 397 (2018).  In a decision issued on May 20, 2019 (the "Supreme Court Decision"), the Supreme Court ruled as follows:

> [W]e hold that under [§] 365(n), a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside of bankruptcy.  Such an act cannot rescind rights that the contract previously granted.  Here, that construction of [§] 365 means that the debtor-licensor's rejection cannot revoke the trademark license.

---

[7]  The First Circuit issued a mandate on January 29, 2018, and the Panel issued a mandate on February 13, 2018.

We accordingly reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

<u>Mission Prod. Holdings, Inc. v. Tempnology, LLC</u>, 139 S. Ct. 1652, 1666 (2019).[8]

**D.     Motion to Sell the Debtor's Assets**

Mission also objected to the Sale Motion, in which the Debtor sought to establish procedures for the sale of substantially all of its assets free and clear of liens, claims, encumbrances, and other interests.  As grounds, Mission argued: (1) its election under § 365(n) precluded the Debtor from selling its assets free and clear of Mission's rights; (2) the proposed sale was to an insider; (3) S&S should not be permitted to credit bid its purported claim; and (4) the bankruptcy court should "recharacterize" S&S's pre-petition debt as equity.

**1.     Appointment of Examiner**

Because the stalking horse bidder—S&S—was an insider of the Debtor, both the U.S. Trustee and Mission sought the appointment of an independent examiner to evaluate the proposed sale and bidding procedures.  After a hearing, the bankruptcy court authorized the appointment of Michael Askenaizer as examiner (the "Examiner") "to investigate the terms of the proposed sale of substantially all the assets of the Debtor."

In an interim report dated September 30, 2015, the Examiner recommended that S&S's credit bid of pre-petition debt "be reduced by $2 million to reflect the conversion of unsecured debt owed to S&S [ ] by the Debtor to secured debt, without any new value flowing to the Debtor."  He further stated, however, that he did "not see a basis for limiting [S&S's] ability to credit bid post-petition loans it has or will make to the Debtor."

---

[8]  The Supreme Court's recent resolution of the 365(n) Question does not alter our analysis in this appeal.

### 2.     The Sale Procedures Order

The bankruptcy court considered the Sale Motion at a hearing on October 2, 2015.  In light of the concern raised in the Examiner's interim report and echoed by the court at the hearing about S&S's pre-petition credit bid, S&S agreed to lower its stalking horse bid from approximately $7 million to just over $1 million, consisting of a credit bid of $750,000 in post-petition debt and the assumption of about $300,000 in pre-petition liabilities.  After the hearing, the bankruptcy court entered an order (the "Sale Procedures Order"), approving procedures for the sale of the Debtor's assets and S&S as the stalking horse bidder.  The court also authorized S&S to credit bid "up to and including the post-petition amounts loaned to the Debtor under [the DIP Facility]" and "an additional $5,650,000 (the amount of [S&S]'s claim listed on the Debtor's Schedule D . . .) on the Assets."

### 3.     The Auction and Mission's Amended Objection to Sale Motion

On November 5, 2015, the Debtor conducted an auction (the "Auction") in accordance with the Sale Procedures Order, which culminated in S&S's winning bid.  The First Circuit, in its decision affirming the court's approval of the asset sale, described the proceedings as follows:

> [O]n November 5, [2015,] Debtor's counsel held an auction for Debtor's assets, at which S&S and Mission were the only bidders.  The bid procedures allowed negotiations to be conducted off the record.  Although S&S had revised its stalking horse bid to exclude forgiven pre-petition debt, its first bid at auction— for a total of $1.4 million—included such a credit bid.  Mission then asserted that S&S had no right to credit bid pre-petition debt, and announced that it would bid under protest for the remainder of the auction.  The next opportunity to bid went to Mission.  To beat S&S's proposal, Mission increased the value of its previous bid, to the apparent confusion of some present, by agreeing to leave in the estate $200,000 in cash, thus increasing the total value of its bid to $1.5 million.  Bidding continued to proceed in this fashion: S&S increased its bid using credit, and Mission agreed to leave additional assets in the estate, including Debtor's finished goods inventory and accounts receivable.  Given Mission's bidding structure, Debtor then revalued its accounts receivable and inventory to reflect their liquidation value as opposed to their book value.  This revaluation reduced

11

the bidding value of the accounts receivable by twenty percent, to $80,000, and the bidding value of the inventory by ninety percent, to $120,000.  Mission's counsel, after being informed that Debtor would recalculate the inventory value, responded that "[a]s long as it's apples to apples, I don't care."  Mission's counsel did not object to the new figures after Debtor announced them.

The parties then broke for lunch.  Back on the record, Debtor's counsel informed those present that, after a negotiation between Debtor's counsel and S&S off the record, S&S intended to adopt Mission's bid structure *by leaving assets in the estate.*  In its next bid, S&S credit bid only its post-petition debt, assumed all pre-petition liabilities other than rejection damages and disputed liabilities, assumed post-petition accounts payable, *and left in the estate all accounts receivable, inventory, and cash*.  In subsequent bidding, S&S increased its bid by credit bidding pre-petition debt, and Mission increased its bid with cash.  Mission soon ceased to bid and declined to be designated the backup bidder, ending the auction. S&S's winning bid, for a total value of $2.7 million, consisted of forgiven pre-petition debt, forgiven post-petition debt, the assumption of post-petition accounts payable, the assumption of certain pre-petition unsecured debt, and *cash, inventory, and accounts receivable left in the estate.*  For this consideration, S&S acquired "all of [Debtor's] assets, properties and businesses," *excluding, among other things, the assets left in the estate.*

879 F.3d at 380-81 (emphasis added).

The exclusion of "cash, inventory, and accounts receivable" (the "Excluded Assets") from S&S's winning bid is central to the issues raised by Mission in its opposition to S&S's motion for relief from stay and in this appeal.  Mission's primary argument is that by excluding cash, inventory, and accounts receivable from the asset sale as part of its winning bid, S&S agreed to either: (1) purchase the Excluded Assets from the Debtor free and clear of S&S's liens and then "recontribute" the now-unencumbered assets back to the Debtor's estate as part of its consideration (Mission's so-called "recontributed assets" theory); or (2) waive its lien on the Excluded Assets (Mission's "lien waiver" theory).

Following the Auction, Mission amended its objection to the Sale Motion arguing, among other things, that S&S's bid was "miscalculated" and "inferior" to the Mission bid, and that the Auction was conducted in bad faith.  In its response to Mission's amended objection, the Debtor

stated, among other things, that S&S's winning bid "leaves behind $600,000 of its own cash . . . [but] *such cash remains subject to the [S&S] liens as proceeds of the sale of its collateral*." (emphasis added). The Debtor also acknowledged that "disputed unsecured claims and holders of interests will not be receiving any distributions under the sale," because the Excluded Assets "will have to be liquidated [and] a liquidating plan will *distribute those assets (or proceeds thereof) to [S&S]* . . . ." (emphasis added).

The Examiner, who was present at the Auction, filed a report after the Auction in which he concluded that the estate, Mission, and all other creditors would receive better treatment through the proposed sale to S&S than through any other alternative, including liquidation. He also acknowledged that S&S would retain a lien on the Excluded Assets after the sale, stating: "The structure of the bid means that immediately after closing there [will be] substantial assets left for creditors the largest of which is inventory . . . . *[T]he S&S security interest reaches all of those assets*." (emphasis added). Mission did not dispute the post-Auction assertions by the Debtor and the Examiner that the Excluded Assets would remain subject to S&S's lien after the asset sale.

### 4. The Sale Order

On December 18, 2015, after a two-day evidentiary hearing, the bankruptcy court entered an order approving the sale of the Debtor's assets to S&S (the "Sale Order") as set forth in the Asset Purchase Agreement (the "APA") between the parties. Later that day, S&S and Debtor consummated the sale.

The Sale Order provided, in relevant part:

[S&S]'s offer for the assets ("Assets") to be sold, as embodied in [the APA], annexed hereto as Exhibit 1, is the highest or best offer for the Assets under the circumstances of this case and is hereby approved.

13

[The APA] is hereby approved pursuant to section 363(b) of the Bankruptcy Code and the Debtor is authorized to consummate and perform all of its obligations under [the APA] and to execute such other documents and take such other actions as are necessary or appropriate to effectuate [the APA].

Pursuant to [§] 363(f) of the Bankruptcy Code, the Assets are being sold and transferred free and clear of all liens[,] claims, interests, and encumbrances (collectively[,] [t]he "Liens") except as otherwise provided in [the APA], with any and all such Liens to attach to proceeds of such sale with the same validity, priority, force, and effect such Liens had on the Assets immediately prior to the sale and subject to the rights, claims, defenses, and objections, if any, of the Debtor and all interested parties with respect to any such asserted Liens, provided, however, the sale of the Assets shall not be free and clear of claims Mission . . . may have pursuant to 11 U.S.C. § 365(n) as determined by a final non-appealable order by a court of competent jurisdiction.

The APA provided that S&S was purchasing all of the Debtor's assets (the "Acquired Assets"), except for certain "Excluded Assets" (consisting of cash, inventory, and accounts receivable), which would remain part of the bankruptcy estate. The "purchase price" for the Acquired Assets was $1,900,000, which included "$1,193,000 of the [Debtor]'s outstanding obligations to [S&S] pursuant to the Secured Loans, compris[ed] of $443,000 of [S&S]'s prepetition secured debt and $750,000 of [S&S]'s postpetition secured debt" and certain "Assumed Liabilities."

In the decision accompanying the Sale Order, the bankruptcy court considered and rejected all of Mission's objections to the sale. See In re Tempnology, LLC, 542 B.R. 50, 68-72 (Bankr. D.N.H. 2015). In rejecting Mission's challenge to S&S's pre-petition credit bid of $443,000, the bankruptcy court ruled:

The Court is also unpersuaded that S&S's secured claim is subject to a bona fide dispute. On Schedule D, the Debtor listed S&S as holding a secured claim in the amount of $5,550,000. Although S&S has not filed a proof of claim, "[a] proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(a)(1) or 1106(a)(2)" that is not "scheduled as disputed, contingent, or unliquidated." 11 U.S.C. § 1111(a). Despite Mission's persistent refrain that S&S's secured claim is

14

invalid, Mission never filed an objection to the claim.  Instead, Mission
challenged S&S's ability to credit bid the claim in the Auction based on
objections that have never been asserted.  For this reason, the Court cannot find
that the validity of S&S's secured claim is sufficiently in dispute to warrant a
limitation of its bidding rights.

Id. at 69.  The bankruptcy court also rejected Mission's argument that cause existed to

recharacterize the Debtor's pre-petition debt as equity, stating: "Mission has failed to sustain its

burden of showing that S&S's debt should be recharacterized in any amount, for any purpose."

Id. at 70.

Neither the Sale Order, nor the APA, contained any provision expressly releasing or

waiving S&S's liens on the Excluded Assets.  The Sale Order clearly provided that the Acquired

Assets were being sold free and clear of liens with liens to attach to the proceeds, and that the

Excluded Assets, which included cash, accounts receivable, and inventory, remained assets of

the estate.  Neither the Sale Order, nor the APA, provided or required that S&S was releasing its

liens on the Excluded Assets.  In the decision accompanying the Sale Order, the bankruptcy

court, in assessing the value of S&S's bid, recited that the Excluded Assets were being "left in

the estate" with no discussion of any release of the S&S lien on those assets or waiver of its

secured claim.  Id. at 71.

Mission appealed the Sale Order to the Panel, and the Panel affirmed.  See In re Old

Cold, LLC, 558 B.R. at 521.  The parties then filed cross-appeals to the First Circuit, which also

affirmed the Sale Order.  See In re Old Cold, LLC, 879 F.3d at 388-89 (concluding that S&S

was a good faith purchaser entitled to the protection of § 363(m), rendering Mission's remaining

challenges to the Sale Order statutorily moot).[9]  Mission sought a rehearing en banc with the

First Circuit, which was denied.[10]

### E.    Mission's Proof of Claim and the Debtor's Objection

Less than two weeks after the Auction, Mission filed a proof of claim (the "Claim"),

asserting an unsecured claim in the amount of $4,160,000.[11]  The Debtor objected to the Claim,

arguing: (1) the Claim was "facially deficient" because it did not provide sufficient details or a

legal basis to support it; (2) the Mission Agreement expressly barred the types of claims asserted

by Mission; and (3) the Claim was barred under the principal of "anticipatory repudiation."

In May 2018, the bankruptcy court entered an order approving an agreement among S&S,

the Debtor, and Mission to stay the Debtor's objection to Mission's Claim.[12]  At this time, there

has been no final determination as to the Debtor's objection to Mission's Claim.

### F.    The Inventory Sale

In February 2016, while the appeal of the Sale Order was pending before the Panel, the

Debtor filed a motion (the "Motion to Sell Inventory") seeking approval to sell certain inventory

---

[9]  S&S asserts, and Mission does not dispute, that at no time during these appeals did Mission argue that S&S acquired the Excluded Assets as part of the sale and then "recontributed" them back to the estate free and clear of its liens, or that S&S had waived its lien on the Excluded Assets as part of its winning bid.

[10]  The First Circuit issued mandates on January 29, 2018, and February 22, 2018, and the Panel issued a mandate on February 23, 2018.

[11]  Mission attached to its proof of claim an exhibit describing the Claim as one for "Estimated Damages" as follows: (1) $450,000 for "Intention[al] Misconduct (including legal costs)"; (2) $210,000 for "Breach of Exclusivity Provisions (net profit)"; (3) $1,500,000 for "Failure to Defend IP [Claims] Against Competitors (net profit)"; and (4) $500,000 for "Damage to Relationships."

[12]  The order provided that, at a status conference held on May 16, 2018, the parties agreed to stay certain matters, including the Debtor's objection to Mission's Claim, pending "full and final resolution of Mission's petition for certiorari . . . ."  As of this date, the matters remain stayed, although a status conference is scheduled for June 20, 2019.

(part of the Excluded Assets) to S&S free and clear of all liens, "with any such liens attaching to the proceeds of the sale." The Debtor noted that the sale would be subject to § 363(f)(2)—which authorizes a sale of property free and clear of liens if the lienholder consents—and maintained that "S&S, who asserts a secured interest in the inventory and any proceeds thereof, has consented to the sale and liquidation of the inventory . . . ."

Mission challenged the inventory sale, arguing that: (1) the Debtor was seeking to sell the inventory to S&S at a discounted price; and (2) the proposed sale was contrary to the terms of the APA and the Sale Order and evidenced "collusion" between the Debtor and S&S. Mission did not dispute the Debtor's assertions that the inventory and its proceeds were subject to S&S's lien. After a hearing in March 2016, the bankruptcy court approved the inventory sale to S&S (the "Inventory Sale Order"). The Inventory Sale Order did not explicitly address S&S's liens. Mission did not appeal the Inventory Sale Order.

### G.     The Debtor's Motions to Extend the Exclusivity Period

Between December 2015 and October 2016, the Debtor filed four motions to extend the exclusivity period for filing a chapter 11 plan, indicating its intent to seek approval of a plan of liquidation. The bankruptcy court granted those requests. The Debtor's exclusive period to file a chapter 11 plan expired on March 1, 2017. The Debtor has not filed a disclosure statement or a chapter 11 plan.

### H.     February 26, 2018 Case Management Conference

On February 26, 2018, the bankruptcy court held a case management conference.[13] During the conference, there was a discussion concerning S&S's secured claim and its liens on

---

[13] Judge Panos presided over this conference and all subsequent proceedings.

the remaining assets of the bankruptcy estate. The bankruptcy court and the Debtor's counsel—

Christopher Desiderio—engaged in the following exchange regarding the extent of the S&S

claim:

> THE COURT: So as far as you're concerned, S&S has an allowed—essentially
> an allowed secured claim with respect to the proceeds of the inventory sale, which
> are the only remaining assets of the estate?
>
> MR. DESIDERIO: That's right. Yes, Your Honor.
>
> THE COURT: And is that disputed here today?
>
> MR. DESIDERIO: Not by anyone in this courtroom, I don't believe.

Mission, appearing by telephone, did not dispute that assertion. Moreover, in a subsequent

exchange during that hearing, the bankruptcy court asked Mission's counsel—Lindsay Z.

Milne—whether Mission disputed that S&S had a lien on the Debtor's remaining assets:

> THE COURT: So let me ask Ms. Milne, do you agree with the proposition that
> S&S has a lien on whatever proceeds are in the [D]ebtor's possession and that
> there's nothing with respect to the pending litigation that would stand in the way
> of either confirming a plan or some other disposition of this case?
>
> MS. ZAHRADKA MILNE: Yes, Your Honor. . . . I would say that there's only
> one thing that I think could perhaps pose a challenge for plan confirmation at this
> stage and *that is not the validity of S&S's liens. I would say at this point that . . .
> there's no live issue. While we may not agree on the merits, there's no live issue
> as to the validity of those liens.*

(emphasis added).

The bankruptcy court then questioned how Mission, having acknowledged that S&S's

liens extended to the remaining assets in the estate, would be able to assert an administrative

claim that would take priority over S&S's secured claim.[14]  The bankruptcy court stated:

---

[14]  Mission's counsel indicated that Mission might be entitled to an administrative claim pending
resolution of the appeal relating to the 365(n) Order. She explained that "any amounts that Mission

"My assumption is that . . . the administrative claim that's been asserted, and I'm sure that's

subject to objection, would not take priority obviously over [S&S's] secured claim with respect

to these proceeds, correct?"  Mission's counsel did not concede the point, but was unable to

explain how an asserted (yet undetermined) administrative claim might take priority over an

undisputed secured claim.  Nor did she argue that S&S did not have a secured claim or a valid

lien on the remaining assets of the bankruptcy estate, or that S&S had waived its lien as to those

assets.

    Then, reflecting upon the future of the case, the bankruptcy court commented to S&S's

counsel: "[T]here are alternatives to distributing under a plan *where no one seems to be arguing*

*that these are the proceeds of collateral and that there's a valid lien,* so you might have to put

your thinking cap on and, you know, pursue that option."  (emphasis added).  Again, Mission's

counsel did not dispute the assertions regarding S&S's lien on the remaining assets of the

bankruptcy estate, or argue that S&S had waived its lien as to those assets.

    The bankruptcy court indicated that it envisioned three potential paths for the case:

> One, there could be a motion by the secured lender to compel a distribution of its
> proceeds of collateral and that would leave the estate with no funds and there
> could be a motion to dismiss.  There could be a motion to compel distribution of
> the proceeds and conversion or there could some sort of a plan path.  And I
> suppose there would be a conversion before the proceeds are distributed, but I'm
> sure that that has issues.

All three options contemplated that S&S had a valid lien on the proceeds of the inventory sale.

    Despite all of the references at the status conference by the bankruptcy court, by the

Debtor's counsel, and by S&S's counsel as to S&S's lien on the remaining assets of the

---

would have been entitled to [under] its exclusive license that . . . accrued after the petition date on account
of . . . the sale to S&S of those rights, [ ] would be entitled to administrative priority[.]"

bankruptcy estate, at no time during the conference did Mission challenge S&S's asserted lien on

those assets, or argue that S&S had waived its lien as part of the sale proceedings.

## I.  May 16, 2018 Case Management Conference

The bankruptcy court held another case management conference on May 16, 2018.

Again, the parties discussed S&S's lien on the remaining assets in the estate.  S&S's counsel

stated that "there's no dispute with respect to the S&S liens and . . . the amount of funds that are

currently in the estate" which would lead to a "motion to distribute funds or something along

those lines."  The Debtor's counsel commented:

> [A]n admin[istrative] claim doesn't somehow undo liens.  S&S's liens are not
> subject to challenge and their liens far exceed the amount of assets left in this
> estate.  I think S&S is still considering its options with respect to the appropriate
> procedure to take a distribution.
>
> But the reality is all the . . . appeal could potentially give . . . Mission [is] an
> administrative expense claim and it may not be that.  It may just be a general
> unsecured claim.  And in either event, both of those are junior to the [S&S] liens
> and there are no unencumbered assets to satisfy those claims potentially.

Mission's counsel also participated in the status conference, but did not dispute the assertions

regarding S&S's liens or indicate it intended to challenge S&S's secured claim.

## III.  The Motion for Relief from Stay Proceedings

### A.  The Stay Relief Motion

On June 11, 2018, the same day Mission filed its Petition with the Supreme Court, S&S

filed a motion (the "Stay Relief Motion"), to which the Debtor assented, seeking relief from the

automatic stay "to pursue its rights and remedies as a holder of a valid, perfected, first-priority

security interest in all of the Debtor's assets by virtue of the grant of security in the Loan

Documents and the filing of the UCC Financing Statements and the entry of the Interim DIP

Orders and the Final DIP Order . . . ."  S&S sought relief under § 362(d)(2), asserting it had an

undisputed secured claim in excess of $5,000,000, and that that claim exceeded the value of the remaining property of the estate—$527,292 in cash (the "Remaining Estate Property").[15]  S&S claimed, therefore, that the Debtor lacked equity in the Remaining Estate Property.  S&S further indicated that the Debtor assented to its request for relief from the automatic stay and, therefore, had "confirmed" that the Property was not necessary to an effective reorganization.  Therefore, S&S maintained, "good and sufficient cause" existed for granting the Stay Relief Motion.

To further support its request for stay relief, S&S represented: (1) the Debtor listed S&S on its Schedule D as holding a secured claim in the amount of $5,550,000; (2) "[n]o party commenced a contested matter or adversary proceeding raising an objection or challenge to [its] security interests and liens" by the applicable deadlines; (3) Mission's objection to S&S's use of the $450,000 pre-petition credit as part of its bid was overruled and all appeals were unsuccessful; and (4) at the February 26, 2018 case management conference, Mission's counsel confirmed that S&S's secured claim was undisputed.

### B.  Mission's Objection to Stay Relief Motion

Mission objected to the Stay Relief Motion ("Mission's Objection"), arguing that: (1) the bankruptcy court was divested of jurisdiction to consider it given the pendency of the Petition before the Supreme Court; and (2) S&S was not entitled to stay relief because it lacked a security interest in the Remaining Estate Property.

### 1.  Lack of Jurisdiction Argument

As to its first argument, Mission contended that, if the bankruptcy court granted S&S relief from stay, S&S would then "drain the estate of assets" that could be used to satisfy any

---

[15]  For the text of § 362(d)(2), see infra at 39.

21

claim to which Mission would be entitled if it was successful in its Supreme Court Appeal.
Mission argued, therefore, that the bankruptcy court was divested of jurisdiction to consider the
Stay Relief Motion because granting the motion and permitting S&S to "remove the remaining
cash from the estate" would "implicate issues 'so closely related' to the [issues presented in the
Petition] that it would 'impermissibly interfere' with Mission's rights related to that issue."
Mission urged the bankruptcy court to deny the Stay Relief Motion on account of the court's
purported lack of jurisdiction "or at a bare minimum" defer consideration of the Stay Relief
Motion until final resolution of the Supreme Court Appeal.

### 2. Lack of Security Interest Argument

Mission also asserted that S&S was not entitled to relief from stay because it lacked a
security interest in the Remaining Estate Property. Mission did not dispute the validity or
priority of S&S's liens as of the date of the Auction. Rather, it maintained that, during the sale
proceedings, the Debtor sold the Excluded Assets to S&S free and clear of all liens and
encumbrances, and then S&S "recontributed" the now-unencumbered Excluded Assets back to
the Debtor's estate as part of its consideration under the Sale Order. The only support Mission
offered for its "recontributed assets" theory was the following exchange between its counsel—
Robert Keach—and the Debtor's counsel (not S&S's)—Christopher Desiderio—at the Auction:

> MR. KEACH: So they're leaving $800,000 of assets in the estate. The estate gets
> to liquidate those and keep the money?
>
> MR. DESIDERIO: It's more than that. They're leaving—
>
> MR. KEACH: Well, if it was 800 for us, it's going to be 800 for them.
>
> MR. DESIDERIO: . . . Yes. That's right. Which means we value S&S's last bid
> at $2,257,000.

22

Mission's "recontributed assets" theory, which S&S argues was asserted for the first time in the objection to the Stay Relief Motion and was inconsistent with Mission's prior recognition of the validity of S&S's lien, is at the heart of this appeal.

### C. July 10, 2018 Preliminary Hearing

At a preliminary hearing on the Stay Relief Motion held on July 10, 2018, Mission indicated that it planned to request "limited discovery" targeted at determining how the Debtor treated the Excluded Assets post-Auction. In response, S&S asserted that discovery was unnecessary as the Stay Relief Motion was adequately supported by the existing record. The bankruptcy court ultimately directed the parties to file supplemental briefs addressing Mission's "recontributed assets" and "lien waiver" theories, thereby postponing a determination as to Mission's request for discovery.

### D. Supplemental Briefs Regarding Stay Relief Motion

Both S&S and Mission filed supplemental briefs as directed by the bankruptcy court.

### 1. S&S's Supplemental Brief

S&S reasserted its position that it was the holder of an undisputed secured claim that exceeded the value of the Remaining Estate Property and, therefore, the Debtor lacked equity in that property. S&S claimed that Mission had "repeatedly" acknowledged the validity and scope of S&S's lien throughout the bankruptcy proceedings and only raised the "recontributed assets theory" when the bankruptcy court, at the February 2018 status conference, questioned how Mission's alleged administrative claim could limit S&S's rights as a secured creditor under § 362(d). S&S stated:

> Recognizing that its prior acknowledgement of the validity and scope of the S&S liens was fatal to any objection to the Motion for Relief from Stay, Mission abandoned its effort to formulate an argument that its asserted administrative

23

> claim could take priority over the S&S secured claim. Instead, in the Objection,
> Mission reverses course and argues that S&S no longer has a secured claim and
> fabricates an argument that the inventory assets excluded from the December
> 2015 sale were "recontributed" to the Debtor's estate free and clear of the S&S
> liens. Once again, Mission does not dispute the validity of the S&S liens, nor
> could it with the Challenge Period having passed and the Bankruptcy Court
> rejecting Mission's recharacterization arguments. Rather, Mission manufactures a
> new asset class—Recontributed Assets—that was unknown to all parties
> (including Mission in February of this year) until the filing of the Objection last
> month. Mission baldly asserts that the Recontributed Assets Theory was
> understood by all parties and that the excluded assets of the sale were returned to
> the estate "unencumbered" in December 2015. Tellingly, the Recontributed
> Assets Theory has never been articulated in any of the voluminous pleadings or
> appellate briefs filed in this heavily litigated case. And for good reason, the
> theory is a product of Mission's imagination and the record does not support it.

According to S&S, the "recontributed assets" theory was "at odds with the Sale Order, and

str[uck] an identical tone to other Mission arguments that were previously raised and rejected by

th[e] Court, and then affirmed on appeal (twice), concerning the valuation of bids."

S&S also argued that the bankruptcy court was not divested of jurisdiction to consider the

Stay Relief Motion. According to S&S, Mission's objection to the merits of that motion focused

"solely on whether S&S's liens extend[ed] to the Debtor's remaining Property," and a

determination regarding the extent of S&S's liens was "irrelevant to any arguments that Mission

may assert in the unlikely event that the Supreme Court elects to take its [§] 365(n) appeal."

### 2. Mission's Supplemental Brief

Mission, on the other hand, maintained that its "recontributed assets" theory was "not a

new theory—it simply was not specified earlier because the bid values asserted at the Auction

and found at the Sale Hearing dictated that the Recontributed Assets were unencumbered."

According to Mission, S&S's agreement to recontribute the Excluded Assets "was confirmed on

the record at the Auction" and became a "premise" of the Sale Order. "In short, everyone

assumed the assets were unencumbered because the Debtor said so at the Auction, S&S was

silent, and the entire sale (and appellate) process proceeded on that mutual belief." Mission also renewed its request for "targeted, reasonable discovery" with respect to this theory.

### E. The Bankruptcy Court's Ruling

Following a hearing on the Stay Relief Motion on September 18, 2018, the bankruptcy court articulated its extensive findings and conclusions on the record and granted the motion from the bench. Acknowledging that motions for relief from stay are summary proceedings, the bankruptcy court first considered, and rejected, Mission's argument that S&S lacked a security interest in the Remaining Estate Property because it "recontributed assets" to the estate as part of its winning bid. The bankruptcy court stated:

> [K]eeping in mind the Grella[16] standard articulated by the First Circuit that motions for relief from stay are to be viewed as summary proceedings and that evidence is required only where there are significant issues of disputed fact that would bear on the Court's conclusion given the burden established by the Bankruptcy Code, the Court believes that in this case where the record is significant, much more significant than in most cases where relief from stay is sought, that there are not sufficient issues of fact that would bear on the determination of the motion for relief, that a further evidentiary hearing would be required and I'll explain why.

> As of the auction date there appears to be no dispute that S&S had a lien on all assets of the estate. The DIP financing agreements and related orders established and confirmed the validity and priority of the S&S liens. The challenge period passed ultimately with no party in interest seeking to challenge those liens. It doesn't seem to be disputed by Mission that as of the date of the auction there was a valid lien encumbering all assets of the estate.

> At the auction, as often happens, the [ ] bidding became creative with the parties working to value and modify bids so that bidding would be apples to apples. Mr. Keach, representing Mission, made a bid that evolved to a bid that consisted of cash to be paid to the estate and assets to be "left behind," presumably excluded from the purchase or included in the purchase and "recontributed" to the estate, although that word is never used or found in the auction transcript.

---

[16]  See Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 33 (1st Cir. 1994). For a discussion of Grella, see infra at 40.

There are some confusing exchanges. Somehow, even though Mission was proposing to "leave behind" cash and other assets, the value of those excluded assets became part of how the bids were valued. When S&S entered a topping bid of [$]2,257,000 there was an exchange between Mr. Keach and Mr. Desiderio in the auction transcript at page 38 where Mr. Keach says:

"So they're leaving [$]800,000 of assets in the estate. The estate gets to liquidate those and keep the money."

There's no discussion in the auction record of how Mission could have proposed that assets left behind[,] if it was the winn[ing] bidder[,] could be free and clear of the S&S liens or even if it bought the cash and [ ] other excluded assets how these could be recontributed and not be considered to be proceeds of the sale of S&S collateral to which the S&S liens would attach. At page 27 of the transcript there's an exchange with the examiner's counsel where counsel to Mission seems to acknowledge that [S&S] has reserved rights to a [ ] lien on the cash being left behind. The exchange is not clear. There's no express waiver or agreement on the record.

The final bid accepted at the auction was valued by the debtor at [$]2.7 million, including a credit bid on prepetition secured debt of $443,000. There was no discussion of the excluded assets, but there were components of the bid attributed to assets that had been described as being "left back" cash, inventory and accounts receivable.

Counsel to the debtor, [and] counsel to S&S, indicate that the fact that assets were being left back or left behind to the estate meant to them that they were being left in the estate to be distributed in accordance with priorities established under the Bankruptcy Code including existing lien rights.

The examiner appointed by the Court was present at the auction and ultimately supported the sale that was proposed to the Court. At the time the sale was presented to the Court for approval, Mission objected to the treatment of the $600,000 bid credit given for the debtor's cash in the S&S credit bid. The asset purchase agreement approved by the Court provided that cash, the accounts receivable and inventory would be excluded assets as that term was defined in the asset purchase agreement, meaning that they were not assets being sold by the estate to S&S. The sale order does not provide that S&S was releasing any lien on excluded assets and the APA does not require that. In a response to Mission's objection to the sale motion the debtor clearly stated its position that the S&S bid "leaves behind $600,000 of its own cash . . . but that cash remains subject to the S&S liens." That's at docket number 258 at page 7. The debtor in that reply stated that the excluded assets would have to be liquidated and distributed to S&S if S&S successfully defended its lien. That's at page 13 of 258.

After a contested hearing Judge Deasy entered the sale order which ultimately was appealed to the First Circuit and affirmed. It is a final order. Judge Deasy's opinion values the bid by reciting that the excluded assets of cash, accounts receivable and inventory are "left in the estate" with no discussion of any release of the S&S lien or waiver of its remaining secured claim.

The sale order approved the sale of assets which were defined to exclude the excluded assets free and clear of liens but was silent as to any disposition of the excluded assets or agreement by S&S with respect to those assets. In its opinion the Court discussed the fact that Mission was "bidding the debtor's cash" in determining that Mission had waived any argument that cash in the estate was improperly advanced under the DIP facility. But the Court did not discuss how Mission could have been credited for that amount in its bid by proposing to "leave" that encumbered cash behind in the estate.

The Court's reference in its decision to a pool of assets for the estate from which additional claims may be paid through a future liquidating plan is ambiguous at best and is not inconsistent with the notion . . . that the assets left to the estate would be distributed in accordance with the priorities established by the Bankruptcy Code and subject to liens.

At this point it seems that the recontribution position advanced by Mission is a misnomer. The sale order could not be more clear that assets other than the excluded assets were sold free and clear of liens with liens to attach to the proceeds and that the excluded assets were not sold by the estate. The cash, accounts receivable and inventory remained estate assets. It appears that Mission's only viable argument is that through the bidding process . . . S&S waived its right to assert a lien with respect to the excluded assets, notwithstanding that it [was] not [ ] so expressed in the APA.

The debtor made statements to the contrary in connection with the sale motion and the sale order does not address that waiver as a condition for approval. S&S points out in its briefing that Mission never asserted this waiver position in any brief or argument in connection with any appeal of the sale order or in connection with its subsequent opposition to the motion to sell the debtor's inventory.

In the inventory sale motion, which is docket number 385, the debtor represented to the Court that S&S asserts a lien in the inventory and any proceeds and that S&S has consented to the proposed sale. Subsequent to the sale the debtor also sought and obtained an amendment to the cash collateral DIP financing orders to increase the amount of the carve-out from the liens of S&S. Certainly this implies that there remained a lien on the remaining assets.

27

On May 18, 2018 this Court conducted a status conference in this case. The Court inquired as to whether there was any dispute that S&S had a lien on the remaining assets of the estate . . . . No party disputed the S&S lien.

The Court further asked whether the pending 365(n) issue appeal could have any effect on confirmation of a plan of liquidation or other disposition of the case given that S&S has a lien on whatever proceeds are in the debtor's possession. Counsel to Mission stated that allowance of an administrative claim in favor of Mission could give it a blocking position with respect to plan confirmation but that there is . . . no live issue as to the validity of the S&S liens. The parties have acknowledged that this doesn't constitute any kind of a judicial waiver or waiver, you know, in an enforceable sense, but that [Mission's] conduct [when it said that there was no live issue as to the validity of S&S's liens was] consistent with the fact that [Mission] had not raised this [lien waiver] issue previously and [is] inconsistent with the current position taken by Mission.

Docket No. 562 (Tr. of Sept. 18, 2018 Hearing at 79-85).

The bankruptcy court then considered Mission's argument that the court was

divested of jurisdiction to decide the Stay Relief Motion. The court ruled:

Turning to the relief requested, the Court has considered the argument that the pending appeal deprives it of jurisdiction. There has been no argument that the legal issues overlap or that a determination of the motion for relief from stay could somehow moot or affect the outcome of the [Supreme Court A]ppeal or that there is any risk of an inconsistent ruling. Instead, Mission contends that if this Court rules that S&S possesses a valid lien and grants relief from stay, the remaining assets in the estate will be transferred to S&S and there will be no assets available to satisfy a possible administrative claim in favor of Mission.

That practical concern does not give rise to divesting this Court of jurisdiction to [ ] decide an issue that is not the subject of a pending appeal. Mission can take an appeal of an order on a motion for relief from stay and seek a stay pending appeal. Entry of an order on stay relief will not impermissibly interfere with Mission's rights in its appeals.

Id. (Tr. of Sept. 18, 2018 Hearing at 85-86).

Finally, the bankruptcy court examined whether S&S had satisfied its burden for

stay relief under § 362(d)(2), stating:

S&S has moved for relief from the automatic stay pursuant to [§] 362(d)(2). That section of the Bankruptcy Code states that the Court shall grant relief from the

28

automatic stay . . . where the moving party demonstrates that the debtor lacks equity in the property that's the subject of the motion and the property is not necessary for an effective reorganization. The debtor has assented to the motion.

Whether S&S has met its burden in this case and demonstrated it possesses valid liens covering the remaining cash in the debtor's estate rests on the viability of Mission's theory that S&S either recontributed assets free and clear of its liens or waived any lien with respect to the excluded assets.

For the reasons I have stated there's no recontribution of assets. There was no transfer of assets free and clear of liens that could be recontributed to the estate. With respect to waiver, Mission does not [argue] . . . that a challenge was made within the challenge period with respect to the S&S liens. It does not contend that it has prevailed in any re-characterization of the S&S debt or that the DIP financing orders, sale orders and other orders of the Court do not establish the validity and priority of the S&S liens as a starting point as of the date of the auction.

While the discussion of assets to be left behind and the notion that Mission could be credited for excluding assets from its bid and what was meant in subsequent bids is a little confusing, the record seems clear that S&S did not expressly agree to waive its liens. The debtor stated in a pleading to the Court prior to the sale hearing that the excluded assets would remain subject to the S&S liens. Even though Mission cites to some evidence that the debtor treated the cash as unrestricted, there is information indicating that that treatment was also given consistently throughout the case even prior to the auction.

Moreover, it appears that the opposition to this motion for relief from stay is the first time after the sale order entered that Mission expressly advances this theory. It does not appear that Mission stated its position in connection with any appeal[,] at the sale hearing or in connection with the inventory sale.

At this Court's status conference Mission did not assert this position and can be viewed to have confirmed that it had no issue with the S&S liens . . . on the assets remaining in the estate. This is not crystal clear because of the reference to inventory proceeds but is a fair interpretation. There is no contention that the amount of the remaining S&S claim exceed[s] the value of the remaining cash assets.

On this record S&S has met its burden to show that the liens are valid and that there is no equity in the cash that is the subject of the motion. The Court does not find sufficient allegations or support in the record that [S&S] agreed to waive its lien on the excluded assets or that it took a position on which the Court relied that could give rise to estoppel. Relief from stay is intended to be a summary

proceeding and the Court does not require a greater record to rule on the waiver issue.

There has been no contention or showing that the encumbered cash assets are necessary to an effective reorganization. As such, the Court will grant the motion for relief from stay . . . .

Id. (Tr. of Sept. 18, 2018 Hearing at 86-88).

Following the hearing, the bankruptcy court entered the Stay Relief Order, which

provided in its entirety:

Upon consideration of the further briefing submitted by the parties and the entire record of this case, the Court having determined that submission of additional evidence was not necessary given the extensive record in this matter, including the final orders supporting the relief requested, for the reasons stated on the record at the hearing held on September 18, 2018, the Objection [Doc# 528] and Omnibus Response [Doc# 549] filed by Mission Product Holdings, Inc. are OVERRULED and the Motion for Relief [Doc# 521] filed by Schleicher & Stebbins Hotels, L.L.C., and assented to by the Debtor, is GRANTED.

In accordance with Fed. R. Bankr. P. 4001(a)(3), the Court hereby stays this Order through and including October 22, 2018.

Mission timely filed a notice of appeal with respect to the Stay Relief Order.

### F.      Motions to Extend Stay and for Stay Pending Appeal

On October 18, 2018, Mission, with S&S's assent, filed a motion seeking to extend the

14-day stay of the Stay Relief Order provided by Bankruptcy Rule 4001(a)(3) because the

Supreme Court had not yet ruled on the Petition. The bankruptcy court granted the motion,

extending the stay through November 5, 2018.

Approximately ten days later, the Supreme Court granted the Petition as to the 365(n)

Question. See supra at 9. Mission then filed with the bankruptcy court a motion seeking:

(1) to further stay the Stay Relief Order "through and including an issuance of a ruling in the

Supreme Court Appeal"; or, alternatively, (2) to stay the Stay Relief Order pending this appeal.

The bankruptcy court denied the motion, although it granted a temporary stay to allow Mission to seek a stay pending appeal from the Panel.

Thereafter, Mission filed a motion with the Panel seeking a stay pending appeal with respect to the Stay Relief Order. The Panel denied the motion, concluding that Mission had not made the requisite showing that it was likely to prevail on the merits of the appeal, or that it would be irreparably harmed in the absence of a stay pending appeal.

## POSITIONS OF THE PARTIES

### I.    Mission

Mission raises two arguments on appeal. First, it contends that we should reverse the Stay Relief Order because the bankruptcy court was divested of jurisdiction to consider the Stay Relief Motion due to the pendency of the Supreme Court Appeal. According to Mission, the Divestiture Rule does not require that an issue be "expressly on appeal," but only that the issue below "would interfere with the appeal process." Because the outcome of the Supreme Court Appeal "govern[s] [its] entitlement to an administrative claim," Mission argues, the bankruptcy court was "divested of jurisdiction to consider a motion where the relief requested would moot [Mission]'s ability to recover on a claim against the [D]ebtor flowing from a pending appeal." According to Mission, by requesting relief from the automatic stay, S&S sought to "drain" the estate's only remaining assets, which would otherwise be available to satisfy Mission's contingent administrative claim for the Debtor's alleged post-petition breach of the Mission Agreement should Mission prevail in the Supreme Court Appeal.

Second, Mission contends that, even if the bankruptcy court was not divested of jurisdiction, it erred in granting the Stay Relief Motion because it "should have required

31

evidence . . . in support of the relief requested and because the movant failed to sustain its burden on the existing record." According to Mission, because the existing record demonstrated that S&S had waived its liens on the Excluded Assets, the bankruptcy court erred in finding that S&S had sustained its burden of proving that the Debtor lacked equity in the Remaining Estate Property.

## II.    S&S

S&S counters that the bankruptcy court properly rejected Mission's "divestiture" argument because there was no risk of confusion or overlap of issues between the Stay Relief Motion and the Supreme Court Appeal. Moreover, S&S argues that the record "thoroughly supports" the bankruptcy court's granting of the Stay Relief Order as Mission's "Recontributed Asset Theory represents a complete reversal of Missions' own prior statements to the [bankruptcy court]."

## APPELLATE JURISDICTION

"Pursuant to 28 U.S.C. §§ 158(a) and (b), the Panel may hear appeals from 'final judgments, orders, and decrees[.]'" Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998); see also Bullard v. Blue Hills Bank, 135 S. Ct. 1686, 1692, 1695 (2015) (discussing the Panel's jurisdiction to hear bankruptcy appeals under 28 U.S.C. § 158(a)). An order granting relief from stay is a final, appealable order. See Pinpoint IT Servs., LLC v. Landrau Rivera (In re Atlas IT Exp. Corp.), 761 F.3d 177, 182 (1st Cir. 2014) ("Orders *granting* stay relief are orders 'disposing of a discrete dispute' and so are

32

final and appealable as of right . . . .").  Therefore, the Stay Relief Order is a final order, and we

have jurisdiction to hear this appeal.[17]

## STANDARD OF REVIEW

We review the bankruptcy court's findings of fact for clear error and its conclusions of

law de novo.  Jeffrey P. White & Assocs., P.C. v. Fessenden (In re Wheaton), 547 B.R. 490, 496

(B.A.P. 1st Cir. 2016) (citation omitted).  "Whether the bankruptcy court had subject matter

jurisdiction is a legal question subject to de novo review."  Whispering Pines Estates, Inc. v.

Flash Island, Inc. (In re Whispering Pines Estates, Inc.), 369 B.R. 752, 757 (B.A.P. 1st Cir.

2007).

Orders granting relief from the automatic stay are usually reviewed for abuse of

discretion.  Mercado v. Combined Invs., LLC (In re Mercado), 523 B.R. 755, 761 (B.A.P. 1st

Cir. 2015) (citing Aguiar v. Interbay Funding, LLC (In re Aguiar), 311 B.R. 129, 132 (B.A.P. 1st

---

[17]  At the Panel's request, the parties submitted supplemental briefs addressing jurisdictional concerns
relating to mootness and appellate standing.  We are satisfied that there are no jurisdictional impediments
to our review of the Stay Relief Order.  We conclude that the appeal has not been rendered moot by the
Debtor's disbursement of the Remaining Estate Property to S&S because S&S can be ordered to disgorge
those funds.  Therefore, the record does not reflect that the Stay Relief Order has been "implemented to
the degree" that we are unable to afford "meaningful appellate relief."  See Hicks, Muse & Co. v. Brandt
(In re Healthco Int'l, Inc.), 136 F.3d 45, 48 (1st Cir. 1998).  We also conclude that the question of
Mission's appellate standing does not restrict our jurisdiction.  Mission asserts that its pecuniary interests
have been directly harmed by the Stay Relief Order, which resulted in the disbursement of assets that
"would otherwise have been available to satisfy" Mission's claim.  See Donarumo v. Furlong (In re
Furlong), 660 F.3d 81, 86 (1st Cir. 2011) (holding that appellate standing in bankruptcy cases "is limited
to 'persons aggrieved,' that is, persons whose pecuniary interests are adversely affected by the challenged
order") (citation omitted).  We conclude, however, that the standing issue and the substantive issue of
whether S&S waived its lien on the Remaining Estate Property as part of the sale proceedings are closely
intertwined.  If S&S retained its lien, Mission could not demonstrate direct pecuniary harm because its
purported administrative claim would not trump S&S's secured claim.  Mindful of the First Circuit's
preference for deciding cases on the merits, see McKeague v. One World Techs., Inc., 858 F.3d 703, 707
(1st Cir. 2017), we proceed to the merits of this appeal.  See Davis v. Cox, 356 F.3d 76, 92 n.15 (1st Cir.
2004) (advancing to the substantive issue on appeal where the substantive issue and standing issues were
"closely intertwined").

Cir. 2004)). An abuse of discretion occurs when a court "relies upon an improper factor, neglects a factor entitled to substantial weight, or considers the correct mix of factors but makes a clear error of judgment in weighing them." Bacardí Int'l Ltd. v. V. Suárez & Co., 719 F.3d 1, 9 (1st Cir. 2013) (citation omitted). However, appellate courts "review de novo contentions that present an issue of law regarding stay relief." Kronemyer v. Am. Contractors Indem. Co. (In re Kronemyer), 405 B.R. 915, 919 (B.A.P. 9th Cir. 2009) (reviewing de novo the bankruptcy court's determination that the party seeking relief from stay had an interest in property that was affected by the automatic stay) (citation omitted).

## DISCUSSION

### I.   Whether the Bankruptcy Court Erred in Concluding It Had Jurisdiction to Consider the Stay Relief Motion

#### A.   The Divestiture Rule Generally

Generally, a notice of appeal divests the lower court of jurisdiction over those matters on appeal. See Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982). "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Id. (citations omitted); see also Watson v. Boyajian (In re Watson), 403 F.3d 1, 6 (1st Cir. 2005) (citing Griggs). This principle, known as the "divestiture rule," is a judge-made doctrine designed to promote judicial economy and prevent the confusion that would result from two courts addressing the same issue. 20 James Wm. Moore, Moore's Federal Practice: Civil ¶ 303.32[1] (3d ed. 2009); see also Neary v. Padilla (In re Padilla), 222 F.3d 1184, 1190 (9th Cir. 2000) (citations omitted); In re Whispering Pines, 369 B.R. at 759 (citations omitted). "The divestiture of jurisdiction rule is, however, not a per se rule." United States v. Rodgers, 101 F.3d

34

247, 251 (2d Cir. 1996). "[I]ts application is guided by concerns of efficiency and is not automatic." Id. (citations omitted). "Whatever the superficial attractiveness of a per se rule that filing of a notice of appeal automatically divests the district court of jurisdiction as to matters covered by the notice, such a rule is subject to abuse, and [the court's] application of the divestiture rule must be faithful to the principle of judicial economy from which it springs." Id.

### B.     Applicability of Divestiture Rule to Bankruptcy Court Orders

The divestiture rule is applicable to an appeal from a bankruptcy court order. In re G-I Holdings, Inc., 568 B.R. 731, 763 (Bankr. D.N.J. 2017) (citation omitted); see also In re Whispering Pines, 369 B.R. at 759 (concluding that bankruptcy court did not have jurisdiction to enter order granting relief from stay while appeal of order confirming plan, which provided for the sale of the subject property, was pending). "Courts have recognized, however, that due to the inherent nature of bankruptcy cases, 'discrete controversies within the overall case framework may often deserve separate appellate consideration' . . . ." In re G-I Holdings, Inc., 568 B.R. at 763 (citation omitted). They have cautioned, therefore, "against a 'broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'" Id. (citation omitted); see also In re Whispering Pines, 369 B.R. at 758 ("The application of a broad rule that a bankruptcy court may not consider any request filed while an appeal is pending has the potential to severely hamper a bankruptcy court's ability to administer its cases in a timely manner."). "Instead, the test is a functional one: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or

effectively circumvent the appeal process.'" <u>In re G-I Holdings, Inc.</u>, 568 B.R. at 763 (quoting <u>In re Whispering Pines</u>, 369 B.R. at 759).  Thus, the test for determining if a pending appeal divests a lower court of jurisdiction is whether the subject matter presented in the appeal is so "closely related" to the issues raised in the motion that the entry of the order "impermissibly interfere[s]" with the appellant's rights in its appeal.  <u>In re Whispering Pines</u>, 369 B.R. at 759.

### C.     Whether Divestiture Rule Applies

#### 1.     Filing of Petition for Writ of Certiorari

Mission argues that the bankruptcy court was divested of jurisdiction to consider the Stay Relief Motion due to the pendency of the Petition to the Supreme Court.  According to Mission, "there is no reason to treat the filing of a petition for a writ of certiorari—still less a *granted* petition—differently than the filing of a notice of appeal."  Mission offers no case law or other legal support for its position.

We conclude that the filing of the Petition did not automatically deprive the bankruptcy court of jurisdiction.  At the time the bankruptcy court ruled on the Stay Relief Motion, Mission had filed the Petition, but the Supreme Court had not yet ruled upon it.  The First Circuit has stated that "the mere act of filing a petition for certiorari does not deprive the district court of jurisdiction over the case."  <u>United States ex rel. Escobar v. Universal Health Servs., Inc.</u>, 842 F.3d 103, 106 n.1 (1st Cir. 2016) (citing <u>United States v. Sears</u>, 411 F.3d 1240, 1241-42 (11th Cir. 2005) and 28 U.S.C. § 2101(f)).[18]  Based on this controlling authority, we conclude that the

---

[18] Other courts have similarly held.  <u>See</u> <u>Sears</u>, 411 F.3d at 1241-42 (stating that issuance of the mandate returned jurisdiction to the district court and the filing of a petition for certiorari to the Supreme Court "did not divest the court of appeals or district court of jurisdiction"); <u>Brown v. Cnty. of Del Norte</u>, No. 16-cv-07235-RMI, 2018 WL 3854876, at *1 (N.D. Cal. Aug. 9, 2018) (determining that, absent the issuance of a stay, the filing of a petition for writ of certiorari did not divest the court of jurisdiction to proceed with resolution of the issues remaining in the case) (citation omitted); <u>Dassault Systemes, S.A. v.</u>

filing of the Petition did not, in and of itself, deprive the bankruptcy court of jurisdiction to consider the Stay Relief Motion.

### 2. Issues Are Not "Closely Related"

Moreover, the record does not reflect that the issue pending before the Supreme Court was so "closely related" to the issues raised in the Stay Relief Motion so as to "impermissibly interfere[]" with Mission's rights in the Supreme Court Appeal. See In re Whispering Pines, 369 B.R. at 759. The issue in the Supreme Court Appeal was whether, under § 365, a debtor-licensor's rejection of a license agreement terminates rights of the licensee that would survive the licensor's breach under applicable nonbankruptcy law. In contrast, the issue in the Stay Relief Motion was whether S&S had met its burden of establishing a colorable claim of a lien on property of the Debtor's estate and, if so, whether S&S was entitled to stay relief under § 362(d)(2) to pursue its rights as a first priority lien holder with respect to the Remaining Estate Property. Mission's rights under the Mission Agreement were not implicated in any way in the Stay Relief Motion. Instead, Mission's objection to the requested relief focused solely on whether S&S's liens extended to the Remaining Estate Property. A nexus between the issues is not readily apparent from the record. In fact, Mission does not argue that the legal issues in the Supreme Court Appeal overlap with the legal issues raised in connection with the Stay Relief Motion. Rather, Mission contends that the subject matter of the Supreme Court Appeal is "closely related to" the issues raised by the Stay Relief Motion because the granting of relief from stay could (and did) result in the dissipation of assets that would otherwise be available to

---

Childress, No. 09-10534, 2012 WL 3109423, at *2 (E.D. Mich. July 31, 2012) (stating that there "is no legal authority that states the Court lacks jurisdiction after the filing of the Petition" for writ of certiorari to the Supreme Court).

satisfy Mission's asserted administrative claim.  Thus, Mission claims, the Stay Relief Order impermissibly interfered with its rights and effectively circumvented the appeal process.

As noted above, the purpose of the divestiture rule is to avoid the confusion of placing the same matter before two courts at the same time and to preserve the integrity of the appeal process.  The bankruptcy court's determination as to whether S&S had met its burden of establishing a colorable claim of a lien on property of the Debtor's estate and that the amount of that lien exceeded the value of the property was irrelevant to the issues before the Supreme Court.  The bankruptcy court did not decide an issue that was the subject of, or closely related to, a pending appeal.  The record does not indicate that there was any risk of confusion or overlap of issues between the Stay Relief Motion and the Supreme Court Appeal, or that the granting of the Stay Relief Motion interfered in any way with the Supreme Court's disposition of the 365(n) Question.[19]  Based on this record, Mission has not established that the bankruptcy court erred in ruling that it had jurisdiction to consider the Stay Relief Motion.

We proceed, therefore, to an examination of whether Mission has demonstrated that the bankruptcy court abused its discretion in granting relief from the automatic stay under § 362(d)(2).

---

[19]  In its recent decision on the 365(n) Question, the Supreme Court did not acknowledge the Stay Relief Order or any issues relating to S&S's asserted liens on the estate's assets.  See Mission Prod. Holdings, Inc., 139 S. Ct. at 1657-66.  It did note that Mission had presented a claim in the bankruptcy case for money damages arising from its inability to use the trademark license after the Debtor rejected the Mission Agreement and that the Debtor had disbursed all of its assets, leaving nothing to satisfy Mission's judgment.  The Supreme Court ruled, however, that the disbursement of estate assets did not render the Supreme Court Appeal moot because, if Mission prevailed in the appeal, "it c[ould] seek the unwinding of prior distributions to get its fair share of the estate." Id. at 1661.  This ruling bolsters our conclusion that the Stay Relief Order did not "impermissibly interfere" with the § 365(n) rights Mission was asserting in the Supreme Court Appeal.

## II. Whether the Bankruptcy Court Abused its Discretion in Granting S&S Relief from Stay under § 362(d)(2)

### A. Section 362(d)(2)

The bankruptcy court granted relief from stay under § 362(d)(2), which provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> . . .
>> (2) with respect to a stay of an act against property . . . , if—
>>
>>> (A) the debtor does not have an equity in such property; and
>>> (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(2). As the party requesting relief, S&S had the burden of proving that there was no equity in the property, and Mission, as the party opposing the requested relief, had the burden on all other issues, including whether the property was necessary to an effective reorganization. See 11 U.S.C. § 362(g).

Mission argues that the bankruptcy court erred in concluding that S&S had met its burden of demonstrating that the estate lacked equity in the Remaining Estate Property. According to Mission, the record clearly demonstrated that "the Debtor *did* have equity in the [Remaining Estate Property]" because, at the Auction, S&S waived its lien on the Excluded Assets. At a "bare minimum," Mission argues, more evidence was required and the court should have allowed "targeted, reasonable discovery to ascertain what the non-lawyer principals believed about the encumbered nature of the [Excluded] Assets." For the reasons set forth below, Mission's arguments are unavailing.

### B. The First Circuit's "Colorable Claim" Standard

In assessing Mission's arguments on appeal, the procedural context giving rise to the Stay Relief Order plays a critical role. Courts have provided ample guidance regarding the scope of a

39

hearing on a motion for relief from stay. In <u>Grella</u>, the First Circuit held that "a hearing on a motion for relief from stay is merely a summary proceeding of limited effect, and . . . a court hearing a motion for relief from stay should seek only to determine whether the party seeking relief has *a colorable claim to property of the estate*." 42 F.3d at 33 (emphasis added). "A colorable claim is one that is legitimate and that may reasonably be asserted, given the facts presented and the current law . . . ." <u>Jin Qing Li v. Rosen (In re Jin Qing Li)</u>, BAP No. NC-17-1062-STaB, 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018) (citation omitted) (internal quotations omitted). "This is a low threshold: 'A colorable claim (one seemingly valid and genuine) is not a difficult standard to meet.'" <u>In re Pansier</u>, No. 18-22297-beh, 2019 WL 1495100, at *4 (Bankr. E.D. Wis. Apr. 3, 2019) (citation omitted). For that reason, a hearing on a motion for relief from stay

> is analogous to a preliminary injunction hearing, requiring a speedy and necessarily cursory determination *of the reasonable likelihood that a creditor has a legitimate claim or lien as to a debtor's property*. If a court finds that likelihood to exist, this is not a determination of the validity of those claims, but merely a grant of permission from the court allowing that creditor to litigate its substantive claims elsewhere without violating the automatic stay.[20]

<u>Grella</u>, 42 F.3d at 33-34 (emphasis added) (footnote omitted); <u>see also</u> <u>Garner v. Select Portfolio Servicing, Inc.</u>, No. 15-cv-10377, 2015 WL 5634449, at *2 (E.D. Mich. Sept. 25, 2015) ("A stay relief order merely establishes—after a summary proceeding—whether a creditor has a <u>colorable</u> claim against the debtor, i.e., whether a creditor has shown a reasonable likelihood that it has a

---

[20] The record does not reflect that S&S litigated its substantive claims in either a non-bankruptcy judicial forum or in another proceeding in the Debtor's bankruptcy case. Rather, it appears that after the stay was lifted, S&S simply requested payment of its cash collateral from the Debtor and the Debtor complied. This does not, however, impact our analysis of whether, under the framework set forth by the First Circuit in <u>Grella</u>, the bankruptcy court erred in determining that S&S demonstrated a colorable claim to the Remaining Estate Property.

meritorious claim."), aff'd in part, vacated in part on other grounds, No. 17-1303, 2017 WL 8294293 (6th Cir. Oct. 27, 2017).

Therefore, "a hearing on a motion to lift the automatic stay under § 362(d) is limited in scope. Questions of the validity of liens are not generally at issue in a § 362 hearing, but only whether there is a *colorable* claim of a lien on property of the estate." In re Vitreous Steel Prods. Co., 911 F.2d 1223, 1234 (7th Cir. 1990) (citation omitted); see also In re Harris, No. 17-31042-CJP, 2018 WL 6729689, at *5 (Bankr. D. Mass. Dec. 21, 2018) ("As a matter of law, the only issue properly and necessarily before a bankruptcy court during relief from stay proceedings is whether the movant creditor has a colorable claim; thus, a decision to lift the stay is not an adjudication of the validity or avoidability of the claim . . . .") (citation omitted); see also Grella, 42 F.3d at 34; In re Quality Elecs. Ctrs., Inc., 57 B.R. 288, 290 (Bankr. D.N.M. 1986) (stating that relief from stay proceedings are "limited to a determination [of whether] the moving creditor has a colorable claim to a perfected security interest"). Consequently, "the only issues necessarily decided at [a] § 362 hearing [a]re whether the [creditor] ha[s] a colorable claim of a lien and whether the amount of that lien exceed[s] the value of the property." In re Vitreous Steel Prods. Co., 911 F.2d at 1234.

Although a hearing on a motion for relief from stay "is not the proper time or place for the determination of [ ] substantive rights," the bankruptcy court is not precluded from considering defenses to a creditor's claim to property of the estate, including whether the movant has waived any of its rights. See United States v. Fleet Bank of Mass. (In re Calore Express Co.), 288 F.3d 22, 35 (1st Cir. 2002) (citing Grella, 42 F.3d at 34)) ("A court may take into account any matter that bears directly on [whether a colorable claim exists]."). "Put another way, . . . a creditor must show a reasonable likelihood that it has a meritorious claim, and the

41

court may consider any defenses or counterclaims that bear on whether this reasonable likelihood exists." Grella, 42 F.3d at 34. "A claim that has clearly been waived is no longer colorable." In re Calore Express Co., 288 F.3d at 35 (citing Grella, 42 F.3d at 35). However, "if waiver [i]s unclear from the record," the movant can still prevail on a motion for relief from stay. Id. at 35-36; see also Montgomery v. Dennis Joslin Co. II, LLC (In re Montgomery), 262 B.R. 772, 775 (B.A.P. 8th Cir. 2001) (noting that court has discretion under § 362(d) to consider evidence concerning challenges to a movant's interest as a secured party, but that the court's consideration of such evidence should stop "as soon as it appears that the movant has a 'colorable claim' to the property in question").

### C. Whether S&S Established a Colorable Claim to Property of the Estate

Mission argues that the bankruptcy court erred in granting relief from stay because S&S waived its liens on the Excluded Assets at the Auction and, therefore, did not have a valid lien—i.e., a colorable claim—on the Remaining Estate Property. Applying the First Circuit's framework, as set forth in Grella, and reviewing the extensive record, we conclude that the bankruptcy court did not err in determining that S&S demonstrated a colorable claim to the Remaining Estate Property.

As the record reflects, there is no dispute that, as of the date of the Auction, S&S had a lien on all of the Debtor's assets. The bankruptcy court correctly observed that the Loan Documents, the UCC financing statements, the DIP Financing Agreements, the Interim DIP Orders, and the Final DIP Order established and confirmed the validity and priority of S&S's liens. No party in interest commenced a contested matter or adversary proceeding challenging S&S's liens or the validity, allowability, priority, status, or amount of S&S's claim before the expiration of the Challenge Periods. Moreover, in the Sale Order, the bankruptcy court rejected

Mission's argument that S&S's debt should be recharacterized as equity. Therefore, as the bankruptcy court pointed out, the question of whether S&S met its burden and demonstrated it possessed a colorable claim to valid liens covering the Remaining Estate Property "rest[ed] on the viability of Mission's theory that S&S either recontributed assets free and clear of its liens or waived its liens with respect to the [E]xcluded [A]ssets." And, as the court further noted, the "recontributed assets" theory was a "misnomer"—the Sale Order made it clear that the Excluded Assets were not being sold by the estate. Therefore, the "only viable" question was whether S&S waived its right to assert a lien on the Excluded Assets.

"[W]aiver is the intentional relinquishment or abandonment of a known right." Kontrick v. Ryan, 540 U.S. 443, 458 n.13 (2004) (citation omitted) (internal quotations omitted); see also Duke/Fluor Daniel v. Hawkeye Funding, Ltd. P'ship, 843 A.2d 946, 948 (N.H. 2004) (stating, when considering whether a statutory mechanic's lien can be waived by contract under New Hampshire law, "[a] waiver requires an actual intention to forego a known right.") (citation omitted).[21] "To establish waiver, the plaintiff must show either explicit language indicating the defendant's intent to forego a known right, or conduct from which it may be inferred that the defendant abandoned this right." Gianola v. Cont'l Cas. Co., 817 A.2d 306, 307 (N.H. 2003) (citation omitted); see also Funai v. Metro. Prop. & Cas. Co., 765 A.2d 689, 692 (N.H. 2000) (stating that waiver requires "a clear expression by a party to do so"). "[A]n implied waiver will exist only if the evidence indicates an actual intention of foregoing a right." Gianola, 817 A.2d at 307 (citation omitted); see also Duke/Fluor Daniel, 843 A.2d at 948 ("[W]aiver should not be

---

[21] The Loan Documents which gave rise to S&S's security interest in the Debtor's assets are governed by the laws of New Hampshire. Therefore, it is appropriate to look to New Hampshire law when considering whether S&S waived its lien.

presumed; a clear expression of intent to waive the right must exist.") (citation omitted).  "When waiver is implied from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case."  <u>Sweet v. Bank of Okla. (In re Sweet)</u>, 954 F.2d 610, 613 (10th Cir. 1992) (citation omitted).  "A lien may be waived by actions of the lien holder, or by any special agreement entered into by the parties, which are inconsistent with the existence of the lien."  <u>City of Portsmouth v. Nash</u>, 493 A.2d 1163, 1165 (N.H. 1985) (citations omitted).  Generally, however, "[t]he law disfavors implicit waivers."  <u>U.S. Trust Co. of N.Y. v. Pardo (In re W.T. Grant Co.)</u>, 119 B.R. 898, 907 (S.D.N.Y. 1990) (determining that the bank never explicitly waived its lien and there was insufficient evidence that the bank implicitly intended to waive its lien).

On this record, Mission has not defeated S&S's colorable claim to a lien on the Remaining Estate Property as there is no support in the record for Mission's argument that S&S expressly or impliedly waived its lien on the Excluded Assets at the Auction.  Neither the Auction transcript, nor the Sale Order, nor the APA, reflect an express release or waiver of liens on the Excluded Assets by S&S.[22]  The Sale Order clearly provided that assets other than the Excluded Assets were being sold free and clear of liens with liens to attach to the proceeds and that the Excluded Assets, which included cash, accounts receivable, and inventory, remained assets of the estate.  Neither the Sale Order, nor the APA, provided that S&S was releasing its liens on the Excluded Assets.  In the decision accompanying the Sale Order, the bankruptcy

---

[22]  Nor is there any evidence that S&S recorded a UCC-3 termination statement releasing its security interest in any of the assets set forth in the UCC-1 financing statements.  <u>See</u> <u>United States v. Jones</u>, 10 F.3d 901, 903 (1st Cir. 1993) (stating that a "UCC-3 is a document which can be used to release a security interest in certain property which has been memorialized in a UCC-1"); <u>see also</u> N.H. Rev. Stat. Ann. 382-A:9-513.

court valued S&S's bid by reciting that the Excluded Assets of cash, accounts receivable, and inventory were being "left in the estate" with no discussion of any release of the S&S lien or waiver of its remaining secured claim.  Moreover, the record demonstrates that the Debtor understood that the Excluded Assets remained subject to S&S's liens.  In its response to Mission's objection to the Sale Motion, the Debtor clearly stated its position that the S&S bid "leaves behind $600,000 of its own cash . . . but that cash remains subject to the S&S liens." The Debtor further stated that the Excluded Assets would have to be liquidated and distributed to S&S if S&S successfully defended its lien.

Mission attempts to rebut S&S's showing of a colorable claim to a valid lien on the Remaining Estate Property by pointing to a single, ambiguous exchange between Mission's counsel and the Debtor's counsel at the Auction where Mission's counsel stated "so they're leaving [$]800,000 of assets in the estate.  The estate gets to liquidate those and keep the money," and the Debtor's counsel (*not S&S's*) appeared to acquiesce.  The bankruptcy court acknowledged that this exchange was "confusing."  Nonetheless, Mission argues that this exchange "proved" that the Excluded Assets "would *not* remain subject to S&S's liens."  This single exchange is not persuasive evidence that S&S waived its liens, particularly in light of acknowledgements by Mission's counsel regarding those liens.  Moreover, this exchange is also insufficient to overcome the language in the Loan Documents, the UCC financing statements, the DIP Financing Agreements, the Interim DIP Orders, and the Final DIP Order which clearly established S&S's liens.  Additionally, there was an exchange at the Auction between the Examiner's counsel and Mission's counsel where Mission's counsel acknowledged that S&S had reserved rights to a secured lien on the assets being left behind.  The Examiner's counsel stated: "I understand from the nature of the discussions here that the secured lender [S&S] is willing to

permit the payables to be paid out of the cash that [Mission] is leaving behind." Mission's counsel responded: "I'm assuming they're reserving all their rights on all this stuff . . . . [T]hey're going to have claims to whatever the proceeds are and they're going to have to work that out afterwards."

Not only does the record fail to disclose an express waiver of liens by S&S during the sale proceedings, it reflects that, at various proceedings *after* the entry of the Sale Order, the bankruptcy court, the Debtor and S&S made statements about S&S's liens on the Debtor's remaining assets, without objection from Mission. For example, the Debtor asserted in its Motion to Sell Inventory that S&S asserted a lien on the inventory and any proceeds thereof, and Mission did not challenge that assertion. And at the February 26, 2018 status conference, the bankruptcy court queried whether there was any dispute that S&S had a lien on the remaining assets of the estate. Neither Mission nor any other party disputed S&S's lien. In fact, Mission's counsel stated that although allowance of an administrative claim in favor of Mission could give it a blocking position with respect to plan confirmation, there was "no live issue as to the validity of [S&S's] liens."

Further, Mission's failure to raise the argument that S&S waived its lien on the Excluded Assets until it filed its opposition to the Stay Relief Motion—three years after the asset sale— greatly undermines its argument. Mission did not assert the waiver argument in any brief or argument in connection with the sale hearing, in any of its appeals of the Sale Order, or in connection with the inventory sale. Nor did Mission assert this position at any of the status conferences—to the contrary, Mission actually confirmed that there were no disputes as the validity of S&S's liens.

The bankruptcy court determined that S&S had a colorable claim of a lien on the Remaining Estate Property, and that the record did not support Mission's argument that S&S waived its lien on the Excluded Assets at the Auction after considering: the final orders of the bankruptcy court (the Final DIP Order, the Sale Order, and the Inventory Sale Order); Mission's own statements throughout the sale process, in briefs filed in the subsequent appeals, during the inventory sale proceedings, and at the status conference hearings; and Mission's failure to raise the issue of a lien waiver by S&S during any of those proceedings. Based on the record, we conclude that the bankruptcy court did not err in so ruling. We now consider whether the bankruptcy court abused its discretion in granting relief from the automatic stay under § 362(d)(2).

### D.    Application of Stay Relief Standard under § 362(d)(2)

S&S had the burden of establishing that the Debtor lacked equity in the Remaining Estate Property, and Mission had the burden of establishing that the property was necessary for an effective reorganization. See 11 U.S.C. § 362(g).

### 1.    Lack of Equity

A debtor lacks equity in the property for purposes of § 362(d)(2) when the debts secured by liens on the property exceed the value of the property. In re Shoney, LLC, No. 16-13905-JNF, 2017 WL 474314, at *3 (Bankr. D. Mass. Feb. 3, 2017) (citations omitted). In seeking relief from the automatic stay under § 362(d)(2), S&S asserted that the Debtor lacked equity in the Remaining Estate Property because the amount of S&S's secured claim was in excess of 5,000,000, and that claim far exceeded the value of the Remaining Estate Property—$527,292 in cash.

The record supports S&S's assertions. The Debtor listed S&S on its Schedule D as holding a secured claim in the amount of $5,550,000. As it did not list that claim as disputed, contingent, or unliquidated, the schedule is prima facie evidence of the validity and amount of S&S's claim. See Fed. R. Bankr. P. 3003(b)(1). The record does not reflect that Mission, or any party in interest, has challenged the validity or amount of S&S's claim. The record also reflects that the only asset remaining in the estate at the time S&S filed the Stay Relief Motion was cash in the amount of $527,292. Therefore, the record supports the bankruptcy court's determination that the Debtor lacked equity in the Remaining Estate Property.

### 2. Necessary for Effective Reorganization

Moreover, the record does not reflect that there was any contention or showing that the Remaining Estate Property was necessary to an effective reorganization. To the contrary, the Debtor, by assenting to S&S's request for relief from stay, confirmed that it was not necessary to an effective reorganization. Therefore, Mission failed to satisfy its burden of showing that the Remaining Estate Property was necessary to the Debtor's reorganization. See Wilmington Dev. Corp. Pocono Futures, Inc. v. Farmers & Merchs. Bank, No. 84-4520, 1985 U.S. Dist. LEXIS 21978 (E.D. Pa. Mar. 8, 1985) (determining that, where debtor consented to relief from the automatic stay, parties opposing bank's request for stay relief were unable to satisfy their burden of showing that the property was necessary for the debtor's reorganization).[23]

---

[23] Here, it is undisputed that the only asset remaining in the Debtor's estate at the time of the stay relief proceedings was cash of approximately $500,000. By consenting to S&S's request to lift the automatic stay under § 362(d)(2), the Debtor implied that its sole asset was not necessary to an effective reorganization. We offer no opinion, however, on the viability of a no-asset chapter 11 reorganization as that is not the issue before us in this appeal and it does not impact our analysis as to whether Mission satisfied its burden of proof under § 362(d)(2)(B).

Based on the foregoing, we conclude that the bankruptcy court did not abuse its discretion in granting S&S relief from the automatic stay under § 362(d)(2).

### E. Whether the Bankruptcy Court Abused its Discretion by Denying Mission's Request for Discovery

Finally, we consider Mission's argument that the bankruptcy court should have allowed Mission's request for "targeted, reasonable discovery to ascertain what the non-lawyer principals believed about the encumbered nature of the [Excluded] Assets."

Although a motion for relief from stay hearing is a summary process, it is a contested matter under Bankruptcy Rule 9014. Bankruptcy Rule 9014(c) provides that the rules governing discovery and presentation of evidence generally apply in contested matters "unless the court directs otherwise." See Fed. R. Bankr. P. 9014(c); see also In re Riedy, 517 B.R. 88, 94 n.7 (Bankr. W.D. Mich. 2014); In re Job P. Wyatt & Sons' Co., No. 11-02664-8-JRL, 2011 WL 5909534, at *1 (Bankr. E.D.N.C. July 14, 2011). Therefore, it is within the discretion of the bankruptcy court to limit discovery in contested matters. See Fed. R. Bankr. P. 9014(c); see also In re John Q. Hammons Fall 2006, LLC, No. 16-21142, 2019 WL 1112310, at *2 (Bankr. D. Kan. Mar. 8, 2019) (noting that "application of the rules listed in Rule 9014(c) . . . is discretionary"). Moreover, in the U.S. Bankruptcy Court for the District of New Hampshire, pursuant to Local Bankruptcy Rule 9014-1(a), which is entitled "No Discovery," the various discovery provisions set forth in Bankruptcy Rule 7026 that are made applicable to contested matters through Bankruptcy Rule 9014(c) do not apply to contested matters unless the court orders otherwise in a particular case. See N.H. LBR 9014-1 ("The court directs that Bankruptcy Rule 7026 and LBR 7026-1 shall not apply to contested matters governed by Bankruptcy Rule 9014 *unless otherwise ordered*.") (emphasis added). It follows, therefore, that the bankruptcy

court was not required to allow discovery in connection with the Stay Relief Motion. Nor did the bankruptcy court abuse its discretion in declining to permit discovery where Mission made no formal discovery requests and it was apparent from the already extensive record before the bankruptcy court that S&S had established a colorable claim to a lien on the Remaining Estate Property.

## <u>CONCLUSION</u>

For the reasons set forth above, we discern no error in the bankruptcy court's determination that it had jurisdiction to consider the Stay Relief Motion despite the filing of the Petition to the Supreme Court. Additionally, we conclude that the bankruptcy court did not abuse its discretion in granting S&S's motion for relief from the automatic stay under § 362(d)(2). Consequently, we **AFFIRM**.