## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re ) | Bk. No. 15-11400 (CJP) |
| ) | |
| OLD COLD, LLC ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

**MISSION PRODUCT HOLDINGS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PAYMENT OF ADMINISTRATIVE CLAIM**

Mission Product Holdings, Inc. ("Mission") hereby submits this memorandum of law (the "Memorandum") in support of its *Motion for Payment of Administrative Claim* [D.E. 635] (the "Admin Claim Motion"), in accordance with this Court's *Consent Order on Motion for Payment of Administrative Claim* [D.E. 681] (the "Consent Order"). This Memorandum addresses the two issues specifically set forth in the Consent Order.

## FACTUAL BACKGROUND

Mission incorporates by reference the statement of facts set forth in the Admin Claim Motion,[1] and provides the following additional factual background relevant to this Memorandum.

S&S was the pre-petition lender to the Debtor and in that capacity had liens on certain of the Debtor's assets (the "Pre-Petition Liens"). *See Final Order (A) Authorizing Debtor to Obtain Post-Petition Financing, (B) Authorizing the Use of Cash Collateral, and (C) Granting Adequate Protection* [D.E. 282] (the "Final DIP Order").

Pursuant to the *Interim Order (A) Authorizing Debtor to Obtain Post-Petition Financing, (B) Authorizing the Use of Cash Collateral, (C) Granting Adequate Protection, and (D) Setting a Final Hearing* [D.E. 57], subsequent interim financing orders and the Final DIP Order, S&S also

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Admin Claim Motion.

provided the Debtor post-petition financing (the "DIP Facility"), secured by first priority liens on the Debtor's assets (the "DIP Liens"), Final DIP Order, ¶ 2, and was also granted adequate protection liens in its pre-petition lender capacity (the "Adequate Protection Liens"), Final DIP Order, ¶ 4.  The DIP Facility terminated upon the earlier of (as relevant here) December 31, 2015 and the date of consummation of a sale of substantially all the Debtor's assets.  Final DIP Order, ¶ 13.

The Final DIP Order also created a "Carve Out Reserve Account"[2] to cover certain fees of the Examiner and his and the Debtor's professionals (collectively, the "Professionals").  *See* Final DIP Order, ¶ 8; *see also* Sale Decision, at 9, 11.  The Carve Out Reserve Account was expressly *not* subject to the Adequate Protection Liens or the Pre-Petition Liens, though remained subject to the DIP Liens.  *See* Final DIP Order, ¶ 8.

As of the Auction (which occurred on November 5, 2015), S&S had advanced $750,000 under the DIP Facility (the "DIP Claims").  *See* Monthly Operating Reports, September – November 2015 [D.E. 210; D.E. 261; D.E. 312] (showing a total of $750,000 in DIP Facility proceeds received by the Debtor between the Petition Date and the Auction).

S&S's winning bid at the Auction included, among other things, a credit bid of all of the DIP Claims.  *See* Sale Decision, at 12-13.  S&S's bid was approved by the Court on December 18, 2015.  *See generally* Sale Order; Sale Decision, at 11-13.  The sale closed the same day [D.E. 310].

S&S made no additional advances under the DIP Facility before the DIP Facility terminated in accordance with the Final DIP Order—i.e. on the Closing Date.  *See* Monthly Operating Reports, November & December 2015 [D.E. 312; D.E. 363].

---

[2] The Carve Out Reserve Account was not a separate or segregated bank account, but an accounting mechanism for a "set aside" of an amount to be used to pay the Professionals.

No Professionals were compensated before the Closing Date. The Examiner and his counsel were first compensated on December 30, 2015 (the Examiner on a final basis, his counsel on an interim basis). See D.E. 314, 323 (orders granting fee applications); Monthly Operating Report, December 2015 [D.E. 363]. The Debtor's counsel was first compensated (on an interim basis) in January 2016. See D.E. 349 (order granting interim fee applications); Monthly Operating Report, January 2016 [D.E. 381].

## ARGUMENT

A. **Any Disgorged Funds Will Return to the Estate Unencumbered Because Any Liens in the Debtor's Cash Collateral Have Been Extinguished**

Because the S&S liens in the Debtor's cash collateral were either consensually released in connection with negotiation of the Carve Out Reserve Account in the Final DIP Order or extinguished upon satisfaction of the DIP Claims, funds remitted to the Professionals and subsequently disgorged would revert to the estate and be unencumbered.

On December 2, 2015, the Bankruptcy Court entered the Final DIP Order, which among other things, created the Carve Out Reserve Account to provide for the payment of certain fees of retained professionals. See Final DIP Order, ¶ 8. Pursuant to the express language of the Final DIP Order, the Carve Out Reserve Account was *not* subject to the Pre-Petition or Adequate Protection Liens, though it remained subject to the DIP Liens. See id.

On December 18, 2015, the Bankruptcy Court rendered the Sale Decision and entered the Sale Order, approving S&S's as the highest and best bid at the Auction, and finding that the S&S bid included a credit bid of all of the DIP Claims. See Sale Decision, at 11-13. Under section 363(k) of the Bankruptcy Code, the holder of a claim secured by a lien on property being sold is permitted to "offset such claim against the purchase price of such property." 11 U.S.C. §363(k). Thus, the claim is reduced to the extent of such offset; in this case, the DIP Claims were fully

utilized, and therefore extinguished, by the S&S credit bid. The sale of substantially all the Debtor's assets closed on December 18, 2015 [D.E. 310]. The DIP Claims were thus satisfied on the same day.

The satisfaction of the DIP Claims pursuant to section 363(k) also extinguished the DIP Liens as a matter of law. *See* In re Spillman Dev. Grp. Ltd., 401 B.R. 240, 252-53 (Bankr. W.D. Tex. 2009) (explaining that a full credit bid pursuant to section 363(k) is the equivalent of a cash purchase, and therefore extinguishes the claim and the lien, and other security interests); *see also* In re Miller, 442 B.R. 621, 632 (Bankr. W.D. Mich. 2011) (noting that Spillman's treatment of credit bids as "the equivalent of a cash purchase" is consistent with "the mainstream of American jurisprudence"); Satsky v. United States, 993 F. Supp. 1027, 1029 (S.D. Tex. 1998) ("A lien is a charge upon property for the payment or discharge of a debt. It is therefore dependent upon the existence, the amount of, and the provability of the debt. If the debt has been paid . . . , the lien is extinguished.") (quoting United States v. Phillips, 267 F.2d 374, 377 (5th Cir. 1959)); The Hull of a New Ship, 12 F.Cas. 860, 862 (D. Me. 1842) ("When the debt was extinguished, the lien which was incidental to it was gone also.").

In addition, the DIP Facility terminated upon consummation of the sale of the Debtor's assets, Final DIP Order, ¶ 13, which as set forth above happened on December 18, 2015 [D.E. 310]. The DIP Liens thus *also* terminated by operation of the Final DIP Order (as opposed to by operation of law upon satisfaction of the DIP Claims) on December 18, 2015. *See* id.

No Professional was compensated by the Debtor's estate until December 30, 2015. *See* supra, at 3. All Professionals were thus compensated from a Carve Out Reserve Account that had been free of Pre-Petition Liens and Adequate Protection Lines as of entry of the Final DIP Order

4

on December 2, 2015, and free of the DIP Liens upon satisfaction of the DIP Claims and/or termination of the DIP Facility, both of which happened on December 18, 2015—the Closing Date.

Because (a) the only liens encumbering the Carve Out Reserve Account were the DIP Liens, (b) those liens were extinguished on the Closing Date, and (c) no professional fees were paid prior to the Closing Date, all Professionals' fees were paid from unencumbered funds, and thus those funds would return to the estate unencumbered. *See* In re NETtel Corp., Case No. 00-01771, 2020 WL 2047965, at *28 (Bankr. D.D.C. Apr. 28, 2020) (explaining that, given prior release of liens by secured parties, disgorged funds were to be returned to the estate unencumbered and liens would not be restored).

### B. The Court Has the Authority to Order Disgorgement of Fees Paid to Professionals

Having determined that any disgorged funds would be unencumbered (including by liens of S&S), the Court can and should exercise its discretion to order disgorgement in these circumstances in order to respect the priorities prescribed by the Bankruptcy Code, which recognize no difference between administrative claims incurred by professionals and those incurred by vendors and business partners.

#### i. *Interim Fee Awards Are Always Subject to Disgorgement*

The fees paid to the Debtor's and the Examiner's counsel, which were approved only on an interim basis,[3] constitute one source of funds that could be disgorged in this case to facilitate a *pro rata* distribution on administrative claims. As **interim** fees are always at risk of disgorgement, regardless of the source of payment, no chapter 11 professional can reasonably claim to be unfairly surprised by that risk. *See*, *e.g.*, In re Rockaway Bedding, Inc., 454 B.R. 592, 596 (Bankr. D.N.J.

---

[3] Fees were awarded to the Examiner [D.E. 314] and the Debtor's investment banker [D.E. 358] on a final basis. As detailed below, the Court also has the authority to cause disgorgement of even final awards.

2011) (explaining that "interim awards to professionals are always subject to re-examination and adjustment and no professional may claim to be unaware of the inherent risk of disgorgement," and further that "[i]t is a fact of life among bankruptcy professionals, and well-chronicled in existing case law, that professionals employed in bankruptcy cases provide services and accept interim compensation at their own peril") (internal quotation omitted); *see also* In re McIntosh, BAP No. NC–15–1029–JuTaD, 2015 WL 6736740, at *12 (9th Cir. B.A.P. Nov. 3, 2015) ("It is well established that interim fees are always subject to disgorgement."); In re Boston Shipyard Corp., No. CIV. A. 92-10694-Z, 1993 WL 370629, at *3 (D. Mass. Sept. 14, 1993) (noting that "every interim award is interlocutory in nature, subject to disgorgement when necessary to effect an equitable *pro rata* distribution"); In re Kaiser Steel Corp., 74 B.R. 885, 891 (Bankr. D. Colo. 1987) ("Certainly, it is clear that if some administrative expenses are paid on an interim basis and it is ultimately determined that there will be insufficient funds to similarly pay all other administrative claims, those who have received interim payments may be required to disgorge funds so that all administrative claims share pro rata.").[4]

Indeed, because interim fees are subject to revision and modification at any time and for any valid reason, no specific statutory recovery provision is necessary to allow the court to disgorge funds paid pursuant to an interim fee award. *See* In re Nettel Corp., Case No. 00–01771, 2017 WL 5664840, at *6 (Bankr. D.D.C. Oct. 2, 2017) ("The trustee's recovery provisions would be unnecessary because the orders authorizing interim payments are interlocutory in nature and can always be modified in the bankruptcy court. Therefore, there is no need for a separate recovery provision in the Bankruptcy Code to recover these funds."). Moreover, providing disgorgement

---

[4] Bankruptcy Code section 330(a)(5) expressly authorizes a court to order the disgorgement of interim fees paid under section 331 to the extent that they exceed the ultimate amount awarded under section 330, *see* 11 U.S.C. § 330(a)(5), though that is not the only justification for disgorgement of professional fees, *see also* infra, at 7-10.

as a remedy is essential to fairness, and the ability to order disgorgement of interim fee payments is within the inherent authority of the court. "[T]o not allow disgorgement would treat nonprofessional-administrative claimants unfairly. . . . It would be fundamentally inequitable to allow professional-administrative claimants a windfall because they collected their fees before other administrative claimants were allowed their distribution. Professionals collect interim fees at their own risk that such disgorgement of fees will be required of them if the bankruptcy estate is insolvent." Id. at *8.

All fees paid to retained professionals on an interim basis are thus inherently subject to disgorgement, regardless of the source of payment, and such "fact of life" works no undue hardship upon chapter 11 professionals. Rather, disgorgement is a risk of doing business with or for a chapter 11 debtor or estate—and a risk that should tilt toward fairness and away from "first in time" in the case at bar.

### ii. The Bankruptcy Code Gives Courts Authority to Order Disgorgement More Generally When Necessary to Achieve Its Purposes

Section 105(a) of the Bankruptcy Code allows courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As all administrative claims allowable under section 503 are entitled to a *pro rata* share of any distribution of estate property, courts may use the authority granted by section 105(a) to order disgorgement of amounts paid if necessary to achieve that *pro rata* distribution. See Kaiser Steel., 74 B.R. at 891 (in a chapter 11 case, explaining that "[a]ll administrative claims which are allowable under Section 503 share pro rata on the same basis," and that disgorgement may be necessary to effectuate the requirement of *pro rata* distribution); see also In re Anolik, 207 B.R. 34, 39 (Bankr. D. Mass. 1997) (in a chapter 7 case, noting that chapter 11 professionals have been required to disgorge previously paid fees so that administrative claims could be paid *pro rata*);

7

Nettel Corp., 2017 WL 5664840, at *7 (in a converted chapter 7 case, explaining that "§ 105(a) provides bankruptcy courts authority to use disgorgement where necessary to enforce" the equitable distribution required by the Bankruptcy Code).[5]

Specific sections of the Bankruptcy Code—sections 330(a)(5) and 329(b)—reinforce "the policy that the court should police distributions on administrative claims in a manner that assures fairness to the creditors and administrative claimants of the estate, and should resort to disgorgement when necessary to achieve such fairness." Nettel Corp., 2017 WL 5664840, at *7. Section 330(a)(5) provides that if the amount of interim compensation paid exceeds the amount of compensation finally awarded under section 330, the court "may order the return of the excess to the estate."[6] 11 U.S.C. §330(a)(5). Indeed, administrative insolvency can and should be a factor in awarding final fees, and section 330(a)(5) can and should be used to disgorge fees in that context. When professionals leave behind an administratively insolvent estate, the value of their services is highly questionable; when a case begins or ends that way, there is little or no benefit to the estate and its legitimate interests. See In re Saint Catherine Hosp. of Ind., Inc., No. 4:17-cv-00182-TWP-DML, 2018 WL 4620273, at *5 (S.D. Indiana Sept. 26, 2018), *vacated due to settlement in* U.S. v. Seiller Waterman LLC, No. 4:17-cv-182-TWP-DML, 2019 WL 2591157 (S.D. Ind. June 20, 2019). While the Saint Catherine Hospital court is among the minority of courts disfavoring disgorgement generally, it nonetheless emphasized that administrative

---

[5] Even authority stemming from chapter 7 cases is applicable in chapter 11, as final distributions in a chapter 11 case must observe and follow the Bankruptcy Code's priority scheme. *See* infra, at 11-12. In any event, should the Court perceive the Bankruptcy Code chapter as relevant on this issue, Mission could refile its Motion for Conversion to Chapter 7 [D.E. 534], and believes there is good cause for granting that motion given the status of this case.

[6] A decision of whether to order disgorgement pursuant to section 330(a)(5) is a determination made upon a professional's application for final fees. Mission reserves the right to object to all or part of the final fees sought by those Professionals who have not yet filed final fee applications.

insolvency can and should be a primary factor in finding the value of services to be less than the sum of interim awards, thus compelling disgorgement under section 330(a)(5):

> There is certainly no requirement or any mention in Section 330 that disgorgement must (or even should) be made to achieve a pro rata distribution among administrative claimants in a chapter 11 insolvency, structured dismissal, case.
>
> This does not mean . . . that administrative insolvency—or other equitable factors—should not be taken into account. Indeed, they should; the "value" of services rendered by counsel must take into account all relevant circumstances, and administrative insolvency is relevant. It may even be appropriate for a bankruptcy court to place significant emphasis in a particular case on administrative insolvency and the reasons for that insolvency, and to decide in assessing the value of services rendered that counsel should not be paid any more than a pro rata share of assets finally available for distribution and must disgorge the rest.

Id. at *5 (internal citation omitted).

The Bankruptcy Code expressly contemplates disgorgement even of *final* fees of debtor's counsel. Section 329(b) provides that if the compensation paid to debtor's counsel exceeds the reasonable value of such services, the court may order the return of any such fee payment, to the extent excessive, to the estate, if such property was or would have been property of the estate. 11 U.S.C. §329(b). Moreover, section 329(b) authorizes courts to disgorge excessive fees charged by and paid to debtor's counsel in connection with the bankruptcy case, **regardless of the source of such fees, including if paid from retainers or so-called carve outs**. *See* 11 U.S.C. § 329(b); *see also* In re Kisseberth, 273 F.3d 714, 718-19 (6th Cir. 2001) (holding that it was authorized to order the disgorgement of certain funds deemed excessive based on the broad authority granted by section 329(b)); Rosen v. Nunez, 19-CV-2895 (LDH), 2021 WL 950056, at *4-5 (E.D.N.Y. Mar, 12, 2021) (noting that the Fourth, Fifth, Sixth, and Ninth Circuits all hold that section 329(b) allows disgorgement of funds even if paid by a third party and/or not from property of the estate, and specifically ordering disgorgement of funds paid from a retainer). And just as in section 330(a)(5),

excessiveness of fees paid to debtor's counsel may be determined with reference to the administrative insolvency of the estate.  See Saint Catherine Hosp., 2018 WL 4620273, at *5. Again, if professionals file a company in a state of administrative insolvency, or administer a case to that result, the reasonable value of such services to the estate is little or nothing.  See id.

The fact that disgorgement, regardless of source of payment, is expressly authorized in sections 329(b) and 330(a)(5) of the Bankruptcy Code lends credence to bankruptcy courts' authority to employ it in other circumstances where necessary to achieve the purposes of the Bankruptcy Code.  See Nettel Corp., 2017 WL 5664840, at *7 (noting that the reference to disgorgement elsewhere in the Bankruptcy Code "reinforces the policy that the courts should police distributions on administrative claims in a manner that assures fairness to the creditors and administrative claimants of the estate, and should resort to disgorgement when necessary to achieve such fairness").  And just as the administrative insolvency of a case is a sound rationale for disgorgement under sections 329(b) and 330(a)(5), so too is it a sound justification for disgorgement under section 105(a).  See id.

The Bankruptcy Code makes no distinction in priority among administrative creditors based either on their nature or on the timing of a bankruptcy court's order approving an administrative claim (to say nothing of the timing of when the claims **arose**).  Bankruptcy Code section 105(a) empowers courts to issue orders that are "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," and one of the chief purposes of the Code is to ensure the like treatment of similarly situated creditors.  Bankruptcy Code section 105(a) thus authorizes bankruptcy courts to order the disgorgement of funds to achieve *pro rata* distributions among similarly situated creditors.  The Court should exercise its discretion to do so here.

### iii. <u>Jevic</u> *Requires This Court to Observe the Bankruptcy Code's Priority Scheme in Orders Effecting Case-Ending Distributions*

The United States Supreme Court's decision in <u>Czyzweski v. Jevic Holding Corp.</u>, 137 S.Ct. 973 (2017) requires disgorgement in this case in order to respect the priorities prescribed by the Bankruptcy Code in any final fee order, order on the Admin Claim Motion, or other case-ending distribution.

In <u>Jevic</u>, the Supreme Court explained that a final distribution in a chapter 11 case must observe and follow the Bankruptcy Code's priority scheme. *See* <u>id.</u> at 983-85. Therefore, no final fee award or other distribution of estate funds could constitutionally favor one group of administrative creditors over another (here, the retained Professionals over Mission) when the Bankruptcy Code provides no basis for the distinction. Indeed, <u>Jevic</u> has specific application to any award of final fees to professionals in a bankruptcy case. *See* <u>NETtel Corp.</u>, 2020 WL 2047965, at *2-3 (ordering disgorgement in administratively insolvent case and specifically citing <u>Jevic</u> as authority; court finds that award of final fees does not fit within any exception in <u>Jevic</u>).

To refuse to order disgorgement in this circumstance would, in effect, grant super-priority status to the retained professionals who received interim payments early in the case—a result not prescribed or authorized by the Bankruptcy Code, and contrary to <u>Jevic</u>. *See* <u>id.</u> at *3; *see also* <u>Specker Motor Sales Co. v. Eisen</u>, 393 F.3d 659, 664 (6th Cir. 2004) (explaining that the failure to order the disgorgement of interim fees would "implicitly create[] a super-category . . . for interim compensation paid to professionals" when "[t]here is no statutory basis for such a super-category. Quite the opposite; fees to professionals can be paid only under § 330(a)(1) and those are explicitly categorized as administrative expenses in § 503(b)."); <u>In re Kearing</u>, 170 B.R. 1, 8 (Bankr. D.D.C. 1994) (in a chapter 7 case, emphasizing that the failure to order disgorgement "would be to ignore

the plain language of § 726(b) and to unjustly award certain administrative claims of professionals a 'superpriority' status that is not mandated by the Code").

### iv. The Existence of the Carve Out Reserve Account Does Not Alter This Analysis

The fact that the Professionals were paid from the Carve Out Reserve Account does not mean that such fees cannot be disgorged. Although certain cases, following In re US Flow Corp., 332 B.R. 792 (W.D. Mich. 2005), note that fees paid from a carve-out are not subject to disgorgement, such cases cannot help the Professionals in this case. In those cases, unlike here, valid liens remained on the funds paid from the carve-out at the time of payment. *See* id. at 796 (explaining that "the liens [on the carve-out funds] are not avoidable and the proceeds transferred from the Secured Creditors for the benefit of the court-appointed professionals may not be recovered for the benefit of the bankruptcy estate"). Here, no liens encumbered the funds at the time of payment; the funds were not cash collateral, and the Professionals had no status as pseudo-secured creditors.

The "carve-out exception" cases, even if they applied, are simply wrongly decided because they rely on the inaccurate premise that the secured creditor's cash collateral (from which amounts are "carved out") is **not** estate property, but rather the secured party's property. But cash collateral is of course estate property—albeit encumbered by a lien. To demonstrate the obvious: if there are sufficient assets to otherwise satisfy the lienholder's claims, the cash collateral might be distributable to stakeholders other than the lienholder, or even revert to the debtor. The "carve-out exception" cases also invariably, and improperly, rely on the First Circuit's SPM decision, *see* In re SPM Mfg. Corp., 984 F.2d 1305 (1st Cir. 1993); however, that decision involved a post-distribution sharing of secured party property and says nothing about whether encumbered property is or is not property of the estate. As explained in In re MCO Wash, Inc., 555 B.R. 159,

165 (Bankr. E.D.N.Y. 2016), analogizing carve-outs to section 506(c) surcharges, "[a] recovery . . . under § 506(c) is not paid directly to the administrative claimant, but instead is property of the estate, as it is property acquired post-petition pursuant to § 541(a)(7), which is, therefore, subject to the distribution scheme under § 726."[7]  The MCO Wash court went on to explain (debunking reliance on SPM in the process):

> The Court finds that § 541(a)(7) applies to carve-outs such as the one in this case, and a chapter 7 trustee must distribute the funds received from such a carve-out pursuant to the priorities detailed in § 726.
>
> As argued by the UST, SPM, cited by the Trustee, is inapposite here and, therefore, this Court neither accepts nor rejects the holding of SPM.  In SPM, the First Circuit held that where an undersecured creditor and unsecured creditor's committee, pre-conversion, agreed to share whatever distributions the two parties received from the estate, pursuant to a percentage based formula, the unsecured creditors could receive the funds even though priority creditors were not receiving full distributions.  The First Circuit reached this conclusion primarily on the basis that the parties' "[a]greement is to take effect only after a proper distribution under the Code[,]" therefore, it "does not distribute property of the estate 'at the expense of priority creditors nor does it violate the distribution scheme of section 726 or the priorities of section 507."  Here, however, because the Stipulation was entered into post-conversion and the Trustee was the recipient of the Carve-out, it became property of the estate, immediately subject to the distribution scheme set forth in § 726.

Id. at 165 (internal citations omitted).[8]  Accordingly, even if the DIP Liens had not been removed from the funds upon satisfaction of the DIP Claims, any fees received pursuant to the Carve Out Reserve Account were paid from property of the estate, were subject to distribution only under the Bankruptcy Code's priority scheme, and thus are subject to disgorgement.

---

[7] That MCO Wash involved a converted chapter 7 case is a distinction without a difference.  See supra, n.5.

[8] Realizing that the "secured party's property" argument was contrary to the definition of property of the estate, one court "explained" US Flow by musing that true carve outs are treated as a provisional "assignment" of a portion of the secured party's liens.  See In re Appalachian Star Ventures, Inc., 341 B.R. 222, 229 (Bankr. E.D. Tenn. 2006).  This rationale does not assist the Professionals in this case either; there were no liens to "assign" at the time of payment, and the language of the relevant documents and orders, of course, says nothing about such an assignment.

13

## CONCLUSION

For the reasons set forth above (and presuming an order granting Mission an administrative claim), the Court can and should (a) order disgorgement of amounts paid to the Professionals to effect a *pro rata* distribution of such funds among administrative creditors and (b) find that such disgorged amounts would replenish the estate unencumbered by S&S's liens.

Dated: November 2, 2021                    **MISSION PRODUCT HOLDINGS, INC.**

*/s/ Lindsay Zahradka Milne*
Robert J. Keach, Esq. (admitted *pro hac vice*)
Lindsay Zahradka Milne, Esq. BNH 07506
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
Phone: (207) 774-1200
Email: rkeach@bernsteinshur.com
lmilne@bernsteinshur.com

## CERTIFICATE OF SERVICE

I, Lindsay Zahradka Milne, being over the age of eighteen and an attorney at Bernstein, Shur, Sawyer & Nelson, P.A. in Portland, Maine, hereby certify that, on November 2, 2021, I filed the foregoing Motion via the Court's CM/ECF electronic filing system ("CM/ECF"), which sent notice to all parties receiving notification through CM/ECF.

I further certify that, on November 2, 2021, the foregoing Motion will be served via U.S. First Class Mail upon the following parties that do not receive notification through the Court's CM/ECF electronic filing system:

| | | |
|---|---|---|
| Caseiro Burke LLC<br>PO Box 610<br>Scarborough, ME 04070 | Jeffrey Daichman<br>Kane Kessler PC<br>1350 Avenue of the Americas,<br>26th Fl<br>New York, NY 10019 | Christopher M. Desiderio<br>Nixon Peabody, LLC<br>437 Madison Avenue<br>New York, NY 10022 |
| Donna Flood<br>9861 El Greco Circle<br>Bonita Springs, FL 34135 | Greenberg Traurig, LLC<br>One International Place<br>Boston, MA 02110 | Douglas H. Hallward-Driemeier<br>Ropes & Gray<br>2099 Pennsylvania Ave, NW<br>Washington, DC 20006-6807 |
| Lee Harrington<br>Nixon Peabody, LLP<br>100 Summer St.<br>Boston, MA 02110-2131 | Steven J. Venezia<br>Upton & Hatfield, LLP<br>PO Box 13<br>Hillsborough, NH 03244-0013 | Phoenix Capital Resources<br>110 Commons Court<br>Chadds Ford, PA 19317 |
| Ropes & Gray, LLP<br>2099 Pennsylvania Avenue NW<br>Washington, DC 20006-6807 | Gerard Schiano-Strain<br>Kane Kessler PC<br>1350 Avenue of Americas,<br>26th Fl<br>New York, NY 10019 | Stebbins, Lazos &<br>Van Der Beken, P.A.<br>66 Hanover Street, Suite 301<br>Manchester, NH 03101 |
| Tucker & Latifi LLP<br>160 East 84th Street<br>New York, NY 10028 | | |

Dated:  November 2, 2021

/s/ Lindsay Zahradka Milne
Lindsay Zahradka Milne, Esq., BNH# 07506
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street, P.O. Box 9729
Portland, Maine 04104-5029
Tel. (207) 774-1200
Email: lmilne@bernsteinshur.com